IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2007 OCT 31  P 4: 09

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| James Francis Trombley, Jr., | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | 2:07-cv-00547-MEF |
| | * | Lead Case |
| City of Eufaula, | * | |
| | * | |
| Defendant. | * | |

| | | |
|---|---|---|
| James Francis Trombley, Jr., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | 2:07-cv-00575-MHT |
| | * | Member Case |
| City of Eufaula, | * | |
| | * | |
| Defendant. | * | |

## <u>MOTION AND BRIEF FOR SUMMARY JUDGMENT</u>

COMES NOW, Defendant, City of Eufaula, by and through counsel, and moves the

Court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The Defendant supports its motion with the following:

1.    Pleadings.

2.    Defendant's argument.

3.    First Deposition of Plaintiff, Exhibit 1.

4.    Second Deposition of Plaintiff, Exhibit 2.

5.    Third Deposition of Plaintiff, Exhibit 3.

6.    Defendant's Responses to Plaintiff's Interrogatories and Request for Production, Exhibit 4.

7.    Job Description, Exhibit 5.

8.    Certification, Exhibit 6.

9.    Memo from Bill Klein, Exhibit 7.

10.    Memo to Plaintiff, Exhibit 8.

11.    Interdepartmental Report, Exhibit 9.

12.    Interview Transcript, Exhibit 10.

13.    Correspondence from Sonny Harrison, Exhibit 11.

14.    Correspondence from Jimmy Calton, Exhibit 12.

15.    Partial Transcript of Determination Hearing, Exhibit 13.

16.    Personnel Manual, Exhibit 14.

## **FACTS**

Plaintiff James Trombley was employed by the City of Eufaula as the City's Building Official from March 3, 2003, to December 13, 2006. Upon his hire, Mr. Trombley received and acknowledged the personnel rules and regulations applicable to city employees. (Exhibit 6). Within these personnel rules were set forth examples of causes which would be deemed sufficient cause for reprimand, suspension, demotion, or dismissal from employment:

SECTION III.    CAUSES FOR DISCIPLINARY ACTION

The following are examples of causes which shall be sufficient cause for reprimand, suspension, demotion, or dismissal:
...
(9)    Insubordination and/or disregard of orders.
...
(23)    Conduct unbecoming an employee in the public service.

2

(Exhibit 14, pp. 48-49).

Additionally, the personnel manual provided for the removal of city officers and other non-classified employees, such as the building official:

SECTION VIII.    REMOVAL    OF    MUNICIPAL    OFFICER, NON-CLASSIFIED EMPLOYEES.

Any persons appointed to office in the City may, for cause, after a hearing, be removed by the officer making the appointment.  The City Council may remove, by a two-thirds (2/3) vote of all those elected to the Council any such person for incompetency, malfeasance, misfeasance or nonfeasance in office and for conduct detrimental to good order or discipline, including habitual neglect of duty, or for any other reason deemed appropriate by the City Council.

(Exhibit 14, p. 54).

There is no provision for an appeal of the decision of the appointing officer or city council in removing a municipal officer or other non-classified employee.  (Exhibit 14, p. 54, Exhibit 4).

As Building Official, Mr. Trombley's direct supervisor was the Mayor of Eufaula, Jay Jaxon.  (Exhibit 5; Exhibit 3, p. 19, ll. 21-22).  During his employment, Plaintiff had numerous conflicts with Mayor Jackson, and felt that he consistently received "negative feedback" from and was "harassed" by the mayor.  (Exhibit 3, p. 7, ll. 1-17; p. 48, ll. 7-13).  On approximately a monthly basis, the mayor would meet with the Plaintiff, as a department head, which caused the Plaintiff much anxiety.  (Exhibit 3, p, 17, ll. 1-23, p. 18, ll. 1-23).  Plaintiff felt that he would be "picked on" in these meetings.  (Exhibit 3, p. 17, ll. 18-23, p. 18, ll. 1-10).  Additionally, a number of zoning issues in late 2006, on which the Mayor and the Plaintiff did not agree, admittedly further angered the Plaintiff.  (Exhibit 3, p. 38, ll. 1-5).

3

On November 28, 2006, Plaintiff told a co-employee, City Building Inspector Bill Klein, that he was going to "cap" the Mayor and his wife at 10:00 p.m. during a shift change at the Eufaula Police Department. (Exhibit 7). The following day, Mr. Klein informed the City of Eufaula of the conversation and the statement made by Mr. Trombley. (Exhibit 7). The City related the incident to Police Captain Tim Marsh, who interviewed Mr. Trombley regarding the statement. (Exhibit 9; Exhibit 10). On November 30, 2006, the City placed Mr. Trombley on administrative leave until a decision was reached regarding his continued employment. (Exhibit 8). Mr. Trombley was provided written notice of the charges against him, conduct unbecoming an employee in the public service and insubordination, and was given information regarding the determination hearing that would take place. (Exhibit 8). On December 4, 2006, Mr. Trombley's attorney requested additional information regarding the determination hearing. (Exhibit 11). The city attorney responded on December 6, 2006, advising him again of the employment related charges against Mr. Trombley and that the determination hearing would be on December 13, 2006. (Exhibit 12). In this letter, the city attorney also enclosed the statement of Bill Klein and the audio CD of the interview between the Plaintiff and Captain Tim Marsh. (Exhibit 12).

The City conducted a determination hearing, at which Mr. Trombley, who was represented by counsel throughout, testified. (Exhibit 13; Exhibit 3, p. 52, ll. 12-22). At the hearing, and again in his deposition, Plaintiff did not deny making the statement, but claimed he did not remember the conversation:

> Q.   I'm going to read the paragraph into the record just so we'll know what we're talking about when we get ready to read it back.
>
>       On Tuesday, November 28, 2006, I met with Jim Trombley in the parking lot of Alabama Power. Jim was extremely upset

4

about something that happened with the office concerning zoning issues. We talked about the issues and he–and who he thought was responsible for him being upset. He stated that Jay Jaxon has taken away his responsibility and wanted Tim Milner to do it. Jim told me that I was not to do anything regarding zoning issues and turned over all the work to Tim Milner.

During this conversation, Jim made a statement that he would, "cap" Jay and his wife, and he would do it at 10 p.m. during a shift change and no one would know who did it. The conversation then was very uncomfortable for me, and I told him I had to go on an inspection. I left for the inspection, and he went into the office.

Could you give me a little–Jim, we're talking about the letter now. Could you give me your version of the conversation that you had with Bill Klein?

A.    I don't remember that. That was that whole first part of that week that I just – I was so upset. I just don't remember anything about that first part of that week.

(Exhibit 2, p. 71, ll. 12-23, p. 72, ll. 1-18).

Other witnesses also testified at the hearing, including Bill Klein and Captain Tim Marsh.    (Exhibit 13).    Following the determination hearing, the City Council voted unanimously to terminate James Trombley's employment with the City of Eufaula.

Following his employment termination, Plaintiff, appearing pro se, filed lawsuits in the Circuit Court of Barbour County, Alabama, and in the United States District Court for the Middle District of Alabama, and filed amended complaints in both courts. The state court suit was removed by the Defendant to federal court, and the two cases were consolidated. (Doc 7).

In this lawsuit, Plaintiff alleges a violation of his rights to procedural due process,

5

discrimination based on his alleged back[1] and mental disabilities under the Americans with Disabilities Act ("ADA") and Rehabilitation Act of 1973 ("Rehabilitation Act"), unconstitutionality of the City's personnel rules and regulations, wrongful termination, and a violation of Alabama's Open Meetings Act. (Complaint, clarified by Plaintiff in his deposition, Exhibit 2, p. 3, ll. 15-20; p. 4, ll. 1-4; p. 10, ll. 18-23; p. 13, ll. 12-23; p. 14, ll. 1-10; p. 17, ll. 11-21; p. 23, ll. 14-20). Defendant, the City of Eufaula, now files this motion for summary judgment as to each of Plaintiff's claims, as there are no genuine issues of material fact and this Defendant is entitled to judgment as a matter of law.

---

[1] Plaintiff has degenerative disc disease.  (Exhibit 1, p. 48, ll. 21-23).

## SUMMARY JUDGMENT STANDARD

Summary judgment must be entered on a claim if it shown "that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56( c). On a motion for summary judgment, although the Court is to construe the evidence and factual inferences arising from it in the light most favorable to the nonmoving party, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970), "the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party that fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Furthermore, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

## ARGUMENT

I.   **The Plaintiff's Procedural Due Process Claim Fails Because the City Fulfilled Its Obligations As A Matter Of Law**

The Plaintiff has asserted a claim of a violation of procedural due process against this Defendant, contending that the City of Eufaula failed to follow the rules of procedural due process established in its own personnel regulations for its employees. (Exhibit 2, p. 14, ll. 1-7).

The Plaintiff admits he was given a determination hearing pursuant to the personnel rules pertaining to his position. (Exhibit 1, p. 51, ll. 14-18). He also admits that he had legal counsel present during his determination hearing. (Exhibit 1, p. 52, ll. 16-22). His claim appears to be that he was not given a "predetermination hearing" related to the charges against him (Exhibit 1, p. 55, ll. 4-15), that he was not given adequate notice of the charges, and that he was not allowed to appeal the decision made by the city council. (Complaint, Amended Complaint; Exhibit 3, p. 51, ll. 14-23, p. 52, ll. 1-5).

It is undisputed that, pursuant to the rules and regulations of the City of Eufaula applicable to the Plaintiff, he was given a determination hearing prior to his dismissal. (Exhibit 1, p. 51, ll. 14-18). The rules and regulations do not provide for any "predetermination" hearing. Following his determination hearing, at which Plaintiff was represented by counsel and given the opportunity to present testimony and witnesses in his defense, the city council unanimously voted to terminate the Plaintiff's employment on the basis of conduct unbecoming an employee in public service and insubordination. The determination hearing fully satisfied the requirements of due process, as set forth below.

8

Plaintiff was also undisputedly provided written notice of the charges against him prior to the hearing. (Exhibit 8; Exhibit 12). Plaintiff claims that he was not provided with charges of a requisite specificity to satisfy the requirements of the rules and such that would satisfy the requirements of due process to which he was entitled. However, it is undisputed that Plaintiff, and his attorney, were provided with notice that his hearing would be based on charges of conduct unbecoming an employee in public service and insubordination. (Exhibit 8; Exhibit 12). Further, his attorney was given a copy of Bill Klein's statement as well as the transcript of the statement given to Captain Tim Marsh by the Plaintiff prior to the hearing, as the evidence against him. (Exhibit 12).

It is well established that procedural due process under the Fourteenth Amendment requires that, prior to termination, an employee receives "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L.Ed. 494 (1985). It is clear that Plaintiff's contentions are without merit under the established law regarding the satisfaction of procedural due process.

The Alabama Supreme Court has similarly held that procedural due process:

> "broadly speaking, contemplates the rudimentary requirements of fair play, whether in a court or an administrative authority, which include a fair and open hearing before a legally constituted court or other authority, with notice and opportunity to present evidence and argument; representation by counsel, if desired; and information as to the claims of the opposing party, with reasonable opportunity to controvert them."

9

*Simpson v. Van Ryzin*, 265 So. 2d 569, 571 (Ala. 1972) (citations omitted).

It is undisputed that the requirements of federal or state procedural due process were satisfied in the present case.  The city provided Plaintiff, and his attorney, not only the charges against him, insubordination and conduct unbecoming an employee in public service, but the evidence in its possession to support those charges at the determination hearing, well in advance of the hearing, with sufficient opportunity to prepare and present his defenses thereto.  Plaintiff's claim that the city did not specify the basis for the charges is without merit.  His attorney received the transcript of Plaintiff's conversation with Captain Tim Marsh, as well as Bill Klein's statement, which fully apprised him of the charges, if he was ignorant of them prior to that time.

The charges provided to Mr. Trombley were clearly sufficient. These charges were further clarified, however, upon request of his attorney.  Accordingly, due process concerns were satisfied by the notice provided to Mr. Trombley prior to his dismissal.

At the determination hearing, evidence was presented that Plaintiff threatened to "cap" the mayor and his wife, a specific threat, at a specific time, i.e., the 10:00 p.m. "shift change" of the Eufaula Police Department.  (Exhibit 13, p. 7).  The person to whom Mr. Trombley made this statement testified, as did the police officer who subsequently interviewed the Plaintiff.  (Exhibit 13, pp. 1-18, pp. 19-28).  The Plaintiff and his attorney were given the opportunity to cross-examine these witnesses and present their own evidence in rebuttal.  It simply cannot be said that the actions of the city were in violation of Mr. Trombley's procedural due process rights. The City followed its procedures established for the dismissal of non-classified employees, and its actions fully comport with

10

federal and state law.

Plaintiff also claims that his rights to due process were violated because he was not allowed to appeal the decision of the city council to terminate his employment following the determination hearing. However, as set forth above, Plaintiff was not eligible to appeal the decision of the council following the determination hearing, pursuant to the personnel rules applicable to Plaintiff's position as Building Official, a non-classified position. (Exhibit 4; Exhibit 14, p. 54). The procedural due process available to him consisted of notice of the charges against him and an opportunity to be heard on those charges, at a determination hearing before the city council. These requirements were fully met. Accordingly, Plaintiff's due process claim is without merit and due to be dismissed as a matter of law.

## II.   Plaintiff's Discrimination Claims Under the ADA and Rehabilitation Act Fail as a Matter of Law

Plaintiff alleges that his dismissal violated the ADA and Rehabilitation Act, in that he was discriminated against and terminated because of his alleged back problems and adjustment disorder, which he claims are disabilities. (Exhibit 2, p. 3, ll. 15-23,p. 4, ll. 1-4, p. 9, ll. 7-9, p. 10, ll. 18-20). These claims are without merit[2].

Under the ADA, a person with a "disability" is a person with a physical or mental impairment that "substantially limits" one or more of that person's major life activities; a person with a record of such an impairment; or a person regarded as having such an

---

[2] While it is unclear how Plaintiff's back problems are related to his dismissal, Plaintiff does assert that his dismissal was shortly after his back surgery. However, no accommodations were requested that were not allowed and there is no evidence that Plaintiff's back issues were in any way related to the incident which gave rise to Plaintiff's termination.

11

impairment. 42 U.S.C. § 12102(2)(A)-(C)(1994). To be considered "disabled" under the

ADA, Plaintiff must prove that his condition is a substantial impairment to a "major life

activity". 29 C.F.R. § 1630.2(g)(1)(1994). A "major life activity" is defined as "caring for

one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing,

learning, and working." 29 C.F.R. §1630.2(i)(1994). In regard to the major life activity of

working, a person with an impairment that "substantially limits" an activity is a person who,

because of an impairment, is "significantly restricted in the ability to perform either a class

of jobs or a broad range of jobs in various classes as compared to the average person

having comparable training, skills and abilities." 29 C.F.R. §1630.2(j)(3)(i)(1994). However,

"[t]he inability to perform a single, particular job does not constitute a substantial limitation

in the major life activity of working."  29 C.F.R. §1630.2(j)(3)(i)(1994).

Under the statute, Plaintiff must carry the initial burden of establishing a prima facie

case of discrimination.  This may be done by showing: (1) that he is a member of a

protected class; (2) that adverse employment action was taken against him; (3) that he was

replaced by a person outside the protected class; and (4) that he was qualified for the

position for which he was rejected. *Carter v. City of Miami*, 870 F. 2d 578 (11th Cir. 1989).

Once established, the prima facie case would serve as a rebuttable presumption that the

City unlawfully discriminated against Mr. Trombley and would require the City to present

a legitimate, nondiscriminatory reason for its action. *Pace v. Southern Ry.*, 701 F. 2d 1383

(11th Cir. 1983). In other words, it may be a defense to a charge of disparate treatment

that the challenged action is justified by a legitimate, nondiscriminatory reason. 29 C.F.R.

§1630.15(a)(1994).

Plaintiff asserts that he suffers from a mental disability known as adjustment

12

disorder, with anxiety mode and depressive mode. (Exhibit 2, p. 4, ll. 7-17). However, "the mere existence of a [mental] impairment does not constitute a disability under the ADA; the impairment must substantially limit a major life activity." *Standard v. A.B.E.L. Services, Inc.*, 161 F. 3d 1278, 1328 (11th Cir. 1998). In determining whether an impairment substantially limits a major life activity, courts consider "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* Plaintiff asserts that he told the mayor of his adjustment disorder, but there is no evidence that his condition would substantially limit his ability to work either long term or permanently. Accordingly, Plaintiff has failed to establish that he suffers from a "disability" as defined under the ADA and federal regulations.

Moreover, Plaintiff cannot show that he was otherwise "qualified" to perform his job. James Trombley was fired solely for insubordination and conduct unbecoming an employee in public service, related to his threats of violence. Courts have held that "more lenient disciplinary action" is "not a required reasonable accommodation" for a plaintiff's misconduct, because the defendant has "the right to insist that [the plaintiff] meet the standards of conduct required of all other employees regardless of [his]...alleged impairment." *Hall v. Wal-Mart Assoc., Inc.*, 373 F. Supp. 2d, 1267, 1273 (M.D.Ala. 2005). See also *Coaker v. Home Nursing Services,* 1996 WL 316739 at *1 (S.D.Ala. 1996); *Childress v. Clement*, 5 F. Supp. 2d 384, 390-91 (E.D.Va. 1998); *Bercovitch v. Baldwin School*, 133 F. 3d 141, 154 (1st Cir. 1998).

Thus, Plaintiff's ADA claims fail because he cannot show that he was otherwise

qualified to perform his job, and the City had no obligation to deal with his threats of violence against the mayor and mayor's wife with more leniency because of his alleged mental disability.

The Eleventh Circuit has likewise addressed this issue:

> Technical skills and experience are not the only essential requirements of a job and stability and the ability to interact with co-workers constitutes an essential function...Our review of the record reflects that there is overwhelming evidence of Williams' inability to work with others, not to mention engaging in threats of violence, and insubordination. Williams' ADA claims also fail because the record is clear that she was not discharged for her failure to submit to a medical examination. Motorola terminated Williams because of her inability to work with others, and for insubordination and threats of violence. Williams acknowledged in testimony that the termination letter related she was discharged for insubordination and inability to get along with co-workers.

*Williams v. Motorola, Inc.*, 303 F. 3d 1284, 1291 (11th Cir. 2002).

Similarly, it is clear from the record in this case that Plaintiff was not discharged because of any alleged disability. Rather, he was discharged for his insubordination, conduct unbecoming a city employee, and threats of violence. Further, the City had no obligation to "accommodate" the Plaintiff with greater leniency where misconduct or threats were involved. Accordingly, Plaintiff's claims under the ADA are due to be dismissed.

Plaintiff's claims arising under the Rehabilitation Act are likewise without merit. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides, *inter alia*, that no "otherwise qualified handicapped individual" shall, solely by reason of his handicap, be excluded from participation in any program receiving federal financial assistance. The definitions of "otherwise qualified" and "handicapped" applicable to the Rehabilitation Act mirror those under the ADA. Accordingly, the same reasoning as set forth above applies

14

to preclude Plaintiff's claims under the Act, and Plaintiff's claims should be dismissed. See *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 107 S. Ct 1123, 94 L.Ed.2d 307 (1987).

III.    <u>The City's Personnel Rules and Regulations Are Not Unconstitutional</u>

Plaintiff contends that the City of Eufaula' Personnel Rule regarding the procedure for the dismissal of non-classified employees is unconstitutional, as it does not allow for an appeal following the decision of the city council at an open hearing. (Exhibit 2, p. 46, ll. 18-23,p. 47, ll. 1-17). This claim is likewise due to be dismissed.

The City's rules and regulations do provide for procedural due process, as discussed above, and the same was afforded Mr. Trombley. However, Plaintiff simply cannot point to a Constitutional right to an appeal. Therefore, the subject provision in the City's policy is not an unconstitutional infringement upon Mr. Trombley's rights guaranteed under the United States Constitution and federal law, and is not an "unreasonable" limitation. See *City of Huntsville v. Certain*, 453 So. 2d 715 (Ala. 1984). Accordingly, Plaintiff's claim that the rules and regulations of the City of Eufaula are unconstitutional is due to be dismissed.

IV.    <u>Plaintiff's Wrongful Termination Claim Fails as a Matter of Law</u>

Plaintiff also alleges wrongful termination by the City of Eufaula. (Exhibit 2, p. 17, ll. 11-19). However, it is undisputed that Plaintiff was dismissed for his insubordination, conduct unbecoming an employee in public service, and threats of violence. The Plaintiff received the City's Personnel Rules when he was hired, which set forth numerous examples of reasons that would provide "good cause" for disciplinary action, including

15

insubordination and conduct unbecoming an employee in the public service.  The Personnel Rules also set forth the procedure for dismissal of non-classified employees, such as Plaintiff.  Plaintiff was aware of these rules, or should have been, as he signed an acknowledgment to that effect. (Exhibit 6).  In Alabama, a person who signs a contract is presumed to have knowledge of the contents therein. *Anderson v. Ashby*, 873 So. 2d 168 (Ala. 2003). Similarly, if a plaintiff employee signs an acknowledgment form, they are bound by the terms they have agreed to by signing the form.  See *Ex parte McNaughton*, 728 So. 2d 592 (Ala. 1998).

Furthermore, pursuant to its Personnel Rules, the City Council conducted a determination hearing regarding Plaintiff's actions and prior to his dismissal. Thus, Plaintiff was indeed provided a meaningful opportunity to be heard. Simply put, Plaintiff's termination cannot be said to have been wrongful, either under the City's policies or Alabama law.  Accordingly, Plaintiff's wrongful termination claim is due to be dismissed.

**V.    The Plaintiff's Claim under the Alabama Open Meetings Act is Without Merit**

Finally, Plaintiff claims that the determination hearing was in violation of the Alabama Open Meetings Act, because it was open to the public and information about Plaintiff's health was discussed in the open meeting, <u>not</u> in executive session. (Exhibit 2, p. 23, ll. 14-23, p. 24, ll. 1-21). This claim is without merit.

The Alabama Open Meetings Act provision for executive sessions specifically states:

> **Alabama Open Meetings Act**
> **§36-25A-7. Executive Sessions.**
> (a)    Executive sessions are **not** required by this chapter, but may be held by a governmental body only for the following purposes:
>
> (1)    To discuss the general reputation and character, physical condition, professional competence, or mental health of individuals, or, subject to the limitations set out herein, to discuss the job performance of certain public employees...

§36-25A-7 (Emphasis added).

Thus, the statute makes expressly clear that a governing body is never *required* to conduct a closed proceeding; rather, the statute merely provides for limited topics of discussion and situations in which a governing body is *allowed* to enter executive session. Thus, Plaintiff's claim that the Council violated the statute by *not* discussing his health in executive session is without merit and due to be dismissed.

17

## Conclusion

The Defendant is entitled to summary judgment as there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Plaintiff was provided procedural due process and cannot show that his termination was in violation of the ADA or Rehabilitation Act. Further, Plaintiff's wrongful termination claim, Alabama Open Meetings Act claim, and attack on the constitutionality of the City's personnel rules are without merit and due to be dismissed.

Respectfully submitted,

Alex L. Holtsford, Jr. (HOL048)
Rick A. Howard (HOW045)
April W. McKay (WIL304)
Attorneys for Defendant City of Eufaula

OF COUNSEL:
Nix Holtsford Gilliland Higgins & Hitson, P.C.
Post Office Box 4128
Montgomery, Alabama  36101-4128
(334) 215-8585
(334) 215-7101 - facsimile

18

Respectfully submitted,

ALEX L. HOLTSFORD, JR. (HOL048)

RICK A. HOWARD (RAH045)

APRIL W. MCKAY (WIL304)

Attorneys for Defendant

OF COUNSEL:

NIX HOLTSFORD GILLILAND HIGGINS & HITSON, P.C.

P. O. Box 4128

Montgomery, Alabama 36103

Tel: 334-215-8585

Fax: 334-215-7101

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon:

James F. Trombley

224 North Hwy 67 #107

Florissant, MO 63031-5108

by placing same in the United States Mail, postage prepaid, on this the 31st day of October, 2007.

OF COUNSEL

19

COPY [1]

1         IN THE UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4    JAMES FRANCIS TROMBLEY, JR.,

5         Plaintiff,

6    Vs.                        CIVIL ACTION NO.
                                2:07-CV-00547-MEF
7    CITY OF EUFAULA,               LEAD CASE

8         Defendant.

9              * * * * * * * * * * *

10   JAMES FRANCIS TROMBLEY, JR.,

11        Plaintiff,

12
     Vs.                        CIVIL ACTION NO.
13                              2:07-CV-00575-MHT
                                   MEMBER CASE
14   CITY OF EUFAULA,

15        Defendant.

16             * * * * * * * * * * *

17                  VOLUME I

18             * * * * * * * * * * *

19            TELEPHONE DEPOSITION

20                     OF

21         JAMES F. TROMBLEY, JR.

22          SEPTEMBER 5, 2007

23

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
              (334) 263-4455

DEFENDANT'S
EXHIBIT
1

2

1          TELEPHONE DEPOSITION OF JAMES F. TROMBLEY, JR.,

2     taken before Pamela A. Wilbanks, Registered Professional

3     Reporter and Commissioner for the State of Alabama at

4     Large, in the Law Offices of Nix, Holtsford, Gilliland,

5     Hitson & Higgins, 4001 Carmichael Road, Suite 300,

6     Montgomery, Alabama, on Wednesday, September 5, 2007,

7     commencing at approximately 3:30 p.m.

8                    * * * * * * * * * * * *

9                         APPEARANCES

10    FOR THE PLAINTIFF:

11    Pro se

12    FOR THE DEFENDANT CITY OF EUFAULA:

13    Mr. Rick A. Howard
      Ms. April W. McKay
14    NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
      Attorneys at Law
15    4001 Carmichael Road
      Suite 300
16    Montgomery, Alabama

17    ALSO PRESENT:

18    Ms. Kelly Trawick
      Personal Manager, City of Eufaula
19

20                   * * * * * * * * * * * *

21                     EXAMINATION INDEX

22       BY MR. HOWARD . . . . . . . . . . .      3

23
                     * * * * * * * * * * * *

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

3

1                   **JAMES F. TROMBLEY, JR.**

2           The witness, after having first been duly sworn

3    to speak the truth, the whole truth and nothing but the

4    truth testified as follows:

5                          **EXAMINATION**

6    BY MR. HOWARD:

7    Q.    If you could, please state your full name for

8          me.

9    A.    James Francis Trombley, Jr.

10   Q.    Where are you originally from?

11   A.    I was an Air Force brat so I went to high school

12         in Biloxi, Mississippi.  Then I went in the

13         Navy.  Before that I was in Valdosta, Georgia.

14         Before that I was in England and before that I

15         was in Spain.  So my parents are from Upstate

16         New York.

17   Q.    What brought you to Alabama?

18   A.    I was working in Atlanta.  I had been laid -- I

19         was a government contractor in Charleston, South

20         Carolina and got laid off and went to Atlanta.

21         And then after I was in Atlanta for a while with

22         all the congestion and the traffic, we decided

23         to look for another job.  And I saw Eufaula on

4

1      CareerBuilder.  We just wanted to move to a

2      small town.  That's how I got there.

3  Q.  Who were you working for in South Carolina?

4  A.  In South Carolina?

5  Q.  Yes.

6  A.  Well, I moved from Atlanta to Alabama.

7  Q.  I thought you said you lived in South Carolina

8      and then moved to Atlanta.

9  A.  Right.  South Carolina to Atlanta to Alabama.

10  Q.  Did you work for anybody in South Carolina?

11  A.  Yes.

12  Q.  Who did you work for in South Carolina?

13  A.  I worked for a company called Management Systems

14      Applications.

15  Q.  What did you do there?

16  A.  I was an electronics technician.

17  Q.  What does an electronics technician do?

18  A.  Electrical work.  I did alarm systems and fences

19      and construction and electrical work.

20  Q.  And you were laid off from that job?

21  A.  Yeah.

22  Q.  How long did you work for them?

23  A.  Five-and-a-half years.  That was when they shut

5

| | | |
|---|---|---|
| 1 | | the shipyard down.  A lot of contracts got cut. |
| 2 | Q. | This was at a shipyard on the coast? |
| 3 | A. | That was Charleston Naval Electronic Engineering |
| 4 | | Center. |
| 5 | Q. | Where did you work at before that job? |
| 6 | A. | Before that job I was -- let me see -- I worked |
| 7 | | for Analysis & Technology. |
| 8 | Q. | What did you do there? |
| 9 | A. | I was a radio technician. |
| 10 | Q. | Do you remember what year you moved to Atlanta? |
| 11 | A. | I moved to Atlanta in 1995. |
| 12 | Q. | Did you have a job when you moved to Atlanta? |
| 13 | A. | Yeah. |
| 14 | Q. | Who did work for when you moved to Atlanta? |
| 15 | A. | SharpTech. |
| 16 | Q. | Is that with an "e" on the end of it? |
| 17 | A. | Sharp then T-E-C-H. |
| 18 | Q. | Do you spell Sharp S-H-A-R-P or S-H-A-R-P-E? |
| 19 | A. | Sharp, S-H-A-R-P. |
| 20 | Q. | What did you do at SharpTech? |
| 21 | A. | I was an electronics technician.  Did burglar |
| 22 | | alarm systems and intercoms and cameras. |
| 23 | Q. | Why did you leave Analysis & Tech before moving |

6

| | | |
|---|---|---|
| 1 | | to South Carolina? |
| 2 | A. | Well, Analysis Technology was one of the jobs I |
| 3 | | had after getting out of the Navy.  And I was in |
| 4 | | South Carolina, and then I went -- I changed |
| 5 | | jobs from them to Management Systems in |
| 6 | | Charleston, South Carolina. |
| 7 | Q. | So you went from Analysis Technology to |
| 8 | | Management Systems -- |
| 9 | A. | Right. |
| 10 | Q. | -- or Management Systems Applications? |
| 11 | A. | Right. |
| 12 | Q. | Why did you change jobs there? |
| 13 | A. | More money. |
| 14 | Q. | Any other reasons? |
| 15 | A. | No.  The other job was more interesting. |
| 16 | | Analysis Technology, I was sitting in a shop |
| 17 | | working on radios.  But Analysis Technology I |
| 18 | | did traveling and went to different military |
| 19 | | bases.  And since I had a clearance, it was a |
| 20 | | good start. |
| 21 | Q. | How many years were you in the Navy? |
| 22 | A. | Eight years. |
| 23 | Q. | How old were you when you went into the Navy? |

7

1   A.   Twenty.

2   Q.   You got out at 28 and went to Analysis

3        Technology.  How long did you stay at Analysis

4        Technology?

5   A.   Well, I got out of the Navy, and I went to

6        Barton Air Traffic Control.  I got a lot of

7        jobs.  I went to Barton Air Traffic Control and

8        worked as a control tower repair technician.

9   Q.   Where else have you worked?

10  A.   Let's see.  I worked at Barton.  Then I went to

11       work for Tautron, T-A-U-T-R-O-N.

12  Q.   Okay.  Who else have you worked for before

13       Analysis Technology?

14  A.   That was it.  It went from Barton to -- Barton

15       ATC to Tautron to Analysis Technology then to

16       MSA, Management Systems, then to SharpTech.

17       Then after SharpTech I worked for SecureCom.

18  Q.   SecureCom.  Okay.  Who else?

19  A.   After SecureCom I was self-employed.  The

20       company was called Tromtech.

21  Q.   Trom, T-R-O-M?

22  A.   Right.  T-E-C-H.

23  Q.   As in Trombley?

8

1    A.    Yeah.

2    Q.    After that what did you do?

3    A.    After that I went to Forsyth County, Georgia as

4          an electrical inspector, and that was in 2000.

5    Q.    Do you remember what year you got out of the

6          Navy?

7    A.    1989.

8    Q.    Do you remember how long you worked at Analysis

9          Technology?

10   A.    About a year.

11   Q.    Do you remember why you left Barton ATC?

12   A.    That was a contract.  Contract cut.  I was the

13         junior tech, and they decided when they renewed

14         the contract to not have a junior tech so I was

15         downsized.

16   Q.    Why did you leave Tautron?

17   A.    Because I got called by Analysis & Technology.

18         Tautron was up in Massachusetts, and I went up

19         there because after I got out of the Navy my

20         parents were up there and got a job up there

21         working in a tower.  And then got -- the

22         contract got cut.  Went to work at Tautron, and

23         then I was referred to Analysis Technology

9

1        because of my military background and my

2        electronics expertise.  So they tracked me down

3        and offered me a job, and I went back to

4        Charleston.

5    Q.   Since 1989 how many jobs have you had?

6    A.   I'm not sure.

7    Q.   Let me help you count them up.  After Forsyth

8        Georgia, did you go to the City of Eufaula?

9    A.   No.  After that I went to the City of Sugar Hill

10        and then Eufaula, and that's all of them.

11    Q.   We have Barton ATC, Tautron, Analysis

12        Technology, MSA?

13    A.   Right.  MSA.

14    Q.   SharpTech, Sourcecom.  You were self-employed,

15        Forsyth County, Georgia; Sugar Hill, and then

16        the City of Eufaula; is that correct?

17    A.   Yes.  That's correct.

18    Q.   What did you do at Sourcecom?

19    A.   It's SecureCom.

20    Q.   I'm sorry.

21    A.   It's just like secure -- security and add a

22        "com" on the end.

23    Q.   What did you do there?

10

1    A.    I did security systems, maintained camera, card

2          readers, stuff like that, for AT&T, MCI, other

3          high-end customers like that.  I was their

4          on-call service rep when they started a new

5          office in this area.

6    Q.    Why did you leave SecureCom?

7    A.    Because I wanted to start my own business.

8    Q.    How did that go?

9    A.    It went all right.  I had some good customers

10         and stuff, but it didn't work out too good

11         because my hands with carpal tunnel got too

12         bad.  So that's why I went to being an

13         inspector.

14   Q.    You said you had carpal tunnel?

15   A.    Right.

16   Q.    Any other problems like that?

17   A.    Well, yeah.  I had carpal tunnel surgery on both

18         hands and degenerative disc disease.

19   Q.    Is that like arthritis?

20   A.    Arthritis, yeah.

21   Q.    Anything else?  We're going to come back to all

22         these.  I just wanted to get a broad category of

23         each, and then we'll come back and hit these

11

1        highlights.

2                Any other physical problems?

3    A.    No.  That was it.  Just the hands and the back.

4    Q.    Any mental problems?

5    A.    Not since I started working for the City of

6          Eufaula.

7    Q.    Is that a yes?  Have you had any mental problems

8          in the past?

9    A.    I don't know how to answer that question.

10   Q.    Okay.

11   A.    Only with the City of Eufaula.

12   Q.    That's the only time you've had mental problems?

13   A.    Yes.

14   Q.    What type of mental problems?

15   A.    Depression, anxiety.

16   Q.    I'm writing all this down as you talk.

17   A.    Okay.

18   Q.    Any other physical or mental problems?  We're

19          going to come back and talk about these.

20   A.    Not that I recall other than just, you know,

21          IBS, stomach problems.

22   Q.    What is IBS?

23   A.    Irritable Bowel Syndrome.

12

1    Q.    IBS is not any way related to this case, is it?

2    A.    No.

3    Q.    We'll mark it off the list.

4    A.    Okay.  Good.

5    Q.    What did you do at Forsyth County, Georgia?

6    A.    I started out there as an electrical inspector

7          inspecting electrical mechanical systems,

8          residential and commercial.

9    Q.    How long did you stay at Forsyth, Georgia?

10   A.    I was there probably a year and a half.

11   Q.    How long did you stay at SharpTech?

12   A.    SharpTech, I was there for two years.

13   Q.    How long were you at SecureCom?

14   A.    One year.

15   Q.    How long were you self-employed?

16   A.    About two-and-a-half years.

17   Q.    Why did you leave Forsyth County, Georgia?

18   A.    Promotion to be the building official for Sugar

19         Hill.  They didn't have a building official, and

20         my boss recommended me for the job.  And it was

21         about an $18,000 a year pay raise.

22   Q.    Where is Sugar Hill located?

23   A.    Metro Atlanta.

13

| | | |
|---|---|---|
| 1 | Q. | I've just never heard of that. |
| 2 | A. | It's a small town of 13,000. |
| 3 | Q. | Whereabouts around Atlanta?  North, south, east |
| 4 | | or west? |
| 5 | A. | Northeast. |
| 6 | Q. | By Stone Mountain? |
| 7 | A. | No.  Further out than that.  It's outside the |
| 8 | | loop.  Out by Lake Lanier. |
| 9 | Q. | Okay.  How long did you work for Sugar Hill? |
| 10 | A. | A little over a year. |
| 11 | Q. | What did the building official do in Sugar Hill? |
| 12 | A. | I did all the inspections and all the plant |
| 13 | | reviews. |
| 14 | Q. | Were you sort of like the planning committee for |
| 15 | | that town or did they have a planning council? |
| 16 | A. | They contracted out to an engineering firm for |
| 17 | | planning.  The director of the department was |
| 18 | | the director of planning and zoning.  I worked |
| 19 | | under him.  He did all the site plan reviews.  I |
| 20 | | did all the construction approvals for |
| 21 | | buildings, fences, stuff like that, all the |
| 22 | | inspections. |
| 23 | Q. | Why did you leave Sugar Hill? |

14

1    A.    Because of the -- we were living on a two-lane

2          road in the country when we moved there.  And

3          eight years later, they were getting ready to

4          four-lane our road so we wanted to get away from

5          the congestion.  So we decided to look somewhere

6          rural.  When I found the job in Eufaula and I

7          told my wife about it, she had recognized the

8          town on our drives and said she would really

9          like to go there.

10   Q.    You found this job on CareerBuilders?

11   A.    Yeah.  CareerBuilder.com, yes.

12   Q.    Do you have any of the printouts from

13         CareerBuilders about the job in Eufaula?

14             Throughout your deposition I'm going to be

15         asking you if you have documents about this

16         or -- I just want to tie documents with events

17         and try to build a paper chronology.

18   A.    Okay.  I've been looking through my stuff, and I

19         haven't seen it.

20   Q.    What did CareerBuilders' web site say about the

21         job in Eufaula?

22   A.    Well, it was just the same as their newspaper

23         ad.  They didn't post it with CareerBuilder.

15

1    Because of the newspaper, it automatically went

2    there.

3  Q.  That's a good point.  So you're saying the City

4      of Eufaula did not post it.  It's just if you

5      put it in the paper, it automatically went to

6      CareerBuilders?

7  A.  Yes.  Any job that's advertised in the Columbus,

8      Georgia newspaper automatically goes to

9      CareerBuilder.  I don't think the City posted it

10     on CareerBuilder because that costs money.

11 Q.  Okay.

12 A.  But I'm not sure.  I think my attorney -- I

13     think I gave my attorney all that stuff, and

14     he's supposed to be mailing it to me.  He may

15     have it.

16 Q.  Let me stop you right here.  Do you have any

17     type of attorney in this lawsuit?

18 A.  No.

19 Q.  Because if you do, I can't talk to you.  And I

20     just want to make sure of that today.

21 A.  I do not, no.  He did not want to represent me

22     in this lawsuit.

23 Q.  What was his name?

16

1   A.   Sonny Harrison.

2   Q.   And you're saying he's sending you a bunch of

3        documents?

4   A.   Yes.

5   Q.   And when he sends you those documents, can you

6        send me a copy of all those documents?  I think

7        we might have sent you a request for production

8        on that.

9   A.   You sent me a request for some stuff, and,

10       yeah.  I asked him for it last week, and I

11       haven't heard back or seen it yet.  But I'll --

12       He was trying to find an attorney to represent

13       me so he had all my documentation and would send

14       it to attorneys.

15  Q.   That's fine.  And you do not have to tell me

16       what he's doing or what he's told you.  Okay?

17  A.   Okay.

18  Q.   That's completely confidential between you and

19       Sonny.

20  A.   Okay.

21  Q.   What I would like to do is when I get those

22       documents to call you again and resume the

23       deposition at that point.  Okay?

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

17

1    A.    Okay.

2    Q.    But I would like to go on and continue until we

3          run out of time today.

4    A.    Okay.

5    Q.    How did you respond to the request or the

6          solicitation for resumes that you saw in the

7          CareerBuilders?

8    A.    I believe I mailed a resume to the City of

9          Eufaula.

10   Q.    Do you remember what year that was?

11   A.    I think that was late 2002.

12   Q.    Were you employed by the City of Eufaula longer

13         than you were employed by anybody else other

14         than the Navy?

15   A.    No.  I was employed longer by MSA, Management

16         Systems Applications.

17   Q.    And that was for five-and-a-half years?

18   A.    Right.

19   Q.    Would the City of Eufaula be the next longest

20         employer?

21   A.    It may be.

22   Q.    About four-and-a-half years or something like

23         that?

18

1    A.    No, it hasn't been that long.  I started in

2          March of 2003 so -- I didn't make it to March of

3          2007.  So that wasn't even ...

4    Q.    About three-and-three-quarter-years or something

5          like that?

6    A.    Something like that, yeah.

7    Q.    What did you do in the Navy?

8    A.    I was an electronics warfare technician,

9          electronic intelligence.

10   Q.    I'm not too smart on all that.  What did

11         electronics intelligence do?

12   A.    I was on submarines, and I was in what's called

13         electronic support measures.  What I did was

14         classified, and what we did was just documented

15         transmitted signals, like radar and

16         communications, and would use it for targeting

17         and for identification purposes.

18   Q.    Where all were you stationed in the Navy?

19   A.    I was stationed on USS Batfish that was in

20         Charleston, South Carolina, and I can't say

21         where the submarine went.

22   Q.    I'm not asking you that.  I realize that.

23   A.    But I was -- I went to school and started out

19

```
 1            boot camp in Orlando and then submarine school

 2            and electronic school in New London,

 3            Connecticut.  Then I was transferred to --

 4    Q.      Is that close to Branford, Connecticut?

 5    A.      I'm not sure.  That's Grattan -- the New London,

 6            Grattan area.

 7    Q.      What is your educational background?

 8    A.      I've taken a couple of college courses.

 9    Q.      Where at?

10    A.      Trident Technical College in Charleston, South

11            Carolina.

12    Q.      Anything else?

13    A.      I did some continuing education at Gwinnett Tech

14            in Atlanta, but I finished two years of trade

15            school for electronics technician in the Navy.

16    Q.      Right.

17            Where did you learn about buildings?

18    A.      When I was in the Navy towards the end of my

19            career, I was stationed in Charleston with a

20            mobile technical unit.  We were a bunch of, I

21            guess called, super techs that went around the

22            country fixing things and going out to sea and

23            fixing things that the crew couldn't fix
```

20

1          themselves.  We moved from one building to

2          another so we gutted the building and built it

3          from the ground up ourselves.  So we had some

4          CBs, and so I learned all about construction

5          when I was in the Navy.  After then after that

6          when I got to MSA, that was all commercial

7          electrical work so that's how I learned about

8          construction.

9     Q.   Did you ever work with a building code in any of

10         these jobs?

11    A.   I worked with --

12    Q.   And I say that because I think some of the

13         documents that you sent me talked about the

14         building code.

15    A.   I used the fire safety codes when I did fire

16         alarm systems.  But the building codes I used

17         when I started working at Forsyth County, my

18         first job as an inspector.

19    Q.   Did Forsyth County have their own electrical

20         code or did they adopt a national electrical

21         code?

22    A.   They adopted the state mandated electrical code.

23    Q.   I didn't know there was a state one in Georgia.

21

1    A.    Yes.

2    Q.    What about Sugar Hill?  Did they do the same

3          thing?

4    A.    Same thing.  Same code.

5    Q.    What about Eufaula?

6    A.    There's no state mandated code, but Eufaula

7          adopted the electrical code.

8    Q.    I'm just familiar with the Alabama, the way we

9          do it here.

10   A.    Right.  They adopted the standard building codes

11         and the electrical codes.  And then one of the

12         things they wanted to do was get the

13         international codes adopted, and I helped them

14         do that.

15   Q.    So you sent your resume to the City of Eufaula

16         somewhere near the end of 2002.  What happened

17         next?

18   A.    I didn't hear anything for a really, really long

19         time, and then I got a call.  Actually, I got a

20         call -- Well, I got a call for an interview.  I

21         don't remember exactly when it happened.

22         Shortly after the interview, I got a call by a

23         real estate agent who wanted to talk houses

22

1          before I had been offered a job, and that was

2          the next thing I heard.

3  Q.    Who did you interview with?

4  A.    I interviewed with the mayor and the city

5          council.

6  Q.    Was this an employment position or an appointed

7          position?

8  A.    It was an appointed position.

9  Q.    I know what I mean when I say appointed

10         position.  What do you mean when you agree with

11         me?  What are you thinking an appointed position

12         is?

13  A.    Okay.  From what I understand, the procedure was

14         the mayor picks a candidate and nominates that

15         candidate to the city council to be appointed to

16         the position of building official.  And so

17         instead of -- I guess they had some problems in

18         the past with not agreeing so they decided to do

19         the interviews together.  And then after the

20         interviews were made, the mayor made his

21         nomination and they decided to make me the

22         building official.  Now, whether it was

23         appointed or -- All I know is they hired me, but

23

| | | |
|---|---|---|
| 1 | | I don't know about appointment or anything. |
| 2 | Q. | Okay.  Were you considered a department head? |
| 3 | A. | Yes. |
| 4 | Q. | Just a little background on the City of |
| 5 | | Eufaula.  How many department heads did the City |
| 6 | | of Eufaula have in 2002? |
| 7 | A. | They had -- I don't know exactly how many they |
| 8 | | had.  They had the street department, water |
| 9 | | department -- |
| 10 | Q. | Was that one department or two? |
| 11 | A. | Street is one department.  The water department |
| 12 | | is actually a separate board. |
| 13 | Q. | Okay. |
| 14 | A. | But, yeah, street, police, fire.  Then you've |
| 15 | | got building department. |
| 16 | Q. | How about police? |
| 17 | A. | Yeah.  Police, fire, building, and street. |
| 18 | Q. | So at least four? |
| 19 | A. | Uh-huh (positive response). |
| 20 | Q. | Did you think that your appointment ended at the |
| 21 | | end of the mayor's term and you would have to be |
| 22 | | reappointed? |
| 23 | A. | Yeah.  I remember that.  I remember them |

24

| | | |
|---|---|---|
| 1 | | revoting to keep all the department heads after |
| 2 | | the last election. |
| 3 | Q. | Do you know what year the last election was? |
| 4 | | Could it have been 2004? |
| 5 | A. | 2004, yes. |
| 6 | Q. | Also for background, what all positions were |
| 7 | | there in the building department?  I know you |
| 8 | | said you were, what, the building official? |
| 9 | A. | Right.  I'm the building official, and |
| 10 | | underneath it was -- when I started was a |
| 11 | | part-time building inspector and then a |
| 12 | | secretary. |
| 13 | Q. | I'm writing this down. |
| 14 | A. | Okay. |
| 15 | Q. | Did they have a building official before you |
| 16 | | were hired? |
| 17 | A. | Yes.  I replaced Milton Ledon.  He retired. |
| 18 | Q. | How do you spell that last name? |
| 19 | A. | L-E-D-O-N. |
| 20 | Q. | Do you know how many years Milton had been there |
| 21 | A. | It had been several years.  I'm not really sure |
| 22 | | how many.  I think maybe seven. |
| 23 | Q. | Okay.  So you interviewed with the mayor and the |

25

```
1        city council?

2   A.   Yes.

3   Q.   And then a real estate agent called you?

4   A.   Yes.

5   Q.   When did somebody from the City of Eufaula call

6        you about the position?

7   A.   I think it was a week or two after the real

8        estate agent had called.

9   Q.   What did they tell you at that time?

10  A.   They had called and wanted to offer me a job at,

11       I believe it was, 37,000.

12  Q.   Did they offer you a contract or just a position

13       or appointment or -- Whatever it is, it is.

14  A.   They offered me the position of building

15       official for, I think it was, 37,000.

16  Q.   Do you know if that was an employment at will?

17       When I say that, do you know what that means?

18  A.   Yes.

19  Q.   You can be fired anytime and you can quit

20       anytime?

21  A.   I understand that.

22  Q.   Were you an employee at will?

23  A.   I am an employee that's appointed that has -- I
```

26

1          can leave the position at any time.

2    Q.    Right.

3    A.    The city council, since the person is appointed,

4          has obligations -- legal obligations to make.

5    Q.    I understand that.  You're right.  I understand.

6                Do you know who called you?  Was it the

7          mayor or somebody with the city council?

8    A.    I believe it was the mayor.  I had also spoke

9          with Mo Erkins.  He was the personnel manager.

10         But I'm not sure if he had called me with the

11         job offer or it was the mayor.  I don't

12         remember.

13   Q.    Mo who?

14   A.    Mo Erkins.  I remember I talked to him, but I

15         don't know if he had called me with the initial

16         offer.  I know I talked to the mayor in the

17         offers that followed but not that time.

18   Q.    How much were you making at Sugar Hill before

19         you came to the City of Eufaula?

20   A.    51,000 annual salary.

21   Q.    How much were your making at Forsyth, Georgia?

22   A.    I think it was making -- I started out as a

23         building inspector and was promoted up to plans

27

1     examiner.  I think it was 13-and-a-half an hour.

2  Q.    Is that 35 a year or something like that?

3  A.    I think somewhere around there.

4  Q.    Are you saying that you left a job making

5     $51,000 a year and took a job making 37,000?

6  A.    No.  We had negotiated up to 47-and-a-half.

7  Q.    Okay.  Thank you for pointing that out.

8        So they called and offered 37.  What did you

9     respond with?

10  A.    I told them I wasn't interested.  It wasn't

11     enough money.

12  Q.    I guess you told them no.  Did you give them a

13     number or did they call you back?

14  A.    They called me back on my cell phone.

15  Q.    How soon after you turned them down the first

16     time did they call you back?

17  A.    I don't recall.  I don't know if it was a day or

18     two or a week or two.  I don't recall.

19  Q.    What did they call back with?

20  A.    They called back with another offer, and I had

21     decided when they called me back that I no

22     longer wanted the job.  And I told them no, that

23     I withdraw my application.

28

1    Q.    What did they say?

2    A.    Well, they asked why, and I told them --

3    Q.    Why did you withdraw your application?

4    A.    Because I couldn't get the 51,000 and I was

5          having back problems.  And I told them, look,

6          I'm having these back problems, and I don't know

7          what kind of vehicle y'all are going to give me,

8          and I don't want to deal with that hassle; I'm

9          okay where I'm at.  My back was hurting really

10         bad that day, and I said, I don't want it

11         anymore.  It was sometime later they called me

12         back and told me that they would let me use my

13         own truck and pay me mileage, and I think that

14         was in the offer letter.

15   Q.    Do you still have a copy of that offer letter?

16   A.    I think it might be in this stuff the attorney

17         might have.

18   Q.    That's fine.  We'll get to it later.

19   A.    Okay.

20   Q.    If not, I may have it in your personnel file.  I

21         think we're getting all that stuff together to

22         send to you too.

23   A.    Uh-huh (positive response).

29

| | | |
|---|---|---|
| 1 | Q. | Did they call you back or did you call them back |
| 2 | | after you received the letter? |
| 3 | A. | They called me back after I had withdrawn my |
| 4 | | application.  And I think what had happened is |
| 5 | | Mo Erkins had called me, and I told him I |
| 6 | | withdraw.  He was the personnel manager.  And |
| 7 | | then I believe a few days later, the mayor |
| 8 | | called me back. |
| 9 | Q. | What did the mayor say to you at that time? |
| 10 | A. | He asked me to reconsider withdrawing my |
| 11 | | application. |
| 12 | Q. | And this was Mayor Jaxon? |
| 13 | A. | Yes. |
| 14 | Q. | Jay Jaxon? |
| 15 | A. | Yes. |
| 16 | Q. | And what did you tell him? |
| 17 | A. | Well, he said -- he offered me 47-and-a-half. |
| 18 | | And I says, well, if I can use my truck and get |
| 19 | | paid the going rate for mileage, then -- I |
| 20 | | accepted the job. |
| 21 | Q. | Was your wife employed at that time in Sugar |
| 22 | | Hill or somewhere over there? |
| 23 | A. | Yes, she was. |

30

1   Q.   Where was she employed at?

2   A.   She was working in Buford for a model train

3       company.

4   Q.   What does she do with model trains?  Just sounds

5       pretty interesting.

6   A.   She was shipping and receiving.  She wasn't the

7       model fixer.

8   Q.   Did she quit her job?

9   A.   Yes.  She resigned a couple of months after I

10      had taken the job.  I was living in Eufaula by

11      myself in a camper at a campground because we

12      were trying to sell our house.

13   Q.   I guess you eventually did sell your house, and

14      she moved over there to Eufaula?

15   A.   She moved before we sold our house.  We just

16      paid rent and paid a mortgage at the same time

17      for about four months, five months.

18   Q.   You indicated that you were having back problems

19      while you worked at the City of Sugar Hill.

20   A.   Uh-huh (positive response).

21   Q.   One thing I need you to do is get you to answer

22      "yes" or "no" because when the court reporter

23      takes it down, it's hard for her to tell what a

| | | |
|---|---|---|
| 1 | | uh-huh means. |
| 2 | A. | Okay. |
| 3 | Q. | So you were having back problems in Sugar Hill. |
| 4 | | Is that yes? |
| 5 | A. | Yes. |
| 6 | Q. | Do you remember the names of the doctors that |
| 7 | | you sought treatment from while you lived in |
| 8 | | Sugar Hill, Georgia? |
| 9 | A. | I believe it was Dr. Greg Kennedy. |
| 10 | Q. | Were there any other doctors? |
| 11 | A. | Yeah.  I've got all the doctors listed. |
| 12 | Q. | Where are they listed? |
| 13 | A. | Well, I was putting a list together on your |
| 14 | | request. |
| 15 | Q. | That's fine.  As soon as we get those, we'll |
| 16 | | call you and talk to you about those right |
| 17 | | there.  We'll just kind of keep this deposition |
| 18 | | open until we can get all the documents |
| 19 | | exchanged. |
| 20 | A. | Okay. |
| 21 | Q. | I need a list of doctors as far back as you can |
| 22 | | remember. |
| 23 | | Now, how did you initially hurt your back? |

32

| | | |
|---|---|---|
| 1 | A. | I was injured in the Navy. |
| 2 | Q. | Can you tell me what you were doing or is that |
| 3 | | classified? |
| 4 | A. | Well, I fell.  I can't really tell you where or |
| 5 | | how, but I fell and landed on a pipe.  And I was |
| 6 | | fine for a year or two, and then I started |
| 7 | | having real bad hip pains.  They concluded it |
| 8 | | might have been that injury that caused a |
| 9 | | herniated disc. |
| 10 | Q. | Can you tell me what treatment you received from |
| 11 | | the Navy? |
| 12 | A. | Physical therapy was about all they did. |
| 13 | Q. | Did they ever do surgery on you? |
| 14 | A. | No. |
| 15 | Q. | After you got out of the military in, what, |
| 16 | | 1989, did you ever go to the VA for any |
| 17 | | treatment? |
| 18 | A. | Yes. |
| 19 | Q. | Did they perform surgery on you at the VA? |
| 20 | A. | No. |
| 21 | Q. | By the time you went to work in Sugar Hill, had |
| 22 | | you had back surgery somewhere? |
| 23 | A. | No. |

33

| | | |
|---|---|---|
| 1 | Q. | What was wrong with your back, if you know? |
| 2 | A. | At that time I had no idea.  All I know is I had |
| 3 | | hip pain, and sometimes it radiated down my |
| 4 | | leg.  I didn't know at the time that I had |
| 5 | | degenerative disc disease.  I didn't know that |
| 6 | | until just before I was released from the City |
| 7 | | of Eufaula. |
| 8 | Q. | Did Dr. Kennedy -- I think that's the one you |
| 9 | | said you went to while you were in Sugar Hill. |
| 10 | A. | Right. |
| 11 | Q. | Did he do any MRIs or tests on you or anything |
| 12 | | like that? |
| 13 | A. | Not on my back. |
| 14 | Q. | How about your carpal tunnel?  When did you |
| 15 | | start having those problems? |
| 16 | A. | I started having those problems I believe in the |
| 17 | | mid-1990s.  As a matter of fact -- No.  I had |
| 18 | | numbness starting in my hand right after I got |
| 19 | | out of the Navy. |
| 20 | Q. | Do they know what caused that or do you know |
| 21 | | what caused that? |
| 22 | A. | No.  When I was in the Navy, we couldn't use |
| 23 | | power tools on a submarine.  So I had to take |

34

```
 1        hundreds of filters apart with a screwdriver and
 2        clean them all the time.  And I used a system
 3        that had a keyboard.  It was a really advanced
 4        system back then, a computer keyboard and all
 5        that stuff.  And I had to type a lot.  Had to
 6        use a lot of hand tools and screwdrivers.  So
 7        when I got out of the Navy, I couldn't make
 8        models anymore because every time I tried to do
 9        some fine work, my hands would go to sleep.
10   Q.   You couldn't make models.  I don't understand
11        what that is.
12   A.   Little model airplanes and model cars.
13   Q.   Okay.
14   A.   I used to do that as a kid, but then I tried to
15        go back to it after the Navy and I couldn't do
16        it.
17   Q.   I understand.
18        Did you have a different doctor when you
19        lived in Atlanta as opposed to Dr. Kennedy when
20        you lived in Sugar Hill?
21   A.   Yeah.  I saw a Dr. Jay Desai.
22   Q.   Do you remember what facility you saw him in?
23        What hospital?  What building?  What city?
```

35

```
 1   A.   He was Gwinnett Internal Medicine.  He had a
 2        couple of different offices around it the
 3        Atlanta area.
 4   Q.   Did you see him -- What did you see him for,
 5        your back or hands or something else?
 6   A.   My back, my stomach, my hands.  He's the one
 7        that referred me for testing for carpal tunnel.
 8   Q.   Since that time have you had any surgical
 9        intervention on your hands?
10   A.   Yes.  I had de Quervain's surgery on my left
11        wrist about a year and a half ago.
12   Q.   Was that while you worked at the City of
13        Eufaula?
14   A.   Yes.
15   Q.   What about for your back?
16   A.   Well, yeah.  I had surgery October 3 of 2006.
17   Q.   Did you have surgery on your hands and your back
18        the same year?
19   A.   May have been.
20   Q.   Which doctor did surgery on your hands while you
21        lived in Eufaula?
22   A.   It was Dr. Chitwood.
23   Q.   Where is he located?
```

36

| | | |
|---|---|---|
| 1 | A. | Southern Bone & Joint in Dothan. |
| 2 | Q. | What about for your back? |
| 3 | A. | It was Dr. Patrick Ryan. |
| 4 | Q. | Montgomery? |
| 5 | A. | Montgomery. |
| 6 | Q. | At Jackson Hospital? |
| 7 | A. | Yes. |
| 8 | Q. | How are you doing today as far as your hands? |
| 9 | A. | My hands are doing fine.  I still have weakness |
| 10 | | and numbness, but that's because it was -- the |
| 11 | | damage was so bad. |
| 12 | Q. | What about your back? |
| 13 | A. | Not doing too good because I'm not in my bed. |
| 14 | | I'm at my mother-in-law's house. |
| 15 | Q. | If I was at my mother-in-law's house, my back |
| 16 | | would hurt too.  Is it just your bed or is it |
| 17 | | something you're doing, or what is it? |
| 18 | A. | Well, I'm under a lot of stress, and I've got |
| 19 | | this new job going on, and I'm sitting at a new |
| 20 | | desk and staying at a different house and |
| 21 | | sleeping on a different bed.  It's just |
| 22 | | difficult to recuperate when I'm going through |
| 23 | | all this. |

37

1    Q.    Where are you working now?

2    A.    I don't feel comfortable releasing that since

3          the City has already retaliated against me once.

4    Q.    Now, let me -- you're not going to tell me where

5          you work at now?  I'm not going to argue with

6          you.  You don't have a lawyer so --

7    A.    Let me --

8    Q.    My position is I'm entitled to send a subpoena

9          to that employer and get your records from

10         there, and I can't do it if I don't know where

11         you work.

12   A.    Well, it's City of Hazelwood.

13   Q.    What state?

14   A.    Missouri.

15   Q.    What do you do there?

16   A.    I'm a building inspector.

17   Q.    Is it pretty much the same thing you do now or

18         you did in Eufaula?

19   A.    Well, I'm the number two man now.  I'm not the

20         number one.  It's lower pay.  I'm not the

21         department head.

22   Q.    How much do you make there in the City of

23         Hazelwood?

38

```
1    A.   47,000.

2    Q.   Can you use your own truck?

3    A.   No.  I use a Ranger that they gave me.

4    Q.   They provided you a truck.  Okay.

5    A.   Well, it's broken down three times since I've

6         been here.

7    Q.   You shouldn't be so rough on it.

8    A.   Well ...

9    Q.   What was your salary when you parted ways with

10        the City of Eufaula?

11   A.   It was almost 54,000.

12   Q.   What were your benefits?

13   A.   Benefits was medical, dental, life insurance.

14        Benefits were they paid about, I think, 500 a

15        month for the medical insurance on my behalf.

16   Q.   What kind of benefits do you have now?

17   A.   I have -- They just started on the 1st of

18        September.  I have medical, dental, life

19        insurance.

20   Q.   How much do they pay towards your health?

21   A.   They pay half of it.

22   Q.   Are your benefits pretty much the same in

23        Hazelwood as they were in Eufaula?
```

39

| | | |
|---|---|---|
| 1 | A. | They are a lot better.  Of course, I'm in a |
| 2 | | larger metro area here so the benefits are |
| 3 | | better. |
| 4 | Q. | So the benefits at the City of Hazelwood are |
| 5 | | better or a lot better than the City of Eufaula? |
| 6 | A. | A lot better. |
| 7 | Q. | Where is the City of Hazelwood located?  What |
| 8 | | metropolitan area? |
| 9 | A. | St. Louis. |
| 10 | Q. | Is that on the St. Charles side of St. Louis or |
| 11 | | the other side? |
| 12 | A. | It's on the east side of -- It's between the |
| 13 | | Mississippi and the Missouri River.  So, yeah, |
| 14 | | it's on the -- not on the St. Charles side. |
| 15 | | It's on the eastern side. |
| 16 | Q. | Okay.  It's on the airport side, I believe, |
| 17 | | isn't it? |
| 18 | A. | Yeah.  Hazelwood borders the airport. |
| 19 | Q. | Who is your immediate supervisor?  You said you |
| 20 | | were under somebody. |
| 21 | A. | Yeah.  It's Pat McShehey. |
| 22 | Q. | Do your job duties differ in Hazelwood than they |
| 23 | | did in Eufaula? |

1  A.  Well, I do code enforcement, but I don't make

2      detailed departmental decisions.

3  Q.  What kind of detailed departmental decisions did

4      you make in Eufaula?

5  A.  On approving plans and approving building

6      permits and making recommendations to the

7      planning commission and board of adjustments and

8      city council.

9  Q.  How do they handle that in Hazelwood?

10  A.  That's done by my boss.

11  Q.  What is his title called?

12  A.  Code administrator.

13  Q.  What's your title now?

14  A.  Building inspector and code enforcement officer.

15  Q.  Are you in charge of other things like -- I

16      don't know.  Some --

17  A.  Excuse me?

18  Q.  Some cities combine the building inspector with

19      enforcement, and code enforcement talks about

20      get that car out of your yard and things like

21      that.  Is that what you do now?

22  A.  Yes.  I do that and building inspections.

23  Q.  What was your starting salary in Hazelwood?

41

| 1 | A. | 46,911, something like that. |
|---|---|---|
| 2 | Q. | When did you start there? |
| 3 | A. | I started September -- no -- July 9th. |
| 4 | Q. | Of 2007? |
| 5 | A. | Yes. |
| 6 | Q. | I think it was shortly after you filed this |
| 7 | | lawsuit, correct? |
| 8 | A. | Yes. |
| 9 | Q. | And they've moved you up, what, to 47,000 or -- |
| 10 | | When you said 47,000 earlier, was that 46,911? |
| 11 | A. | Yeah.  I just rounded it up to 47,000. |
| 12 | Q. | I understand. |
| 13 | | When are you eligible for your first pay |
| 14 | | increase? |
| 15 | A. | There's people that work in my office that say |
| 16 | | they haven't had a raise in five years.  So I |
| 17 | | don't know. |
| 18 | Q. | That's pretty much the way it is at every city, |
| 19 | | I think. |
| 20 | | Do they have any steps -- Do you know what |
| 21 | | I'm talking about when I say step increases? |
| 22 | A. | Yes, they do. |
| 23 | Q. | Are you eligible for any of those? |

42

| | | |
|---|---|---|
| 1 | A. | Not yet.  But I'm in the middle of the pay range |
| 2 | | for building inspector. |
| 3 | Q. | Do you know what that tops out at? |
| 4 | A. | 53,000 or 54,000, somewhere around there. |
| 5 | Q. | Pretty much what you were making in Eufaula? |
| 6 | A. | Right.  And they do a cost of living adjustment |
| 7 | | every year to the pay scales. |
| 8 | Q. | Every year? |
| 9 | A. | I think.  I'm not really sure. |
| 10 | Q. | Do you know if the City of Eufaula did a pay |
| 11 | | increase like that every year? |
| 12 | A. | They did do one in 2005 or -- I don't remember |
| 13 | | which year, but there was one year I was there |
| 14 | | that they said they weren't going to do a cost |
| 15 | | of living increase. |
| 16 | Q. | What is your marital status now?  Is your wife |
| 17 | | living with you there in Hazelwood? |
| 18 | A. | We're living in Grover, Missouri with her |
| 19 | | mother. |
| 20 | Q. | How far is that from Hazelwood? |
| 21 | A. | Twenty-five miles. |
| 22 | Q. | Did she have a job in Eufaula or somewhere |
| 23 | | around Eufaula when you worked at the City? |

43

```
 1    A.    No.

 2    Q.    Does she have a job now?

 3    A.    No.

 4    Q.    Do you have any kids?

 5    A.    No.

 6    Q.    How old are you?

 7    A.    Forty-five.

 8    Q.    What is your social security number?

 9    A.    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.

10    Q.    What's your date of birth?

11    A.    November 23rd, 1961.

12    Q.    Do you have any relatives in Alabama?

13    A.    No.

14    Q.    Have you ever been involved in a lawsuit other

15          than this one?

16    A.    Yes.

17    Q.    How many?

18    A.    Just one.

19    Q.    Tell me about that one.

20    A.    I had just started working for Forsyth County,

21          and I was coming out of a small subdivision that

22          was at the bottom of a hill where a turn was.

23    Q.    Correct.
```

44

| | | |
|---|---|---|
| 1 | A. | And I didn't wreck, no.  I pulled out of the |
| 2 | | intersection when it was clear, and over the |
| 3 | | hill came this Jeep.  The speed limit was 25, |
| 4 | | and he must have been going about 60.  And he |
| 5 | | went off in the trees.  His father was an |
| 6 | | attorney in Forsyth County. |
| 7 | Q. | Right. |
| 8 | A. | He had some minor injuries, I guess, but he got |
| 9 | | out of the car okay and everything.  And Forsyth |
| 10 | | County had been sued by his father several times |
| 11 | | so they wouldn't investigate.  They called for a |
| 12 | | state trooper to come in.  The sheriff's |
| 13 | | department wouldn't do it.  So the trooper wrote |
| 14 | | me a failure to yield right-of-way.  So after |
| 15 | | that I went to trial.  The county paid for a |
| 16 | | lawyer to represent me, and I was found not |
| 17 | | guilty.  And then after that, his father sued in |
| 18 | | Forsyth County courts. |
| 19 | Q. | You were found not guilty on the failure to |
| 20 | | yield? |
| 21 | A. | Yes. |
| 22 | Q. | Then you went to civil court? |
| 23 | A. | Right.  Then he filed in civil court in Forsyth |

45

1              County, and it ended in a mistrial.

2    Q.    Then what happened?

3    A.    And then the judge ordered a settlement

4          conference before he could refile.  So the

5          father just went to my county of residence,

6          which is Gwinnett County, and he filed another

7          lawsuit, civil suit, in Gwinnett County.

8              And then after that -- he filed that, he

9          came to a settlement agreement with the

10         insurance company before it went to trial in

11         Gwinnett County.  I think it was for about

12         $2,800.

13   Q.    They probably spent a lot more on lawyers,

14         didn't they?

15   A.    I think so.

16   Q.    Any other lawsuit that you've been involved

17         with?

18   A.    No.  That was it.

19   Q.    Have you ever filed bankruptcy before?

20   A.    No.

21   Q.    What is your wife's name?

22   A.    Arlene.

23   Q.    What was her maiden name?

46

| 1 | A. | Smith. |
|---|---|---|

1    A.    Smith.

2    Q.    Does she have any relatives in Alabama?

3    A.    No.

4    Q.    Do you have any children?

5    A.    No.  Oh, no.

6    Q.    Now, come on.  You either -- That's a yes-or-no

7          question.

8    A.    Well, she's here and I don't want to bring it

9          up, but she had a child when she was in high

10         school, and it was given up for adoption.

11   Q.    You're right.  Don't bring that up.  That's

12         fine.

13   A.    I don't want to leave anything out that's going

14         to come up later.

15   Q.    I understand.  I appreciate your honesty, but

16         that's not something we're going to deal with.

17              Is she there with you now?

18   A.    I think she's in another room.

19   Q.    So you accepted the job at the City of Eufaula

20         for $47,500, correct?

21   A.    Yes.

22   Q.    Do you know if they created any new title for

23         you or anything like that when you came to work

47

1       there?

2  A.    No.  They just said this is the grade and scale

3       we're putting you in.  And they went to the job

4       scale and found one that came close to me and

5       just gave me that grade and that scale under

6       another job name.

7  Q.    I don't understand that.  You got a job under a

8       different job name?

9  A.    Right.  The salary they offered me -- I told

10      them -- they said it topped out at 37, and I

11      said I'm not interested.  So when they offered

12      me a higher salary, they said they had to go out

13      of my pay scale to another grade -- another pay

14      grade and put me in that pay grade.  So I don't

15      know if that was the street department or

16      whatever it was.  So they gave me another pay

17      grade.  I don't remember what it was, but that's

18      all they did.  Every time I had a pay raise, the

19      personnel manager would say, okay, this is where

20      we're putting you, over in this category.  So I

21      was outside of my range.

22  Q.    I understand.  They accommodated you in that

23      way, right?

48

1    A.    Right.

2    Q.    Now, in this lawsuit you've sued for some type

3          of disabilities.  What disabilities are you

4          suing for?

5    A.    Well, I'm suing for mental disabilities that

6          they discussed in the hearing.

7    Q.    And we're going to come back to all that stuff

8          right there.  I just kind of want to get a

9          handle on this first.  What disabilities first?

10         We've talked about your back and your hands.

11         Are you suing for anything for those

12         disabilities?

13   A.    Yeah.  I'm going to sue for the back because I

14         just had the surgery on my back, and that was

15         placed part with them making the decision not to

16         keep me around because I couldn't go crawl or

17         climb or -- so yeah.

18   Q.    So you're saying they discriminated against you

19         on the basis of your back, correct?

20   A.    Yes.

21   Q.    What disabilities?  I know you've got back

22         problems, but what disability is your back?

23   A.    Degenerative disc disease.

49

```
1   Q.   Does that keep you from doing normal functions
2        in your life?
3   A.   That makes it difficult for me to stand or sit
4        for long periods of time, but I'm mostly
5        under -- The Rehabilitation Act is what I'm
6        trying to go for right here.
7   Q.   How is that different from the Americans With
8        Disabilities Act, if you know?
9   A.   Well, because the Americans With Disabilities,
10       you have to prove a limited life function.  But
11       I know with the Rehabilitation Act that because
12       of my case research that they brought up during
13       the hearing, my mental disabilities, that I'm
14       covered under the -- that one act, the
15       rehabilitation.
16  Q.   Are you saying the City of Eufaula discriminated
17       against you because of your carpal tunnel?
18  A.   No.  They discriminated against me because of my
19       back disability and because of my adjustment
20       disorder, which is related to my pain and back
21       disability, and my memory loss.
22  Q.   Let's go through each one of those, and then
23       we're going to come back and talk about what
```

50

1       happened step-by-step.

2  A.   Okay.

3  Q.   How specifically did the City of Eufaula

4       discriminate against you on the basis of your

5       degenerative disc disease?

6  A.   That they -- After having my surgery that they

7       didn't give me a right to a fair hearing because

8       I was post surgery and because I was in

9       recovery, and that was -- Part of their

10      decision-making process was that I was

11      recovering from surgery, and I was limited in my

12      abilities.  That's how I feel they discriminated

13      against me.

14  Q.   Do you know of any other person that has some

15      type of medical problem that they did not give a

16      hearing to?

17  A.   I'm not aware.  They've had very few hearings.

18  Q.   You were involved in one hearing, weren't you?

19  A.   Just one, right.

20  Q.   What was that lady's name?

21  A.   Oh, Rosie Jordan.

22  Q.   Did you get her fired?

23  A.   I was her supervisor.

|     |     |     |
| --- | --- | --- |
| 1   | Q.  | What was her position? |
| 2   | A.  | She was a custodian. |
| 3   | Q.  | Now, her job wasn't anything like yours, was it? |
| 4   | A.  | No.  She was a mop runner. |
| 5   | Q.  | Are there any other ways that you say that the |
| 6   |     | City of Eufaula discriminated against you |
| 7   |     | because of your degenerative disc disease? |
| 8   | A.  | No. |
| 9   | Q.  | And it's your testimony you were discriminated |
| 10  |     | against because of your degenerative disc |
| 11  |     | disease, and one way they discriminated against |
| 12  |     | you is not giving you a hearing; is that |
| 13  |     | correct? |
| 14  | A.  | Not giving me -- going through the due process. |
| 15  | Q.  | Okay.  They didn't give you -- Well, let's break |
| 16  |     | that down.  They did give you a hearing, didn't |
| 17  |     | they? |
| 18  | A.  | They gave me a hearing, correct. |
| 19  | Q.  | I think you got a letter that said we're having |
| 20  |     | a determination hearing, and that was on the |
| 21  |     | 13th of December; is that correct? |
| 22  | A.  | They did give me a letter, yes.  That's |
| 23  |     | correct.  But -- That's part of my due process |

52

1      claim is that letter is not -- was not properly

2      done.

3  Q.  We're going to get through all that stuff too.

4      One of my jobs -- One of the reasons the

5      deposition is going to take a long time is

6      because you have, I would say, a tremendous

7      number of claims.  And my job as the lawyer for

8      the City is to find out exactly what you're

9      suing for.  So it's going to go a little slow.

10     Let me write that due process down there because

11     we'll come back and talk about that.

12          So the City of Eufaula gave you an initial

13     hearing, correct?

14 A.  No.  They just gave me the -- They just gave me

15     a determination hearing.

16 Q.  You had a hearing at some point, correct, that

17     determination hearing?

18 A.  Yes.  I had that one determination hearing,

19     correct.

20 Q.  Did you have a lawyer present for the

21     determination hearing?

22 A.  Yes.

23 Q.  And that was Mr. -- What's his name?

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1    A.    Sonny Harrison.

2    Q.    Did you have any other lawyers present?

3    A.    No, not that were representing me.

4    Q.    I understand.

5          Now, you knew about the determination

6          hearing before it took place, correct?

7    A.    Yes.

8    Q.    You had enough time to go get a lawyer, right?

9    A.    Yes.

10   Q.    And you had enough time to get there on time for

11         the meeting, correct?

12   A.    Yes.

13   Q.    And you presented your side of the story,

14         correct?

15   A.    No.

16   Q.    Who presented your side of the story?

17   A.    Well, I wasn't in a good state of mind during

18         that hearing.

19   Q.    Now, wait a minute.  Why not?

20   A.    Well, because I was suffering from anxiety and

21         depression, and I couldn't -- Even when they

22         asked me -- Sonny Harrison would ask me

23         questions, he would have to repeat the question

54

1          because I couldn't remember it.

2    Q.    Who did Sonny Harrison tell that to?

3    A.    That happened during the hearing.

4    Q.    Well, did Sonny Harrison say, we need to come

5          back and do this later; my guy is not in the

6          right state of mind?

7    A.    No.  Because after that happened, the city

8          council and the city attorney, they were all

9          like a bunch of sharks, and they used that

10         memory loss against me and made comments about

11         they don't want me around people if I can't

12         remember things.  And they wouldn't listen.

13         Sonny --

14   Q.    Okay.  The question was:  Did Sonny Harrison

15         tell anybody, my client has got a problem; he's

16         not all here tonight?  Did he ever stop and tell

17         anybody that?

18   A.    No.

19   Q.    After that hearing did you have any other type

20         of hearing?

21   A.    No.

22   Q.    Is that how you're claiming you were

23         discriminated against, because you didn't have a

55

```
 1          second hearing and that was because they

 2          discriminated against you for your degenerative

 3          disc disease?

 4     A.   Well, sort of.  What I'm claiming is that they

 5          did not give me a predetermination hearing

 6          legally which they are obligated to do with a

 7          meeting of city council to agree -- to write in

 8          the letter to agree to the suspension with pay,

 9          which was not done.  They did not have that

10          first hearing to make that determination to put

11          me on paid leave.

12     Q.   Go slow.  I'm writing this down.  You're saying

13          they did not give you a predetermination

14          hearing?

15     A.   No, they did not.

16     Q.   And you said they legally had to do that?

17     A.   Yes.

18     Q.   What says they have a legal obligation to give

19          you a predetermination hearing?

20     A.   It's because -- I don't understand how a

21          councilmember can write a letter without --

22          representing the council without having been in

23          session as a council, meeting the requirements
```

56

1    of the open meeting law for the State of

2    Alabama.   I don't understand how a city

3    councilman can write a letter representing the

4    City when they haven't met and agreed on the

5    letter or agreed on the suspension or agreed on

6    the charges.   I don't understand how that

7    happened.

8  Q.   What I asked you was what legally says that you

9       have to have a predetermination hearing.   Do you

10      know of any law or you're just thinking there

11      should be a law?

12 A.   I think established law in the State of Alabama

13      or other laws requires them to have that first

14      hearing.

15 Q.   Do you know what law?

16 A.   No, not off the top of my head.   Not right now.

17 Q.   I'm trying to flip through some of my documents.

18 A.   Okay.

19 Q.   Hang on just a second.

20          I've looked through some stuff, and I don't

21      see any law saying there must be a

22      predetermination hearing.   And I'm not saying

23      there's not.   We'll come back and talk about

1          that later.

2                You're saying they did not give you a

3          predetermination hearing?

4    A.   Correct.  What I'm saying is when they handed me

5          the termination letter telling me from the city

6          council, Jim Martin, that I was being suspended,

7          they did not have specific charges.  And I told

8          them that from when I had done the termination

9          hearing with Rosie and worked with the personnel

10         manager at the time, Mo Erkins, that I had to

11         specifically list time, date, witnesses, and all

12         that stuff on the termination letter.  And I

13         advised the personnel manager, a new manager at

14         that time, and she said she didn't have to do

15         that.  So I --

16   Q.   Who was that?

17   A.   -- was not given a proper determination letter

18         as required by the personnel rules and

19         regulations for the City of Eufaula.

20   Q.   Who was that?

21   A.   That was Kelly Trawick.

22   Q.   Is it your contention that you have been

23         discriminated against on the basis of your

58

```
1              disability, and that disability being

2              degenerative disc disease, in that you did not

3              receive a predetermination hearing?

4     A.       Yeah.  That as well as other disabilities.

5     Q.       We're going to get there.  I just want to start

6              a list of things you're suing for and exactly

7              why.

8     A.       Okay.

9     Q.       Just to make sure we're on the same page, I'm

10             going to say this is number one disability, and

11             I'm going to put degenerative disc disease and

12             no predetermination hearing.

13    A.       Right.  And I don't know if it's the right time

14             to add it now --

15    Q.       Go ahead.

16    A.       Never mind.  I forgot.

17    Q.       Are you on any type of medication today --

18    A.       Yes.

19    Q.       -- that would affect your memory?

20    A.       Not that I know of.  I'm starting -- It's been

21             going on for an hour, and I'm starting to have a

22             hard time concentrating.

23    Q.       Well, can we resume this deposition at a later
```

59

| | | |
|---|---|---|
| 1 | | date, maybe next week sometime, and just maybe |
| 2 | | do it for an hour each time -- |
| 3 | A. | Yeah, that will be better. |
| 4 | Q. | -- until we go through all this stuff? |
| 5 | A. | Yeah. |
| 6 | Q. | And maybe by then I can have these documents |
| 7 | | copied and put numbers on them and send them to |
| 8 | | you, and let's -- just get you to read your |
| 9 | | handwriting. |
| 10 | A. | Okay. |
| 11 | Q. | Could we do that?  By then you'll probably have |
| 12 | | all of your documents to me that you owe me. |
| 13 | A. | Uh-huh (positive response). |
| 14 | Q. | Let's go forward.  How about next Wednesday at |
| 15 | | the same time? |
| 16 | A. | Let me get my calendar. |
| 17 | Q. | Okay.  I've got to get my calendar too.  Let's |
| 18 | | look at that date, and I'll call you back |
| 19 | | tomorrow and see if that date is okay. |
| 20 | A. | Okay.  It's fine with me. |
| 21 | Q. | I will call you tomorrow and let you know if |
| 22 | | that date is okay with me, and we'll just kind |
| 23 | | of suspend the deposition right here because |

60

1      what I'm understanding you're saying is you

2      don't need to go more than an hour at a time; is

3      that correct?

4  A.   Yeah.  I just started getting treated for high

5      blood pressure today, and I'm having a lot of

6      health issues, heart-related and everything

7      else, because of all this.  So I can't

8      concentrate for very long.

9  Q.   One thing that may make it go quicker is what

10     I'm going through in this next part of the

11     deposition the next time we speak is exactly

12     what you're suing for, like this one -- like

13     you're saying you have a disability of

14     degenerative disc disease and they discriminated

15     against you by not allowing you to have a

16     predetermination hearing.

17  A.   Right.

18  Q.   That's the kind of things I'm going through your

19     complaint to pull out and then ask you questions

20     about that.  We've got left to talk about all

21     these documents, and we have really left to talk

22     about your entire employment at Eufaula.

23  A.   Okay.

1    Q.    Okay?

2    A.    I just remembered that one thing.

3    Q.    What is it?

4    A.    It's in your request for production of documents

5          and stuff like that.  You had said that I said

6          that the employee manual is unconstitutional.

7          The other thing I just want to mention to you is

8          that one of my claims is I was treated

9          differently as a department head personnel

10         manager, you know, as an employee of the City,

11         wasn't given the same rights of due process as

12         other employees.  So I was treated as

13         technically a second-class citizen.  So that's

14         one of my claims.

15   Q.    Just my interpretation of the law, sometimes you

16         can treat somebody else differently.  Do you

17         have any type of unlawful reason that you were

18         treated differently?

19   A.    Political retaliation.  That was their reason.

20   Q.    Now, do you just want to start here next time?

21   A.    Yes, that would be good.

22   Q.    Before we move on from the degenerative disc

23         disease, why don't we -- before we move on to

62

| | | |
|---|---|---|
| 1 | | the political retaliation and stuff like that, |
| 2 | | let's go back next time and talk about other |
| 3 | | disabilities and how you claim you were |
| 4 | | discriminated against.  Okay? |
| 5 | A. | Okay. |
| 6 | Q. | Can we pick up there?  I think you talked about |
| 7 | | memory loss and talked about your back and some |
| 8 | | mental problems. |
| 9 | A. | Yeah.  Depression and anxiety. |
| 10 | Q. | The next time we get together, we'll start |
| 11 | | talking about a particular disease or disability |
| 12 | | and how you were discriminated against by the |
| 13 | | City of Eufaula.  Okay? |
| 14 | A. | Okay. |
| 15 | Q. | I will call you tomorrow, and we'll talk about |
| 16 | | next Wednesday about 3:30. |
| 17 | A. | Okay. |
| 18 | Q. | I'll talk to you tomorrow. |
| 19 | A. | All right. |
| 20 | | MR. HOWARD:  Thank you. |
| 21 | | (Deposition adjourned at approximately |
| 22 | | 4:40 p.m.) |
| 23 | | * * * * * * * * * * * |

63

1                        DEPOSITION ADJOURNED

2                    * * * * * * * * * * * *

3

4                      REPORTER'S CERTIFICATE

5  STATE OF ALABAMA:

6  MONTGOMERY COUNTY:

7          I, Pamela A. Wilbanks, Registered Professional

8  Reporter and Commissioner for the State of Alabama at

9  Large, do hereby certify that I reported Volume I of the

10 telephone deposition of:

11                    **JAMES F. TROMBLEY, JR.**

12 who was first duly sworn by me to speak the truth, the

13 whole truth and nothing but the truth, in the matter of:

14                 JAMES FRANCIS TROMBLEY, JR.,

15                 Plaintiff,

16                 Vs.

17                 CITY OF EUFAULA,

18                 Defendant.

19                 In The U.S. District Court

20                 For the Middle District of Alabama

21                 Northern Division

22                 2:07-CV-00547-MEF

23 on Wednesday, September 5, 2007.

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

64

1          The foregoing 63 computer printed pages contain

2    a true and correct transcript of the examination of said

3    witness by counsel for the parties set out herein.   The

4    reading and signing of same is hereby waived.

5          I further certify that I am neither of kin nor

6    of counsel to the parties to said cause nor in any

7    manner interested in the results thereof.

8          This 10th day of September 2007.

9

10

11

12

13

14

15

16    _____

17    Pamela A. Wilbanks, Registered
      Professional Reporter and
      Commissioner for the State

18    of Alabama at Large.

19

20

21

22

23

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

# TELEPHONE DEPOSITION OF
# JAMES F. TROMBLEY, JR.
# VOLUME II

## September 12, 2007

## Pages 1 through 108

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

DEFENDANT'S
EXHIBIT
2



Page 1

```
1         IN THE UNITED STATES DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3                  NORTHERN DIVISION
4  JAMES FRANCIS TROMBLEY, JR.,
5        Plaintiff,
6  Vs.                    CIVIL ACTION NO.
7                    2:07-CV-00547-MEF
   CITY OF EUFAULA,              LEAD CASE
8
        Defendant.
9
           * * * * * * * * * * *
10
   JAMES FRANCIS TROMBLEY, JR.,
11
        Plaintiff,
12
13 Vs.                    CIVIL ACTION NO.
14                    2:07-CV-00575-MHT
                     MEMBER CASE
15 CITY OF EUFAULA,
16        Defendant.
17         * * * * * * * * * * *
18              VOLUME II
19
           * * * * * * * * * * *
20
          TELEPHONE DEPOSITION
21
                 OF
22
        JAMES F. TROMBLEY, JR.
23
```

Page 2

```
1        TELEPHONE DEPOSITION OF JAMES F. TROMBLEY, JR.,
2  taken before Pamela A. Wilbanks, Registered Professional
3  Reporter and Commissioner for the State of Alabama at
4  Large, in the Law Offices of Nix, Holtsford, Gilliland,
5  Hitson & Higgins, 4001 Carmichael Road, Suite 300,
6  Montgomery, Alabama, on Wednesday, September 12, 2007,
7  commencing at approximately 2:30 p.m.
8           * * * * * * * * * * *
9              APPEARANCES
10 FOR THE PLAINTIFF:
11 Pro se (By telephone)
12 FOR THE DEFENDANT CITY OF EUFAULA:
13 Mr. Rick A. Howard
   Ms. April McKay
14 NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
   Attorneys at Law
15 4001 Carmichael Road
   Suite 300
16 Montgomery, Alabama
17 ALSO PRESENT:
18 Ms. Kelly Trawick
   Personal Manager, City of Eufaula
19
20        * * * * * * * * * * *
21          EXAMINATION INDEX
22      BY MR. HOWARD . . . . . . . . . . .  3
23
```

Page 3

```
1           DEFENDANT'S EXHIBIT INDEX
2  1    Group of 132 documents . . . . . . . 106
3
4
             * * * * * * * * * * *
5
6           JAMES F. TROMBLEY, JR.
7     The witness, after having been previously sworn
8  to speak the truth, the whole truth and nothing but the
9  truth testified as follows:
10              EXAMINATION
11 BY MR. HOWARD:
12 Q.  My notes indicate that we were starting to get
13     into things that you're suing the City for.
14 A.  Right.
15 Q.  The first one we went into was the disability
16     claims.  You indicated that you had degenerative
17     disc disease in your back and that
18     discrimination manifested itself with no
19     pretermination hearing; is that correct?
20 A.  That is correct.
21 Q.  The second disability that you mentioned was an
22     adjustment disorder; is that correct?
23 A.  Yes.
```

Page 4

```
1  Q.  Are you suing the City saying that you had the
2      disability of adjustment disorder and they
3      discriminated against you because of it?
4  A.  Yes.
5  Q.  What is an adjustment disorder?  I'm not
6      familiar with that term.
7  A.  Adjustment disorder, from what I understand my
8      doctor told me, is when someone goes through a
9      lot of changes where -- For example, my
10     situation, my stressor, was the work environment
11     with not being able to know which way to turn
12     because I would make a decision on what to do,
13     and it was right last time but this time it's
14     wrong.  The feeling of adjustment disorder is
15     you have stressors that put you into deep
16     depression and anxiety.  And I have adjustment
17     disorder with anxiety mode and depressive mode.
18 Q.  Let me write that down real quick.  Adjustment
19     disorder with anxiety mode and depressive mode?
20 A.  Right.  So that means, you know, with --
21     stressors can put me into depression or I can
22     get real anxious and worry and overconcentrate
23     on something and that kind of stuff.  And it all
```

Page 5

1    comes back from, you know, what happened at work
2    and then, you know, with the way I grew up, not
3    settling in one place for very long. So it's a
4    matter of the past and the present, adjustment
5    disorder. It's manageable with medication and
6    counseling.
7    Q. Do you take medication for the adjustment
8       disorder?
9    A. Yes, I do.
10   Q. When did you start taking medication for
11      adjustment disorder?
12   A. I started -- When I first started seeing the
13      doctor was in 2004 when I worked for the City of
14      Eufaula, and he put me on Lexapro.
15   Q. Did you have -- I'm going to use the term --
16      "mental problems"? I don't even know if that's
17      the correct term. Is there a better term to
18      use?
19   A. No. It's a mental disorder.
20   Q. Did you have any type of mental disorder before
21      you went to the City of Eufaula?
22   A. No, I did not.
23   Q. Did anybody at the City of Eufaula know that you

Page 6

1    had a mental disorder?
2    A. I told the mayor. I don't remember exactly
3       when. I think it might have been April of 2005
4       or somewhere around there. I told him that I
5       was having a lot of depression and I was seeing
6       a doctor and I was having marriage problems and
7       that I didn't want him to hear it from somebody
8       else that I was leaving my wife. And so I made
9       sure he was informed because of the political
10      situation.
11   Q. Did you ever leave your wife?
12   A. I did for a couple of months, but we've got
13      everything back together. Once I started
14      treatment for the adjustment disorder and got
15      diagnosed, I -- Another symptom of adjustment
16      disorder is -- mostly what it is you're at
17      one place and you don't want to be there; you
18      want to be someplace else. So once you go to
19      someplace else you want to be there, you don't
20      want to be there either. It's real difficult
21      about adjusting to your environment thinking you
22      want something else.
23   Q. Did you ever give any type of medical records or

Page 7

1    doctor's letter to the City of Eufaula to tell
2    them you had this type of issue?
3    A. No. No doctor's letter. Just told the mayor
4       verbally.
5    Q. Are you saying that the problems with your wife
6       stemmed from issues that you had with the City
7       of Eufaula?
8    A. Well, they stemmed from the depression.
9    Q. And your depression -- does your depression come
10      from the City of Eufaula?
11   A. Yes. I would say it was compounded by the City
12      of Eufaula. My depression is partly caused by
13      my back disorder from the pain. And another one
14      of the big things with adjustment disorder is
15      mild memory loss and inability to concentrate.
16   Q. Were you having an affair when you were having
17      problems with your wife?
18   A. Yes, I had one.
19   Q. Who was that with?
20   A. It was Karen Wilsey.
21   Q. Was she an employee at the City of Eufaula?
22   A. No.
23   Q. How did the City of Eufaula discriminate against

Page 8

1    you because of your adjustment disorder? What
2    did they do that you felt was discriminatory?
3    A. It's that -- in the hearing that they had --
4       They had this whole hearing and all this meeting
5       and the suspension and all this stuff because of
6       an accused threat I have said or accused comment
7       I had made.
8    Q. Right.
9    A. And when I talked to the mayor about my mental
10      health, he says, oh, yeah; Terry Bush has --
11      she's bipolar. So I talked to her, and she
12      says, well, Gloria Cole is bipolar too, you
13      know. So they are on medications. And Terry
14      has outbursts and yells at customers that come
15      in off the street, and she's not reprimanded or
16      anything and she's allowed to have her
17      outbursts.
18   Q. Let me ask you this. Do you think you were
19      treated differently because of your adjustment
20      disorder?
21   A. Yes, I think so. Because in the hearing, once I
22      told them that, you know -- I told them that I
23      had the adjustment disorder; I had memory

Telephone Deposition of James F. Trombley, Jr.                    September 12, 2007

1    problems, and it was pretty much from that point
2    on that they discussed my memory. And that was
3    pretty much from my opinion and the attorney
4    that was representing me at the time, his
5    opinion, that they solely based their decision
6    to fire me on that.
7  Q.  You're saying that you got fired because of your
8      adjustment disorder; is that correct?
9  A.  Yes.
10 Q.  When you say something happened in the hearing,
11     you're talking about you got fired in that
12     hearing; is that correct?
13 A.  No. I mean, at the end of the hearing, they
14     voted to terminate me, and they passed that vote
15     but they didn't say why or anything. But in the
16     hearing prior to them taking a vote, they
17     discussed my mental health and said that I had
18     memory problems and shouldn't be around the
19     City. And even one of the councilmembers, he
20     says, I sure wish there was something else we
21     could do; it's hard to find good people.
22 Q.  Who said that?
23 A.  Bob Powers.

1  Q.  Are there any other discriminatory acts on the
2      part of the City of Eufaula that you claim
3      stem from your adjustment disorder?
4  A.  Is the mayor telling me that he doesn't like my
5      temperament -- He would get on me about a
6      certain project or something, and then he would
7      tell me that he didn't like my temperament or
8      that kind of stuff.
9  Q.  But did you tell anybody at the City of Eufaula
10     or provide any kind of doctor's letter saying
11     I've got something called adjustment disorder?
12 A.  No, I did not.
13 Q.  Do you claim any other type of disability
14     that -- Let me cut it short. Are you claiming
15     any other type of disability?
16 A.  Just degenerative disc disease and the mental
17     for adjustment disorder.
18 Q.  Now, are you suing under the Rehabilitation Act
19     or The Americans With Disabilities Act or both?
20 A.  Both. I did provide one thing in writing prior
21     to my surgery. I did provide a letter to the
22     mayor that I have severe depression and a lot of
23     pain and that I was going to have the surgery.

1    And I asked for his support and understanding.
2  Q.  Did you provide me with a copy of that letter?
3  A.  I don't have it in my possession.
4  Q.  Do you remember about what date that happened or
5      you sent that letter?
6  A.  Yeah. That was the end of September.
7  Q.  Of 2006 I would presume?
8  A.  Yes. I had surgery October 3 so I sent it to
9      him on -- I know I put it in my desk with my
10     outgoing memos, but I didn't grab that folder
11     when I left. I forgot to look for that one.
12     And I thought I saved it on my -- It's saved on
13     my computer as a memo to the mayor, but --
14     because I wrote it at work. I didn't write it
15     at home.
16 Q.  I don't know that anybody has checked your hard
17     drive, and I don't show any memo to the mayor
18     talking about that.
19        What date did you have your surgery on?
20 A.  October 3rd.
21 Q.  And this was before you had your surgery,
22     correct?
23 A.  Yes. I think it was a week or so before I had

1    the surgery.
2  Q.  I'll look for that memo.
3  A.  Appreciate it.
4  Q.  If I find it, I'll send it to you so we can talk
5      about it just in the same way I sent the other
6      documents.
7        So the two disabilities we're talking about
8      are degenerative disc disease, your back
9      problems, and the adjustment disorder, correct?
10 A.  Yes.
11 Q.  And there are no other disabilities that you're
12     suing for?
13 A.  Not at this time, no.
14 Q.  Are you suing for any other type of
15     discrimination?
16 A.  I originally put in there to sue under the
17     reemployment act -- Veterans Reemployment Act,
18     but I really don't have any proof or anything so
19     I'm not going to continue with that.
20 Q.  That's one thing I want us to do. Do you have
21     that stack of documents that I sent you?
22 A.  Yes.
23 Q.  If you will turn to page 38, we might could go

Telephone Deposition of James F. Trombley, Jr.                    September 12, 2007

Page 13

1    through that statement of claim and talk about
2    what's still in the lawsuit and what's not in
3    the lawsuit.
4    A.  Okay.
5    Q.  And you're saying the claim under the Veterans
6        Employment Act is gone?
7    A.  Yeah.  I don't think I'm going to go forward
8        with that one.
9    Q.  Okay.  That will take off a lot of your
10       deposition because I have no idea what that is.
11       So we'll cut that out.
12   A.  Let me see.  The first part -- I'm still
13       definitely going for wrongful termination and
14       due process.
15   Q.  Let me write that down.  Wrongful termination
16       and --
17          Now, the due process, are you making a claim
18       under the United States Constitution or the
19       Constitution of Alabama?
20   A.  United States Constitution.
21   Q.  Is that procedural due process or substantive
22       due process under the federal constitution?
23   A.  I'm not exactly sure.

Page 14

1    Q.  Procedural is like they didn't follow the
2        correct procedures.  Substantive is you got your
3        rights violated by another provision in the
4        constitution.
5    A.  Oh, they didn't follow procedural due process of
6        the rules and regulations of the City of
7        Eufaula.
8    Q.  That's what I thought you were suing for.
9    A.  I'm also suing that the rules and regulations
10       are unconstitutional.
11   Q.  Let me flip pages here.
12          The rules and regulations of the City of
13       Eufaula are unconstitutional?
14   A.  Yes.
15   Q.  As written or as applied?  What I'm saying
16       there, just by reading them are they
17       unconstitutional or as they are written they are
18       okay, but they are applied in a discriminatory
19       manner?
20   A.  I'm going to say both, because as the way they
21       are written, they had made some changes to it a
22       year or so ago, and then they had pretty much
23       written it -- a couple of years before that,

Page 15

1    they made a bunch of changes.  And I've been
2    looking at some other personnel rules and
3    regulations, and I just don't see where theirs
4    are actually written where they are actually
5    constitutional.  So I have that question of law
6    on that one.
7    Q.  I'm going to come back and ask you very
8        specifically what words in that book are
9        unconstitutional, but let's move on to some
10       other claims that you're making now because I'd
11       like to get a whole list of the claims and then
12       come back and talk about them one at a time.
13   A.  Okay.
14   Q.  If you will turn to page 40, I believe there's
15       some causes of action listed on that page.  I
16       think you talk about your civil rights in
17       paragraph H.  Is that the due process rights?
18   A.  Yes.
19   Q.  And then you've got under paragraph H several
20       things that you claim are due process
21       violations; is that correct?
22   A.  Yes.
23   Q.  You've got -- In paragraph I you mention Alabama

Page 16

1    Code 1143160.  What is that?
2    A.  That is Code of Alabama that -- I've got a copy
3        of it here.
4    Q.  I just didn't bring a copy into the deposition.
5        I thought you might know.  I know that's in the
6        municipality section.
7    A.  Yeah.  It's in the -- I tried to get everything
8        organized for you, but --
9    Q.  Well, this case has got a lot of rabbit trails.
10   A.  It's called removal.  Any person appointed to
11       office in any city or town may for cause after a
12       hearing be removed by the officer making the
13       appointment.
14          And my argument with that point is they
15       didn't show cause or give cause or demonstrate
16       cause.
17   Q.  Are there any other things that you're suing
18       for?  And let those documents there kind of
19       refresh your memory because I'd like to go to
20       the very broad claims and then get very specific
21       with these claims.
22   A.  Okay.  Well, like you said, the subjective or
23       whatever about the rules and regulations, that

4 (Pages 13 to 16)

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

|  | Page 17 |
|---|---|
| 1 | they -- for that one employee, Rosie Jordan, |
| 2 | that worked for me and I had a hearing for her, |
| 3 | they -- the mayor ordered me to give her a |
| 4 | appeals hearing even though she wasn't allowed |
| 5 | one by the regulations. But I think because |
| 6 | they applied special rules to her that they |
| 7 | should have applied special rules to me. |
| 8 | Q. Would that be a procedural due process claim, |
| 9 | though? |
| 10 | A. Yes. |
| 11 | Q. Like they didn't apply to -- I've got that one |
| 12 | on the list, and we'll come back and talk about |
| 13 | that. |
| 14 | Are there any other things like -- We have |
| 15 | the disability claims, the wrongful termination |
| 16 | claim, the procedural due process claim, the |
| 17 | rules and regulations are unconstitutional, the |
| 18 | violation of 1143160. Are there any other big |
| 19 | areas that you're suing for? |
| 20 | A. The Alabama Open Meeting Law under the Alabama |
| 21 | Constitution, Code of Alabama. |
| 22 | Q. Any other big areas? |
| 23 | A. I'm trying to remember everything. I tried to |

|  | Page 19 |
|---|---|
| 1 | little bit because we're going to talk about the |
| 2 | things you're suing for so I'll know exactly |
| 3 | what I'm dealing with, and then we're going to |
| 4 | get into the facts of your employment and |
| 5 | Eufaula. Is that okay? |
| 6 | A. That's fine. |
| 7 | Q. Okay. If you'll look on page 38 that I sent |
| 8 | you, can you find any other things you're suing |
| 9 | us for on that page? You talk about due |
| 10 | process. You talk about the Open Meeting Act. |
| 11 | Are there any other things on that page that we |
| 12 | have missed? |
| 13 | A. Oh, yes. The release of my health information. |
| 14 | Q. What happened with that? |
| 15 | A. Well, what started at the very beginning was -- |
| 16 | of course, I went to that interview, and I |
| 17 | contend that interview was not appropriate or |
| 18 | legal. |
| 19 | Q. And that's what the City of Eufaula is calling |
| 20 | the determination hearing? |
| 21 | A. No. The police department interviewing me and |
| 22 | recording the conversation. |
| 23 | Q. Okay. The investigation. Okay. |

|  | Page 18 |
|---|---|
| 1 | come in more relaxed today. |
| 2 | Q. I understand. I appreciate that. |
| 3 | A. I want us to get this -- I apologize if I was a |
| 4 | little defensive last time. This has been a lot |
| 5 | on me. I'm just -- |
| 6 | Q. I understand. And I want this to be as easy -- |
| 7 | This is not a simple conversation, but I do want |
| 8 | it to flow easily for you. |
| 9 | A. I think that's most of the claim. I also claim |
| 10 | that -- or -- I don't know if it's actually -- |
| 11 | those dates aren't included -- but just the |
| 12 | political retaliation and the treatment by the |
| 13 | mayor and the city council because I made my |
| 14 | decisions by the code and treat everybody |
| 15 | fairly. But because of political opinion and |
| 16 | special political favors, I was mostly |
| 17 | criticized and punished for doing my job. And |
| 18 | it specifically says in my job description that |
| 19 | I am to set my own agenda, and I wasn't allowed |
| 20 | to set my own agenda and I wasn't allowed to do |
| 21 | my job the way I was supposed to have done my |
| 22 | job. |
| 23 | Q. We're going to get into all that in just a |

|  | Page 20 |
|---|---|
| 1 | A. The investigation, yeah. And I contend that |
| 2 | wasn't legal. He says that I was free to go. I |
| 3 | was never told I was free to go. I thought I |
| 4 | was there and I wasn't leaving. And I was very |
| 5 | upset. I had a real bad week, and I told him -- |
| 6 | he says, you know, I'm talking to you as a |
| 7 | friend. And he said -- And I think he told me, |
| 8 | or they said it later, that he was just |
| 9 | interviewing me on his own. He was not doing it |
| 10 | on behalf of the personnel manager or the City. |
| 11 | That was not part of their investigation. That |
| 12 | was his own private investigation. He wasn't |
| 13 | asked to do that. He did that on his own. |
| 14 | Q. Now, who told you that? |
| 15 | A. That was -- I think he told me that when we |
| 16 | started the interview or he was -- I think he |
| 17 | was asked why he did the interview in the |
| 18 | determination hearing, and he was asked that -- |
| 19 | if the City wanted him to interview me, and they |
| 20 | said no, that's not necessary. He says, well, |
| 21 | I'm going to go ahead and interview him myself. |
| 22 | So he made that decision to do it himself, not |
| 23 | at their request. |

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

Page 21

1    Q.  Will you look at page 68 in that packet that I
2        sent you?
3    A.  Okay.
4    Q.  Is that the transcript of that meeting that you
5        had with Tim Marsh?
6    A.  I believe it is.
7    Q.  We will go over that in just a little bit.
8        Okay?
9    A.  Okay.
10   Q.  Looking back to page 38, are there any more
11       things that you're suing the City for listed on
12       that page?
13   A.  Yeah.  The last paragraph.  I personally believe
14       that they disregarded intentionally the
15       personnel rules and regulations and interpreted
16       them to fit in this situation the way they
17       wanted them to fit and just wung it.  They
18       winged it.  They just said that's -- you know,
19       we couldn't find another paragraph that related
20       to your situation so we used this one.  Well,
21       they should have followed it by the letter if
22       they were going to use it.
23   Q.  I'm going to put that under procedural due

Page 22

1        process.  Okay?
2    A.  Okay.
3    Q.  If there's anything about following the rules or
4        making it up or a wrong interpretation, I'm
5        going to put that in the due process category.
6        Okay?
7    A.  Okay.  I think that's got it.
8    Q.  In that last paragraph, you mention negligence
9        and willful disregard of duty.
10   A.  Right.
11   Q.  Is that also caught up in that due process claim
12       or is that something --
13   A.  Yeah.  Their neglect contributed to the failure
14       of my right to receive due process.
15   Q.  There's not a separate negligence or
16       willfulness claim?
17   A.  Well, I didn't name them specifically in the
18       suit so ...
19   Q.  I'm just trying to -- The word "negligence" and
20       "willful" is in there.  It looks to me in that
21       paragraph it goes to the due process claim
22       because there was negligence and willful
23       disregard of the duty.  And I'm assuming your

Page 23

1        duty is talking about following the rules?
2    A.  Yes.
3    Q.  Let's turn over to page 39.  Are there any
4        claims on page 39 -- I'm going to put all these
5        pages with your deposition.  So if you order a
6        transcript of your deposition from the court
7        reporter, you'll have exactly what we're talking
8        about.  Okay?
9    A.  Okay.
10   Q.  Are there any other claims on page 39 that we
11       haven't discussed?
12   A.  Well, releasing -- Well, that's part of the Open
13       Meeting Law.
14   Q.  Right.  We've got Alabama Open Meeting Law and
15       release of health information.  Is that the same
16       thing?
17   A.  Well, they held the meeting open when it should
18       have been closed, when my attorney and I were
19       told by the city attorney that it was going to
20       be a closed meeting.
21   Q.  Do you know if they can even legally conduct a
22       closed meeting?
23   A.  They can have a closed meeting by Alabama state

Page 24

1        law to conduct the mental health and work
2        performance of an appointed official, and then
3        before they can take any action to vote on it,
4        they go back into open session.  And Jimmy
5        Calton spelled that out in the letter to my
6        attorney of exactly how the meeting would be
7        held and how they would go into closed session
8        and what article of the Alabama Code applied,
9        and then they would go back into open session to
10       conduct the business.
11   Q.  Right.  Are you talking about executive session?
12   A.  Yes.
13   Q.  Do you know if there's any mandatory requirement
14       that they go into executive session or is that
15       optional?
16   A.  I believe the first part of the code says that
17       it is not mandatory, but it says that, you know,
18       they can do it for these type of things.  So I
19       would think that -- by the way it's written, I
20       would think the intent of it is to try to
21       protect the rights of individuals.
22   Q.  Are there any other things you're suing for on
23       page 39?

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

Page 25

1    A.  I'm not a fast reader.
2    Q.  That's okay.  I just want to make sure -- Once
3        we get this ground covered up front, I think
4        things are going to go a lot faster.  I just
5        need to make sure we're on the same page when we
6        talk about the things you're suing the City for.
7    A.  I remember I listed those things when we had the
8        scheduling conference.  I had named all those
9        items, but I think we're getting a little bit
10       more thorough here.
11   Q.  Yeah.  I've just got to have a heads-up on
12       everything you're going to say at trial.
13   A.  I don't think -- I think this is all in support
14       of the above items that we've already discussed.
15   Q.  That's what I thought too.
16           What about page 40?
17   A.  Yeah.  All these are just in support of the
18       statement of claim.
19   Q.  I agree.  Because they all refer to the due
20       process, the Open Meeting Act, and things like
21       that.
22   A.  Yes.
23   Q.  If we are incorrect and we don't get finished up

Page 26

1        today and we come back next Wednesday, look over
2        it and we can always come back and ask you some
3        of these questions again if I make a mistake.
4        Okay?
5    A.  Okay.
6    Q.  What about page 41?
7    A.  Again, that's the same.  It's just expanding on
8        my statement of claim, giving specific sections
9        to the personnel rules and that kind of stuff.
10   Q.  Right.  And I don't see any new in this right
11       here.
12   A.  No.
13   Q.  What about page 42?
14   A.  No.  Nothing new there.
15   Q.  You talk about a city ordinance and the
16       international building code.  We haven't spoken
17       of that yet.  What is that?
18   A.  The City of Eufaula adopted the international
19       building codes along with some of the appendices
20       in, I believe, October or November of 2005.  I
21       did speak with April about that, I believe.
22   Q.  She's here today.
23   A.  Okay.  What it says here -- It's Appendix A of

Page 27

1        international building code 2003, Section A
2        101.4.
3    Q.  I just -- I wasn't aware that the City of
4        Eufaula adopted the international building code.
5    A.  Yes, they have.
6    Q.  And that's got -- do you know if they made it
7        into an ordinance or they just agreed to
8        recognize it?
9    A.  They adopted a specific ordinance.  I don't
10       remember the number.
11   Q.  That's okay.  We'll find it if it's there.
12   A.  It's like 54-2005, something like that.  I think
13       I told April what the ordinance number was.
14   Q.  Okay.
15   A.  And I wrote the ordinance, and then I gave them
16       all the information about the code and the
17       changes from the standard building code to this
18       one, and we had several meetings about it and
19       they adopted it.  But I drafted it and then gave
20       it to the secretary.
21   Q.  And it's your opinion that they adopted this
22       ordinance and incorporated all of these sections
23       like termination of employment into their local

Page 28

1        law?
2    A.  Yes.  In the local law, the local ordinance,
3        they specifically adopted the international
4        building code and Appendix A.
5    Q.  Is there anything else on page 42 that we
6        haven't discussed?  I don't see anything, but I
7        just want to make sure.
8    A.  I appreciate you bringing that building code up.
9    Q.  I just don't want any surprises, and I want us
10       to be on the same page.
11   A.  Uh-huh (positive response).  I don't see
12       anything else on that page.
13   Q.  What about page 43?  There you do talk about the
14       Department of Veterans Affairs.  Is that the one
15       that you said you're going to let go?
16   A.  Yes.  I believe I'm going to let that one go
17       because, you know, it's -- just because the City
18       doesn't have a Veterans Day parade doesn't give
19       me enough information to prove that they don't
20       like veterans.  So ...
21   Q.  You mentioned the Americans With Disabilities
22       Act.  Do you ever mention the Rehabilitation Act
23       anywhere?

Page 29

1   A.  I did when I sent the lawsuit in, and I
2       specified certain -- I did jurisdiction and --
3           What's that called?
4   Q.  That was the civil action cover sheet, I
5       suspect, where you just checked a box.
6   A.  Well, no.  I mean, in my typed complaint, I had
7       written in there sections when I filed my
8       complaint with the federal court.  Not the one
9       with the City of Eufaula but the one in federal
10      court.  I actually listed the ADA, the
11      Rehabilitation Act, the Veterans Reemployment
12      Act.  I had listed all those.
13  Q.  That's fine.
14  A.  But it is listed as one of them.
15  Q.  That's good.
16          That last page or paragraph W talks about a
17      certified building official and master code
18      professional through the International Code
19      Council.  Does that refer back to this
20      international building code?
21  A.  Yes.
22  Q.  That's not something separate, is it?
23  A.  No.  All that is is a paragraph to explain that

Page 30

1       I'm highly qualified for the job that I was in.
2   Q.  Okay.
3   A.  That's all I'm making a statement of is that I'm
4       qualified for the job.
5   Q.  I just want to make sure that -- We've covered
6       that on another page, and that's just like
7       further defining that international building
8       code section?
9   A.  Right.
10  Q.  Let's turn to page 44.  I don't see any
11      additional claims on that one.
12  A.  No.
13  Q.  That just kind of refers to your claim for
14      damages.
15  A.  Right.
16  Q.  I'm going to stick this section of documents
17      back in the stack.
18          Could you pull out pages 45 through 47?
19      Let's just make sure there's not anything new on
20      that.  That's the EEOC complaint?
21  A.  Right.
22  Q.  And I believe we've covered -- if you'll look at
23      page 45, I believe we've covered everything

Page 31

1       that's listed on that.  You talk about
2       termination of employment, release of mental
3       health, disability discrimination and failure to
4       give due process.  We've already spoken about
5       that.
6   A.  Yes, we have.
7   Q.  If you'll flip the page to page 46, do you see
8       anything new on that page?
9   A.  No.
10  Q.  You do talk about the Medical Leave Act.  Is
11      that something new or is that just put in as a
12      description?
13  A.  Oh, well, that was part of what we talked about
14      with what Bob Powers said.  The City of Eufaula
15      in the personnel manual says that if the City
16      deems a person to be of mental health or if
17      their health is where it would be dangerous to
18      be around others, they could be placed on forced
19      medical leave until they could be evaluate by a
20      doctor.  That is an option that Bob Powers would
21      have liked to have known about because he --
22  Q.  Now, who is Bob Powers?
23  A.  Councilman Bob Powers.

Page 32

1   Q.  Did he get a vote on all of this?
2   A.  Oh, yes.
3   Q.  He just got outvoted or did he vote with you or
4       against you?
5   A.  No.  He voted against me.  It was unanimous.
6   Q.  Okay.
7   A.  But I'm just saying that if he would have known
8       there were other options, he may have voted
9       differently.
10  Q.  If you look at paragraph 9 on page 46, you have
11      a 1, 2 and 3 circled.  Could you read number 1
12      for me?  I want to make sure I can read that.
13  A.  Okay.
14  Q.  Looks like plaintiff interviewed or something --
15      reviewed.  Just go a ahead and read number 1 so
16      I can understand it.
17  A.  Plaintiff interview with me.  Discussed my
18      mental health.  Released to the press and the
19      public.
20  Q.  What's number 2 right after that?
21  A.  Hearing held without due process.  There was no
22      complaint, no specific charges.
23  Q.  Then plaintiff did not follow personnel manual

Page 33

1      rules?
2    A.   Yes.  I think I meant to be writing defendant in
3      there, huh?
4    Q.   Yeah.  That's okay.  That's one of the reasons
5      we're talking about it.
6          What's the next line?  Just read that whole
7      paragraph, if you would.
8    A.   Okay.  Plaintiff discussed my mental health and
9      hearing and said degrading comments.
10    Q.   What degrading comments did they say?
11    A.   They said that -- They talked about my mental
12      loss -- memory loss and that I shouldn't be
13      around other people and stuff like that.
14    Q.   Was that true or untrue?
15    A.   That was untrue.  I mean, on --
16    Q.   What part was untrue, the mental loss or not
17      being around other people?
18    A.   Well, not being around other people.  I mean, my
19      doctor says I'm perfectly fine.  And the thing
20      is is when I get extremely upset because of all
21      the harassment, I might forget something, but
22      I'm not going to forget something that's
23      extremely bad or dangerous.  I mean ...

Page 34

1    Q.   If you could just read that -- go on to the next
2      sentence.
3    A.   Okay.  Plaintiff did not consider my ability to
4      do my job when discharging me.
5    Q.   What's next?
6    A.   No right to appeal per personnel manual.
7    Q.   Is that where you're saying that the personnel
8      manual is unconstitutional?
9    A.   Well, it's both things.  I think they
10      interpreted it to fit their needs and -- when
11      they told me that it just outright didn't give
12      me a right, which I disagree with, with the way
13      it's written.
14    Q.   What does the next sentence say?
15    A.   Did not give reason for discharge or show cause.
16    Q.   What's next?
17    A.   Plaintiff was aware of employee's disabilities
18      and disregarded by political retaliation.
19    Q.   What does that mean?  I know you meant defendant
20      there.  Defendant was aware of your disability.
21      Are you saying they disregarded your disability
22      because of political retaliation?
23    A.   Yeah.  They discriminated against me because of

Page 35

1      that.
2    Q.   What disability and what act of discrimination?
3    A.   The fact that I have adjustment disorder and
4      that my supervisor, the mayor, had been informed
5      about the adjustment disorder and that I had
6      asked him for support and that he wouldn't give
7      me support.  And he was constantly on me about
8      my demeanor and other things like that when --
9    Q.   Now, who was your supervisor, the mayor?
10    A.   The mayor.
11    Q.   But didn't you say that you never turned in any
12      type of doctor's letter or anything discussing
13      the adjustment disorder?  You just said that you
14      are depressed and feeling bad?
15    A.   No.  I told him I was on medication, and I
16      explained to him about what I was being treated
17      for.
18    Q.   Go ahead and read the next sentence.
19    A.   Plaintiff discriminated against me when I was
20      post surgery, spinal.
21    Q.   Is that they didn't give you a pretermination
22      hearing?
23    A.   Right.  I felt that when I had left -- when I

Page 36

1      had gone on leave for surgery and then I had all
2      these complications, the spinal injury and that
3      stuff, and I came back to work and I was limited
4      in what I could do that the other guys still had
5      to do the inspections.  But I felt when they
6      found out there was an opportunity, they didn't
7      research anything like to see if I was going
8      through post surgery stress and see what was
9      going on with me.  They didn't even want to
10      consider anything.
11    Q.   Now, is that their duty to check out your
12      mental -- your physical health?  Is that the
13      City's duty?
14    A.   I feel that -- Since the mayor had been informed
15      of how I was feeling and what was going on, that
16      since they were so nice to everybody else when
17      they had surgeries and they had stuff that they
18      were checking on them and seeing how they were
19      doing and making sure that it was no problem
20      coming back to work and helping them out, I felt
21      like here I am thrown back in the fire, you
22      know, and damn the workload; you're going to do
23      it, you know.  And I understand, you know,

Telephone Deposition of James F. Trombley, Jr.                    September 12, 2007

Page 37

1  you're paid to do a job.  But if they are doing
2  all this for everybody else, why won't they do
3  it for me?
4  Q.  Well, are you saying that they were pretty nice
5  to other people who had disabilities and
6  surgeries?
7  A.  Yes.
8  Q.  And they just didn't provide the same friendship
9  to you?
10  A.  Yeah.  I mean, in my opinion -- the mayor told
11  me one time that Joy White didn't have any
12  children and that she treated the family -- she
13  treated the work office, the people in the
14  office, like part of her family.  I never felt
15  like part of that family.
16  Q.  Go ahead and read the next sentence.
17  A.  Suffering from possible post operation stress.
18  Q.  Next?
19  A.  Plaintiff did not give opportunity for medical
20  leave and review by doctor.
21  Q.  What does that mean?
22  A.  Well, this goes back to Bob Powers asking a
23  question, can we do anything else, because --

Page 38

1  Q.  At that point was it just simply too late?  They
2  were taking a vote on your employment?
3  A.  No.  They were -- I think they were having
4  discussion.  I don't think there was a motion on
5  the floor yet.
6  Then the last just says, please see attached
7  chain of facts or claim of facts.
8  Q.  This is a pretty good list of what you're suing
9  for overall, is it not?
10  A.  Yes.
11  Q.  I'm going to put these documents back in the
12  file or the stack of papers, and we'll come back
13  to those in a minute.
14  Can you think of anything that you're suing
15  for that we haven't spoken about yet?
16  A.  I don't think so.
17  Q.  The wrongful termination claim -- I just want to
18  get a little more information about the big
19  topics, and then we'll go into your employment
20  at the City of Eufaula.
21  Why do you say that you were wrongfully
22  terminated?
23  A.  Well, because I wasn't given an opportunity, you

Page 39

1  know, for a medical review and that due process
2  wasn't given to me.
3  Q.  Is your wrongful termination and due process
4  claim related?
5  A.  Yes.
6  Q.  And I think -- from all of the facts you've put
7  forth, I think when you're claiming like they
8  violated this rule or that rule, I think you're
9  talking about a procedural due process claim
10  where they didn't follow the rules; is that
11  correct?
12  A.  Yes.
13  Q.  What rules or regulations are you claiming are
14  unconstitutional?
15  A.  The ones where it specifically -- I know you
16  want section by section.
17  Q.  Or just some kind of something I can find it in.
18  A.  Okay.
19  Q.  Now, you did provide a copy or I sent you a copy
20  of parts of that personnel manual.
21  A.  Yes.
22  Q.  We will go over those sections in detail, I
23  believe --

Page 40

1  A.  Okay.
2  Q.  -- when we go through that list of documents,
3  because we're going to talk about all 130
4  documents probably pretty quick.  We've already
5  talked about some of them.
6  A.  Okay.
7  Q.  Just what section are you talking about that's
8  unconstitutional?
9  A.  The section where it talks about -- I don't know
10  right now off the top of my head specifically
11  what the section is, but it says that these
12  rules shall apply to all employees.  And then
13  you had the part where it says that employees
14  are -- the appeals section and also the section
15  for determination hearings, because I believe it
16  says in there -- I don't have it with me unless
17  you tell me what page it's on.
18  Q.  Turn to page 55.
19  A.  55?
20  Q.  I think so.
21  A.  Yeah.  That says every employee shall be --
22  Yeah.
23  Q.  This is a lot easier with these pages don't you

Page 41

1    think?
2    A.  Yes, it is.  I'm trying to remember things, and
3        I just can't do it.  And then --
4    Q.  Looking at page 55, 56 --
5    A.  57 --
6    Q.  You've got a 57?  Oh, here it is.
7        -- 58 and 59, can you give me the section
8        number that you claim is unconstitutional?
9    A.  I would have to look over this stuff again to be
10       sure, but I think it's -- the part about
11       determination hearings, it could read as the way
12       the City read it where it says it applies to
13       classified employees, but I think it should
14       apply to all employees.  That's what I'm
15       declaring to be unconstitutional, that they
16       wrote it to single out unclassified employees
17       when that section should be written to cover
18       both classified and unclassified.
19   Q.  Let's talk about that because we need to figure
20       out what we're going to tell the jury.  You're
21       claiming that -- Are you saying it's
22       unconstitutional in that it does not cover
23       everybody or you just believe that it should

Page 42

1        cover everybody; is that correct?
2    A.  Yes.
3    Q.  The way it's written, will you agree with me
4        that it does not cover everyone?
5    A.  Well, there's one part that I disagree with on
6        the City where it says department head, mayor or
7        other designated --
8    Q.  What section are we looking at?
9    A.  Let me see.  That's -- I need the determination
10       hearing section.
11   Q.  That looks like it's on page 56 that you have
12       there right at the bottom on the left-hand
13       side.
14   A.  Yeah.  It says his or her designated
15       representative, but I sort of -- what I'm
16       getting at in this whole thing is they decide to
17       use this section --
18       We're still talking about what I'm saying is
19       unconstitutional?
20   Q.  Right.
21   A.  I'm saying that section is unconstitutional.
22   Q.  How is it unconstitutional?
23   A.  That it doesn't cover all employees of the City

Page 43

1    of Eufaula.  It just covers employees of the
2    mayor and department head and that the City of
3    Eufaula used this section in their hearing,
4    which if it didn't apply to me, they shouldn't
5    have used it.  But since they did use it, it
6    does apply to me.
7    Q.  Just give me a second.  I'm looking over it now.
8    A.  Okay.
9    Q.  I'm reading it.  Okay?
10   A.  Okay.
11   Q.  Is that the only part of that that you claim is
12       unconstitutional?
13   A.  I believe so.
14   Q.  Could you list for me all the rules that you
15       said the City of Eufaula violated?  This is, I
16       believe, what makes up your procedural due
17       process claim.  Which rules did they violate?
18   A.  That should be in my facts in support of claim.
19   Q.  Okay.
20   A.  The first thing was --
21   Q.  Now, I can get -- Whatever is in the facts
22       section is in there.  I mean, we can go over
23       that in a little bit when we go through all

Page 44

1    these pages.  We may just quickly highlight each
2    rule that you claim they violated.  My main
3    point was to find out what part did you think
4    was unconstitutional.
5    A.  Also, the appeals section too.  I have to look
6        at that appeals section.  Do you remember what
7        page that's on?
8    Q.  57.  It's part of -- The determination procedure
9        is Section A; appeal is Section B.
10       When you say they applied this section to
11       you, what parts did they apply?
12   A.  Well, they referred to that determination
13       hearing section in the determination hearing
14       letter to me.
15   Q.  Could they have just called it a determination
16       hearing?
17   A.  I don't know what page that letter is that they
18       sent me, but they specifically stated that
19       section of the personnel rules and regulations.
20   Q.  I'll try to find that, and you tell me what's
21       unconstitutional about the appeals section.
22       Okay?
23   A.  The appeals section is okay.  It doesn't refer

11 (Pages 41 to 44)

Page 45

1    to a specific mayor or department head. It
2    doesn't separate employees into categories. It
3    just says appeals stuff so I think it's okay.
4  Q.  So the appeals section is okay?
5  A.  Yes.
6  Q.  I'm trying to find the page that has that letter
7    on it. I think, if I can remember, it was
8    November 30, 2006.
9  A.  Yes.
10 Q.  And I'm pretty sure I sent you a copy of that
11   with a number on it. Let me just flip through
12   here and see if I can find it so we can talk
13   about that.
14 A.  Okay.
15 Q.  It seems like I had that before we got on the
16   phone. That's why I remember the date.
17 A.  Page 50.
18 Q.  I was looking in the wrong stack.
19     That's it right there, correct?
20 A.  Yes.
21 Q.  It says per Article 8. Article 8 is removal of
22   municipal officers and nonclassified employees.
23   That's on page 58.

Page 46

1  A.  Okay. What about Article 8, Section 8?
2  Q.  So we're looking for Section 5 and 8 of Article
3    5. We're looking for Section 5 and Section 8 of
4    Article 8.
5  A.  Right.
6  Q.  I'm not very good with my Roman Numerals.
7  A.  Page 58 has Section 8, but I don't have a copy
8    of Section 5.
9  Q.  I don't either. Let me see if I've got
10   something else. I probably can get this to you
11   if we need to talk about it. Let's see.
12 A.  Section 5 is procedure applicable to suspensions
13   of more than three days, to demotion and to
14   dismissals. That is a termination procedure
15   section. They referred to it, Section 5.
16 Q.  I just wanted -- earlier you indicated that they
17   used -- Hang on. Let me get my pages right.
18 A.  Section 5 they referred to, which is the one I
19   just said is unconstitutional, determination
20   procedure, which is page 32 of the employee
21   manual.
22 Q.  What article is that under? That's not Article
23   8, is it?

Page 47

1  A.  Yes, it is. It's the same article.
2  Q.  I've just got my pages out of order, then.
3  A.  If you look at the bottom of the pages, the one
4    that says termination procedure on page 65, the
5    left-hand side of the page is page 32, the
6    right-hand side is 33. Go to page 57 where it
7    says appeals, and there's page 34. And page 35
8    is the one to the right of it and then on page
9    58 where it says removal of municipal officers,
10   page 36. It's all in the same article.
11 Q.  We're talking about Article 8. Okay.
12 A.  So they did refer to that section of the
13   termination procedure, yes.
14 Q.  I guess Section 8 titled, removal of municipal
15   officers and nonclassified employees, is in
16   Article 8, correct?
17 A.  Yes, it is.
18 Q.  That's the one we're talking about?
19 A.  Yes.
20 Q.  Now, looking at page 50, that's the letter that
21   you received from --
22 A.  Council president Jim Martin.
23 Q.  You've got some notes on there, don't you? Is

Page 48

1    that your handwriting?
2  A.  Yes, it is.
3  Q.  Charges not specific, and you've got an
4    asterisk: No mention of accused threats. Is
5    that your handwriting?
6  A.  Yes.
7  Q.  That paragraph says the determination hearing is
8    being held to consider the following or the
9    follow charges: Conduct unbecoming and
10   insubordination.
11     What's not specific about that?
12 A.  It doesn't say the actual incident, the
13   witnesses, the time, the place, the location,
14   the date. Because when I did the Rosie Jordan
15   thing, I was told by the personnel officer and
16   the mayor to make sure I listed everything
17   specific.
18 Q.  Did you ever consult the rule to make sure or --
19 A.  Yes, I did. The rules say that the termination
20   letter has to contain specific charges.
21 Q.  Do you still have pages 56, 57, and 58 out?
22 A.  Yes, I do.
23 Q.  Do you know where that says that in that rule?

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

Page 49

1　　A.　Yes. Section 5 A-1: Written notice setting out
2　　　　specific charges.
3　　Q.　Would that not be conduct unbecoming and
4　　　　insubordination?
5　　A.　No, that's not specific. I mean, I think it's
6　　　　the intent of the section to have the charges
7　　　　specific so that when I come to a meeting -- a
8　　　　hearing with counsel that we're prepared for
9　　　　what is in the charges if there are any charges.
10　　Q.　Was your attorney given a memorandum discussing
11　　　　the very, very specifics of these charges?
12　　A.　Yes, he was.
13　　Q.　So you're claiming even though they gave your
14　　　　attorney the very specifics of these charges, it
15　　　　should have been in this letter and therefore
16　　　　it's wrong?
17　　A.　Well, I didn't know about that until the
18　　　　morning.
19　　Q.　Would you agree with me that your attorney was
20　　　　there to represent you and your agent?
21　　A.　Yes.
22　　Q.　Do you have a copy of that memo that was given
23　　　　to your lawyer?

Page 50

1　　A.　Somewhere. I sent you a copy of it today. I
2　　　　don't know if it's in your stuff.
3　　Q.　Look through there because I would like to
4　　　　identify it if we could.
5　　A.　I looked through this yesterday, and I didn't
6　　　　see it in there.
7　　Q.　I don't see it in here either. I'll put that on
8　　　　my things to do: Get memo to lawyer.
9　　A.　It's on the way, certified, and it's the one
10　　　　that says that the hearing would be held
11　　　　closed. They would be in executive session to
12　　　　discuss that stuff.
13　　Q.　In that memo do they also enclose an audio CD of
14　　　　your interview with Tim Marsh or --
15　　A.　No. No. I remember being in my attorney's
16　　　　office, and he called the attorney and said he
17　　　　sent him a disc with some other stuff on it. I
18　　　　think I do recall that. He was supposed to send
19　　　　the correct disc over, but I got everything from
20　　　　the attorney yesterday and that disc was never
21　　　　received. It's not in the stuff he sent me. He
22　　　　sent me everything, and there's no disc in there
23　　　　other than the one I sent him of the hearing.

Page 51

1　　　　But, you know, I didn't know about the disc.
2　　Q.　Okay.
3　　A.　At the time it was played, I didn't know.
4　　Q.　Removal of -- I'm getting back to the list.
5　　　　Removal of an appointed employee, we've talked
6　　　　about that already, haven't we? That's more or
7　　　　less dealing with the rules violation and the
8　　　　procedure of due process?
9　　A.　Yes.
10　　Q.　The Open Meeting Law, you said that was violated
11　　　　because they released your health information?
12　　A.　Yes.
13　　Q.　Let's talk about the retaliation claim. How
14　　　　were you retaliated against and for what?
15　　A.　I believe that what had happened the week before
16　　　　was something to do with Wal-Mart.
17　　Q.　The week before you were terminated had to deal
18　　　　with --
19　　A.　Yes.
20　　Q.　You think you were terminated because of
21　　　　something that dealt with Wal-Mart?
22　　A.　I think part of the reason, yes.
23　　Q.　Okay. And you're saying they retaliated against

Page 52

1　　　　you. What happened about Wal-Mart?
2　　A.　I was the bearer of bad news for the mayor.
3　　　　That's the way he saw it. And what happened was
4　　　　Wal-Mart had come to town, and Tim Milner, the
5　　　　city planner, had known about it. And I was
6　　　　told about it that day and was asked if I wanted
7　　　　to join the meeting. So I met with them, and
8　　　　then we had a meeting for several hours. And
9　　　　the mayor was -- First of all, later on he was
10　　　　pretty upset because he didn't even know they
11　　　　were there having a meeting with us. Later on
12　　　　in the day, we went to planning commission
13　　　　meeting, and it had to do with the facade of the
14　　　　proposed Wal-Mart store. And Wal-Mart had told
15　　　　me with all the hoops that the mayor was making
16　　　　them go through and changing this and changing
17　　　　that that they got the impression from him that
18　　　　he doesn't want the Wal-Mart.
19　　Q.　Do you know whether he wanted the Wal-Mart or
20　　　　not?
21　　A.　I'm not sure. I really had noticed when he
22　　　　talked about it, I think he was pretty much in
23　　　　the middle. I think he would support it if it

13 (Pages 49 to 52)

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

| Page 53 |
|---|

1   came in, and I don't think he would have been
2   too upset if it didn't.
3   Q.  So what kind of bad news did you have to give
4       the mayor?
5   A.  That Wal-Mart felt he was against the project.
6       So --
7   Q.  Did Wal-Mart ever go to Eufaula?
8   A.  They bought that property, but they haven't
9       started construction and I don't think they are
10      going to.  I think they bought the property
11      because they had such a substantial earnest
12      payment on it that I think they bought it and
13      they'll just move it later.
14  Q.  Tell you what.  Let's talk about that whole
15      Wal-Mart process, because you think that's --
16      that's important to your claim, and I want to
17      talk about it.
18  A.  Okay.
19  Q.  When did you first -- I guess you had been
20      working at the City of Eufaula for a couple of
21      years?
22  A.  I had been there about three-and-a-half years.
23  Q.  And then how did you first hear about Wal-Mart?

| Page 54 |
|---|

1   A.  I don't really recall.  I mean, I was the
2       building official and zoning official so -- They
3       had come to town and were looking at property,
4       and somebody come in and talked to me.  A real
5       estate agent, I believe, said that somebody from
6       Wal-Mart might be coming in to get some
7       information about zoning and lot setbacks and
8       that kind of stuff to see if their, as they
9       called it, battleships would fit on the lot.
10  Q.  To see if what --
11  A.  Their big stores.  They call their stores, as a
12      joke, battleships.
13  Q.  Would you flip through the first few pages of
14      those documents that I sent you to see if any of
15      those notes deal with Wal-Mart?
16  A.  Did I send you these pages or --
17  Q.  I don't think so.
18  A.  These look like they were taken out of my
19      inspector's logbooks for different projects.
20  Q.  I think they were.
21  A.  I left them there so they would have them.
22  Q.  Well, I just want to go over these pages to see
23      if they kind of jog your memory about any of

| Page 55 |
|---|

1   this stuff.  I think you had a notebook related
2   specifically to Wal-Mart.
3   A.  Exactly.  I did.  One for Wal-Mart and one for
4       some of the other projects.
5   Q.  Check page 31 to see if that deals with
6       Wal-Mart.
7   A.  Let me see.
8   Q.  Page 37 --
9   A.  I'm sorry.  Go ahead.
10  Q.  Go ahead.  I'm just trying to identify the pages
11      that deal with Wal-Mart.
12  A.  Okay.  I don't think this -- This has got to do
13      with the planning commission, but -- Let me
14      see.  On page 32, 9/20/06, spoke with I guess
15      it's Jimmy O'Brien.  He's a real estate agent
16      for Wal-Mart.
17  Q.  So page 32 deals with Wal-Mart?
18  A.  Yes, I think so.
19  Q.  I don't really want to do this, but I think
20      we're going to have to.  Can you read page 32
21      for me?  And I'll put a check mark at the top to
22      make sure we don't do it again.
23  A.  The whole page?

| Page 56 |
|---|

1   Q.  Yeah, just the whole page.  I can't read your
2       writing.  I'm sorry.
3   A.  Okay.  9/18/06, faxed my sick leave notice to
4       Sharon, which I don't know what that phone
5       number is.  9/19, sent memo to Jay on Wal-Mart
6       update.
7   Q.  Jay is the mayor?
8   A.  Yes.  9/19/06, worked on PC crop -- let me
9       see -- property owner letter, rezoning,
10      transmittal, and agenda.  Oh, I worked on
11      property owner letters for the upcoming --
12      letters I sent to adjacent property owners when
13      someone had a planning commission action on the
14      agenda.
15  Q.  Okay.  Go ahead to the next one.
16  A.  Spoke with Jimmy O'Brien.  He's a real estate
17      agent for Wal-Mart.  He said he was having
18      applications sent to rep in Eufaula for owner
19      signature, and we should have application
20      hand-delivered today.  He also said he would get
21      a preliminary site plan delivered at least one
22      week before the meeting.  Sent memo to mayor on
23      this.

14 (Pages 53 to 56)

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

Page 57

1    Q.  Will you turn to page 31 --
2    A.  Okay.
3    Q.  -- because it looks like those dates go with
4         page 32.
5    A.  Okay.
6    Q.  And I'm going to put a check mark at the top of
7         31 because we're going to read it too.  Okay?
8    A.  Okay.
9    Q.  Read that one, if you could.
10   A.  E-mail zoning -- I think that's map photo.  I
11        don't remember what that is.  Project engineer.
12        9/18/06, four or five p.m.  Spoke with Susan
13        about October meeting of the planning
14        commission.  Told her to get the application and
15        plans to me by Wednesday or Thursday, prefer
16        Wednesday.  I told her I would be having surgery
17        at end of the month and need the replats before
18        then, if possible.  If not possible, there still
19        should not be a delay but better to be safe just
20        in case.  She said she would let survey replat
21        team know.
22   Q.  Does this deal with Wal-Mart too?
23   A.  I believe I gave her the heads-up because there

Page 58

1         was a possibility a plan for Wal-Mart might be
2         coming in.
3    Q.  If you'll turn to page 30 --
4    A.  Okay.
5    Q.  -- and 29, do you know what those deal with
6         or -- Let me ask you this.  Do they deal with
7         Wal-Mart?
8    A.  No.  These are -- Let me tell you what these
9         are.
10   Q.  Okay.
11   A.  I took a class in 2001 when I worked for Forsyth
12        County, Georgia.  In my office I left behind,
13        which was my personal property, a University of
14        Georgia personnel skills or management --
15        interpersonal skills of management in the
16        office.  I was a work unit leader in the
17        training class, and this is training notes from
18        2001 that were taken out of my book.  As you
19        note on the left side, it says, self, and on the
20        right side it says, work unit.
21   Q.  We'll come back to this.  Okay?  Let's skip over
22        to page 33.  Could you read that for me and tell
23        me if it's about Wal-Mart?

Page 59

1    A.  Yes.
2    Q.  Is it about Wal-Mart?
3    A.  Yes.
4    Q.  Could you read it for me, please?
5    A.  Received Wal-Mart zoning application.  Did not
6         have property owners list.  Called Jeanie
7         Taylor.  She will get it to me this week.
8    Q.  What's the next paragraph?
9    A.  9/21/06, Mr. Kealy, I believe that's what that
10        is, with Sain and Associates called and left a
11        message that plat and application were missing
12        and lost.  I left him a message to get the
13        revised appeal plat to me by Monday, and I will
14        resend to all department heads for review.
15   Q.  What about 34?  Is that dealing with Wal-Mart?
16   A.  Yes.
17   Q.  Could you read that for me, please?
18   A.  9/25/06, 11:15 a.m.  Les Kealy called.  Asked
19        for -- I'm not sure of -- pc and -- oh -- dates
20        of planning commission and city council
21        meetings.  Told him planning commission October
22        17, planning commission November 21, city
23        council December 4 and 18th, and then city

Page 60

1         council 18th or January 2nd.
2    Q.  Go ahead.
3    A.  He said we should receive revised application
4         and rezoning plat today.  9/29/06, gave Bill
5         list of project requirements for Wal-Mart.  Told
6         Terry that everything is ready for planning
7         commission and rezoning except for comments.
8    Q.  What about page 35?
9    A.  Discussed variances for Wal-Mart with Tim
10        Milner.  Returned sent (sic) needed.
11   Q.  What about 36?  Could you read that for me?
12   A.  11/21/06, met with Les and Sunday at 2 p.m.
13        That's a woman.  Her name is actually Sunday.
14        At 2 p.m. we met in the small conference room.
15        Talked about site plans and building plans.
16        Everything seems to be okay except for Tim being
17        a pain about landscaping and building facade.
18   Q.  Who is Tim?
19   A.  Tim Milner, the city planner.
20   Q.  Go ahead.
21   A.  He's wrong about making me look bad.  I'm
22        enforcement and decision-maker.  He is not.  Why
23        does he go straight to mayor over my head.

15 (Pages 57 to 60)

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

| Page 61 | Page 63 |
|---|---|

**Page 61**

1  Q.  Are you asking why -- You put in your notes why
2      did Tim go to the mayor about something you had
3      done?
4  A.  Right.  In the planning commission meeting or in
5      the meetings with Wal-Mart and stuff, I would
6      make the decisions, you know -- final decision
7      with everybody's comments on the way something
8      should be based on the codes and enforcement
9      around the town.  And Tim was -- I was told by
10     the mayor to work with Wal-Mart.  And Tim
11     Milner, city planner, is being totally black and
12     white, literally interpreting the code for
13     everything.
14 Q.  Is that how you would want him to do that or
15     not?
16 A.  Not in front of the client.  Not in front of the
17     customer.
18 Q.  Read the last paragraph.
19 A.  Planning commission meeting.  Had meeting
20     between Mayor and Sunday.  She was upset
21     about -- I guess that's -- discussing of facade
22     and feels Mayor would not pick a side and this
23     may kill project.

**Page 63**

1  A.  I think he has some training and college for
2      planning, but he doesn't have a degree.
3  Q.  Go ahead with the last part of that paragraph.
4  A.  Does not give my decisions and interpretations
5      the respect they deserve.  He has done this
6      since Creek Ridge, and I will not tolerate
7      again.
8  Q.  Okay.  Do you want to take a short break and try
9      to go for about another hour maybe?  We're
10     getting a lot of ground covered today.
11 A.  That's good.  If you want to take a little break
12     and call me back --
13 Q.  I'll call you back about four o'clock.  What
14     time is it now?
15 A.  About ten minutes till four.
16 Q.  Do you think we can go to five today?
17 A.  We can try.  I'd like to get it done, yeah.  I'm
18     doing better today.  I think so.
19 Q.  I'll call you back in about ten minutes.
20 A.  Okay.
21        (Brief recess.)
22 Q.  (Continuing by Mr. Howard)  There's a couple of
23     areas that we need to talk about before we get

| Page 62 | Page 64 |
|---|---|

**Page 62**

1  Q.  Page 37?
2  A.  Spoke with Jay about what happened between
3      Sunday and the Mayor and how she felt confused
4      that he asked -- did not -- well, she was
5      confused that he was not -- could not be read.
6      There you go.  That he could not be read as for
7      or against the Wal-Mart.  Also told -- That
8      might be Joy.  Also told Joy that Tim was out of
9      line with the facade and wanting more brick and
10     that I told him not to push it.  I also told Joy
11     what Tim had said and interfered with me doing
12     my job about interpreting the code for
13     landscaping.
14 Q.  Go ahead.
15 A.  I told Joy that Tim was unsupervised and worked
16     directly with the mayor against my instructions.
17 Q.  Let me stop you there.  Were you over Tim or
18     under Tim?
19 A.  We were -- Tim worked for the city clerk.  I was
20     senior to him, but I wasn't his supervisor.  I
21     was a department head when he was an hourly
22     employee.
23 Q.  What is Tim's credentials?

**Page 64**

1      finished up.  One is to go through this list of
2      documents that I sent you.  The other is to talk
3      about your job.  Because we're in the last hour,
4      would it be easier just to go over documents and
5      not really have to think and just kind of read
6      to me or do you want to go into your employment,
7      or what do you want to do?
8  A.  Let's do what we're doing.  I can just read some
9      of these documents to you.
10 Q.  That might be a little easier.  I'll stop you
11     occasionally and have some questions for you.
12 A.  Okay.
13 Q.  What is number 1?  Do you have that list of
14     documents?
15 A.  Yes.
16 Q.  What is number 1?
17 A.  It looks like notes about North Star
18     Engineering.  I think that has to do with
19     Reflections.
20 Q.  What is Reflections?
21 A.  Oh, no, this ain't -- This is Dr. Haggerty's
22     office.
23 Q.  Is that just another project you were working

16 (Pages 61 to 64)

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

1      on?
2   A.  Yes.
3   Q.  Doctor's office.  Let's just go on to page 2.
4        I'm going to write on some of these things
5       just to --
6   A.  Paul Dunseth, he was the general contractor for
7       the doctor's building.
8   Q.  We're still talking about the doctor, right?
9   A.  Right.
10  Q.  What about page 3?
11  A.  More notes about the doctor's building.
12  Q.  And this is still probably, what, 10 or 11
13      months before all this termination went
14      through?  This is before your surgery too, isn't
15      it?
16  A.  Yes.  This is -- Yeah, December '05, January
17      '06.
18  Q.  What about page 4?
19  A.  Page 4 is the same project, Paul Dunseth.  That
20      was in March.  And then in August I met with Kit
21      who was a superintendent for the doctor's
22      project.
23  Q.  Did you have any problems with this doctor's

1       project?
2   A.  No, not that I know of.
3   Q.  What's on page 5?
4   A.  Let me see.  Meeting with Janet Hurst, Steve
5       Loden.  That's about the Governor's Trace
6       project.  That's a big multi-lot commercial
7       project.
8   Q.  Go ahead and go to page 6.
9   A.  That's more of that project.
10  Q.  What about page 7?
11  A.  I'm looking at it.  I think this talks about
12      master plan, and these guys are from Atlanta.
13      This is more about the Janet Hurst Governor's
14      Trace project.
15  Q.  Does the Governor's Trace project have anything
16      to do with this lawsuit?
17  A.  No.
18  Q.  What about page 8?  Is that still the Governor's
19      Trace project?
20  A.  Yes.
21  Q.  What is Governor's Trace?  Is that a subdivision
22      or something?
23  A.  That's a commercial development that's mixed

1       use.  It's going to have retail, commercial,
2       residential, a bunch of water frontage on the
3       creek.
4   Q.  What about page 9?
5   A.  Let's see.  Master plan.  That's time frame, I
6       believe.  Yeah.  R-4, that's Governor's Trace.
7   Q.  What about page 10?
8   A.  Governor's Trace.
9   Q.  What about 11?
10  A.  Same thing, Governor's Trace.
11  Q.  What about 12?
12  A.  Yes.  It mentions Savannah Ridge.  That's the
13      residential subdivision in Governor's Trace.  So
14      that's the same thing.
15  Q.  What about 13?
16  A.  Yeah.  That's Jeff Little.  That's Governor's
17      Trace.
18  Q.  What about 14?
19  A.  This is notes on the Mark Saliba project.  That
20      would be Reflections on the Water.  That's
21      across the intersection from Governor's Trace.
22      It's a residential subdivision about 40 homes.
23  Q.  It's called Reflections?

1   A.  Yeah.  Reflections on the Water.
2   Q.  What about page 15?
3   A.  Same thing.
4   Q.  What about 16?
5   A.  Same thing.
6   Q.  What about 17?
7   A.  Let's see.  Yeah.  Saliba, that's the project --
8       the same.
9   Q.  What about 18?
10  A.  Same thing, Saliba project.
11  Q.  What about 19?
12  A.  Saliba project.
13  Q.  What about 20?
14  A.  ADEM permit.  Yes, that is the same thing.
15  Q.  What about 21?
16  A.  I remember this.  This is Reflections.
17  Q.  What about 22?
18  A.  This is about the Saliba project again.
19  Q.  What about 23?
20  A.  Yeah, same thing.
21  Q.  About what 24?
22  A.  I think this is going back into the regular
23      journal notes now.  I think starting with

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

|  | Page 69 |
|--|---------|
| 1 | page -- Let me see. It might be part of the |
| 2 | Saliba notes. Let me double-check. |
| 3 | Q.  It looks like it's still in that date range. |
| 4 | A.  Okay. |
| 5 | Q.  It looks like the next three pages are those |
| 6 | same notes. |
| 7 | A.  Sure is.  I see another Mark Saliba.  Page 25, |
| 8 | 26 has to do with the same project. |
| 9 | Q.  Earlier you admitted to having an affair.  What |
| 10 | were the dates of that affair?  Do you remember |
| 11 | the months or the time period? |
| 12 | A.  The time period of that was probably maybe |
| 13 | October, November '04 to probably September '05. |
| 14 | Q.  Did that have anything to do with the separation |
| 15 | that you and -- the temporary separation that |
| 16 | you and your wife went through? |
| 17 | A.  Yeah.  That may have had -- Yeah, that had |
| 18 | something to do with it. |
| 19 | Q.  It makes sense that it did. |
| 20 | What is page 27? |
| 21 | A.  Page 27, what this is is the county had asked |
| 22 | for the City to do handicapped ADA inspections |
| 23 | of their voting places.  And the mayor agreed |

|  | Page 70 |
|--|---------|
| 1 | that I would go ahead and do the buildings that |
| 2 | belonged to the county.  But the buildings that |
| 3 | they were leasing just for voting, like grocery |
| 4 | stores and stuff like that, the mayor says that |
| 5 | we can't justify us spending my time doing that |
| 6 | for the county when it doesn't own the buildings |
| 7 | as a favor. |
| 8 | So I spoke with Jimmy Calton, and Jimmy |
| 9 | Calton recommended that if I wanted to do it on |
| 10 | the side that I write up a contract that I can |
| 11 | use with the county to protect me without me |
| 12 | having to buy insurance and all that stuff.  So |
| 13 | I found this online and I worked it up, and I |
| 14 | was going to use it with Barbour County to do |
| 15 | those inspections for them. |
| 16 | Q.  And that's 27 and 28? |
| 17 | A.  Yes. |
| 18 | Q.  And you said 29 was some notes you took from a |
| 19 | class? |
| 20 | A.  Yes. |
| 21 | Q.  30 is the same thing? |
| 22 | A.  Yes. |
| 23 | Q.  We've been through 31 through 37. |

|  | Page 71 |
|--|---------|
| 1 | A.  Yes, I believe so. |
| 2 | Q.  We've also been 38 through 44. |
| 3 | A.  Yes. |
| 4 | Q.  We've also been through 45 through 47, correct? |
| 5 | A.  Yes. |
| 6 | Q.  What is page 48? |
| 7 | A.  I believe that's a memo from Bill Klein to the |
| 8 | file. |
| 9 | Q.  It's dated November 29, 2006.  Are those your |
| 10 | handwritten notes on that? |
| 11 | A.  Yes. |
| 12 | Q.  I'm going to read the paragraph into the record |
| 13 | just so we'll know what we're talking about when |
| 14 | we get ready to read it back. |
| 15 | On Tuesday, November 28, 2006, I met with |
| 16 | Jim Trombley in the parking lot of Alabama |
| 17 | Power.  Jim was extremely upset about something |
| 18 | that happened with the office concerning zoning |
| 19 | issues.  We talked about the issues and he -- |
| 20 | and who he thought was responsible for him being |
| 21 | upset.  He stated that Jay Jaxon has taken away |
| 22 | his responsibility for zoning and wanted Tim |
| 23 | Milner to do it.  Jim told me that I was not to |

|  | Page 72 |
|--|---------|
| 1 | do anything regarding zoning issues and turned |
| 2 | over all the work to Tim Milner. |
| 3 | During the conversation, Jim made a |
| 4 | statement that he would, quote, cap, end quote |
| 5 | Jay and his wife, and he would do it at 10 p.m. |
| 6 | during a shift change and no one would know who |
| 7 | did it.  The conversation then was very |
| 8 | uncomfortable for me, and I told him I had to go |
| 9 | on an inspection.  I left for the inspection, |
| 10 | and he went into the office. |
| 11 | Could you give me a little -- Jim, we're |
| 12 | talking about the letter now.  Could you give me |
| 13 | your version of the conversation that you had |
| 14 | with Bill Klein? |
| 15 | A.  I don't remember that.  That was that whole |
| 16 | first part of that week that I just -- I was so |
| 17 | upset.  I just don't remember anything about |
| 18 | that first part of that week. |
| 19 | Q.  So the week starting on Monday was November |
| 20 | 27th.  You're saying -- It's your testimony that |
| 21 | you don't remember that entire week? |
| 22 | A.  Not the entire week.  I mean, most of the first |
| 23 | part of that week.  I mean, I was still dealing |

Telephone Deposition of James F. Trombley, Jr.                    September 12, 2007

Page 73

1    with a lot of pain from surgery and the
2    depression. And when I -- I remember I called
3    my counselor at the last part of the week
4    before, and I wanted to go see him. I had an
5    appointment to see him Wednesday. But I don't
6    really remember any of the events from Monday or
7    Tuesday.
8  Q.  So your testimony is that you do not remember
9       November 27th, 2006 or November 28th, 2006; is
10      that correct?
11 A.  Correct.
12 Q.  Tell me why you don't remember those dates or
13      the events that happened on those dates.
14 A.  I just was so upset. I just --
15 Q.  Upset about what?
16 A.  Stressed out. I mean, I don't remember those
17      days. All I know is I remember I had to go talk
18      to my counselor because I was upset about work.
19 Q.  How often did you go talk to your counselor?
20 A.  Well, that was the whole problem. I hadn't seen
21      him in a while because of the surgery.
22 Q.  Now, be careful. I don't want to know anything
23      your counselor told you or you told your

Page 74

1    counselor. Okay?
2  A.  Okay.
3  Q.  But I do think I'm entitled to know that you are
4       seeing a counselor and what dates you saw a
5       counselor.
6  A.  Yeah. I was seeing him typically on Wednesdays,
7       and I think --
8  Q.  Every Wednesday?
9  A.  At first we were.
10 Q.  When did that start?
11 A.  It started in December of '04.
12 Q.  And you started out seeing him, what, four times
13      a month probably?
14 A.  I started out -- For a couple of months it was
15      every week. And then after that it went to two
16      weeks, and then we went once a month.
17 Q.  Is that the counselor at the VA Hospital?
18 A.  No. That's a private counselor in Dothan.
19 Q.  What's his name or her name?
20 A.  Brad Bullard.
21 Q.  Did that have anything to do with the military?
22 A.  I went when I was having marital problems, and I
23      was telling you about my adjustment disorder and

Page 75

1    being in one place and not wanting to be there
2    and going someplace else and not wanting -- When
3    I had left my wife, I had realized there's
4    something wrong, and I went and saw the doctor.
5  Q.  Do you remember what date or month you left your
6       wife and what year?
7  A.  I remember the time that I went to get help was
8       the day when I left her, like on the day after
9       Christmas.
10 Q.  What year?
11 A.  I'm trying to remember. I think that was 2005.
12 Q.  How long were you separated from your wife?
13 A.  Oh, I came back. I came back the next day, or
14      that night I came back.
15 Q.  At this time -- Let me ask you this. Does she
16      know about your affair?
17 A.  I don't think so.
18 Q.  Not now she does not?
19 A.  No.
20 Q.  Did she kick you out or did you leave?
21 A.  I left.
22 Q.  During the time that -- You said that you don't
23      remember November 27th or 28, 2006. Did that

Page 76

1    have anything to do with your marriage and
2    stress in your marriage?
3  A.  No. Our marriage was fine. I had been -- She
4       was so great taking care of me and everything
5       after surgery. Our marriage was fine.
6  Q.  And I'm not going to tell her -- I'm not going
7       to give her a copy of this deposition. I don't
8       want you to worry about that.
9         If Bill Klein says that you did make this
10        statement, isn't it true that you can't dispute
11        that if you don't remember it?
12 A.  Well, in the hearing I said I don't remember. I
13      didn't deny it.
14 Q.  Well, I don't know what went on at the hearing.
15 A.  Okay.
16 Q.  So I'm probably going to ask you questions that
17      you may think I know the answer to, but I really
18      don't.
19 A.  I don't recall the day.
20 Q.  Do you remember talking to Bill Klein at all
21      that day?
22 A.  No.
23 Q.  Do you keep a personal journal or diary?

19 (Pages 73 to 76)

Telephone Deposition of James F. Trombley, Jr.                                        September 12, 2007

| | Page 77 | | | Page 79 |
|---|---|---|---|---|
| 1 | A. Yes. | | 1 | Q. What medication were you on? |
| 2 | Q. Do you -- | | 2 | A. I was on Lexapro. |
| 3 | A. I mean, other than what you already have -- I | | 3 | Q. Anything else? |
| 4 | mean, I have notes, but I haven't seen any notes | | 4 | A. Seroquel. |
| 5 | about that day or those days. Maybe some notes | | 5 | Q. Anything else? |
| 6 | from a meeting with the mayor maybe, but I don't | | 6 | A. For anything? |
| 7 | know. | | 7 | Q. Yes, sir. |
| 8 | Q. Do you keep like a personal journal? | | 8 | A. I was on Lipitor. |
| 9 | A. Uh-huh (positive response). Yes. | | 9 | Q. Okay. |
| 10 | Q. I don't have a copy of that, do I? | | 10 | A. Travatan. |
| 11 | A. I'm not sure if you have a copy of those dates. | | 11 | Q. Okay. |
| 12 | I can look and see if I made notes those dates. | | 12 | A. Miralax. |
| 13 | Q. I'm going to send you a request for you to make | | 13 | Q. Okay. What's all that stuff for? |
| 14 | a copy of the entire journal. How far does it | | 14 | A. The Lexapro is the antidepressant and |
| 15 | go back? | | 15 | anti-anxiety. It's for anxiety disorder. And |
| 16 | A. I've got probably a dozen journals, lots and | | 16 | the Seroquel is -- |
| 17 | lots of pages. | | 17 | Q. Do you know your dosage of these medications? |
| 18 | Q. I bet they are all handwritten pages too, aren't | | 18 | A. Yes. |
| 19 | they? | | 19 | Q. What is your dosage of Lipitor? |
| 20 | A. Yes, they are. Most of them are. | | 20 | A. Lipitor was 20. |
| 21 | Q. I'll tell you what. I'm going to send you a | | 21 | Q. What's your next medication? |
| 22 | request for a copy of those. But I -- if you | | 22 | A. The Lexapro I told you, it was 20. |
| 23 | will go to Kinko's or somewhere like that and | | 23 | Q. Okay. What's next? |

| | Page 78 | | | Page 80 |
|---|---|---|---|---|
| 1 | get them copied, I will, of course, reimburse | | 1 | A. The Seroquel was 150. |
| 2 | you your copying charges. Okay? Send me a bill | | 2 | Q. A day? |
| 3 | with that, and I will promptly get a check back | | 3 | A. A day. |
| 4 | to you. Okay? | | 4 | Q. What's next? |
| 5 | A. Okay. | | 5 | A. Seroquel was at night. |
| 6 | Q. I will send you a request for that. | | 6 | Q. Okay. |
| 7 | A. How far back, all the way back to when I | | 7 | A. I said the Travatan. That's glaucoma eye drops. |
| 8 | started? | | 8 | Q. I'm not worried about that. |
| 9 | Q. Yeah, I would like to get that when you first | | 9 | What's next? |
| 10 | started with Eufaula, if you could. | | 10 | A. Let me see. Of course, nose spray for allergies |
| 11 | A. Okay. I will get that together for you. No | | 11 | and Sudafed and that kind of stuff. |
| 12 | problem. | | 12 | Q. I'm not worried about all that. |
| 13 | Q. Send me a bill. Just send me your copying | | 13 | A. Okay. |
| 14 | bill. Just put it on your credit card or | | 14 | Q. Anything else? |
| 15 | something, and I'll have a check back to you | | 15 | A. I was only on two mental health medicines, the |
| 16 | before the credit card bill comes due. | | 16 | Lexapro and the Seroquel. |
| 17 | A. Okay. | | 17 | Q. And you don't remember anything from November |
| 18 | Q. Do you remember November 30th, 2006, that | | 18 | 27th or November 28th, 2006, correct? |
| 19 | Wednesday? | | 19 | A. Correct. |
| 20 | A. Yeah. I remember I had seen my counselor that | | 20 | Q. Did you remember it at that time? Let me start |
| 21 | morning, and I was feeling better. | | 21 | over. |
| 22 | Q. Were you on any type of medication at this time? | | 22 | At what point did you forget what happened |
| 23 | A. I was still on medication, yes. | | 23 | on those two dates? |

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

Page 81

| | |
|---|---|
| 1 | A.  Sometime after all that.  I mean, I remember |
| 2 | when I spoke with the interviewer, I looked at |
| 3 | my notes and said in there that I had -- I said |
| 4 | something about I had said something or |
| 5 | something.  So I know at that point it was sort |
| 6 | of still there, but I don't know if I just |
| 7 | don't -- if it's too stressful to try to |
| 8 | remember or I just don't recall it. |
| 9 | Q.  Let me ask you about an incident that took place |
| 10 | in the City of Eufaula a few years ago.  Do you |
| 11 | remember a firefighter trying to kill the mayor? |
| 12 | A.  I remember something about that, yeah.  He had |
| 13 | stolen some medication or something like that. |
| 14 | Q.  Tell me everything you remember about that. |
| 15 | A.  I don't remember much.  I remember reading about |
| 16 | it in the newspaper where he had driven around |
| 17 | town.  And they were going from one place to |
| 18 | another, and then he crashed in the fire house |
| 19 | or something like that.  But that's all I know. |
| 20 | Q.  Isn't it true that that guy, the firefighter, |
| 21 | had to be shot by the Eufaula Police Department? |
| 22 | A.  Yes, I recall that. |
| 23 | Q.  And he had a gun threatening all those police |

Page 82

| | |
|---|---|
| 1 | officers, correct? |
| 2 | A.  I guess so.  I'm not -- I don't quite remember. |
| 3 | Yeah, I think he had a gun. |
| 4 | Q.  Were you aware he threatened to kill the mayor |
| 5 | before that incident took place? |
| 6 | A.  No, I did not know that. |
| 7 | Q.  Do you see how the City of Eufaula would take |
| 8 | threats -- I'm not saying you made a threat. |
| 9 | Would you see how they would take any threat |
| 10 | seriously? |
| 11 | A.  Yes, I understand. |
| 12 | Q.  If you will, flip over to page 49. |
| 13 | A.  Okay. |
| 14 | Q.  Is that your handwriting on this document? |
| 15 | A.  Right. |
| 16 | Q.  At the top and at the bottom? |
| 17 | A.  Yes. |
| 18 | Q.  Did you ask Bill Klein or just told him that it |
| 19 | would be best for him to resign his position? |
| 20 | A.  Yes. |
| 21 | Q.  Why? |
| 22 | A.  Because after I had gotten that notice, I had |
| 23 | talked to my wife about it.  And she says, you |

Page 83

| | |
|---|---|
| 1 | don't talk like that; you don't use those kind |
| 2 | of words and said that, you know, he works for |
| 3 | you and he must be wanting your job, you know. |
| 4 | So I sort of agreed with her and told Bill that |
| 5 | I wanted him to resign. |
| 6 | Q.  What did he say to you? |
| 7 | A.  He said he would think about it, I believe, but |
| 8 | I'm not sure. |
| 9 | Q.  Was this after or before your session with your |
| 10 | counselor? |
| 11 | A.  This was after.  I had my counselor's |
| 12 | appointment, I believe, Wednesday morning at |
| 13 | nine o'clock.  That's when I usually had them. |
| 14 | Q.  This says at approximately 9:30 you had the |
| 15 | conversation with Bill Klein. |
| 16 | A.  I don't think so. |
| 17 | Q.  I'm not saying this memo is correct.  I'm not |
| 18 | asking you to say that to me, but you do |
| 19 | remember that there was a conversation outside |
| 20 | the ABC store? |
| 21 | A.  Yes. |
| 22 | Q.  Could you read your notes there at the bottom? |
| 23 | A.  Asked Klein to resign because I respected him as |

Page 84

| | |
|---|---|
| 1 | a sponsor like AA, and he violated my trust when |
| 2 | he said that -- I don't know what the rest of |
| 3 | it -- oh -- when he said he was there for me |
| 4 | because I had quit -- What that note refers to |
| 5 | is I had quit drinking, and he was an alcoholic |
| 6 | as well.  And so I had trouble going through |
| 7 | this depression and everything, and he said we |
| 8 | could talk. |
| 9 | Q.  When did you stop drinking? |
| 10 | A.  November '04. |
| 11 | Q.  Have you had anything to drink since then? |
| 12 | A.  No. |
| 13 | Q.  And Bill was going through AA, too, or had been |
| 14 | through AA? |
| 15 | A.  I think he had, yeah, and we would talk.  And |
| 16 | sometimes I would need somebody to talk to, and |
| 17 | he would listen and we would talk. |
| 18 | Q.  At the bottom it says something about now I know |
| 19 | he was using this friendship or something.  Mine |
| 20 | is cut off, and I'm sure your page is cut off |
| 21 | too.  Do you know what else that says? |
| 22 | A.  Yeah.  Friendship to get my job. |
| 23 | Q.  Why did you think Bill Klein wanted your job? |

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

Page 85

1    A.   Just all the stuff, the way it was happening.  I
2         was in a lot of pain before the surgery.  And I
3         go through the surgery and I came back.  And
4         between everything Tim and Bill were doing and
5         the mayor, I was just like -- I wasn't needed
6         anymore.
7    Q.   Do you think it was just a conspiracy between
8         the mayor, Tim, and Bill to get you out?
9    A.   I think so at the time.
10   Q.   Do you have any proof of that?
11   A.   No.
12   Q.   Did Bill ever say anything else to you about
13        wanting your job or say anything at all about
14        wanting your job?
15   A.   The only thing I remember him ever saying was --
16        he says, Jim, I don't understand why you put up
17        with this crap; and if you leave, I'm right
18        behind you because I don't want to deal with
19        it.  And so that's the only thing he had ever
20        said to me about it, and that's why I say that
21        now I know that he was using our so-called
22        friendship because, you know, he was -- he
23        didn't want it.  And he was always telling me,

Page 86

1         how can you let the mayor talk to you like that,
2         you know.  He would say things to me like that
3         after the mayor come out of my office and be
4         talking to me like I was a piece of dirt.  And
5         Bill would hear it all outside from his office.
6    Q.   This letter mentions e-mails.  Did you
7         frequently send e-mails to people or receive
8         e-mails?
9    A.   No.  It sounds like to me if he told me to
10        e-mail it, he just wanted it in writing.
11   Q.   It also talks about the rehabilitation project.
12        What's that?
13   A.   That's a part of town that's going through --
14        It's an older subdivision with shotgun houses,
15        and there's a rehab grant project where the
16        houses for low income people are being
17        rehabilitated.
18   Q.   Let's flip over to page 50.
19   A.   Okay.
20   Q.   We've talked about that page, haven't we?
21   A.   Yes, we have.
22   Q.   And those are your notes on there too?
23   A.   Right.  Yes.

Page 87

1         Can I add one thing?
2    Q.   Absolutely.
3    A.   The insubordination charge wasn't heard, and the
4         mayor was asked in the hearing if I had ever
5         been insubordinate, and he said no.  That
6         insubordination isn't even part of this letter.
7    Q.   Okay.
8    A.   I just wanted you to know that.
9    Q.   I appreciate it.  If there's anything else you
10        can think of while we flip through these, just
11        let me know.
12             Turn over to page 51.  What is that?
13   A.   That's my separation letter from Kelly Trawick,
14        the personnel manager.
15   Q.   That note says separation letter, no reason
16        given.
17   A.   Right.
18   Q.   Is it your testimony that you had no idea why
19        you had been fired?
20   A.   True.  Yeah, I had no idea.
21   Q.   You didn't think the alleged statement that you
22        were going to cap the mayor had anything to do
23        with your employment termination?

Page 88

1    A.   I mean, I understand that that was -- they said
2         the statement -- you know, inappropriate
3         statements.  I understand that that alleged
4         statement is what the hearing was held for, but
5         I still don't see -- being part of the due
6         process claim is that they didn't give me any
7         discharge paperwork, not even -- I didn't even
8         receive a personnel action form which is
9         required for termination, discipline, or any
10        other kind of action.  I've never received such
11        a form.
12   Q.   Is that a form for employees or appointed
13        individuals?
14   A.   That's for all employees of the City when they
15        are originally hired, when they are promoted,
16        when they are disciplined.  A personnel action
17        form is supposed to be done for all employees.
18   Q.   Let me ask this.  I know you said you don't
19        remember November 27th or 28th, but if you did
20        make that statement, I'm going to cap the mayor
21        at ten o'clock and his wife at the shift change,
22        don't you think you should -- you deserve to
23        have been fired, if you made that statement?

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

Page 89

1    A.   I don't know why I would make that statement.
2    Q.   No. No. I'm not saying -- asking you to admit
3         that you did. I'm saying if you made that
4         statement or anybody made that statement, don't
5         you think that person would deserve to be fired?
6    A.   Well, it all depends on the situation with that
7         person. I mean, if that person needs help, I
8         think they should try to give the person help
9         and take every resource to make sure everything
10        is okay.
11   Q.   Don't you see where I'm coming from, that that's
12        a pretty serious statement if anybody made it,
13        correct?
14   A.   Oh, I understand that.
15   Q.   Okay. Let's flip over to page 52. What is
16        that?
17   A.   That's the State of Alabama Department of
18        Industrial Relations. It's about a hearing
19        before the unemployment board for compensation.
20   Q.   Did you go to a hearing or something?
21   A.   Yes.
22   Q.   What was the result of the unemployment
23        compensation claim?

Page 90

1    A.   They granted me 22 weeks.
2    Q.   And it looks like they took off four weeks of
3         it.
4    A.   They took off four weeks, yes.
5    Q.   Why were the four weeks taken off?
6    A.   Because of the accusation, the accused threat.
7    Q.   Did you challenge that threat?
8    A.   Yes. I challenged it with a hearing, yes.
9    Q.   What is page 54?
10   A.   It's just a notice of termination from the
11        unemployment board.
12   Q.   We've talked about 55, 56, 57, 58, and 59,
13        haven't we?
14   A.   Well, we talked about forced medical leave, but
15        we never talked about it with the page. But
16        we've talked about the forced medical leave.
17   Q.   We can go back and talk about some of these
18        rules if you want to, but they pretty much --
19   A.   Yeah. Can I add something about this forced
20        medical leave?
21   Q.   Absolutely. Where are you seeing forced medical
22        leave?
23   A.   Page 59.

Page 91

1    Q.   Let me get there. Okay. I'm there.
2    A.   It's like in my situation, I take Seroquel every
3         night at 8:30. And it relaxes me and I lose my
4         coordination. I can't drive. I can't walk. I
5         can't do anything. So at 8:30 at night, I'm
6         totally out every night. Well, now the
7         medication could have caused my heart problems
8         so I'm almost off of it. But that's Seroquel,
9         and at that time I was taking 150 milligrams at
10        night. And I just -- I can't go outside after
11        8:30 p.m. I can't drive a vehicle. I can't do
12        anything. I just wanted you to understand that.
13   Q.   Are you saying that you should have received
14        this forced medical leave?
15   A.   I'm saying that since Mr. Bob Powers wished that
16        there would have been another option that I
17        think he should have been heard and that it was
18        the duty of the personnel manager at that
19        time --
20   Q.   Who was that? Who was the personnel manager at
21        that time?
22   A.   Kelly Trawick, same person.
23   Q.   Okay.

Page 92

1    A.   That I think since they were talking so much
2         about my mental disabilities that I think that
3         point should have been brought up. Now, if I
4         would have been totally together myself, then
5         maybe I would have brought it up. But I just
6         think that should have been an option that could
7         have been exercised for that purpose.
8    Q.   Okay.
9    A.   That's all I've got on that.
10   Q.   What about page 60?
11   A.   We talked about that earlier, Appendix A,
12        termination of employment, the international
13        building code.
14   Q.   Okay. It talks about employees in the position
15        of the building official. What if that's an
16        appointed person? Does the international
17        building code Appendix A refer to appointed
18        individuals?
19   A.   Yes. It refers to, employees in the position of
20        building official, chief inspector, or inspector
21        shall not be removed from office except for
22        cause after full opportunity has been given to
23        be heard on specific charges.

Telephone Deposition of James F. Trombley, Jr.

September 12, 2007

Page 93

1  Q.  Is that where you're saying that you should have
2      had the specific charges in a letter somewhere?
3  A.  That's another instance, yes.
4  Q.  This talks about employees in the position of
5      building officials.  What about appointed
6      individuals in the position of building
7      official?  Does it make any distinction between
8      that?
9  A.  I'm not sure.
10 Q.  Let me ask you this.  If an employee makes a
11     death threat, do you think that would be for
12     cause?
13 A.  Well, I was never charged with making a threat.
14 Q.  Well, I'm just saying if -- I'm not talking
15     about you right now because -- I'm not asking
16     you to admit or deny because you said you don't
17     remember, and I don't think it's fair to ask you
18     that.  If you don't remember it, you don't
19     remember it.  But say anybody makes a threat and
20     it's a death threat.  Do you think that would be
21     just cause for termination?
22 A.  I think the -- I personally think that all this
23     stuff has been blown out of proportion.  No, I

Page 94

1      do not think so.
2  Q.  Go to page 61.
3  A.  I want to answer your other question you had
4      about a building official being appointed.  The
5      top paragraph, the very last sentence, the
6      building official shall be appointed or hired by
7      the -- Okay.  So it doesn't say you have to be
8      appointed.  It just says you have to be
9      appointed or hired.
10 Q.  Right.  I was just wondering if there was any
11     distinction in that.
12 A.  Okay.  61.
13 Q.  Yeah, 61.
14 A.  We talked about that, removal.
15 Q.  That's the state code, correct?
16 A.  Yes, sir.
17 Q.  What is 62?
18 A.  Job description.
19 Q.  That looks like it goes through page 65.
20 A.  Yes.
21 Q.  I don't see any handwritten notes on that; is
22     that true?
23 A.  Yes.  I just underlined some sections.

Page 95

1  Q.  So that underlining is yours, correct?
2  A.  Yes.
3  Q.  Let's skip over to page 66.  What is that?
4  A.  This is the, I guess, transmittal letter or
5      whatever with the -- from the police officer
6      with the transcript of the interview.
7  Q.  What does your handwritten note say there?
8  A.  I wasn't given a right to talk to my lawyer.  I
9      panicked because that morning Bill Klein had
10     told me what he told the city clerk about what
11     he said I said.
12 Q.  Is this November -- Well, it says November
13     29th.  So this is the day after, correct?
14 A.  Yes.
15 Q.  This is a Tuesday?
16 A.  This is --
17 Q.  Because Monday was the 28th.  So this would
18     be -- Well, no.  Wednesday is the 29th.
19 A.  Yeah.  That's what I thought, yeah.
20 Q.  You're right.
21 A.  That's what I said.  That's what it says in the
22     statement, the first words:  on Wednesday.
23 Q.  Right.

Page 96

1          When you say you panicked, what did you
2      panic about?
3  A.  Because I thought I was being held.
4  Q.  And I guess you remembered the conversation on
5      this date because you panicked about it?
6  A.  Bill Klein had told me what he had said to the
7      city clerk about what I had said, and I know at
8      that time that I was -- or he told me I was
9      pretty upset.  And I think at that time I may
10     have remembered being upset, but I don't know if
11     I remember exactly what was said.
12 Q.  Have you ever had any anger management classes?
13 A.  No.  No.  See, that's something I wanted to get
14     into about my medication.
15 Q.  Okay.  Let it rip.
16 A.  I was on Lexapro, and I'll admit while I was
17     having that pain and stuff that I was -- I was
18     having trouble with -- I wasn't having any
19     emotions.  I was having -- getting angry.  And
20     after I lost my job, I had to go to the VA for
21     medical care.  And the VA switched me off
22     Lexapro because they don't carry it.  And once I
23     got off that Lexapro, I had emotions again, just

24 (Pages 93 to 96)

Telephone Deposition of James F. Trombley, Jr.                                            September 12, 2007

Page 97

1    normal everyday emotions, and I didn't have the
2    anger.
3    Q.  Do you remember what day that was?  That was
4        sometime in December, wasn't it?
5    A.  I believe I went to the VA Hospital or the VA
6        clinic sometime in December, yes.
7    Q.  Let's move on to page 68.  That's -- That goes
8        from 68 to, it looks like, 78.  Let's talk about
9        that next time in the context of your
10       employment.  Okay?
11   A.  Okay.  That's fine.
12   Q.  What is page 79?
13   A.  That's some of my journal notes.
14   Q.  I can read that.
15   A.  Uh-huh (positive response).
16   Q.  80, 81, 82, 83, 84, 85, 86, 87 look like more
17       journal notes.
18   A.  Yes.
19   Q.  Some of these notes have asterisks by them.
20       What does that mean?
21   A.  That's the sections that I plan to use in the
22       case.
23   Q.  88, 89 are also journal notes, correct?

Page 98

1    A.  Yes.
2    Q.  What is 90?
3    A.  Some more journal notes.
4    Q.  That's just handwritten journal notes?
5    A.  Yes.
6    Q.  It looks like 90, 91, 92, -- I'm trying to flip
7        the page -- 93, 94, 95, 96 are more journal
8        notes, correct?
9    A.  Yes.
10   Q.  What is 97?
11   A.  It's the announcement for my job after I was
12       discharged.
13   Q.  Did Bill Klein get that job?
14   A.  Not that I know of.
15   Q.  Do you know who got that job?
16   A.  It was a while, but I believe they appointed a
17       part-time.
18   Q.  What is 98?
19   A.  It's a note from my doctor on my adjustment
20       disorder or on my depression.
21   Q.  Who did you give this letter to, if anybody?
22   A.  I didn't.
23   Q.  You did not give it to anybody?

Page 99

1    A.  I mean, this letter -- I think I got this
2        letter, I believe -- Oh, this was for the VA
3        claim to increase my benefits is why I got this
4        letter to send it to the VA.
5    Q.  So this letter has -- does it have anything to
6        do with the City of Eufaula?
7    A.  No.  I just thought maybe it might apply to the
8        case to give you some information about my
9        health.  That's all.
10   Q.  You never gave it to anybody at the City of
11       Eufaula, did you?
12   A.  No.
13   Q.  What's 99?
14   A.  It's a note on my back surgery that I sent to
15       the VA.  And, again, it was just given to you as
16       a reference.  It wasn't given to the City of
17       Eufaula.
18   Q.  What about 100?
19   A.  It's just a copy of -- just to show that I have
20       a disability rating of more than 30 percent for
21       the VA just for your reference.  Since we're not
22       going -- I'm not proceeding with the Veterans
23       Reemployment Act, it really didn't apply.

Page 100

1    Q.  What about 101?
2    A.  Copy of a letter I got back from Health and
3        Human Services.
4    Q.  The City of Eufaula never saw these, did they?
5    A.  No.
6    Q.  What about 103, same thing?
7    A.  Same thing.
8    Q.  What about 104?
9    A.  Same thing.
10   Q.  What about 105?
11   A.  This was just my complaint.  Let me see.  What
12       is this?  Oh, I had to send this in with my --
13       for information when I wrote to the Department
14       of Labor under the Veterans Reemployment Act.
15       They require that information so that's -- Yeah,
16       I never gave this to the City.  It doesn't
17       apply.
18   Q.  What about 107?  Is that just like a statement
19       about your claim?
20   A.  Yes.  This is my claim that I sent to the
21       Department of Labor vet's office.
22   Q.  You did have an attorney there present at your
23       determination hearing, didn't you?

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

Page 101

1  A. Yes.
2  Q. 107 is the same thing and 108 is the same thing?
3  A. Yes.
4  Q. 109 looks like the same thing, and 110?
5  A. Yes.
6  Q. 111 looks like some more of that application?
7  A. Yes.
8  Q. 112, the same thing?
9  A. Yes.
10 Q. What is 113?
11 A. That was just a letter I sent to them, to the
12    veteran's office.
13 Q. I'm just reading over it right quick.
14 A. Okay.
15 Q. What about 115?
16 A. This was a letter from the Office of Civil
17    Rights.
18 Q. What about 116?
19 A. It's a letter I sent to the Office of Civil
20    Rights.
21 Q. Did the Office of Civil Rights get back to you?
22 A. Yes, they did.
23 Q. What did they say?

Page 102

1  A. They said that HIPAA didn't apply to the City of
2    Eufaula.
3  Q. Did they say why not?
4  A. Said something -- that they don't handle the
5    medical records.
6  Q. They are not a medical provider. Is that what
7    they said?
8  A. Yeah, something like that. Yes.
9  Q. What is 117?
10 A. It's part of that Office of Civil Rights
11    complaint form.
12 Q. Same for 118?
13 A. Yes.
14 Q. Same for 119?
15 A. Yes.
16 Q. Same for 120?
17 A. Yes.
18 Q. Same for 121?
19 A. This was EEOC.
20 Q. Oh, this is the EEOC part?
21 A. Yes.
22 Q. Do you still have anything pending at the EEOC?
23 A. No. We talked about that right to sue letter

Page 103

1    that they just released.
2  Q. Right. You got the right to sue letter for the
3    retaliation, but the other has been dismissed,
4    hasn't it?
5  A. Right. They dismissed it with the right to sue
6    letter, yes.
7  Q. 122 is the EEOC stuff?
8  A. Yes.
9  Q. 123 and 124 is EEOC?
10 A. Yes. EEOC is 125.
11 Q. 125. 126 is Department of Justice. What's
12    that?
13 A. I sent them a complaint as well.
14 Q. Did they ever get back with you?
15 A. Yes. They forwarded my complaint to EEOC.
16 Q. 127 is the letter to the Justice Department?
17 A. Right.
18 Q. What is 129?
19 A. I sent a letter to ACLU.
20 Q. Why did you send a letter to the ACLU?
21 A. See if they were interested.
22 Q. What did they tell you?
23 A. They just sent back a letter saying that --

Page 104

1    Well, all they sent me was this letter back.
2  Q. Did you ever have any conversations with the
3    ACLU prior to sending them this letter?
4  A. No.
5  Q. In the past had you ever had any connection with
6    the ACLU whatsoever?
7  A. No.
8  Q. You just took a shot in the dark that they would
9    help?
10 A. Yeah. I just did some research on the Internet
11    and thought I would give them a letter.
12 Q. What is 130?
13 A. It's an advertisement for another building
14    inspector at the City of Eufaula.
15 Q. Is that after your termination or before?
16    That's after?
17 A. After.
18 Q. Okay. The same thing for 131, or what is 131?
19 A. 131 is just a candidate's interview, and it says
20    that -- where it says building inspector.
21 Q. Right.
22 A. See, I had on several occasions -- you'll see on
23    my notes -- that I had asked the mayor for some

26 (Pages 101 to 104)

Page 105

| | |
|---|---|
| 1 | additional help.  But it sounds like the City is |
| 2 | now getting it. |
| 3 | Q.  What about 132?  Is that just the same stuff? |
| 4 | A.  Yeah.  This was where they hired the interim |
| 5 | building official part-time. |
| 6 | Q.  If they hired somebody part-time, that means |
| 7 | they probably didn't have enough for a full-time |
| 8 | and assistant, did they, or do you know? |
| 9 | A.  No, they didn't.  Because everything has slowed |
| 10 | down.  The economy -- Houses aren't selling and |
| 11 | new houses are sitting in Eufaula so I would |
| 12 | imagine it's pretty slow. |
| 13 | Q.  Do you want to call it a day at this point and |
| 14 | come back next Wednesday at 2:30 and finish this |
| 15 | stuff up? |
| 16 | A.  That would be good. |
| 17 | Q.  I'm pretty confident that we'll get through next |
| 18 | week. |
| 19 | A.  Okay. |
| 20 | Q.  And then I guess the next time I see you or talk |
| 21 | to you will be November 10 in Nashville |
| 22 | somewhere. |
| 23 | A.  Yes. |

Page 106

| | |
|---|---|
| 1 | Q.  I'll pick out a hotel on the west side of |
| 2 | Nashville and just get a conference room or just |
| 3 | meet in my hotel room or in the lobby for a |
| 4 | quick meeting -- |
| 5 | A.  Okay. |
| 6 | Q.  -- for the court required settlement conference |
| 7 | and then see where we go. |
| 8 | A.  Okay. |
| 9 | Q.  I will talk to you next Wednesday or April will |
| 10 | talk to you next Wednesday at 2:30 central |
| 11 | standard time.  Okay? |
| 12 | A.  Okay.  Sounds good. |
| 13 | Q.  Have a good week. |
| 14 | A.  You too. |
| 15 | (Defendant's Exhibit 1 marked for |
| 16 | identification.) |
| 17 | (Deposition adjourned at approximately |
| 18 | 4:52 p.m.) |
| 19 | |
| 20 | * * * * * * * * * * * * |
| | |
| | DEPOSITION ADJOURNED |
| 21 | |
| | * * * * * * * * * * * * |
| 22 | |
| 23 | REPORTER'S CERTIFICATE |

Page 107

| | |
|---|---|
| 1 | STATE OF ALABAMA: |
| 2 | MONTGOMERY COUNTY: |
| 3 | I, Pamela A. Wilbanks, Registered Professional |
| 4 | Reporter and Commissioner for the State of Alabama at |
| 5 | Large, do hereby certify that I reported Volume II of |
| 6 | the deposition of: |
| 7 | JAMES F. TROMBLEY, JR. |
| 8 | who was first duly sworn by me to speak the truth, the |
| 9 | whole truth and nothing but the truth, in the matter of: |
| 10 | JAMES FRANCIS TROMBLEY, JR., |
| 11 | Plaintiff, |
| 12 | Vs. |
| 13 | CITY OF EUFAULA, |
| 14 | Defendant. |
| 15 | In The U.S. District Court |
| 16 | For the Middle District of Alabama |
| 17 | Northern Division |
| 18 | 2:07-CV-00547-MEF |
| 19 | * * * * * * * * * * * |
| | JAMES FRANCIS TROMBLEY, JR., |
| 20 | |
| | Plaintiff, |
| 21 | |
| | Vs. |
| 22 | |
| | CITY OF EUFAULA, |
| 23 | |

Page 108

| | |
|---|---|
| 1 | In The U.S. District Court |
| 2 | For the Middle District of Alabama |
| 3 | Northern Division |
| 4 | 2:07-CV-00575-MHT |
| 5 | on Wednesday, September 12, 2007. |
| 6 | The foregoing 107 computer printed pages |
| 7 | contain a true and correct transcript of the examination |
| 8 | of said witness by counsel for the parties set out |
| 9 | herein.  The reading and signing of same is hereby not |
| 10 | waived. |
| 11 | I further certify that I am neither of kin nor |
| 12 | of counsel to the parties to said cause nor in any |
| 13 | manner interested in the results thereof. |
| 14 | This 1st day of October 2007. |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | _____ |
| | Pamela A. Wilbanks, Certified |
| 21 | Court Reporter, ACCR# 391, |
| | Registered Professional Reporter |
| 22 | and Commissioner for the State |
| | of Alabama at Large. |
| 23 | |

Telephone Deposition of James F. Trombley, Jr.    September 12, 2007

I, James F. Trombley, Jr., hereby certify that
I have read the foregoing Volume II of my deposition given
on September 11, 2007, and it is a true and correct
transcript of the testimony given by me at the time and
place stated with the corrections, if any, and the
reasons therefor noted on a separate sheet of paper and
attached hereto.

_____
James F. Trombley, Jr.

SWORN TO AND SUBSCRIBED before me this _____
day of _____, 20__.

_____
NOTARY PUBLIC

10/1/07
Mr. James F. Trombley, Jr.
224 North Highway 67 #107
Florissant, MO 63031
IN RE: TROMBLEY VS. CITY OF EUFAULA
Dear Mr. Trombley:
Enclosed is a copy of the Volume II of your deposition
taken on Wednesday, September 12, 2007. Please read the
transcript and make any corrections on the correction
sheet provided specifying the page and line number of
each correction.

You will find the original signature page attached to the
front of the transcript. Even if there are no
corrections, please sign the original signature page and
have your signature notarized.

Please return the signature page, correction sheet and
transcript within thirty days. The list of corrections
will be attached to the original deposition and all
parties will be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,

Pamela A. Wilbanks, RPR

cc: Mr. Rick A. Howard

28 (Page 109)

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

**A**

AA 84:1,13,14
ABC 83:20
ability 34:3
able 4:11
about 6:21 8:9 9:11
  10:5 11:4,18 12:5,7
  13:1 15:12,16 16:23
  17:12 19:1,9,10 22:3
  23:1,8 24:11 25:6,16
  26:6,13,15,21 27:16
  27:18 28:13,13 29:16
  31:1,4,10,13,21 33:5
  33:11 35:5,7,16
  38:15,18 39:9 40:3,5
  40:7,9 41:10,19
  42:18 44:21 45:13
  46:1,11 47:11,18
  48:11 49:17 51:1,6
  51:13 52:1,5,6,22
  53:14,17,22,23 54:7
  54:23 57:13 58:23
  59:2,15 60:8,11,15
  60:17,21 61:2,21
  62:2,12 63:9,13,15
  63:19,23 64:3,17
  65:8,10,11,18 66:5
  66:10,11,13,18 67:4
  67:7,9,11,15,18,22
  68:2,4,6,9,11,13,15
  68:17,18,19,21 71:13
  71:17,19 72:12,17
  73:15,18 74:23 75:16
  76:8 77:5 80:8,12
  81:4,9,12,14,15
  82:23 83:7 84:18
  85:12,13,20 86:11,20
  89:18 90:12,14,15,16
  90:17,19 92:2,10,11
  92:14 93:4,5,15 94:4
  94:14 95:10 96:2,5,7
  96:14 97:8 99:8,18
  100:1,6,8,10,18,19
  101:15,18 102:23
  105:3
above 25:14
Absolutely 87:2 90:21
ACCR 108:21
accusation 90:6
accused 8:6,6 48:4 90:6
ACLU 103:19,20 104:3
  104:6
across 61:7
act 10:18,19 12:17,17
  13:6 19:10 25:20
  28:22,22 29:11,12
  31:10 35:2 99:23
  100:14

action 1:6,13 15:15
  24:3 29:4 56:13 88:8
  88:10,16
acts 10:1
actual 48:12
actually 15:4,4 18:10
  29:10 60:13
ADA 29:10 69:22
add 87:1 90:19
additional 30:11 105:1
ADEM 68:14
adjacent 56:12
adjourned 106:17,20
adjusting 6:21
adjustment 3:22 4:2,5
  4:7,14,16,18 5:4,7,11
  6:14,15 7:14 8:1,19
  8:23 9:8 10:3,11,17
  12:9 35:3,5,13 74:23
  98:19
admit 89:2 93:16 96:16
admitted 69:9
adopted 26:18 27:4,9
  27:19,21 28:3
advertisement 104:13
affair 7:16 69:9,10
  75:16
Affairs 28:14
after 3:7 16:11 32:20
  74:15 75:8 76:5 81:1
  82:22 83:9,11 86:3
  91:10 92:22 95:13
  96:20 98:11 104:15
  104:16,17
again 26:3,7 41:9 55:22
  63:7 68:18 96:23
  99:15
against 4:3 7:23 32:4,5
  34:23 35:19 51:14,23
  53:5 62:7,16
agenda 18:19,20 56:10
  56:14
agent 49:20 54:5 55:15
  56:17
ago 14:22 81:10
agree 25:19 42:3 49:19
agreed 27:7 69:23 83:4
ahead 20:21 32:15
  35:18 37:16 55:9,10
  56:15 60:2,20 62:14
  63:3 66:8 70:1
ain't 64:21
Alabama 1:2 2:3,6,16
  13:19 15:23 16:2
  17:20,20,21 23:14,23
  24:8 71:16 89:17
  107:1,4,16 108:2,22
alcoholic 84:5
alleged 87:21 88:3

allergies 80:10
allowed 8:16 17:4
  18:19,20
almost 91:8
along 26:19
already 25:14 31:4
  40:4 51:6 77:3
always 26:2 85:23
Americans 10:19 28:21
anger 96:12 97:2
angry 96:19
announcement 98:11
another 6:15 7:13 14:3
  21:19 30:6 63:9
  64:23 69:7 81:18
  91:16 93:3 104:13
answer 76:17 94:3
antidepressant 79:14
anti-anxiety 79:15
anxiety 4:16,17,19
  79:15
anxious 4:22
anybody 5:23 10:9
  11:16 89:4,12 93:19
  98:21,23 99:10
anymore 85:6
anything 8:16 9:15
  12:18 22:3 28:5,6,12
  30:19 31:8 35:12
  36:7,10 37:23 38:14
  66:15 69:14 72:1,17
  73:22 74:21 76:1
  79:3,5,6 80:14,17
  84:11 85:12,13 87:9
  87:22 91:5,12 99:5
  102:22
anywhere 28:23
apologize 18:3
appeal 34:6 44:9 59:13
appeals 17:4 40:14
  44:5,6,21,23 45:3,4
  47:7
APPEARANCES 2:9
appendices 26:19
Appendix 26:23 28:4
  92:11,17
applicable 26:19
application 56:19
  57:14 59:5,11 60:3
  101:6 .
applications 56:18
applied 14:15,18 17:6,7
  24:8 44:10
applies 41:12
apply 17:11 40:12
  41:14 43:4,6 44:11
  99:7,23 100:17 102:1
appointed 16:10 24:2
  51:5 88:12 92:16,17

93:5 94:4,6,8,9 98:16
appointment 16:13
  73:5 83:12
appreciate 12:3 18:2
  28:8 87:9
appropriate 19:17
approximately 2:7
  83:14 106:17
April 2:13 6:3 26:21
  27:13 106:9
areas 17:19,22 63:23
argument 16:14
around 6:4 9:18 31:18
  33:13,17,18 61:9
  81:16
article 24:8 45:21,21
  46:1,2,4,22,22 47:1
  47:10,11,16
asked 11:1 20:13,17,18
  35:6 52:6 59:18 62:4
  69:21 83:23 87:4
  104:23
asking 37:22 61:1
  83:18 89:2 93:15
assistant 105:8
Associates 59:10
assuming 22:23
asterisk 48:4
asterisks 97:19
Atlanta 66:12
attached 38:6 109:7,31
  109:35
attention 109:37
attorney 9:3 23:18,19
  24:6 49:10,14,19
  50:16,20 100:22
Attorneys 2:14
attorney's 50:15
audio 50:13
August 65:20
aware 27:3 34:17,20
  42:8
away 71:21
A-1 49:1
a.m 59:18

**B**

B 44:9
back 3:17 5:1 6:13 7:13
  12:8 15:7,12 17:12
  21:10 24:4,9 26:1,2
  29:19 30:17 36:3,20
  36:21 37:22 38:11,12
  51:4 58:21 63:12,13
  63:19 68:22 71:14
  75:13,13,14 77:15
  78:3,7,7,15 85:3
  90:17 99:14 100:2
  101:21 103:14,23

104:1 105:14
bad 20:5 33:23 35:14
  52:2 53:3 60:21
Barbour 70:14
based 9:5 61:8
battleships 54:9,12
bearer 52:2
before 2:2 5:20 11:21
  11:23 14:23 24:3
  45:15 51:15,17 56:22
  57:17 62:23 65:13,14
  73:4 78:16 82:5 83:9
  85:2 89:19 104:15
  109:15
beginning 19:15 .
behalf 20:10
behind 58:12 85:18
being 4:11 33:17,18
  35:16 48:8 50:15
  60:16 61:11 71:20
  75:1 86:16 88:5 94:4
  96:3,10
believe 15:14 21:6,13
  24:16 26:20,21 28:16
  30:22,23 39:23 40:15
  41:23 43:13,16 51:15
  54:5 57:23 59:9 67:6
  71:1,7 83:7,12 97:5
  98:16 99:2
belonged 70:2
benefits 99:3
best 82:19
bet 77:18
better 5:17 57:19 63:18
  78:21
between 61:20 62:2
  85:4,7 93:7
big 7:14 17:18,22 38:18
  54:11 66:6
bill 60:4 71:7 72:14
  76:9,20 78:2,13,14
  78:16 82:18 83:4,15
  84:13,23 85:4,8,12
  86:5 95:9 96:6 98:13
bipolar 8:11,12
bit 19:1 21:7 25:9
  43:23
black 61:11
blown 93:23
board 89:19 90:11
Bob 9:23 31:14,20,22
  31:23 37:22 91:15
book 15:8 58:18
both 10:19,20 14:20
  34:9 41:18
bottom 42:12 47:3
  82:16 83:22 84:18
bought 53:8,10,12
box 29:5

Telephone Deposition of James F. Trombley, Jr.        September 12, 2007

Page 2

**Brad** 74:20
**break** 63:8,11
**brick** 62:9
**Brief** 63:21
**bring** 16:4
**bringing** 28:8
**broad** 16:20
**brought** 92:3,5
**building** 26:16,19 27:1
  27:4,17 28:4,8 29:17
  29:20 30:7 54:2
  60:15,17 65:7,11
  92:13,15,17,20 93:5
  93:6 94:4,6 104:13
  104:20 105:5
**buildings** 70:1,2,6
**Bullard** 74:20
**bunch** 15:1 67:2
**Bush** 8:10
**business** 24:10
**buy** 70:12

_____
     **C**
**call** 54:11 63:12,13,19
  105:13
**called** 10:11 16:10 29:3
  44:15 50:16 54:9
  59:6,10,18 67:23
  73:2
**calling** 19:19
**Calton** 24:5 70:8,9
**came** 36:3 53:1 75:13
  75:13,14 85:3
**candidate's** 104:19
**cap** 72:4 87:22 88:20
**card** 78:14,16
**care** 76:4 96:21
**careful** 73:22
**Carmichael** 2:5,15
**carry** 96:22
**case** 1:7,14 16:9 57:20
  97:22 99:8
**categories** 45:2
**category** 22:5
**caught** 22:11
**cause** 16:11,15,15,16
  34:15 92:22 93:12,21
  108:12
**caused** 7:12 91:7
**causes** 15:15
**cc** 109:42
**CD** 50:13
**central** 106:10
**certain** 10:6 29:2
**CERTIFICATE**
  106:23
**certified** 29:17 50:9
  108:20
**certify** 107:5 108:11

109:1
**chain** 38:7
**challenge** 90:7
**challenged** 90:8
**change** 72:6 88:21
**changes** 4:9 14:21 15:1
  27:17 109:36
**changing** 52:16,16
**charge** 87:3
**charged** 93:13
**charges** 32:22 48:3,9
  48:20 49:2,6,9,9,11
  49:14 78:2 92:23
  93:2
**check** 36:11 55:5,21
  57:6 78:3,15
**checked** 11:16 29:5
**checking** 36:18
**chief** 92:20
**children** 37:12
**Christmas** 75:9
**circled** 32:11
**city** 1:7,15 2:12,18 3:13
  4:1 5:13,21,23 7:1,6
  7:10,11,21,23 9:19
  10:2,9 14:6,12 16:11
  18:13 19:19 20:10,19
  21:11 23:19 25:6
  26:15,18 27:3 28:17
  29:9 31:14,15 38:20
  41:12 42:6,23 43:2
  43:15 52:5 53:20
  59:20,22,23 60:19
  61:11 62:19 69:22
  81:10 82:7 88:14
  95:10 96:7 99:6,10
  99:16 100:4,16 102:1
  104:14 105:1 107:13
  107:22 109:26
**City's** 36:13
**civil** 1:6,13 15:16 29:4
  101:16,19,21 102:10
**claim** 10:2,13 13:1,5,17
  15:20 17:8,16,16
  18:9,9 22:11,16,21
  25:18 26:8 30:13
  38:7,17 39:4,9 41:8
  43:11,17,18 44:2
  51:13 53:16 88:6
  89:23 99:3 100:19,20
**claiming** 10:14 39:7,13
  41:21 49:13
**claims** 3:16 15:10,11
  16:20,21 17:15 23:4
  23:10 30:11
**class** 58:11,17 70:19
**classes** 96:12
**classified** 41:13,18
**clerk** 62:19 95:10 96:7

**client** 61:16
**clinic** 97:6
**closed** 23:18,20,22,23
  24:7 50:11
**code** 16:1,2 17:21
  18:14 24:8,16 26:16
  27:1,4,16,17 28:4,8
  29:17,18,20 30:8
  61:12 62:12 92:13,17
  94:15
**codes** 26:19 61:8
**Cole** 8:12
**college** 63:1
**come** 7:9 8:14 15:7,12
  17:12 18:1 26:1,2
  38:12 49:7 52:4 54:3
  54:4 58:21 86:3
  105:14
**comes** 5:1 78:16
**coming** 36:20 54:6 58:2
  89:11
**commencing** 2:7
**comment** 8:6
**comments** 33:9,10 60:7
  61:7
**commercial** 66:6,23
  67:1
**commission** 52:12
  55:13 56:13 57:14
  59:20,21,22 60:7
  61:4,19
**Commissioner** 2:3
  107:4 108:22
**compensation** 89:19,23
**complaint** 29:6,8 30:20
  32:22 100:11 102:11
  103:13,15
**complications** 36:2
**compounded** 7:11
**computer** 11:13 108:6
**concentrate** 7:15
**concerning** 71:18
**conduct** 23:21 24:1,10
  48:9 49:3
**conference** 25:8 60:14
  106:2,6
**confident** 105:17
**confused** 62:3,5
**connection** 104:5
**consider** 34:3 36:10
  48:8
**conspiracy** 85:7
**constantly** 35:7
**constitution** 13:18,19
  13:20,22 14:4 17:21
**constitutional** 15:5
**construction** 53:9
**consult** 48:18
**contain** 48:20 108:7

**contend** 19:17 20:1
**context** 97:9
**continue** 12:19
**Continuing** 63:22
**contract** 70:10
**contractor** 65:6
**contributed** 22:13
**conversation** 18:7
  19:22 72:3,7,13
  83:15,19 96:4
**conversations** 104:2
**coordination** 91:4
**copied** 78:1
**copy** 11:2 16:2,4 39:19
  39:19 45:10 46:7
  49:22 50:1 76:7
  77:10,11,14,22 99:19
  100:2 109:28
**copying** 78:2,13
**correct** 3:19,20,22 5:17
  9:8,12 11:22 12:9
  14:2 15:21 39:11
  42:1 45:19 47:16
  50:19 71:4 73:10,11
  80:18,19 82:1 83:17
  89:13 94:15 95:1,13
  97:23 98:8 108:7
  109:3
**correction** 109:29,30
  109:34
**corrections** 109:5,29
  109:32,35
**council** 18:13 29:19
  47:22 59:20,23 60:1
**Councilman** 31:23
**councilmembers** 9:19
**counsel** 49:8 108:8,12
**counseling** 5:6
**counselor** 73:3,18,19
  73:23 74:1,4,5,17,18
  78:20 83:10
**counselor's** 83:11
**county** 58:12 69:21
  70:2,6,11,14 107:2
**couple** 6:12 14:23
  53:20 63:22 74:14
**course** 19:16 78:1
  80:10
**court** 1:1 23:6 29:8,10
  106:6 107:15 108:1
  108:21
**cover** 29:4 41:17,22
  42:1,4,23
**covered** 25:3 30:5,22
  30:23 63:10
**covers** 43:1
**crap** 85:17
**crashed** 81:18
**credentials** 62:23

**credit** 78:14,16
**creek** 63:6 67:3
**criticized** 18:17
**crop** 56:8
**customer** 61:17
**customers** 8:14
**cut** 10:14 13:11 84:20
  84:20

_____
     **D**
**damages** 30:14
**damn** 36:22
**dangerous** 31:17 33:23
**dark** 104:8
**date** 11:4,19 45:16
  48:14 69:3 75:5 96:5
**dated** 71:9
**dates** 18:11 57:3 59:19
  69:10 73:12,13 74:4
  77:11,12 80:23
**day** 28:18 52:6,12 75:8
  75:8,13 76:19,21
  77:5 80:2,3 95:13
  97:3 105:13 108:14
  109:16
**days** 46:13 73:17 77:5
  109:35
**deal** 51:17 54:15 55:11
  57:22 58:5,6 85:18
**dealing** 19:3 51:7 59:15
  72:23
**deals** 55:5,17
**dealt** 51:21
**Dear** 109:27
**death** 93:11,20
**December** 59:23 65:16
  74:11 97:4,6
**decide** 42:16
**decision** 4:12 9:5 20:22
  61:6
**decisions** 18:14 61:6
  63:4
**decision-maker** 60:22
**declaring** 41:15
**deems** 31:16
**deep** 4:15
**defendant** 1:8,16 2:12
  33:2 34:19,20 107:14
**Defendant's** 3:1 106:15
**defensive** 18:4
**defining** 30:7
**definitely** 13:13
**degenerative** 3:16
  10:16 12:8
**degrading** 33:9,10
**degree** 63:2
**delay** 57:19
**delivered** 56:21
**demeanor** 35:8

Telephone Deposition of James F. Trombley, Jr.

September 12, 2007

Page 3

demonstrate 16:15
demotion 46:13
deny 76:13 93:16
department 19:21
 28:14 42:6 43:2 45:1
 59:14 62:21 81:21
 89:17 100:13,21
 103:11,16
depends 89:6
deposition 1:20 2:1
 13:10 16:4 23:5,6
 76:7 106:17,20 107:6
 109:2,28,35
depressed 35:14
depression 4:16,21 6:5
 7:8,9,9,12 10:22 73:2
 84:7 98:20
depressive 4:17,19
description 18:18
 31:12 94:18
deserve 63:5 88:22
 89:5
designated 42:7,14
desk 11:9
detail 39:22
determination 19:20
 20:18 40:15 41:11
 42:9 44:8,12,13,15
 46:19 48:7 100:23
development 66:23
diagnosed 6:15
diary 76:23
different 54:19
differently 8:19 32:9
difficult 6:20
directly 62:16
dirt 86:4
disabilities 10:19 12:7
 12:11 28:21 34:17
 37:5 92:2
disability 3:15,21 4:2
 10:13,15 17:15 31:3
 34:20,21 35:2 99:20
disagree 34:12 42:5
disc 3:17 10:16 12:8
 50:17,19,20,22 51:1
discharge 34:15 88:7
discharged 98:12
discharging 34:4
discipline 88:9
disciplined 88:16
discriminate 7:23
discriminated 4:3
 34:23 35:19
discrimination 3:18
 12:15 31:3 35:22
discriminatory 8:2
 10:1 14:18
discuss 50:12

discussed 9:2,17 23:11
 25:14 28:6 32:17
 33:8 60:9
discussing 35:12 49:10
 61:21
discussion 38:4
disease 3:17 10:16 12:8
dismissals 46:14
dismissed 103:3,5
disorder 3:22 4:2,5,7
 4:14,17,19 5:5,8,11
 5:19,20 6:1,14,16
 7:13,14 8:1,20,23 9:8
 10:3,11,17 12:9 35:3
 35:5,13 74:23 79:15
 98:20
dispute 76:10
disregard 22:9,23
disregarded 21:14
 34:18,21
distinction 93:7 94:11
District 1:1,2 107:15
 107:16 108:1,2
Division 1:3 107:17
 108:3
doctor 4:8 5:13 6:6
 31:20 33:19 37:20
 65:8 75:4 98:19
doctor's 7:1,3 10:10
 35:12 65:3,7,11,21
 65:23
document 82:14
documents 3:2 12:6,21
 16:18 30:16 38:11
 40:2,4 54:14 64:2,4,9
 64:14
doing 18:17 20:9 36:19
 37:1 62:11 63:18
 64:8 70:5 85:4
done 18:21 61:3 63:5
 63:17 88:17
dosage 79:17,19
Dothan 74:18
double-check 69:2
down 18:21 4:18 13:15
 105:10
dozen 77:16
Dr 64:21
drafted 27:19
drink 84:11 ...
drinking 84:5,9
drive 11:17 91:4,11
driven 81:16
drops 80:7
due 13:14,17,21,22
 14:5 15:17,20 17:8
 17:16 19:9 21:23
 22:5,11,14,21 25:19
 43:4 32:21 39:1,3,9

43:16 51:8 78:16
88:5
duly 107:8
Dunseth 65:6,19
during 72:3,6 75:22
duty 22:9,23 23:1
 36:11,13 91:18

———————————
          E
———————————
each 44:1 109:30
earlier 46:16 69:9
 92:11
earnest 53:11
easier 40:23 64:4,10
easily 18:8
easy 18:6
economy 105:10
EEOC 30:20 102:19,20
 102:22 103:7,9,10,15
either 6:20 46:9 50:7
emotions 96:19,23 97:1
employee 7:21 17:1
 40:21 46:20 51:5
 62:22 93:10
employees 40:12,13
 41:13,14,16 42:23
 43:1 45:2,22 47:15
 88:12,14,17 92:14,19
 93:4
employee's 34:17
employment 13:6 19:4
 27:23 31:2 38:2,19
 64:6 87:23 92:12
 97:10
enclose 50:13
Enclosed 109:28
end 9:13 11:6 57:17
 72:4
enforcement 60:22
 61:8
engineer 57:11
Engineering 64:18
enough 28:19 105:7
entire 72:21,22 77:14
entitled 74:3
environment 4:10 6:21
estate 54:5 55:15 56:16
Eufaula 1:7,15 2:12,18
 5:14,21,23 7:1,7,10
 7:12,21,23 10:2,9
 14:7,13 19:5,19
 26:18 27:4 29:9
 31:14 38:20 43:1,3
 43:15 53:7,20 56:18
 78:10 81:10,21 82:7
 99:6,11,17 100:4
 102:2 104:14 105:11
 107:13,22 109:26
evaluate 31:19

even 5:16 9:19 17:4
 23:21 36:9 49:13
 52:10 87:6 88:7,7
 109:32
events 73:6,13
ever 6:11,23 28:22
 48:18 53:7 85:12,15
 85:19 87:4 96:12
 103:14 104:2,5
every 40:21 74:8,15
 89:9 91:2,6
everybody 18:14 36:16
 37:2 41:23 42:1
everybody's 61:7
everyday 97:1
everyone 42:4
everything 6:13 16:7
 17:23 25:12 30:23
 48:16 50:19,22 60:6
 60:16 61:13 76:4
 81:14 84:7 85:4 89:9
 105:9
exactly 6:2 13:23 19:2
 23:7 24:6 55:3 96:11
examination 2:21 3:10
 108:7
example 4:9
except 60:7,16 92:21
executive 24:11,14
 50:11
exercised 92:7
Exhibit 3:1 106:15
expanding 26:7
explain 29:23
explained 35:16
extremely 33:20,23
 71:17
eye 80:7
e-mail 57:10 86:10
e-mails 86:6,7,8

———————————
          F
———————————
F 1:22 2:1 3:6 107:7
 109:1,11,24
facade 52:13 60:17
 61:21 62:9
fact 35:3
facts 19:4 38:7,7 39:6
 43:18,21
failure 22:13 31:3
fair 93:17
fairly 18:15
familiar 4:6
family 37:12,14,15
far 77:14 78:7
fast 25:1
faster 25:4
favor 70:7
favors 18:16

faxed 56:3
federal 13:22 29:8,9
feel 36:14
feeling 4:14 35:14
 36:15 78:21
feels 61:22
felt 8:2 35:23 36:5,20
 37:14 53:5 62:3
few 54:13 81:10
figure 41:19
file 38:12 71:8
filed 29:7
final 61:6
find 9:21 12:4 19:8
 21:19 27:11 39:17
 44:3,20 45:6,12
 109:31
fine 19:6 29:13 33:19
 76:3,5 97:11
finish 105:14
finished 25:23 64:1
fire 9:6 36:21 81:18
fired 9:7,11 87:19
 88:23 89:5
firefighter 81:11,20
first 3:15 5:12 13:12
 24:16 43:20 52:9
 53:19,23 54:13 72:16
 72:18,22 74:9 78:9
 95:22 107:8
fit 21:16,17 34:10 54:9
five 57:12 63:16
flip 14:11 31:7 45:11
 54:13 82:12 86:18
 87:10 89:15 98:6
floor 38:5
Florissant 109:25
flow 18:8
folder 11:10
follow 14:1,5 32:23
 39:10 48:9
followed 21:21
following 22:3 23:1
 48:8
follows 3:9
forced 31:18 90:14,16
 90:19,21 91:14
foregoing 108:6 109:2
forget 33:21,22 80:22
forgot 11:11
form 88:8,11,12,17
 102:11
Forsyth 58:11
forth 39:7
forward 13:7
forwarded 103:15
found 36:6 70:13
four 57:12 63:13,15
 74:12 90:2,4,5

Telephone Deposition of James F. Trombley, Jr.

September 12, 2007

Page 4

frame 67:5
FRANCIS 1:4,10
  107:10,19
free 20:2,3
frequently 86:7
friend 20:7
friendship 37:8 84:19
  84:22 85:22
from 4:7 5:1 6:7 7:6,8
  7:10,13 9:1,3 10:3
  23:6 27:17 37:17
  39:6 47:21 50:19
  52:17 54:5 58:17
  66:12 67:21 70:18
  71:7 73:1,6 75:12
  77:6 80:17 81:17
  86:5 87:13 89:11
  90:10 92:21 95:5
  97:8 98:19 100:2
  101:16
front 25:3 61:16,16
  109:32
frontage 67:2
full 92:22
full-time 105:7
further 30:7 108:11

_____

G

gave 27:15,19 49:13
  57:23 60:4 99:10
  100:16
general 65:6
Georgia 58:12,14
getting 25:9 42:16 51:4
  63:10 96:19 105:2
Gilliland 2:4,14
give 6:23 16:15 17:3
  28:18 31:4 34:11,15
  35:6,21 37:19 41:7
  43:7 53:3 63:4 72:11
  72:12 76:7 88:6 89:8
  98:21,23 99:8 104:11
given 38:23 39:2 49:10
  49:22 87:16 92:22
  95:8 99:15,16 109:2
  109:4
giving 26:8
glaucoma 80:7
Gloria 8:12
go 6:18 12:23 13:7
  16:19 20:2,3,21 21:7
  24:4,7,9,14 25:4
  28:15,16 32:15 34:1
  35:18 37:16 38:19
  39:22 40:2 43:22,23
  47:6 52:16 53:7
  54:22 55:9,10 56:15
  57:3 60:2,20,23 61:2
  62:6,14 63:3,9,16

64:1,4,6 65:3 66:8,8
  70:1 72:8 73:4,17,19
  77:15,23 85:3 89:20
  90:17 91:10 94:2
  96:20 106:7
goes 4:8 22:21 37:22
  94:19 97:7
going 5:15 10:23 12:19
  13:7,13 14:20 15:7
  18:23 19:1,3 20:21
  21:22,23 22:5 23:4
  23:19 25:4,12 28:15
  28:16 30:16 33:22
  36:7,9,15,22 38:11
  40:3 41:20 53:10
  55:20 57:6,7 65:4
  67:1 68:22 70:14
  71:12 75:2 76:6,6,16
  77:13,21 81:17 84:6
  84:13 86:13 87:22
  88:20 99:22
gone 13:6 36:1
good 9:21 29:15 38:8
  46:6 63:11 105:16
  106:12,13
gotten 82:22
Governor's 66:5,13,15
  66:18,21 67:6,8,10
  67:13,16,21
grab 11:10
grant 86:15
granted 90:1
great 76:4
grew 5:2
grocery 70:3
ground 25:3 63:10
Group 3:2
guess 47:14 53:19
  55:14 61:21 82:2
  95:4 96:4 105:20
gun 81:23 82:3
guy 81:20
guys 36:4 66:12

_____

H

H 15:17,19
Haggerty's 64:21
handicapped 69:22
handle 102:4
handwriting 48:1,5
  82:14
handwritten 71:10
  77:18 94:21 95:7
  98:4
hand-delivered 56:20
Hang 46:17
happened 5:1 9:10 11:4
  19:14 51:15 52:1,3
  62:2 71:18 73:13

80:22
happening 85:1
harassment 33:21
hard 9:21 11:16
having 3:7 6:5,6 7:16
  7:16 38:3 52:11
  56:17 57:16 69:9
  70:12 74:22 96:17,18
  96:18,19
head 40:10 42:6 43:2
  45:1 60:23 62:21
heads 59:14
heads-up 25:11 57:23
health 8:10 9:17 19:13
  23:15 24:1 31:3,16
  31:17 32:18 33:8
  36:12 51:11 80:15
  99:9 100:2
hear 6:7 53:23 86:5
heard 87:3 91:17 92:23
hearing 3:19 8:3,4,21
  9:10,12,13,16 16:12
  17:2,4 19:20 20:18
  32:21 33:9 35:22
  42:10 43:3 44:13,13
  44:16 48:7 49:8
  50:10,23 76:12,14
  87:4 88:4 89:18,20
  90:8 100:23
hearings 40:15 41:11
heart 91:7
held 23:17 24:7 32:21
  48:8 50:10 88:4 96:3
help 75:7 89:7,8 104:9
  105:1
helping 36:20
her 8:11,16 17:2,3,6
  37:14 42:14 57:14,16
  57:23 60:13 74:19
  75:8 76:6,7 83:4
hereto 109:7
Higgins 2:5,14
highlight 44:1
highly 30:1
Highway 109:24
him 6:4,7 11:9 20:5,19
  20:21 35:6,15,16
  50:17,23 52:17 59:12
  59:21 61:14 62:10,20
  71:20 72:8 73:4,5,21
  74:6,12 82:18,19
  83:5,23 85:15
himself 20:22
HIPAA 102:1
hired 88:15 94:6,9
  105:4,6
Hitson 2:5,14
Holtsford 2:4,14
home 11:15

homes 67:22
hoops 52:15
Hospital 74:17 97:5
hotel 106:1,3
hour 63:9 64:3
hourly 62:21
hours 52:8
house 81:18
houses 86:14,16 105:10
  105:11
Howard 2:13,22 3:11
  63:22 109:42
huh 33:3
Human 100:3
Hurst 66:4,13

_____

I

idea 13:10 87:18,20
identification 106:16
identify 50:4 55:10
II 1:18 107:5 109:2,28
imagine 105:12
important 53:16
impression 52:17
inability 7:15
inappropriate 88:2
incident 48:12 81:9
  82:5
included 18:11
income 86:16
incorporated 27:22
incorrect 25:23
increase 99:3
INDEX 2:21 3:1
indicate 3:12
indicated 3:16 46:16
individuals 24:21
  88:13 92:18 93:6
Industrial 89:18
information 19:13
  23:15 27:16 28:19
  38:18 51:11 54:7
  99:8 100:13,15
informed 6:9 35:4
  36:14
injury 36:2
inspection 72:9,9
inspections 36:5 69:22
  70:15
inspector 92:20,20
  104:14,20
inspector's 54:19
instance 93:3
instructions 62:16
insubordinate 87:5
insubordination 48:10
  49:4 87:3,6
insurance 70:12
intent 24:20 49:6

intentionally 21:14
interested 103:21
  108:13
interfered 62:11
interim 105:4
international 26:16,18
  27:1,4 28:3 29:18,20
  30:7 92:12,16
Internet 104:10
interpersonal 58:15
interpretation 22:4
interpretations 63:4
interpreted 21:15
  34:10
interpreting 61:12
  62:12
intersection 67:21
interview 19:16,17
  20:16,17,19,21 32:17
  50:14 95:6 104:19
interviewed 32:14
interviewer 81:2
interviewing 19:21
  20:9
investigation 19:23
  20:1,11,12
issue 7:2
issues 7:6 71:19,19
  72:1
items 25:9,14

_____

J

James 1:4,10,22 2:1
  3:6 107:7,10,19
  109:1,11,24
Janet 66:4,13
January 60:1 65:16
Jaxon 71:21
Jay 56:5,7 62:2 71:21
  72:5
Jeanie 59:6
Jeff 67:16
Jim 47:22 71:16,17,23
  72:3,11 85:16
Jimmy 24:4 55:15
  56:16 70:8,8
job 18:17,18,21,22 30:1
  30:4 34:4 37:1 62:12
  64:3 83:3 84:22,23
  85:13,14 94:18 96:20
  98:11,13,15
jog 54:23
join 52:7
joke 54:12
Jordan 17:1 48:14
journal 68:23 76:23
  77:8,14 97:13,17,23
  98:3,4,7
journals 77:16

Telephone Deposition of James F. Trombley, Jr.

**Joy** 37:11 62:8,8,10,15
**Jr** 1:4,10,22 2:1 3:6
   107:7,10,19 109:1,11
   109:24
**jurisdiction** 29:2
**jury** 41:20
**just** 7:3 10:16 12:5
   14:16 15:3 16:4 18:5
   18:11,23 20:8 21:7
   21:17,18 22:19 25:2
   25:4,11,17 26:7 27:3
   27:7 28:7,9,17 29:5
   30:5,6,13,19 31:11
   32:3,7,15 33:6 34:1
   34:11 35:13 37:8
   38:1,6,17 39:17 40:7
   41:3,23 43:1,7 44:1
   44:15 45:3,11 46:16
   46:19 47:2 53:13
   54:22 55:10 56:1
   57:19 64:4,5,8,23
   65:3,5 70:3 71:13
   72:16,17 73:14,14
   78:13,14 81:6,8
   82:18 85:1,5,7 86:10
   87:8,10 90:10 91:10
   91:12 92:5 93:14,21
   94:8,10,23 96:23
   98:4 99:7,15,19,19
   99:21 100:11,18
   101:11,13 103:1,23
   104:8,10,19 105:3
   106:2,2
**Justice** 103:11,16
**justify** 70:5

**K**

**Karen** 7:20
**Kealy** 59:9,18
**keep** 76:23 77:8
**Kelly** 2:18 87:13 91:22
**kick** 75:20
**kill** 61:23 81:11 82:4
**kin** 108:11
**kind** 4:23 10:8,10
   16:18 26:9 30:13
   39:17 53:3 54:8,23
   64:5 80:11 83:1
   88:10
**Kinko's** 77:23
**Kit** 65:20
**Klein** 71:7 72:14 76:9
   76:20 82:18 83:15,23
   84:23 95:9 96:6
   98:13
**know** 4:11,20 5:1,2,16
   5:23 8:13,22 11:9,16
   16:5,5 18:10 19:2
   20:6 21:18 23:21

24:13,17 27:6 28:17
34:19 36:22,23,23
39:1,15 40:9 44:17
48:23 49:17 50:2
51:1,1,3 52:10,19
56:4 57:21 58:5 61:6
66:2 71:13 72:6
73:17,22 74:3 75:16
76:14,17 77:7 79:17
81:5,6,19 82:6 83:2,3
84:2,18,21 85:21,22
86:2 87:8,11 88:2,18
89:1 96:7,10 98:14
98:15 105:8
**known** 31:21 32:7 52:5

**L**

**Labor** 100:14,21
**landscaping** 60:17
   62:13
**Large** 2:4 107:5 108:22
**last** 4:13 18:4 21:13
   22:8 29:16 38:6
   61:18 63:3 64:3 73:3
   94:5
**late** 38:1
**later** 20:8 52:9,11
   53:13
**law** 2:4,14 15:5 17:20
   23:13,14 24:1 28:1,2
   51:10
**lawsuit** 13:2,3 29:1
   66:16
**lawyer** 49:23 50:8 95:8
**LEAD** 1:7
**leader** 58:16
**leasing** 70:3
**least** 56:21
**leave** 6:11 31:10,19
   36:1 37:20 56:3
   75:20 85:17 90:14,16
   90:20,22 91:14
**leaving** 6:8 20:4
**left** 11:11 35:23 54:21
   58:12,19 59:10,12
   72:9 75:3,5,8,21
**left-hand** 42:12 47:5
**legal** 19:18 20:2
**legally** 23:21
**Les** 59:18 60:12
**less** 51:7
**let** 4:18 8:18 10:14
   13:12,15 14:11 16:18
   28:15,16 42:9 45:11
   46:9,17 55:7,13 56:8
   57:20 58:6,8 62:17
   66:4 69:1,2 75:15
   80:10,20 81:9 86:1
   87:11 88:18 91:1

93:10 96:15 100:11
**letter** 7:1,3 10:10,21
   11:2,5 21:21 24:5
   35:12 44:14,17 45:6
   47:20 48:20 49:15
   56:9 72:12 86:6 87:6
   87:13,15 93:2 95:4
   98:21 99:1,2,4,5
   100:2 101:11,16,19
   102:23 103:2,6,16,19
   103:20,23 104:1,3,11
**letters** 56:11,12
**let's** 15:9 23:3 30:10,19
   41:19 46:11 51:13
   53:14 58:21 64:8
   65:3 67:5 68:7 86:18
   89:15 95:3 97:7,8
**Lexapro** 5:14 79:2,14
   79:22 80:16 96:16,22
   96:23
**like** 10:4,7 14:1 15:11
   16:19,22 17:11,14
   25:20 27:12,12,23
   28:20 30:6 32:14
   33:13 35:8 36:7,21
   37:14,15 39:7 42:11
   45:15 50:3 54:18
   57:3 63:17 64:17
   69:3,5 70:3,4 75:8
   77:8,23 78:9 81:13
   81:19 83:1 84:1 85:5
   86:1,2,4,9 90:2 91:2
   94:19 97:8,16 98:6
   100:18 101:4,6 102:8
   105:1
**liked** 31:21
**limited** 36:3
**line** 33:6 62:9 109:29
**Lipitor** 79:8,19,20
**list** 15:11 17:12 38:8
   40:2 43:14 51:4 59:6
   60:5 64:1,13 109:35
**listed** 15:15 21:11 25:7
   29:10,12,14 31:1
   48:16
**listen** 84:17
**literally** 61:12
**little** 18:4 19:1 21:7
   25:9 38:18 43:23
   63:11 64:10 67:16
   72:11
**lobby** 106:3
**local** 27:23 28:2,2
**location** 48:13
**Loden** 66:5
**logbooks** 54:19
**long** 5:3 75:12
**look** 11:11 12:2 19:7
   21:1 26:1 30:22

32:10 41:9 44:5 47:3
   50:3 54:18 60:21
   77:12 97:16
**looked** 50:5 81:2
**looking** 15:2 21:10
   41:4 42:8 43:7 45:18
   46:2,3 47:20 54:3
   66:11
**looks** 22:20 32:14
   42:11 57:3 64:17
   69:3,5 90:2 94:19
   97:8 98:6 101:4,6
**lose** 91:3
**loss** 7:15 33:12,12,16
**lost** 59:12 96:20
**lot** 4:9 6:5 10:22 13:9
   16:9 18:4 25:4 40:23
   54:7,9 63:10 71:16
   73:1 85:2
**lots** 77:16,17
**low** 86:16

**M**

**made** 6:8 8:7 14:21
   15:1 18:13 20:22
   27:6 72:3 77:12 82:8
   88:23 89:3,4,12
**main** 44:2
**make** 4:12 25:2,5 26:3
   28:7 30:5,19 32:12
   48:16,18 55:22 61:6
   76:9 77:13 88:20
   89:1,9 93:7 109:29
**makes** 43:16 69:19
   93:10,19
**making** 13:17 15:10
   16:12 22:4 30:3
   36:19 52:15 60:21
   93:13
**manageable** 5:5
**management** 58:14,15
   96:12
**manager** 2:18 20:10
   87:14 91:18,20
**mandatory** 24:13,17
**manifested** 3:18
**manner** 14:19 108:13
**manual** 31:15 32:23
   34:6,8 39:20 46:21
**map** 57:10
**March** 65:20
**marital** 74:22
**mark** 55:21 57:6 67:19
   69:7
**marked** 106:15
**marriage** 6:6 76:1,2,3
   76:5
**Marsh** 21:5 50:14
**Martin** 47:22

**master** 29:17 66:12
   67:5
**matter** 5:4 107:9
   109:37
**may** 16:11 32:8 44:1
   61:23 69:17 76:17
   96:9
**maybe** 63:9 69:12 77:5
   77:6 92:5 99:7
**mayor** 6:2 7:3 8:9 10:4
   10:22 11:13,17 17:3
   18:13 35:4,9,10
   36:14 37:10 42:6
   43:2 45:1 48:16 52:2
   52:9,15 53:4 56:7,22
   60:23 61:2,10,20,22
   62:3,16 69:23 70:4
   77:6 81:11 82:4 85:5
   85:8 86:1,3 87:4,22
   88:20 104:23
**McKay** 2:13
**mean** 9:13 29:6 33:15
   33:18,23 34:19 37:10
   37:21 43:22 49:5
   54:1 72:22,23 73:16
   77:3,4 81:1 88:1 89:7
   97:20 99:1
**means** 4:20 105:6
**meant** 33:2 34:19
**medical** 6:23 31:10,19
   37:19 39:1 90:14,16
   90:20,21 91:14 96:21
   102:5,6
**medication** 5:5,7,10
   35:15 78:22,23 79:1
   79:21 81:13 91:7
   96:14
**medications** 8:13 79:17
**medicines** 80:15
**meet** 106:3
**meeting** 8:4 17:20
   19:10 21:14 23:13,14
   23:17,20,22,23 24:6
   25:20 49:7 51:10
   52:7,8,11,13 56:22
   57:13 61:4,19,19
   66:4 77:6 106:4
**meetings** 27:18 59:21
   61:5
**MEMBER** 1:14
**memo** 11:13,17 12:2
   49:22 50:8,13 56:5
   56:22 71:7 83:17
**memorandum** 49:10
**memory** 7:15 8:23 9:2
   9:18 16:19 33:12
   54:23
**memos** 11:10
**mental** 5:16,19,20 6:1

Telephone Deposition of James F. Trombley, Jr.

September 12, 2007

Page 6

8:9 9:17 10:16 24:1
31:2,16 32:18 33:8
33:11,16 36:12 80:15
92:2
mention 15:23 22:8
28:22 48:4
mentioned 3:21 28:21
mentions 67:12 86:6
message 59:11,12
met 52:7 60:12,14
65:20 71:15
middle 1:2 52:23
107:16 108:2
might 6:3 12:23 16:5
33:21 54:6 58:1 62:8
64:10 69:1 99:7
mild 7:15
military 74:21
milligrams 91:9
Milner 52:4 60:10,19
61:11 71:23 72:2
Mine 84:19
minute 38:13
minutes 63:15,19
Miralax 79:12
missed 19:12
missing 59:11
mistake 26:3
mixed 66:23
MO 109:25
mode 4:17,17,19,19
Monday 59:13 72:19
73:6 95:17
Montgomery 2:6,16
107:2
month 57:17 74:13,16
75:5
months 6:12 65:13
69:11 74:14
more 18:1 21:10 25:10
38:18 46:13 51:6
62:9 65:11 66:9,13
97:16 98:3,7 99:20
101:6
morning 49:18 78:21
83:12 95:9
most 18:9 72:22 77:20
mostly 6:16 18:16
motion 38:4
move 15:9 53:13 97:7
much 9:1,3 14:22 52:22
81:15 90:18 92:1
multi-lot 66:6
municipal 45:22 47:9
47:14
municipality 16:6
must 83:3
myself 20:21 92:4

**N**

name 22:17 60:13
74:19,19
named 25:8
Nashville 105:21 106:2
necessary 20:20
need 25:5 41:19 42:9
46:11 57:17 63:23
84:16
needed 60:10 85:5
needs 34:10 89:7
neglect 22:13
negligence 22:8,15,19
22:22
neither 108:11
never 20:3 35:11 37:14
50:20 88:10 90:15
93:13 99:10 100:4,16
new 26:10,14 30:19
31:8,11 105:11
news 52:2 53:3
newspaper 81:16
next 26:1 33:6 34:1,5
34:14,16 35:18 37:16
37:18 56:15 59:8
69:5 75:13 79:21,23
80:4,9 97:9 105:14
105:17,20 106:9,10
nice 36:16 37:4
night 75:14 80:5 91:3,5
91:6,10
nine 83:13
Nix 2:4,14
nonclassified 45:22
47:15
normal 97:1
North 64:17 109:24
Northern 1:3 107:17
108:3
nose 80:10
notarized 109:33
NOTARY 109:19
note 58:19 84:4 87:15
95:7 98:19 99:14
notebook 55:1
noted 109:6
notes 3:12 47:23 54:15
58:17 61:1 64:17
65:11 67:19 68:23
69:2,6 70:18 71:10
77:4,4,5,12 81:3
83:22 86:22 94:21
97:13,17,19,23 98:3
98:4,8 104:23
nothing 3:8 26:14
107:9
notice 49:1 56:3 82:22
90:10

noticed 52:21
notified 109:36
November 26:20 45:8
59:22 69:13 71:9,15
72:19 73:9,9 75:23
78:18 80:17,18 84:10
88:19 95:12,12
105:21
number 27:10,13 32:11
32:15,20 41:8 45:11
56:5 64:13,16 109:29
Numerals 46:6

**O**

occasionally 64:11
occasions 104:22
October 11:8,20 26:20
57:13 59:21 69:13
108:14
off 8:15 13:9 40:10
84:20,20 90:2,4,5
91:8 96:21,23
office 16:11 37:13,14
50:16 58:12,16 64:22
65:3 71:18 72:10
86:3,5 92:21 100:21
101:12,16,19,21
102:10
officer 16:12 48:15
95:5
officers 45:22 47:9,15
82:1
Offices 2:4
official 24:2 29:17 54:2
54:22 92:15,20 93:7
94:4,6 105:5
officials 93:5
often 73:19
oh 8:10 14:5 19:13
31:13 32:2 41:6
56:10 59:19 64:21
75:13 84:3 89:14
99:2 100:12 102:20
okay 13:4,9 14:18
15:13 16:22 19:5,7
19:23,23 21:3,8,9
22:1,2,6,7 23:8,9
25:2 26:4,5,23 27:11
27:14 30:2 32:6,13
33:4,8 34:3 39:18
40:1,6 43:8,9,10,19
44:22,23 45:3,4,14
46:1 47:11 51:2,23
53:18 55:12 56:3,15
57:2,5,7,8 58:4,10,21
60:16 63:8,20 64:12
69:4 74:1,2 76:15
78:2,4,5,11,17 79:9
79:11,13,23 80:6,13

82:13 86:19 87:7
89:10,15 91:1,23
92:8,14 94:7,12
96:15 97:10,11
101:14 104:18
105:19 106:5,8,11,12
older 86:14
once 6:13,18 8:21 25:2
74:16 96:22
one 3:15 5:3 6:17 7:13
7:18 9:19 10:20
11:11 12:20 13:8
15:6,12 17:1,5,11
21:20 27:18 28:14,16
29:8,9,14 30:11 33:4
37:11 42:5 46:18
47:3,8,18 50:9,23
55:3,3 56:15,21 57:9
64:1 72:6 75:1 81:17
87:1
ones 39:15
online 70:13
only 43:11 80:15 85:15
85:19
open 17:20 19:10 23:12
23:14,17 24:4,9
25:20 51:10
operation 37:17
opinion 9:3,5 18:15
27:21 37:10
opportunity 36:6 37:19
38:23 92:22
option 31:20 91:16
92:6
optional 24:15
options 32:8
order 23:5 47:2
ordered 17:3
ordinance 26:15 27:7,9
27:13,15,22 28:2
organized 16:8
original 109:31,32,35
originally 12:16 88:15
other 10:1,13,15 12:5
12:11,14 15:2,10
16:17 17:14,18,22
19:8,11 23:10 24:22
32:8 33:13,17,18
35:8 36:4 37:5 42:7
50:17,23 55:4 64:2
77:3 88:10 94:3
103:3
others 31:18
out 13:11 24:5 30:18
36:6,11,20 41:16,20
44:3 47:2 48:21 49:1
54:18 58:18 62:8
73:16 74:12,14 75:20
85:8 86:3 91:6 93:23

106:1 108:8
outbursts 8:14,17
outgoing 11:10
outright 34:11
outside 83:19 86:5
91:10
outvoted 32:3
over 21:7 23:3 26:1
39:22 41:9 43:7,22
50:19 54:22 58:21
60:23 62:17 64:4
72:2 80:21 82:12
86:18 87:12 89:15
95:3 101:13
overall 38:9
overconcentrate 4:22
own 18:19,20 20:9,12
20:13 70:6
owner 56:9,11,18
owners 56:12 59:6
O'Brien 55:15 56:16
o'clock 63:13 83:13
88:21

**P**

packet 21:1
page 12:23 15:14,15
19:7,9,11 21:1,10,12
23:3,4,10 24:23 25:5
25:16 26:6,13 28:5
28:10,12,13 29:16
30:6,10,23 31:7,7,8
32:10 40:17,18 41:4
42:11 44:7,17 45:6
45:17,23 46:7,20
47:4,5,5,6,7,7,8,10
47:20 55:5,8,14,17
55:20,23 56:1 57:1,4
58:3,22 60:8 62:1
65:3,10,18,19 66:3,8
66:10,18 67:4,7 68:2
69:1,7,20,21 71:6
82:12 84:20 86:18,20
87:12 89:15 90:9,15
90:23 92:10 94:2,19
95:3 97:7,12 98:7
109:29,31,32,34
pages 14:11 23:5 30:18
40:23 44:1 46:17
47:2,3 48:21 54:13
54:16,22 55:10 69:5
77:17,18 108:6
paid 37:1
pain 7:13 10:23 60:17
73:1 85:2 96:17
Pamela 2:2 107:3
108:20 109:41
panic 96:2
panicked 95:9 96:1,5

Telephone Deposition of James F. Trombley, Jr.

paper 109:6
papers 38:12
paperwork 88:7
parade 28:18
paragraph 15:17,19,23
  21:13,19 22:8,21
  29:16,23 32:10 33:7
  48:7 59:8 61:18 63:3
  71:12 94:5
parking 71:16
part 10:2 13:12 20:11
  23:12 24:16 31:13
  33:16 37:14,15 40:13
  41:10 42:5 43:11
  44:3,8 51:22 63:3
  69:1 72:16,18,23
  73:3 86:13 87:6 88:5
  102:10,20
parties 108:8,12
  109:36
partly 7:12
parts 39:20 44:11
part-time 98:17 105:5
  105:6
passed 9:14
past 5:4 104:5
Paul 65:6,19
payment 53:12
pc 56:8 59:19
pending 102:22
people 9:21 33:13,17
  33:18 37:5,13 86:7
  86:16
per 34:6 45:21
percent 99:20
perfectly 33:19
performance 24:2
period 69:11,12
permit 68:14
person 16:10 31:16
  89:5,7,7,8 91:22
  92:16
personal 2:18 58:13
  76:23 77:8
personally 21:13 93:22
personnel 15:2 20:10
  21:15 26:9 31:15
  32:23 34:6,7 39:20
  44:19 48:15 58:14
  87:14 88:8,16 91:18
  91:20
phone 45:16 56:4
photo 57:10
physical 36:12
pick 61:22 106:1
piece 86:4
place 5:3 6:17 48:13
  75:1 81:9,17 82:5
  109:5

placed 31:18
places 69:23
plaintiff 1:5,11 2:10
  32:14,17,23 33:8
  34:3,17 35:19 37:19
  107:11,20
plan 56:21 58:1 66:12
  67:5 97:21
planner 52:5 60:19
  61:11
planning 52:12 55:13
  56:13 57:13 59:20,21
  59:22 60:6 61:4,19
  63:2
plans 57:15 60:15,15
plat 59:11,13 60:4
played 51:3
please 38:6 59:4,17
  109:28,32,34
point 9:1 16:14 38:1
  44:3 80:22 81:5 92:3
  105:13
police 19:21 81:21,23
  95:5
political 6:9 18:12,15
  18:16 34:18,22
position 82:19 92:14,19
  93:4,6
positive 28:11 77:9
  97:15
possession 11:3
possibility 58:1
possible 37:17 57:18,18
post 35:20 36:8 37:17
Power 71:17
Powers 9:23 31:14,20
  31:22,23 37:22 91:15
prefer 57:15
preliminary 56:21
prepared 49:8
present 2:17 5:4
  100:22
president 47:22
press 32:18
presume 11:7
pretermination 3:19
  35:21
pretty 9:1,3 14:22 37:4
  38:8 40:4 45:10
  52:10,22 89:12 90:18
  96:9 105:12,17
previously 3:7
printed 108:6
prior 9:16 10:20 104:3
private 20:12 74:18
Pro 2:11
probably 40:4 46:10
  65:12 69:12,13 74:13
  76:16 77:16 105:7

problem 36:19 73:20
  78:12
problems 5:16 6:6 7:5
  7:17 9:1,18 12:9
  65:23 74:22 91:7
procedural 13:21 14:1
  14:5 17:8,16 21:23
  39:9 43:16
procedure 44:8 46:12
  46:14,20 47:4,13
  51:8
procedures 14:2
proceeding 99:22
process 13:14,17,21,22
  14:5 15:17,20 17:8
  17:16 19:10 22:1,5
  22:11,14,21 25:20
  31:4 32:21 39:1,3,9
  43:17 51:8 53:15
  88:6
professional 2:2 29:18
  107:3 108:21
project 10:6 53:5 57:11
  60:5 61:23 64:23
  65:19,22 66:1,6,7,9
  66:14,15,19 67:19
  68:7,10,12,18 69:8
  86:11,15
projects 54:19 55:4
promoted 88:15
prompt 109:37
promptly 78:3
proof 12:18 85:10
property 53:8,10 54:3
  56:9,11,12 58:13
  59:6
proportion 93:23
proposed 52:14
protect 24:21 70:11
prove 28:19
provide 10:10,20,21
  11:2 37:8 39:19
provided 109:29
provider 102:6
provision 14:3
public 32:19 109:19
pull 30:18
punished 18:17
purpose 92:7
push 62:10
put 4:15,21 5:14 11:9
  12:16 21:23 22:5
  23:4 31:11 38:11
  39:6 50:7 55:21 57:6
  61:1 78:14 85:16
p.m 2:7 57:12 60:12,14
  72:5 91:11 106:18

Q

qualified 30:1,4
question 15:5 37:23
  94:3
questions 26:3 64:11
  76:16
quick 4:18 40:4 101:13
  106:4
quickly 44:1
quit 84:4,5
quite 82:2
quote 72:4,4

R

rabbit 16:9
range 69:3
rating 99:20
RE 109:26
read 32:11,12,15 33:6
  34:1 35:18 37:16
  41:11,12 55:20 56:1
  57:7,9 58:22 59:4,17
  60:11 61:18 62:5,6
  64:5,8 71:12,14
  83:22 97:14 109:2,28
reader 25:1
reading 14:16 43:9
  81:15 101:13 108:9
ready 60:6 71:14
real 4:18,22 6:20 20:5
  54:4 55:15 56:16
realized 75:3
really 12:18 52:21 54:1
  55:19 64:5 73:6
  76:17 99:23
reason 34:15 51:22
  87:15
reasons 33:4 109:6
recall 50:18 54:1 76:19
  81:8,22
receive 22:14 60:3 86:7
  88:8
received 47:21 50:21
  59:5 88:10 91:13
recess 63:21
recognize 27:8
recommended 70:9
record 71:12
recording 19:22
records 6:23 102:5
reemployment 12:17
  12:17 29:11 99:23
  100:14
refer 25:19 29:19 44:23
  47:12 92:17
reference 99:16,21
referred 44:12 46:15
  46:18
refers 30:13 84:4 92:19
Reflections 64:19,20

67:20,23 68:1,16
refresh 16:19
regarding 72:1
Registered 2:2 107:3
  108:21
regular 68:22
regulations 14:6,9,12
  15:3 16:23 17:5,17
  21:15 39:13 44:19
rehab 86:15
rehabilitated 86:17
rehabilitation 10:18
  28:22 29:11 86:11
reimburse 78:1
related 21:19 39:4 55:1
Relations 89:18
relaxed 18:1
relaxes 91:3
release 19:13 23:15
  31:2
released 32:18 51:11
  103:1
releasing 23:12
remember 6:2 11:4
  17:23 25:7 27:10
  41:2 44:6 45:7,16
  50:15 57:11 68:16
  69:10 72:15,17,21
  73:2,6,8,12,16,17
  75:5,7,11,23 76:11
  76:12,20 78:18,20
  80:17,20 81:1,8,11
  81:12,14,15,15 82:2
  83:19 85:15 88:19
  93:17,18,19 96:11
  97:3
remembered 96:4,10
removal 16:10 45:21
  47:9,14 51:4,5 94:14
removed 16:12 92:21
rep 56:18
replat 57:20
replats 57:17
reported 107:5
reporter 2:3 23:7 107:4
  108:21,21
REPORTER'S 106:23
represent 49:20
representative 42:15
representing 9:4
reprimanded 8:15
request 20:23 77:13,22
  78:6
require 100:15
required 88:9 106:6
requirement 24:13
requirements 60:5
research 36:7 104:10
resend 59:14

Telephone Deposition of James F. Trombley, Jr.                                    September 12, 2007

Page 8

residential 67:2,13,22
resign 82:19 83:5,23
resource 89:9
respect 63:5
respected 83:23
response 28:11 77:9
  97:15
responsibility 71:22
responsible 71:20
rest 84:2
result 89:22
results 108:13
retail 67:1
retaliated 51:14,23
retaliation 18:12 34:18
  34:22 51:13 103:3
return 109:34
Returned 60:10
review 37:20 39:1
  59:14
reviewed 32:15
revised 59:13 60:3
rezoning 56:9 60:4,7
Rick 2:13 109:42
Ridge 63:6 67:12
right 3:14 4:13,20 8:8
  22:10,14 23:14 24:11
  26:10,10 30:9,15,21
  32:20 34:6,12 35:23
  40:10 42:12,20 45:19
  46:5,17 47:8 58:20
  61:4 65:8,9 82:15
  85:17 86:23 87:17
  93:15 94:10 95:8,20
  95:23 101:13 102:23
  103:2,2,5,5,17
  104:21
rights 14:3 15:16,17
  24:21 101:17,20,21
  102:10
right-hand 47:6
rip 96:15
Road 2:5,15
Roman 46:6
room 60:14 106:2,3
Rosie 17:1 48:14
RPR 109:41
rule 39:8,8 44:2 48:18
  48:23
rules 14:6,9,12 15:2
  16:23 17:6,7,17
  21:15 22:3 23:1 26:9
  33:1 39:10,13 40:12
  43:14,17 44:19 48:19
  51:7 90:18
R-4 67:6

S
safe 57:19

Sain 59:10
Saliba 67:19 68:7,10,12
  68:18 69:2,7
same 12:5 23:15 25:5
  26:7 28:10 37:8 47:1
  47:10 65:19 67:10,14
  68:3,5,8,10,14,20
  69:6,8 70:21 91:22
  100:6,7,9 101:2,2,4,8
  102:12,14,16,18
  104:18 105:3 108:9
Savannah 67:12
saved 11:12,12
saw 52:3 74:4 75:4
  100:4
saying 4:1 7:5 9:7
  10:10 13:5 14:15
  32:7 34:7,21 37:4
  41:21 42:18,21 51:23
  72:20 82:8 83:17
  85:15 89:2,3 91:13
  91:15 93:1,14 103:23
says 8:10,12 9:20 18:18
  20:2,6,20 24:16,17
  26:23 31:15 33:19
  38:6 40:11,13,16,21
  41:12 42:6,14 45:3
  45:21 47:4,7,9 48:7
  48:23 50:10 58:19,20
  70:4 76:9 82:23
  83:14 84:18,21 85:16
  87:15 94:8 95:12,21
  104:19,20
scheduling 25:8
se 2:11
second 3:21 43:7
secretary 27:20
section 16:6 27:1 30:8
  30:16 39:16,16 40:7
  40:9,11,14,14 41:7
  41:17 42:8,10,17,21
  43:3,22 44:5,6,9,9,10
  44:13,19,21,23 45:4
  46:1,2,3,3,7,8,12,15
  46:15,18 47:12,14
  49:1,6
sections 26:8 27:22
  29:7 39:22 94:23
  97:21
see 13:12 15:3 26:10
  28:6,11 30:10 31:7
  36:7,8 38:6 42:9
  45:12 46:9,11 50:6,7
  54:8,10,14,22 55:5,7
  55:14 56:9 66:4 67:5
  68:7 69:1,7 73:4,5
  77:12 80:10 82:7,9
  88:5 89:11 94:21
  96:13 100:11 103:21

104:22,22 105:20
  106:7
seeing 5:12 6:5 36:18
  74:4,6,12 90:21
seems 45:15 60:16
seen 73:20 77:4 78:20
self 58:19
selling 105:10
send 12:4 50:18 54:16
  77:13,21 78:2,6,13
  78:13 86:7 99:4
  100:12 103:20
sending 104:3
senior 62:20
sense 69:19
sent 11:5,8 12:5,21
  19:7 21:2 29:1 39:19
  44:18 45:10 50:1,17
  50:21,22,23 54:14
  56:5,12,18,22 60:10
  64:2 99:14 100:20
  101:11,19 103:13,19
  103:23 104:1
sentence 34:2,14 35:18
  37:16 94:5
separate 22:15 29:22
  45:2 109:6
separated 75:12
separation 69:14,15
  87:13,15
September 2:6 11:6
  69:13 108:5 109:3,28
serious 89:12
seriously 82:10
Seroquel 79:4,16 80:1
  80:5,16 91:2,8
Services 100:3
session 24:4,7,9,11,14
  50:11 83:9
set 18:19,20 108:8
setbacks 54:7
setting 49:1
settlement 106:6
settling 5:3
several 15:19 27:18
  52:8 104:22
severe 10:22
Sharon 56:4
sheet 29:4 109:6,29,34
shift 72:6 88:21
short 10:14 63:8
shot 81:21 104:8
shotgun 86:14
show 11:17 16:15
  34:15 99:19
sic 60:10
sick 56:3
side 42:13 47:5,6 58:19
  58:20 61:22 70:10

106:1
sign 109:32
signature 56:19 109:31
  109:32,33,34
signing 108:9
simple 18:7
simply 38:1
since 36:14,16 43:5
  63:6 84:11 91:15
  92:1 99:21
Sincerely 109:39
single 41:16
sir 79:7 94:16
site 56:21 60:15
sitting 105:11
situation 4:10 6:10
  21:16,20 89:6 91:2
skills 58:14,15
skip 58:21 95:3
slow 105:12
slowed 105:9
small 60:14
solely 9:5
some 14:21 15:2,9,15
  26:2,19 39:17 40:5
  47:23 50:17 54:6
  55:4 63:1 64:8,11
  65:4 70:18 77:5
  81:13 90:17 94:23
  97:13,19 98:3 99:8
  101:6 104:10,23
somebody 6:7 54:4,5
  84:16 105:6
someone 4:8 56:13
someplace 6:18,19 75:2
something 4:23 6:22
  9:10,20 10:6,11
  22:12 27:12 29:22
  31:11 32:14 33:21,22
  39:17 46:10 51:16,21
  61:2,7 66:22 69:18
  71:17 75:4 78:15
  81:4,4,5,12,13,19
  84:18,19 89:20 90:19
  96:13 102:4,8
sometime 81:1 97:4,6
sometimes 84:16
somewhere 6:4 50:1
  77:23 93:2 105:22
sorry 55:9 56:2
sort 42:15 81:5 83:4
sounds 86:9 105:1
  106:12
so-called 85:21
speak 3:8 26:21 107:8
special 17:6,7 18:16
specific 16:20 26:8
  27:9 32:22 45:1 48:3
  48:11,17,20 49:2,5,7

92:23 93:2
specifically 15:8 18:18
  22:17 28:3 39:15
  40:10 44:18 55:2
specifics 49:11,14
specified 29:2
specifying 109:29
spelled 24:5
spending 70:5
spinal 35:20 36:2
spoke 55:14 56:16
  57:12 62:2 70:8 81:2
spoken 26:16 31:4
  38:15
sponsor 84:1
spray 80:10
stack 12:21 30:17
  38:12 45:18
standard 27:17 106:11
Star 64:17
start 5:10 74:10 80:20
started 5:12,12 6:13
  19:15 20:16 53:9
  74:11,12,14 78:8,10
starting 3:12 68:23
  72:19
state 2:3 23:23 89:17
  94:15 107:1,4 108:22
stated 44:18 71:21
  109:5
statement 13:1 25:18
  26:8 30:3 72:4 76:10
  87:21 88:2,4,20,23
  89:1,4,4,12 95:22
  100:18
statements 88:3
States 1:1 13:18,20
stem 10:3
stemmed 7:6,8
Steve 66:4
stick 30:16
still 13:2,12 36:4 42:18
  48:21 57:18 65:8,12
  66:18 69:3 72:23
  78:23 81:6 88:5
  102:22
stolen 81:13
stop 62:17 64:10 84:9
store 52:14 83:20
stores 54:11,11 70:4
straight 60:23
street 8:15
stress 36:8 37:17 76:2
Stressed 73:16
stressful 81:7
stressor 4:10
stressors 4:15,21
stuff 4:23 8:5 10:8 26:9
  33:13 36:3,17 41:9

45:3 50:2,12,17,21
54:8 55:1 61:5 70:4
70:12 79:13 80:11
85:1 93:23 96:17
103:7 105:3,15
**subdivision** 66:21
67:13,22 86:14
**subjective** 16:22
**SUBSCRIBED** 109:15
**substantial** 53:11
**substantive** 13:21 14:2
Sudafed 80:11
**sue** 12:16 102:23 103:2
103:5
**Suffering** 37:17
**suing** 3:13 4:1 10:18
12:12,14 14:8,9
16:17 17:19 19:2,8
21:11 24:22 25:6
38:8,14
**suit** 22:18
**Suite** 2:5,15
**Sunday** 60:12,13 61:20
62:3
**superintendent** 65:21
**supervisor** 35:4,9
62:20
**support** 11:1 25:13,17
35:6,7 43:18 52:23
**supposed** 18:21 50:18
88:17
**sure** 6:9 9:20 13:23
25:2,5 28:7 30:5,19
32:12 36:19 41:10
45:10 48:16,18 52:21
55:22 59:19 69:7
77:11 83:8 84:20
89:9 93:9
**surgeries** 36:17 37:6
**surgery** 10:21,23 11:8
11:19,21 12:1 35:20
36:1,8 57:16 65:14
73:1,21 76:5 85:2,3
99:14
**surprises** 28:9
**survey** 57:20
**Susan** 57:12
**suspect** 29:5
**suspension** 8:5
**suspensions** 46:12
**switched** 96:21
**sworn** 3:7 107:8 109:15
**symptom** 6:15

**T**

**take** 5:7 13:9 24:3 63:8
63:11 82:7,9 89:9
91:2
**taken** 2:2 54:18 58:18

71:21 90:5 109:28
**taking** 5:10 9:16 38:2
76:4 91:9
**talk** 12:4 13:1 15:12,16
17:12 19:1,9,10 25:6
26:15 28:13 31:1,10
40:3 41:19 45:12
46:11 51:13 53:14,17
63:23 64:2 73:17,19
83:1 84:8,15,16,17
86:1 90:17 95:8 97:8
105:20 106:9,10
**talked** 8:9,11 31:13
33:11 40:5 51:5
52:22 54:4 60:15
71:19 82:23 86:20
90:12,14,15,16 92:11
94:14 102:23
**talking** 9:11 11:18 12:7
20:6 23:1,7 24:11
33:5 39:9 40:7 42:18
47:11,18 65:8 71:13
72:12 76:20 86:4
92:1 93:14
**talks** 29:16 40:9 66:11
86:11 92:14 93:4
**Taylor** 59:7
**team** 57:21
**telephone** 1:20 2:1,11
**tell** 7:1 10:7,9 40:17
41:20 44:20 53:14
58:8,22 73:12 76:6
77:21 81:14 103:22
**telling** 10:4 74:23
85:23
**temperament** 10:5,7
**temporary** 69:15
**ten** 63:15,19 88:21
**term** 4:6 5:15,17,17
**terminate** 9:14
**terminated** 38:22
51:17,20
**termination** 13:13,15
17:15 27:23 31:2
38:17 39:3 46:14
47:4,13 48:19 65:13
87:23 88:9 90:10
92:12 93:21 104:15
**Terry** 8:10,13 60:6
**testified** 3:9
**testimony** 72:20 73:8
87:18 109:4
**Thank** 109:37
**their** 9:5 20:11,23
22:13 27:23 31:17
34:10 36:11 43:3
54:8,11,11 69:23
**theirs** 15:3
**therefor** 109:6

**thereof** 108:13
**thing** 10:20 12:20
23:16 33:19 42:16
43:20 48:15 67:10,14
68:3,5,10,14,20
70:21 85:15,19 87:1
100:6,7,9 101:2,2,4,8
104:18
**things** 3:13 7:14 15:20
16:17 17:14 19:2,8
19:11 21:11 24:18,22
25:4,6,7,20 34:9 35:8
41:2 50:8 65:4 86:2
**think** 6:3 8:18,21 11:23
13:7 15:16 17:5 18:9
20:7,15,16 22:7
24:19,20 25:3,9,13
25:13 27:12 33:2
34:9 38:3,4,14,16
39:6,7,8 40:20 41:1
41:10,13 44:3 45:3,7
49:5 50:18 51:20,22
52:22,23 53:1,9,10
53:12,15 54:17,20
55:1,12,18,19 57:10
63:1,16,18 64:5,18
66:11 68:22,23 74:3
74:7 75:11,17 76:17
82:3 83:7,16 84:15
84:23 85:7,9 87:10
87:21 88:22 89:5,8
91:17 92:1,2,6 93:11
93:17,20,22,22 94:1
96:9 99:1
**thinking** 6:21
**thirty** 109:35
**thorough** 25:10
**though** 17:4,9 49:13
**thought** 11:12 14:8
16:5 20:3 25:15
71:20 95:19 96:3
99:7 104:11
**threat** 8:6 82:8,9 90:6,7
93:11,13,19,20
**threatened** 82:4
**threatening** 81:23
**threats** 48:4 82:8
**three** 46:13 69:5
**three-and-a-half** 53:22
**through** 4:8 13:1 29:18
30:18 36:8 40:2
43:23 45:11 50:3,5
52:16 54:13 64:1
65:14 69:16 70:23,23
71:2,4,4 84:6,13,14
85:3 86:13 87:10
94:19 105:17
**thrown** 36:21
**Thursday** 57:15

**till** 63:15
**Tim** 21:5 50:14 52:4
60:9,16,18,19 61:2,9
61:10 62:8,11,15,17
62:18,19 71:22 72:2
85:4,8
**time** 4:13,13 9:4 12:13
15:12 18:4 37:11
48:13 51:3 63:14
67:5 69:11,12 70:5
75:7,15,22 78:22
80:20 85:9 91:9,19
91:21 96:8,9 97:9
105:20 106:11 109:4
**times** 74:12
**Tim's** 62:23
**titled** 47:14
**today** 18:1 26:1,22
50:1 56:20 60:4
63:10,16,18
**together** 6:13 78:11
92:4
**told** 4:8 6:2,4 7:3 8:22
8:22 20:3,5,7,14,15
23:19 27:13 34:11
35:15 37:10 48:15
52:6,14 57:14,16
59:21 60:5 61:9 62:7
62:8,10,10,15 71:23
72:8 73:23,23 79:22
82:18 83:4 86:9
95:10,10 96:6,8
**tolerate** 63:6
**top** 40:10 55:21 57:6
82:16 94:5
**topics** 38:19
**totally** 61:11 91:6 92:4
**town** 16:11 52:4 54:3
61:9 81:17 86:13
**Trace** 66:5,14,15,19,21
67:6,8,10,13,17,21
**trails** 16:9
**training** 58:17,17 63:1
**transcript** 21:4 23:6
95:6 108:7 109:4,29
109:32,35
**transmittal** 56:10 95:4
**Travatan** 79:10 80:7
**Trawick** 2:18 87:13
91:22
**treat** 18:14
**treated** 8:19 35:16
37:12,13
**treatment** 6:14 18:12
**trial** 25:12
**tried** 16:7 17:23
**Trombley** 1:4,10,22
2:1 3:6 71:16 107:7
107:10,19 109:1,11

109:24,26,27
**trouble** 84:6 96:18
**true** 33:14 76:10 81:20
87:20 94:22 108:7
109:3
**trust** 84:1
**truth** 3:8,8,9 107:8,9,9
**try** 24:20 44:20 63:8,17
81:7 89:8
**trying** 17:23 22:19 41:2
45:6 55:10 75:11
81:11 98:6
**Tuesday** 71:15 73:7
95:15
**turn** 4:11 12:23 15:14
23:3 30:10 40:18
57:1 58:3 87:12
**turned** 35:11 72:1
**two** 12:7 74:15 80:15
80:23
**type** 5:20 6:23 7:2
10:13,15 12:14 24:18
35:12 78:22
**typed** 29:6
**typically** 74:6

**U**

**Uh-huh** 28:11 77:9
97:15
**unanimous** 32:5
**unbecoming** 48:9 49:3
**unclassified** 41:16,18
**uncomfortable** 72:8
**unconstitutional** 14:10
14:13,17 15:9 17:17
34:8 39:14 40:8 41:8
41:15,22 42:19,21,22
43:12 44:4,21 46:19
**under** 10:18 12:16 13:5
13:18,22 15:19 17:20
21:23 46:22 62:18
100:14
**underlined** 94:23
**underlining** 95:1
**understand** 4:7 18:2,6
32:16 36:23 82:11
85:16 88:1,3 89:14
91:12
**understanding** 11:1
**unemployment** 89:19
89:22 90:11
**unit** 58:16,20
**United** 1:1 13:18,20
**University** 58:13
**unless** 40:16
**unsupervised** 62:15
**until** 31:19 49:17
**untrue** 33:14,15,16
**upcoming** 56:11

Telephone Deposition of James F. Trombley, Jr.                                September 12, 2007

Page 10

| | | | | |
|---|---|---|---|---|
| **update** 56:6 | 32:12 36:9 38:17 | 75:12 78:22 79:1 | 86:10 | **107** 100:18 101:2 108:6 |
| **upset** 20:5 33:20 52:10 | 39:16 52:18 53:16 | 81:17 82:4 85:4 | **written** 14:15,17,21,23 | **108** 101:2 |
| 53:2 61:20 71:17,21 | 54:22 55:19 61:14 | 87:22 90:5 92:1 | 15:4 24:19 29:7 | **109** 101:4 |
| 72:17 73:14,15,18 | 63:8,11 64:6,7 73:22 | 103:21 | 34:13 41:17 42:3 | **11** 65:12 67:9 109:3 |
| 96:9,10 | 76:8 85:18,23 90:18 | **west** 106:1 | 49:1 | **11/21/06** 60:12 |
| **use** 5:15,18 21:22 42:17 | 94:3 105:13 | **we'll** 13:11 17:12 27:11 | **wrong** 4:14 22:4 45:18 | **11:15** 59:18 |
| 43:5 67:1 70:11,14 | **wanted** 20:19 21:17 | 38:12,19 58:21 71:13 | 49:16 60:21 75:4 | **110** 101:4 |
| 83:1 97:21 | 46:16 52:6,19 70:9 | 105:17 | **wrongful** 13:13,15 | **111** 101:6 |
| **used** 21:20 43:3,5 | 71:22 73:4 83:5 | **we're** 12:7 18:23 19:1,3 | 17:15 38:17 39:3 | **112** 101:8 |
| 46:17 | 84:23 86:10 87:8 | 23:7 25:5,9 33:5 40:3 | **wrongfully** 38:21 | **113** 101:10 |
| **using** 84:19 85:21 | 91:12 96:13 | 41:20 42:18 46:2,3 | **wrote** 11:14 27:15 | **1143160** 16:1 17:18 |
| **usually** 83:13 | **wanting** 62:9 75:1,2 | 47:11,18 49:8 55:20 | 41:16 100:13 | **115** 101:15 |
| **U.S** 107:15 108:1 | 83:3 85:13,14 | 57:7 63:9 64:3,8 65:8 | **wung** 21:17 | **116** 101:18 |
| | **wasn't** 17:4 18:19,20 | 71:13 72:11 99:21 | | **117** 102:9 |
| **V** | 20:2,4,12 27:3 38:23 | **we've** 6:12 23:14 25:14 | **Y** | **118** 102:12 |
| **VA** 74:17 96:20,21 | 39:2 62:20 85:5 87:3 | 30:5,22,23 31:4 40:4 | **yeah** 8:10 11:6 13:7 | **119** 102:14 |
| 97:5,5 99:2,4,15,21 | 95:8 96:18 97:4 | 51:5 70:23 71:2,4 | 16:7 20:1 21:13 | **12** 2:6 67:11 108:5 |
| **variances** 60:9 | 99:16 | 86:20 90:12,16 | 22:13 25:11,17 33:4 | 109:28 |
| **vehicle** 91:11 | **water** 67:2,20 68:1 | **whatsoever** 104:6 | 34:23 37:10 40:21,22 | **120** 102:16 |
| **verbally** 7:4 | **way** 4:11 5:2 12:5 | **while** 73:21 87:10 | 42:14 56:1 63:17 | **121** 102:18 |
| **version** 72:13 | 14:20 18:21 21:16 | 96:16 98:16 | 65:16 67:6,16 68:1,7 | **122** 103:7 |
| **very** 5:3 15:7 16:20,20 | 24:19 34:12 41:11 | **white** 37:11 61:12 | 68:20 69:17,17 74:6 | **123** 103:9 |
| 19:15 20:4 46:6 | 42:3 50:9 52:3 61:7 | **whole** 3:8 8:4 15:11 | 78:9,20 81:12 82:3 | **124** 103:9 |
| 49:11,11,14 72:7 | 78:7 85:1 | 33:6 42:16 53:14 | 84:15,22 87:20 90:19 | **125** 103:10,11 |
| 94:5 | **Wednesday** 2:6 26:1 | 55:23 56:1 72:15 | 94:13 95:19,19 | **126** 103:11 |
| **veterans** 12:17 13:5 | 57:15,16 73:5 74:8 | 73:20 107:9 | 100:15 102:8 104:10 | **127** 103:16 |
| 28:14,18,20 29:11 | 78:19 83:12 95:18,22 | **wife** 6:8,11 7:5,17 | 105:4 | **129** 103:18 |
| 99:22 100:14 | 105:14 106:9,10 | 69:16 72:5 75:3,6,12 | **year** 14:22 75:6,10 | **13** 67:15 |
| **veteran's** 101:12 | 108:5 109:28 | 82:23 88:21 | **years** 14:23 53:21,22 | **130** 40:3 104:12 |
| **vet's** 100:21 | **Wednesdays** 74:6 | **Wilbanks** 2:2 107:3 | 81:10 | **131** 104:18,18,19 |
| **violate** 43:17 | **week** 11:23 20:5 51:15 | 108:20 109:41 | **yells** 8:14 | **132** 3:2 105:3 |
| **violated** 14:3 39:8 | 51:17 56:22 59:7 | **willful** 22:9,20,22 | **yesterday** 50:5,20 | **14** 67:18 |
| 43:15 44:2 51:10 | 72:16,18,19,21,22,23 | **willfulness** 22:16 | | **15** 68:2 |
| 84:1 | 73:3 74:15 105:18 | **Wilsey** 7:20 | **Z** | **150** 80:1 91:9 |
| **violation** 17:18 51:7 | 106:13 | **winged** 21:18 | **zoning** 54:2,7 57:10 | **16** 68:4 |
| **violations** 15:21 | **weeks** 74:16 90:1,2,4,5 | **wish** 9:20 | 59:5 71:18,22 72:1 | **17** 59:22 68:6 |
| **Volume** 1:18 107:5 | **well** 7:8 8:12 16:9,22 | **wished** 91:15 | | **18** 68:9 |
| 109:2,28 | 19:15 20:20 21:20 | **witness** 3:7 108:8 | **#** | **18th** 59:23 60:1 |
| **vote** 9:14,16 24:3 32:1 | 22:17 23:12,12,17 | **witnesses** 48:13 | **#107** 109:24 | **19** 68:11 |
| 32:3 38:2 | 29:6 31:13 33:18 | **woman** 60:13 | | |
| **voted** 9:14 32:5,8 | 34:9 37:4,22 38:23 | **wondering** 94:10 | **0** | **2** |
| **voting** 69:23 70:3 | 42:5 44:12 49:17 | **word** 22:19 | **04** 69:13 74:11 84:10 | **2** 32:11,20 60:12,14 |
| **Vs** 1:6,13 107:12,21 | 54:22 62:4 73:20 | **words** 15:8 83:2 95:22 | **05** 65:16 69:13 | 65:3 |
| 109:26 | 76:12,14 84:6 89:6 | **work** 4:10 5:1 11:14 | **06** 65:17 | **2nd** 60:1 |
| | 90:14 91:6 93:13,14 | 24:1 36:3,20 37:13 | | **2:07-CV-00547-MEF** |
| **W** | 95:12,18 103:13 | 58:16,20 61:10 72:2 | **1** | 1:7 107:18 |
| **W** 29:16 | 104:1 | 73:18 | **1** 3:2 32:11,11,15 64:13 | **2:07-CV-00575-MHT** |
| **waived** 108:10 | **went** 3:15 5:21 19:16 | **worked** 5:13 17:2 56:8 | 64:16 106:15 | 1:14 108:4 |
| **walk** 91:4 | 52:12 65:13 69:16 | 56:10 58:11 62:15,19 | **1st** 108:14 | **2:30** 2:7 105:14 106:10 |
| **Wal-Mart** 51:16,21 | 72:10 74:15,16,22 | 70:13 | **10** 65:12 67:7 72:5 | **20** 68:13 79:20,22 |
| 52:1,4,14,14,18,19 | 75:4,7 76:14 97:5 | **working** 53:20 64:23 | 105:21 | 109:16 |
| 53:5,7,15,23 54:6,15 | **were** 3:12 7:16,16 8:18 | **workload** 36:22 | **10/1/07** 109:23 | **2001** 58:11,18 |
| 55:2,3,6,11,16,17 | 14:8 21:22 23:18 | **works** 83:2 | **100** 99:18 | **2003** 27:1 |
| 56:5,17 57:22 58:1,7 | 32:8 36:16,18,18 | **worried** 80:8,12 | **101** 100:1 | **2004** 5:13 |
| 58:23 59:2,5,15 60:5 | 37:4 38:2,3,3,21 | **worry** 4:22 76:8 | **101.4** 27:2 | **2005** 6:3 26:20 75:11 |
| 60:9 61:5,10 62:7 | 51:14,17,20 52:11 | **wouldn't** 35:6 | **103** 100:6 | **2006** 11:7 45:8 71:9,15 |
| **want** 6:7,17,18,19,20 | 54:3,18,20 58:18 | **write** 4:18 11:14 13:15 | **104** 100:8 | 73:9,9 75:23 78:18 |
| 6:22 12:20 18:3,6,7 | 59:11 62:17,19 64:23 | 65:4 70:10 | **105** 100:10 | 80:18 |
| 25:2 28:7,9,9 30:5 | 69:10 70:3 74:9 | **writing** 10:20 33:2 56:2 | **106** 3:2 | **2007** 2:6 108:5,14 |

| | | | | |
|---|---|---|---|---|
| 109:3,28 | **54-2005** 27:12 | **97** 98:10 | | |
| **21** 59:22 68:15 | **55** 40:18,19 41:4 90:12 | **98** 98:18 | | |
| **22** 68:17 90:1 | **56** 41:4 42:11 48:21 | **99** 99:13 | | |
| **224** 109:24 | 90:12 | | | |
| **23** 68:19 | **57** 41:5,6 44:8 47:6 | | | |
| **24** 68:21 | 48:21 90:12 | | | |
| **25** 69:7 | **58** 41:7 45:23 46:7 47:9 | | | |
| **26** 69:8 | 48:21 90:12 | | | |
| **27** 69:20,21 70:16 | **59** 41:7 90:12,23 | | | |
| **27th** 72:20 73:9 75:23 | | | | |
| 80:18 88:19 | ——— **6** ——— | | | |
| **28** 70:16 71:15 75:23 | **6** 66:8 | | | |
| **28th** 73:9 80:18 88:19 | **60** 92:10 | | | |
| 95:17 | **61** 94:2,12,13 | | | |
| **29** 58:5 70:18 71:9 | **62** 94:17 | | | |
| **29th** 95:13,18 | **6301** 109:25 | | | |
| | **65** 47:4 94:19 | | | |
| ——— **3** ——— | **66** 95:3 | | | |
| **3** 2:22 11:8 32:11 65:10 | **67** 109:24 | | | |
| **3rd** 11:20 | **68** 21:1 97:7,8 | | | |
| **30** 45:8 58:3 70:21 | | | | |
| 99:20 | ——— **7** ——— | | | |
| **30th** 78:18 | **7** 66:10 | | | |
| **300** 2:5,15 | **78** 97:8 | | | |
| **31** 55:5 57:1,7 70:23 | **79** 97:12 | | | |
| **32** 46:20 47:5 55:14,17 | | | | |
| 55:20 57:4 | ——— **8** ——— | | | |
| **33** 47:6 58:22 | **8** 45:21,21 46:1,1,2,3,4 | | | |
| **34** 47:7 59:15 | 46:7,23 47:11,14,16 | | | |
| **35** 47:7 60:8 | 66:18 | | | |
| **36** 47:10 60:11 | **8:30** 91:3,5,11 | | | |
| **37** 55:8 62:1 70:23 | **80** 97:16 | | | |
| **38** 12:23 19:7 21:10 | **81** 97:16 | | | |
| 71:2 | **82** 97:16 | | | |
| **39** 23:3,4,10 24:23 | **83** 97:16 | | | |
| **391** 108:21 | **84** 97:16 | | | |
| | **85** 97:16 | | | |
| ——— **4** ——— | **86** 97:16 | | | |
| **4** 59:23 65:18,19 | **87** 97:16 | | | |
| **4:52** 106:18 | **88** 97:23 | | | |
| **40** 15:14 25:16 67:22 | **89** 97:23 | | | |
| **4001** 2:5,15 | | | | |
| **41** 26:6 | ——— **9** ——— | | | |
| **42** 26:13 28:5 | **9** 32:10 67:4 | | | |
| **43** 28:13 | **9/18/06** 56:3 57:12 | | | |
| **44** 30:10 71:2 | **9/19** 56:5 | | | |
| **45** 30:18,23 71:4 | **9/19/06** 56:8 | | | |
| **46** 31:7 32:10 | **9/20/06** 55:14 | | | |
| **47** 30:18 71:4 | **9/21/06** 59:9 | | | |
| **48** 71:6 | **9/25/06** 59:18 | | | |
| **49** 82:12 | **9/29/06** 60:4 | | | |
| | **9:30** 83:14 | | | |
| ——— **5** ——— | **90** 98:2,6 | | | |
| **5** 46:2,3,3,8,12,15,18 | **91** 98:6 | | | |
| 49:1 66:3 | **92** 98:6 | | | |
| **50** 45:17 47:20 86:18 | **93** 98:7 | | | |
| **51** 87:12 | **94** 98:7 | | | |
| **52** 89:15 | **95** 98:7 | | | |
| **54** 90:9 | **96** 98:7 | | | |

# TELEPHONE DEPOSITION OF
# JAMES F. TROMBLEY, JR.
# VOLUME III

## September 19, 2007

## Pages 1 through 77

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

DEFENDANT'S
EXHIBIT
3



Page 1

1      IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4   JAMES FRANCIS TROMBLEY, JR.,
5        Plaintiff,
6   Vs.              CIVIL ACTION NO.
                    2:07-CV-00547-MEF
7   CITY OF EUFAULA,        LEAD CASE
8        Defendant.
9        * * * * * * * * * * * *
10  JAMES FRANCIS TROMBLEY, JR.,
11       Plaintiff,
12
       Vs.              CIVIL ACTION NO.
13                  2:07-CV-00575-MHT
                    MEMBER CASE
14  CITY OF EUFAULA,
15       Defendant.
16       * * * * * * * * * * * *
17              VOLUME III
18
        * * * * * * * * * * * * *
19
         TELEPHONE DEPOSITION
20
              OF
21
       JAMES F. TROMBLEY, JR.
22
         SEPTEMBER 19, 2007
23

Page 2

1      TELEPHONE DEPOSITION OF JAMES F. TROMBLEY, JR.,
2   taken before Pamela A. Wilbanks, Certified Court
3   Reporter, ACCR# 391, Registered Professional Reporter
4   and Commissioner for the State of Alabama at Large, in
5   the Law Offices of Nix, Holtsford, Gilliland, Hitson &
6   Higgins, 4001 Carmichael Road, Suite 300, Montgomery,
7   Alabama, on Wednesday, September 19, 2007, commencing at
8   approximately 2:30 p.m.
9        * * * * * * * * * * * *
10           APPEARANCES
11  FOR THE PLAINTIFF:
12  Pro se (By telephone)
13  FOR THE DEFENDANT CITY OF EUFAULA:
14  Mr. Rick A. Howard
     Ms. April W. McKay
15  NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
     Attorneys at Law
16  4001 Carmichael Road
     Suite 300
17  Montgomery, Alabama
18  ALSO PRESENT:
19  Ms. Kelly Trawick
     Personal Manager, City of Eufaula
20
21       * * * * * * * * * * * *
        EXAMINATION INDEX
22
     BY MR. HOWARD . . . . . . . . . . .   3
23

Page 3

1          JAMES F. TROMBLEY, JR.
2       The witness, after having been previously sworn
3   to speak the truth, the whole truth and nothing but the
4   truth testified as follows:
5              EXAMINATION
6   BY MR. HOWARD:
7   Q.  We're on the record.  Do you remember -- We've
8       talked a little bit about the hiring process of
9       the City of Eufaula.  Do you remember your first
10      day of work?
11  A.  No.  I mean, I met with -- I believe I came in
12      and met with Mo Erkins, but I don't remember
13      everything about the first day work.
14  Q.  Do you remember receiving any documents or
15      personnel manuals or anything like that your
16      first day?
17  A.  No.  I know I signed something a year or two
18      later about receiving a copy of the personnel
19      manual.  But when I got hired, I don't remember
20      signing anything other than just doing my tax
21      papers for state and federal taxes.  But other
22      than that, I don't remember.
23  Q.  Now, correct me if I'm wrong, but isn't it true

Page 4

1       that the City of Eufaula did not have a building
2       official before you came?  They had --
3   A.  They did.
4   Q.  Who was that?
5   A.  Milton Ledon.  He retired and I took his place.
6   Q.  Was he a building official or building
7       inspector?
8   A.  Building official.
9   Q.  Is there a difference between building official
10      and building inspector?
11  A.  Yes.
12  Q.  What is that?
13  A.  The building official is the department head,
14      and he's the official mentioned in city codes
15      that refer to official and in each code book
16      where it refers to the code official.  So in
17      different ordinances, they refer to the building
18      official as the person to do certain functions.
19      Some places they list it as building inspector,
20      like I think some places in the regulations they
21      might mention building inspector, but it's all
22      pretty much meant to mean building official,
23      because when I got hired, there was a full-time

Telephone Deposition of James F. Trombley, Jr., Vol. III                                    September 19, 2007

**Page 5**

1    building official, but there was only a
2    part-time inspector that only worked a couple of
3    days here and there.
4  Q.  Did they call your predecessor building official
5    or building inspector?
6  A.  I really don't know.  His official title was
7    building official, but I think a lot of people
8    called him the city building inspector.
9  Q.  When was your first meeting with the mayor about
10    various projects?  Do you remember?
11  A.  I go to meetings the first Monday of every month
12    for department head meetings, and I would
13    sometimes get updates on that.  I remember
14    specifically that when I was hired, there was a
15    lot of things going on with oncoming projects
16    that I was never given information about or
17    talked -- told about.  So I wasn't really sure
18    at the beginning what my role was.
19  Q.  When did the Wal-Mart issue arise or when did
20    somebody get word that Wal-Mart may be coming to
21    Eufaula?
22  A.  That was probably a couple of years after I -- I
23    mean, there's always been a rumor ever since

**Page 6**

1    I've been there that Wal-Mart was coming, but
2    nothing actually probably came in front of my
3    desk that was -- actually really, like, showed
4    it until probably -- I don't know -- a year
5    before I left.
6  Q.  In some earlier depositions, you indicate that
7    had you started having adjustment disorder when
8    you went to work for the City of Eufaula.  When
9    did that start and do I have that correct?
10  A.  Yeah.  I mean, I suffered anxiety and
11    depression, which is all part of adjustment
12    disorder.
13  Q.  Did that start when you went to work for Eufaula
14    or did you have that before?
15  A.  That started with Eufaula.  I never had that --
16    I may have had it mildly sometimes, but --
17  Q.  Are you saying you might have had it mildly
18    before you went to work for the City of Eufaula?
19  A.  I may have, but I was never treated or diagnosed
20    or seen for it.  But I remember having anxiety
21    at times, you know, just like everybody does.
22    When certain things happen, you get a little
23    anxious.

**Page 7**

1  Q.  Are you saying that the City of Eufaula caused
2    you to have anxiety and depression and
3    adjustment disorder?
4  A.  I'm saying they significantly contributed to it.
5  Q.  Did you ever file a worker's compensation claim
6    for that?
7  A.  No, I did not.
8  Q.  Did you ever talk to anybody about filing a
9    worker's compensation claim?
10  A.  I don't think I did.
11  Q.  What in your opinion caused your adjustment
12    disorder to get worse when you went to work for
13    the City of Eufaula?
14  A.  Because of the negative feedback I continued to
15    receive.
16  Q.  From who?
17  A.  From the mayor.
18  Q.  Such as ...
19  A.  You know, not being allowed to do my job the
20    best I can.
21  Q.  Do you have any specific examples?
22  A.  Oh, yeah.  One example would be I was doing a
23    residential inspection on a house out at Country

**Page 8**

1    Club in Alabama that belonged to Jackie
2    Whitehead.  I inspected his house and we had
3    adopted building codes saying that there has to
4    be Sheetrock separating the garage from the rest
5    of the house.  So I inspected the house, and he
6    had put vinyl siding on the ceiling in the
7    garage.  So I told him that I would have to fail
8    the inspection, and he would have to take the
9    vinyl down and put Sheetrock up in the garage.
10  Q.  Now, you've lost me.  He had -- Does the code
11    provision say you have to have Sheetrock in the
12    garage between the house, or how does that --
13  A.  You have to separate the garage from the
14    house -- that means any walls that are touching
15    the house -- and separate it from the attic.  So
16    you would have to run a wall up through the roof
17    in the attic or you have to put Sheetrock on the
18    garage ceiling, because if you have a garage
19    fire, you don't want it to spread to the attic
20    because it could go all throughout the house.
21  Q.  Okay.  So if you have Sheetrock on the ceiling,
22    it's okay.  Correct?
23  A.  Correct.  Sheetrock on the ceiling separates the

Telephone Deposition of James F. Trombley, Jr., Vol. III                    September 19, 2007

Page 9

1    garage in case there's a car fire or anything
2    else. The code requires that. It says it has
3    to be a half inch Sheetrock on the garage side.
4        Instead of him complying or coming up with
5    another -- he started calling the mayor, and I
6    explained to the mayor that the code says that
7    it has to be that way and this is the reason for
8    it. So the next thing I know is I'm sitting in
9    the conference room with the mayor while Jackie
10   is saying they can't believe I'm making them do
11   this. And I explained it was the code. And it
12   turned into this shouting match by him telling
13   me nobody in town likes me, and the mayor --
14   this situation -- I'm just enforcing the code
15   that I was hired to enforce, and I'm having to
16   go through this time after time. And that was
17   just one example with the mayor and his friends.
18   Q.  Do you have any examples with businesses?
19   A.  Businesses?
20   Q.  Yes, sir.
21   A.  I can't think of any off the top of my head
22   right now. I know there was some more
23   residential things. But businesses, I imagine

Page 10

1    there was some. I just don't recall any right
2    now.
3    Q.  Is it your testimony you don't recall getting
4    any negative feedback from the mayor regarding
5    businesses at this time?
6    A.  At this time. I might be able to look through
7    my notes and find another one, but right now --
8    I mean, I don't know if you consider a church a
9    business. Oh, yeah, there was some more because
10   it was about people wanting to -- Yeah, I
11   remember there was some now.
12   Q.  What were those?
13   A.  There was a business where a lady wanted to put
14   a tea room in downtown, and they had to bring
15   the building up to meet certain fire codes and
16   they didn't want to do that because of the
17   cost. I don't remember any of those situations
18   getting really out of hand like the one --
19   example with Jackie Whitehead.
20   Q.  Okay. What do you think your -- What is your
21   opinion of how people perceived you in the
22   community?
23   A.  I got praise quite a bit from the community at

Page 11

1    first. At first they were pretty rigid to
2    change. But what happened after a while was I
3    had a lot of contractors that had been there,
4    and they would thank me for -- saying I turned a
5    department into a professional department just
6    like there is in other cities and that it's
7    fairer now from one contractor to another, that
8    I go out and do an inspection and they know
9    what's going to happen. They know they are not
10   going to have to do something that they didn't
11   have to do before or --
12       What they would complain about was
13   discretionary enforcement in the past where
14   people that would complain to the mayor or cause
15   trouble for the previous building official, he
16   would just say, oh, don't worry about it; leave
17   it the way it is; it's okay. But people that
18   cooperated would have to go through the extra
19   effort and change out the wall or do whatever
20   they had to do to fix it. And these people that
21   had to go by the rules were happy now that the
22   rules applied to everybody. And, of course, the
23   people that were getting away with things before

Page 12

1    and had to apply to the rules now weren't happy,
2    and they all had direct lines to the mayor.
3    Q.  Who was happy with your work? Can you name
4    anybody?
5    A.  Oh, sure. Bobby Wright with Wright
6    Construction, and then you've got C & C
7    Mechanical. I can't remember his name. He
8    works with Bobby Wright. There's several
9    contractors that were grateful that things had
10   gotten that way. I just started to make the
11   department a lot better. And even the
12   electrical supply house that supplied parts in
13   town, I would do inspections and tell them they
14   would need a certain part, you know, but they
15   didn't have them in stock here because the codes
16   were so far behind that the inspector just
17   didn't have the knowledge that he needed. So
18   then once I got here, I started talking with the
19   people at Ray Arms', and they would start
20   ordering these parts and stocking them so it
21   would make the electrical insulation safe.
22   Q.  Did you say Ray Arms?
23   A.  Right.

Page 13

1  Q.  This is off the subject, but doesn't he serve as
2      an expert witness in some situations?
3  A.  He does in some cases.
4  Q.  That's what I thought.  I know him.  I've used
5      him before.
6  A.  He's currently right now, I believe, the
7      appointed interim building official for the City
8      of Eufaula.
9  Q.  You're kidding me.  Really?
10 A.  He's the one.  That's why I gave you that
11     newspaper article.  I know Ray Arms.  Let me
12     tell you something about Ray.
13 Q.  Okay.
14 A.  He is one of the ones that made my life
15     difficult from day one.  I came in doing things
16     the way I had been trained to do it from
17     Georgia, and they had the same codes adopted
18     here.  So I was doing it the way I was trained
19     and the way that was making it safer.  Ray Arms,
20     I believe he applied for my job, and he was
21     really mad he didn't get it.  So he was one of
22     the big complainers that would call into the
23     mayor complaining about the way I'm doing my

Page 14

1      job.
2  Q.  Isn't he an engineer?
3  A.  Yeah.  But he's -- I don't know how to put this
4      tactfully.  He's, as far as I understand, an
5      electrical engineer, but he practices all
6      trades.
7  Q.  Were there any building codes adopted while you
8      were employed at the City of Eufaula?
9  A.  Yes.  Yes.  One of the things -- I was given a
10     list by Milton of top priority items, and we
11     discussed it together with the mayor.  And one
12     of them was to adopt the international building
13     codes.  Do you know --
14 Q.  Let me interrupt you.  Do you know any other
15     cities in Alabama who have adopted the
16     international building code?
17 A.  Yes.  There's a lot of them.  You can go to
18     www.iccsafe -- S-A-F-E -- .org, and it will list
19     all states that have -- municipalities that have
20     adopted codes nationwide.
21 Q.  And you're saying that cities -- other cities in
22     Alabama have adopted this?
23 A.  Oh, yeah.  Yeah.  It's been -- Phenix City has

Page 15

1      adopted them.  Troy has adopted them.  There are
2      cities all around in Alabama that have adopted
3      them.
4  Q.  Did you make any presentation to the council
5      about the international building code in trying
6      to get them to adopt it?
7  A.  We talked about doing that.  I had given them a
8      short presentation just explaining and some
9      memos about some of the major changes.  It was
10     mostly energy code and hurricane resistant
11     construction, and I explained all that to them
12     about the changes.
13 Q.  What about --
14 A.  I --
15 Q.  Go ahead.
16 A.  I just gave them, you know, detailed
17     information.  There was some information
18     available in handouts that talked about the
19     differences, and that was made available to them
20     as well.
21 Q.  That provision that we spoke of last week about
22     the termination of the building official --
23 A.  Right.

Page 16

1  Q.  -- do you know if other cities have adopted that
2      appendix?  I think it was Appendix A.  My
3      question is:  How in the world did that get in
4      there?  Do you know?
5  A.  I don't know.  I just went through what
6      appendices I thought should be adopted, and I
7      let them know.
8  Q.  Did you leave out any appendices --
9  A.  Yes, I specifically left out some.
10 Q.  Which ones did you leave out?
11 A.  I don't recall.  It would be in the draft that I
12     gave to the secretary.
13 Q.  Is there any particular reason why you kept the
14     employee qualifications appendix?
15 A.  No.  I just don't think there's any reason to
16     delete it.
17 Q.  Let me ask you this.  Please describe the
18     mayor's interaction with you as the building
19     official on a day-to-day basis.
20 A.  On a day-to-day basis?
21 Q.  Yes, sir.  Did he ride around in the truck with
22     you or just occasionally meet with all
23     department heads?

Telephone Deposition of James F. Trombley, Jr., Vol. III                                    September 19, 2007

Page 17

1  A.  He occasionally met with all department heads.
2     And then if there was a complaint, sometimes --
3     He said he would not talk to me about all
4     complaints, but some complaints he would come to
5     my office and ask me questions about them.
6  Q.  Complaints about you?
7  A.  Complaints about an inspection.  I guess it
8     would be a complaint about me doing my job.
9  Q.  Did the mayor ever call you on a daily basis
10    or -- You indicated you got negative feedback.
11    How often did that happen?
12 A.  Not on a daily basis.  Occasionally.
13 Q.  What's occasionally?  Monthly?
14 A.  Yeah, monthly.
15 Q.  Did the mayor's interaction cause you to have
16    problems with your adjustment disorder?
17 A.  Yes.
18 Q.  So the monthly meetings with the mayor caused
19    you anxiety?
20 A.  Yes.
21 Q.  What would go on in those monthly meetings that
22    caused you anxiety?
23 A.  Well, I was very detailed in what I do to try to

Page 18

1     get as much information and memos and reports to
2     the mayor, and I would get picked on in the
3     meetings about it.
4  Q.  Picked on how?
5  A.  Everybody would have a good laugh because I
6     can't do a one-page memo.
7  Q.  And that caused you to have anxiety?
8  A.  Yeah.  About going to the meetings, wondering
9     what kind of smart crack or how he was going to
10    cut me down at this one.
11 Q.  Could that have been a joke?
12 A.  I don't think so.
13 Q.  Other than not being able to write a one-page
14    memo and having that pointed out by the mayor,
15    what else caused you to have anxiety?
16 A.  Trying to control my agenda for doing my job.
17 Q.  What do you mean control your agenda?
18 A.  He would tell me that -- If I wouldn't do a
19    certain thing a certain way or approve a certain
20    job, something like that, then -- or enforce a
21    code that he didn't agree with, he would tell
22    me, I'm not going to support you if you go
23    forward.

Page 19

1  Q.  Do you have any examples of that?
2  A.  Well, the thing that got blown out of proportion
3     was with John Wise.  He was putting silt into
4     the creek, and the silt was plugging the creek
5     up and pretty much dry -- silted up the creek
6     for a campground that is a community that has
7     several different condo units where they have
8     campers and stuff there.  So it made their boat
9     docks useless and all this kind of stuff.  So it
10    became a political mess.  And I tried to work
11    things out with the property owner, and the
12    mayor got involved.
13    And the next thing you know is John Wise
14    writes a letter to the newspaper, and it gets in
15    the newspaper and all this stuff gets blown out
16    of proportion because I have an approach to
17    handle it, but I'm not allowed to continue.
18 Q.  Do you think that could be just a difference of
19    opinion of how to address a problem?
20 A.  It could be.
21 Q.  Who was your direct supervisor?
22 A.  The mayor.
23 Q.  Did the mayor have authority to, I guess, tell

Page 20

1     you what to do?
2  A.  I believe he does.
3  Q.  And is that why you had anxiety, because he
4     would tell you what to do?
5  A.  I mean, I did my daily job and I did everything
6     that needed to be done.  It's just so much in
7     the way I was trying to do it.  I'm a trained
8     code enforcement officer, trained building
9     inspector, certified, and I know how to handle
10    these situations.  But then I'm -- it's more of
11    a procedural thing.  He's needling me to do
12    things a certain way.
13 Q.  Did you think it was important to do what your
14    supervisor wanted?
15 A.  I felt that at times it was unlawful orders.
16 Q.  Such as ...
17 A.  And --
18 Q.  When was that?
19 A.  When you have a property owner that wants to
20    build a house and he went and bought some
21    additional property and he combined it with his
22    lot, and there's a state law and city ordinance
23    that says communities over 10,000 people, when

5 (Pages 17 to 20)

Page 21

1    you have a combination of property, has to be
2    approved by a planning commission. So one of
3    his family friends went out and bought some
4    extra property and then decided to submit plans
5    to build a house across the property line
6    without going to the planning commission for
7    approval. That got way blown -- I actually had
8    to show the mayor a copy of the state law
9    stating that any official who issues or causes
10   to be issued a permit without planning
11   commission approval is guilty of a misdemeanor.
12   To get me to do my job and back off, I had to
13   show him that law out of the architectural
14   manual one day.
15 Q.  What did he say when you showed it to him?
16 A.  He said he wasn't going to ask me to break the
17   law so he backed off. And his friend had to
18   wait two or three months before he could start
19   building his house.
20 Q.  When did the Wal-Mart thing kick off or when did
21   you become involved in the Wal-Mart deal?
22 A.  I remember there was some talk of Governor's
23   Trace that was coming in. They were going

Page 22

1    through approvals. And then there was some talk
2    about Wal-Mart, but nobody was sure where it was
3    going to go yet. And then once we found out,
4    which I don't recall exactly when, that they had
5    made an offer on the property, at that point I
6    got involved and made recommendations of the
7    water that's on the -- The sewer and water
8    that's on that part of town isn't adequate for a
9    whole bunch of growth so it has to be brought up
10   to be able to handle a larger load. And I got
11   involved by making a recommendation that if
12   Governor's Trace was going to come in and put a
13   pump station in and upsize the lines from this
14   point to that point, why aren't we looking at
15   what Wal-Mart's going to have to make sure
16   what's being put in is adequate so we don't have
17   to change it again. The mayor didn't like that.
18 Q.  These -- I'm sorry. When you had, I guess we
19   can say, issues with the mayor, were there ever
20   times when there could have been two right ways
21   to handle it; he went with one way and you went
22   with another?
23 A.  Yeah. Yeah. And -- Yeah.

Page 23

1 Q.  When did Tim Milner come to the City of Eufaula?
2 A.  He was hired a few months before I started.
3 Q.  So he was there before you got there?
4 A.  Right.
5 Q.  And I think based on the last deposition you
6    sometimes had some issues with Tim; is that
7    correct?
8 A.  Right.
9 Q.  Did it make you mad when the mayor said he
10   thought Tim was right and not you?
11 A.  Well, I guess.
12 Q.  What is Tim's background? Do you know?
13 A.  No. I think I told you last time I think he has
14   some college in planning, but he doesn't have a
15   degree.
16 Q.  Were there ever any times where the mayor agreed
17   with you and not Tim?
18 A.  I don't think so.
19 Q.  Was there ever anytime where the mayor agreed
20   with Tim and not you?
21 A.  Yes.
22 Q.  Do you know how many times?
23 A.  Oh, say a dozen.

Page 24

1 Q.  Were there any issues like that on Wal-Mart?
2 A.  Yes.
3 Q.  What was the issue on Wal-Mart?
4 A.  About the brick facade and about the
5    landscaping. And the issues I had with the
6    discussion and stuff like that between the
7    mayor, Tim Milner, and myself is that I want to
8    be fair to all the citizens in the City of
9    Eufaula, and I want to make sure that all
10   projects go by the same guides and the same
11   rules. So I am the person appointed by the
12   zoning ordinance -- It's written in the zoning
13   ordinance adopted by the city council that I
14   would do all interpretations.
15 Q.  Where is that written?
16 A.  It's written in the zoning ordinance in the
17   section I think called interpretations, but I'm
18   not sure exactly where. It says the building
19   official (unintelligible) zone administrator
20   shall interpret the zoning ordinance.
21 Q.  It says the building official?
22 A.  Yes. I believe it says building official.
23 Q.  If that's true, then why would you ever have a

Telephone Deposition of James F. Trombley, Jr., Vol. III                                    September 19, 2007

Page 25

1        zoning committee or a planning committee?
2   A.  Well, you have to have a planning committee to
3        look at the things that are going to be planned
4        and done in the future.
5   Q.  Let me ask you this.  You're saying the zoning
6        ordinance has a section called interpretation?
7   A.  It's not a whole article or whatever.  It's a
8        subtitle interpretation, yes.
9   Q.  I'll find that.
10  A.  I think it's in the administration section or
11       the enforcement section.  I'm not sure.  But,
12       see, when you have a zoning ordinance, by law
13       you would have to have an appeals board.  So
14       when the zoning administrator makes an
15       interpretation or decision, then that decision
16       can be appealed to the zoning board of
17       adjustments.  That's why --
18  Q.  What was the specific issue with the brick in
19       Wal-Mart?
20  A.  Well, we don't have a large, big box retail
21       ordinance so we were in the process of adopting
22       one.
23  Q.  What is a big box retail ordinance?  Is that

Page 26

1        just like a big store?
2   A.  Yeah.  It's a retail ordinance that a lot of
3        places had to deal with the big battleships like
4        Wal-Mart and Kohl's and stuff like that, and
5        that's what Wal-Mart calls their big buildings,
6        battleships.  That's just a joking word.  It
7        says this is how many parking spots you have to
8        have; this is the kind of trees and landscaping
9        and sidewalks, common area, green space so you
10       don't have a very big concrete jungle.  You have
11       it broken up by different kinds of aesthetics
12       and features and stuff like that.
13           So it says in there certain parts of your
14       building have to be this much brick or this
15       much -- They can be this material, but they
16       can't be that material.  Do you see what I
17       mean?
18  Q.  Yeah.  What was the precise issue with the
19       brick?
20  A.  Well, Wal-Mart did a CMU building, and on the
21       front of it they put probably 25 percent brick.
22       And the building really looked good, and it
23       could be a great asset.  But the mayor -- Tim

Page 27

1        Milner -- The mayor liked it.  I liked it.  Tim
2        Milner, we talked about it, and he said
3        everything looked good to him.  And the next
4        thing I know is he recommended to the mayor that
5        they have more brick and pointed out which
6        sections are going to be brick, which sections
7        need more brick.
8            And I had a meeting with the mayor after I
9        had a meeting with Wal-Mart and told them, you
10       know, that's a huge expense because they are
11       building with block, and then the brick is just
12       a facade, you know.  So Wal-Mart told me that
13       was a $300,000 additional cost.  And since we
14       had no ordinance adopted that said they had to
15       do that, it was just clearly political.
16  Q.  You say political.  What do you mean by
17       political?
18  A.  I think --
19  Q.  Are you talking about to get somebody elected or
20       just a decision somebody made that's in
21       politics?
22  A.  Just to make -- I don't know -- to make a
23       difference, that he wanted all that brick.

Page 28

1   Q.  You think the mayor wanted it just to look good?
2   A.  Yes.
3   Q.  You think Tim just wanted it to look good?
4   A.  Yes.
5   Q.  The last time we were together, we talked about
6        a memo or a note that you had written in your
7        Wal-Mart folder.  And it was talking about
8        something -- you were talking about Jay and Tim,
9        and I will not tolerate it again.  Do you
10       remember what I'm talking about?
11  A.  Yeah, I remember that.  I saw it in here.  I
12       don't remember what page.
13  Q.  You got it marked as something that you're going
14       to use too.
15           What was that about?  Was that about this
16       Wal-Mart issue with the brick?
17  A.  Yeah.  That was all about not -- doing end runs.
18  Q.  What is an end run?
19  A.  Tim and I always discussed all the projects
20       ahead of time, and we always made
21       recommendations.  We always concurred on
22       recommendations before it went to the planning
23       commission or the zoning board or the mayor.  We

Telephone Deposition of James F. Trombley, Jr., Vol. III                    September 19, 2007

---

Page 29

1   always agreed. We always did. We always made
2   sure that we came to an agreement or compromise
3   before it got to the mayor.
4   Q.  Always?
5   A.  Always. We always worked as a team. Well,
6       maybe not always, but most of the time. The
7       majority of the time. This time it just didn't
8       work out that way.
9   Q.  And this is talking about brick facade,
10      correct?
11  A.  Right.
12  Q.  What are you saying that you will not tolerate
13      again?
14  A.  Interference, not letting me interpret the code
15      like I'm supposed to. And all I mean by not
16      tolerate it again is write a letter to the city
17      council explaining that I have been appointed as
18      the building official and I interpret the zoning
19      ordinance, and that's my responsibility and I'm
20      not being allowed to do that.
21  Q.  And you'll agree with me that you don't mention
22      anything about a letter to the city council in
23      your notes, do you?

---

Page 30

1   A.  I do. It mentions that I would file a grievance
2       in my notes.
3   Q.  On that same day?
4   A.  That same page it says it. I told Joy White
5       that I would file a grievance. If you let me
6       know what page that was, I can -- I don't --
7   Q.  I wish I knew too. I don't have that. It's on
8       November 22, '06.
9   A.  Okay.
10  Q.  In the Wal-Mart section.
11  A.  Yeah. I remember looking at those notes
12      specifically, and I read that to you the other
13      day, that I told her that I would file a
14      grievance.
15  Q.  Do you have a letter that you sent me on
16      September 10, 2007?
17  A.  Let's see here. Yeah.
18  Q.  Okay. Did you find the actual handwritten notes
19      from November 22, '06?
20  A.  I'm looking.
21  Q.  I'm sorry I don't have that page number.
22  A.  No, I don't have it.
23  Q.  I don't see it.

---

Page 31

1       My question was going to be: Do you use the
2   word "grievance" on the note from that date? I
3   know you used it in the letter you sent me
4   describing this, but I just can't find the word
5   "grievance" or "Joy" in that letter or in that
6   note.
7   A.  Yeah. Right here: I spoke with Joy White in
8       her office. Everything right there is word for
9       word except what's in the parentheses. I told
10      Joy, this is last time; I will file a grievance
11      next time this happens and will not tolerate it
12      anymore. That's word for word what I wrote
13      because I sat right here and looked at my notes
14      and typed this stuff up word for word. And
15      what's in the parentheses is not what's written
16      in the notes.
17  Q.  I'm trying to match it up now. So if there's a
18      quiet period, that's what I'm trying to do.
19  A.  Here it is. Page 37.
20  Q.  Okay. This first letter talks about spoke with
21      Joy about what happened Sunday or something.
22  A.  I told Joy that Tim was unsupervised and worked
23      directly with the mayor against my instructions

---

Page 32

1   and does not give my intentions --
2   Q.  Or my decisions --
3   A.  -- my decisions the interpretations --
4   Q.  Your decisions and interpretations the respect
5       they deserve?
6   A.  Right. He has done this since Creek Ridge, and
7       I will not tolerate it again. So I must have
8       typed that wrong. Wait a minute. Is that 26?
9       Yeah, that's 26. I forgot to put --
10  Q.  I just couldn't match it up word for word.
11  A.  Yeah. I got you.
12  Q.  When did you have surgery on your back?
13  A.  October 3rd.
14  Q.  Of 2006?
15  A.  Yes.
16  Q.  How long were you out?
17  A.  After a couple of weeks, I did a little bit of
18      work from home, just there to answer some
19      questions. And then after about six weeks, I
20      think I went in for half days, and then I was
21      full-time back after like eight weeks.
22  Q.  Nobody at the City gave you a problem about
23      being out for eight weeks, did they?

---

Page 33

1  A.  No.
2  Q.  Did you ever tell anybody at the City of Eufaula
3      before October 3, 2006 that you had adjustment
4      disorder?
5  A.  Yeah.  I talked to the mayor about it.
6  Q.  Now, just like in passing or did you say, look,
7      mayor, I've got adjustment disorder and you've
8      got to make accommodations for me?
9  A.  No, I never did it that way.  I just said that
10      things are doing better and that I had been
11      diagnosed and I have adjustment disorder and I'm
12      trying to do the best I can.
13  Q.  When did you tell the mayor that?  Do you
14      remember?
15  A.  No.  No, I don't remember.
16  Q.  Was it before or after your surgery?
17  A.  It was before.
18  Q.  When were you diagnosed with adjustment
19      disorder?
20  A.  I believe it was early 2006.
21  Q.  Who made that diagnosis?
22  A.  Dr. Charles Hicks.
23  Q.  In this lawsuit are you claiming that the

Page 34

1      statement that you allegedly made to Bill about
2      capping the mayor was because of your adjustment
3      disorder?
4  A.  I don't know how to answer that.  What I'm
5      saying is that because of my adjustment disorder
6      and because I was taking medication and I was
7      recovering from surgery and under a lot of
8      stress that -- You know, the medication caused
9      irritability.  The adjustment disorder causes
10      irritability.  A combination of all these
11      factors could have made me angry, irritable.
12  Q.  How about snap?
13  A.  Excuse me?
14  Q.  Could it have made you snap and do something
15      wrong?
16  A.  It could have made me, you know, maybe -- I
17      sometimes snap at my wife.  I would just -- you
18      know, but I never would hurt anybody.  But just
19      like raise my voice.
20  Q.  Did you have a gun during the last part of 2006?
21  A.  I mean, I owned a weapon, yes.
22  Q.  What kind of weapon?
23  A.  Let me just say that, you know, this line of

Page 35

1      questioning -- I wasn't charged with having a
2      gun or charged with making threats, and I object
3      to the questions.
4  Q.  Okay.  Are you going to answer it?
5  A.  Yeah.
6  Q.  Go ahead.
7  A.  Yeah, I owned a gun.  It was a 9 millimeter.
8  Q.  Did you have a permit for it?
9  A.  Yes.
10  Q.  Did you ever carry it to work?
11  A.  I had it sometimes in my truck when I had to go
12      over to certain parts of town where there's
13      problems.
14  Q.  So I guess the answer would be yes?
15  A.  Yes.
16  Q.  Did you ever carry it on your body or just keep
17      it in your truck?
18  A.  I think I had it on my body on one occasion.
19  Q.  Did you have a permit to carry a concealed
20      weapon?
21  A.  Yes.
22  Q.  Did you have any type of arms training in the
23      military?

Page 36

1  A.  Yes.
2  Q.  I guess everybody does, don't they?
3  A.  Yes.
4  Q.  Do you still have that permit today?
5  A.  No.  It expired.
6  Q.  What county did you get that in?
7  A.  Barbour.
8  Q.  When did it expire?
9  A.  Probably -- I think it expired in May of 2007.
10      I think somewhere around there.
11  Q.  Did you ever make any threatening remarks to
12      Terry Bush?
13  A.  Not that I recall.
14  Q.  Did you ever make any threatening remarks to
15      Gloria Cole?
16  A.  No.
17  Q.  Did you ever make any threatening remarks to
18      Lucy Young?
19  A.  No.  Who is Lucy Young?  Is that a new name?
20  Q.  Abby?  I think she does have a new name.  Hang
21      on.  Lucy Appling.  I think she got married.
22  A.  Okay.
23  Q.  So after you came back from surgery, did you

Telephone Deposition of James F. Trombley, Jr., Vol. III                                      September 19, 2007

---

Page 37

1   have any, I guess, issues with the mayor or
2   receive negative feedback from the mayor after
3   you came back from surgery?
4   A.  I don't remember.
5   Q.  Was the Wal-Mart issue heating up in the last
6   part of 2006?
7   A.  I believe it was.  I mean, they were just
8   getting the plans together, and nobody really
9   knew -- You know, they were saying that they had
10  some more plans coming, and that's why I told
11  people I would work from home to answer
12  questions, you know, if their plans came in for
13  planning review or they had to have an answer
14  quick because they were saying he wanted to
15  close quick or they wanted to have -- And I told
16  the mayor that I would do the best I could.  He
17  specifically asked me to try to expedite things,
18  and he asked me when I was going to be out for
19  surgery, is this going to be in planning
20  commission?  And I said no, I've got everything
21  caught up to date, and I will work from home so
22  nothing comes here and sits in planning
23  commission and it will stay on schedule.

---

Page 38

1   Q.  Do you remember becoming angry at the mayor for
2   any reason around Thanksgiving and the week
3   after in 2006?
4   A.  I think that was about the building and Wal-Mart
5   and the brick and stuff.
6   Q.  Were there any issues involved in that other
7   than Wal-Mart?
8   A.  I don't remember right now.  Oh, there was the
9   Creek Ridge thing in the past.
10  Q.  Tell me about the Creek Ridge thing.
11  A.  Creek Ridge was a housing project when I started
12  with the City.  People were talking about it.
13  It was going to go forward, and it was going to
14  do this and this many units and all this stuff.
15  And I was like, oh, okay, whatever.  It made me
16  think I wasn't involved in these things because
17  it all sounded like a done deal to me.  So then
18  they went and started going through the approval
19  processes and getting the property, and so then
20  they were doing their designs.
21      So it came time where I had been with the
22  City maybe three weeks, and they had asked me a
23  question about how much -- how many -- what the

---

Page 39

1   lot size could be or how many buildings they
2   could have on the property.  So I had no idea.
3   So I went to Jimmy Calton and talked to him
4   about the zoning ordinance and what I thought.
5   And he says, Jim, you're the building official;
6   you interpret the code; it's your decision.  So
7   I did that.
8       And then later on it went back for
9   approvals.  And because the community come in an
10  uproar about it, the mayor and the city attorney
11  and everybody said, oh, now it's got to go
12  through all these procedures and variances and
13  Jim was wrong and he shouldn't have said they
14  could have that many buildings.  And then the
15  city attorney said I never talked to him.  So
16  Tim Milner took -- that's where we had our first
17  big disagreement.  He said that it had to have
18  so many square feet considered per lot, and I
19  explained to him that that's not the correct way
20  to do it.
21      So it ended up getting turned down and going
22  to court, and the court upheld the Board of
23  Adjustments for denying their variance for a

---

Page 40

1   couple of extra buildings.  But, you know, I did
2   show the mayor and everybody else, here's the
3   thing they did in the past.  They never said it
4   had to have this many square feet for this many
5   units.  They had never done it that way before.
6   But they started doing it a new way, and the
7   court upheld it.  So Eufaula is the only town I
8   know of that does it that way now.
9   Q.  So you had surgery on October 3rd and were out
10  for about eight weeks.  That puts you coming
11  back when, at the end of November?
12  A.  I came back around the middle of November.
13  Q.  And that's right when this was starting -- the
14  Wal-Mart thing was getting more involved,
15  correct?
16  A.  Yes.
17  Q.  Did you ever get mad at the mayor and walk out
18  of the building to talk to Bill?
19  A.  I don't remember.
20  Q.  Did you ever -- Do you smoke?
21  A.  I did before the surgery, but I quit.
22  Q.  Did you and Bill sometimes go outside to smoke
23  or talk about these things?

---

Telephone Deposition of James F. Trombley, Jr., Vol. III                                         September 19, 2007

| Page 41 | Page 43 |
|---|---|
| 1  A.  Yeah.  Before I had surgery. | 1      for me to obtain those records from the VA? |
| 2  Q.  What kind of medication were you on in the -- at | 2  A.  I don't think so. |
| 3      the time you came back to work? | 3  Q.  Okay.  Let me tell you this.  If you plan to |
| 4  A.  I was on Lexapro 20 milligrams and Seroquel, | 4      come into court and say you have all these |
| 5      150. | 5      problems without some type of doctor's notes or |
| 6  Q.  Are you on any type of medication today? | 6      doctor's testimony, I'm going to object to the |
| 7  A.  Yes. | 7      fact that you're not a doctor.  And the judge |
| 8  Q.  What medication are you on? | 8      more than likely will say, Mr. Trombley, are you |
| 9  A.  I'm taking 30 milligrams of Celexa and 25 | 9      a doctor, and you're going to say no.  How are |
| 10     milligrams of Seroquel. | 10     you going to prove you have all these back |
| 11 Q.  Anything else other than, you know, vitamins?  I | 11     problems and adjustment disorder problems? |
| 12     don't want to know about vitamins. | 12 A.  I mean, I can send you some information I have, |
| 13 A.  I'm taking blood pressure medicine.  I don't | 13     but -- |
| 14     remember what it's called. | 14 Q.  What type of information is that? |
| 15 Q.  Don't worry about that. | 15 A.  I have their determination letter on my |
| 16     Are you taking any kind of pain medicine for | 16     disabilities. |
| 17     your back? | 17 Q.  I would like to have that if I could. |
| 18 A.  I'm just taking Tylenol. | 18 A.  Okay. |
| 19 Q.  Are you taking any kind of medication for any | 19 Q.  Do you -- |
| 20     type of mental problem? | 20 A.  At the same time, I'm also going to say that the |
| 21 A.  Just the Celexa and the Seroquel for adjustment | 21     city council, when they, of course, didn't give |
| 22     disorder. | 22     a reason for terminating me and talked about my |
| 23 Q.  Who is prescribing those for you in Missouri? | 23     memory and medication and how I would be if I |

| Page 42 | Page 44 |
|---|---|
| 1  A.  The VA.  The VA prescribed them for me before I | 1      didn't take it, they were talking about all that |
| 2      left, and I'm trying to -- I'm going through | 2      stuff so they already considered me disabled by |
| 3      counseling with my local doctor.  And I've | 3      what they were saying. |
| 4      reduced the Seroquel from 150 to 25, and I'm | 4  Q.  Let's go to that hearing.  Let's skip down to |
| 5      going to be stopping the Seroquel soon because | 5      that.  Tell me what happened at the -- Well, let |
| 6      my adjustment disorder is now a lot better | 6      me get some background. |
| 7      because I'm at a workplace where I'm | 7      I guess the allegation was made by Bill that |
| 8      appreciated, and it's a really good job.  And | 8      you made the statement you're going to cap the |
| 9      I'm going to try getting off the Celexa as well. | 9      mayor; is that correct? |
| 10 Q.  Did you tell me or did I read somewhere that you | 10 A.  Yeah. |
| 11     are 30 percent disabled because of your back? | 11 Q.  And then what happened after that? |
| 12 A.  20 percent disability for my back and 10 percent | 12 A.  Bill said -- I went and talked to Bill, and he |
| 13     for adjustment disorder. | 13     did that second memo about the -- asking him to |
| 14 Q.  When was the determination given to you about | 14     resign. |
| 15     your disability for adjustment disorder? | 15 Q.  That's where your wife and you got together and |
| 16 A.  July of 2005. | 16     asked Bill to resign? |
| 17 Q.  When was the determination of disability made | 17 A.  Yeah. |
| 18     for your back? | 18 Q.  I guess he did not resign.  Then what happened? |
| 19 A.  I've had that back disability since 1989. | 19 A.  Then I got a call to go to the police station. |
| 20 Q.  It's been a while since you've had that, and the | 20 Q.  Who did you receive that call from? |
| 21     adjustment disorder is relatively new? | 21 A.  Tim Marsh, I believe. |
| 22 A.  Yes.  That was July of 2005. | 22 Q.  Police Captain Tim Marsh? |
| 23 Q.  Would you sign some type of waiver or consent | 23 A.  Yes. |

Telephone Deposition of James F. Trombley, Jr., Vol. III                    September 19, 2007

Page 45

1   Q.  What did he say to you?
2   A.  I really don't remember a whole lot of the
3       hearing.  He said that he had heard something
4       from the City about what Bill had said -- about
5       something that Bill said I had said.
6   Q.  Okay.  And did you go to the police department
7       or did he come to you?
8   A.  I went there.
9   Q.  You have a copy of the transcript of your
10      conversation with Tim Marsh, don't you?
11  A.  Yes.
12  Q.  Did you tell the truth in that conversation with
13      Tim Marsh?
14  A.  I don't have to say I did that.  I can --
15  Q.  What did you say?  I didn't catch that.
16  A.  Remember we talked about before that I contend
17      that this was not a legal interview.  It wasn't
18      requested by the personnel office of the City of
19      Eufaula.
20  Q.  Does that mean you lied in that interview?
21  A.  No, it doesn't mean that at all.
22  Q.  I asked did you tell the truth in your interview
23      to Tim Marsh.  That's all I asked you.

Page 46

1   A.  I understand that.  But I'm trying keep that
2       from being used against me because I don't think
3       it's legal.
4   Q.  Well, I'm not an expert on the rules of
5       evidence, but anything that you say -- said I
6       can use in court.  It's called an admission by a
7       party opponent, and I just want to know is it
8       your position that you told the truth in your
9       statement to Tim Marsh.
10  A.  Yeah.  I told the truth to the best of my
11      knowledge in that meeting with Tim Marsh.  And
12      there's things in there that, you know, came out
13      the way they weren't meant.
14  Q.  Such as ...
15  A.  Such as when -- there's something in there that
16      I said that -- I said something that upset
17      Bill.  What I meant to say was Bill was so
18      upset, I must have said something to upset Bill
19      or at least that's what I think I meant.
20  Q.  After the conversation with Captain Marsh, what
21      happened?
22  A.  I believe I was called to the office.
23  Q.  Which office?

Page 47

1   A.  City Hall.
2   Q.  The same day or the day after?
3   A.  I guess it was the same day.
4   Q.  What happened there?
5   A.  I went to the mayor's office, and they gave me
6       my determination hearing letter.
7   Q.  Who was there with the mayor?
8   A.  I think it was Kelly Trawick, Joy White, and the
9       mayor.
10  Q.  Do you think Joy White did anything wrong?
11  A.  No.
12  Q.  Do you think Kelly Trawick did anything wrong?
13  A.  Yes.
14  Q.  What?
15  A.  She referred to the section of the personnel
16      rules and regulations about the termination
17      hearings, and it was in a letter.  And I said,
18      these are not specific charges, and she says, I
19      don't have to give you specific charges.
20  Q.  What else did she do wrong, if anything?
21  A.  I had talked to her on a couple of occasions
22      that I felt I was being harassed by the mayor
23      and that if it was to continue, I was going to

Page 48

1       file a grievance.
2   Q.  Who would you have filed a grievance with?
3   A.  That was the whole thing I was talking to her
4       about is to find out how, how to bring that to
5       somebody's attention.  And I had no idea of
6       where to go.  That's why I went to her.
7   Q.  And you're claiming the mayor had been harassing
8       you?
9   A.  Yes.
10  Q.  In, what, the week after you came back from
11      surgery?
12  A.  No.  It's over the years I was employed with the
13      City.
14  Q.  Do you think Kelly did anything else wrong?
15  A.  That's all I can think of right now.
16  Q.  Do you think the mayor did anything wrong?
17  A.  Yes.
18  Q.  What?
19  A.  In the hearing, you know, he was asked
20      questions.  And in that hearing he was asked
21      about a conversation where he had said that Tim
22      Milner was my equal.  And in the hearing he said
23      that he didn't say that.  He said that he said

Telephone Deposition of James F. Trombley, Jr., Vol. III

September 19, 2007

Page 49

1    Tim Milner had equal input, and that's not what
2    he said.
3    Q.  Could you have been misinterpreting what the
4    mayor said?
5    A.  It could be.
6    Q.  After that meeting with you, Kelly, the mayor,
7    and Joy, what happened?
8    A.  I think I went to my office and picked up some
9    of my personal items, and I left.
10   Q.  Were you given a city truck or did you use your
11   own truck?
12   A.  I used my own truck.
13   Q.  At some point you hired a lawyer.  And I'm not
14   asking you what you and your lawyer talked
15   about, but you did hire a lawyer, correct?
16   A.  To represent me at the hearing, yes.
17   Q.  How long was it from the time you got the letter
18   until the determination hearing took place?
19   A.  Two weeks.
20   Q.  During that time did you go back up to the City
21   for anything?
22   A.  I went back up to the City for some of my -- I
23   went back a day or two later to get the rest of

Page 50

1    my certificates and some of my personal items
2    out of my office and whatever paperwork the City
3    had for me.
4    Q.  Now, in that meeting with you, Kelly, and Joy,
5    and the mayor, they told you that you were on
6    administrative leave with pay, didn't they?
7    A.  Yes.
8    Q.  Why did you go get your stuff out of your office?
9    A.  Because I just thought that was -- they were
10   going to can me, that the mayor finally got his
11   way.
12   Q.  If you thought you were just already canned,
13   then why did you go to the trouble of hiring a
14   lawyer to represent you in the hearing?
15   A.  Because I wanted to be treated fairly.
16   Q.  Did you tell Joy, Kelly, and the mayor that you
17   had a lawyer when they handed you the letter
18   regarding the determination hearing?
19   A.  Yes, I think I did.
20   Q.  So you had a lawyer before you got that letter,
21   correct?
22   A.  No.  I mean, I've used them in the past for
23   personal stuff.  So I told them I was going to

Page 51

1    hire a lawyer, but I hadn't talked with them
2    before that about this situation.
3    Q.  Had he ever filed a lawsuit on your behalf
4    before?
5    A.  No.
6    Q.  I'm not going to ask you what you've ever talked
7    to him about.  Okay?
8    A.  Okay.
9    Q.  I'm not entitled to know that.
10       What did you do during that two-week period
11   from the time you got the letter until the
12   hearing?
13   A.  I don't remember.
14   Q.  Earlier in your deposition you indicated that
15   you believed that you were entitled to a
16   predetermination hearing.  Do I remember that
17   correctly?
18   A.  Yes.
19   Q.  What should that have -- What would that
20   predetermination hearing do?  I'm not real sure
21   I understand what a predetermination hearing is.
22   A.  Well, I don't know if that's exactly what it is,
23   but it should have been an actual open meeting

Page 52

1    conducted by the city council, whether they were
2    in executive session or whatever they did.
3    There should have been some kind of meeting for
4    them to sit down and make a determination to put
5    me on administrative leave with pay.
6    Q.  And why do you say that?
7    A.  I mean, because they are my employer.  They are
8    my boss.  They are the ones that hired me.  And
9    for one or two people to make the decisions on
10   what to do and what to have a hearing based
11   on --
12   Q.  You're argument is that they should have had a
13   hearing to decide whether they were going to
14   have another hearing?
15   A.  Yes.  And to come up with, you know, the
16   specific charges.  It's like one person called
17   another and here's the letter and bam, boom,
18   bam.  No one did the research and no one sat
19   down and came up with the specifics of what the
20   charges were going to be.  And then the city
21   attorney sending a letter to us saying that it's
22   going to be a closed hearing, and then the city
23   council doesn't even know anything about it, and

Telephone Deposition of James F. Trombley, Jr., Vol. III

September 19, 2007

**Page 53**

1    we never even got a copy of the transcript
2    before the hearing. We never even knew the
3    transcript was going to be there.
4    Q.   The transcript between you and Marsh?
5    A.   Yes.
6    Q.   Doesn't that letter say the city attorney was
7        going to recommend that they go into executive
8        session?
9    A.   Yes.
10   Q.   It doesn't say they were going to go.
11   A.   Right.
12   Q.   Tell me about the hearing -- the determination
13       hearing. What happened?
14   A.   It was three-and-a-half hours long.
15   Q.   Was that three-and-a-half hours all about you?
16   A.   Pretty much, yes.
17   Q.   Tell me what happened.
18   A.   Well, first they -- first thing they did was
19       hand out transcripts of the interview with Tim
20       Marsh to everybody: newspaper, public that was
21       in the meeting. Everyone in attendance at the
22       meeting got a copy of it, and my attorney and I
23       had never even seen it. So they handed that out

**Page 54**

1    to everybody in the public saying, oh, who wants
2    one; if you don't have one, we've got some more
3    here.
4        So they started off with that, and then my
5    attorney asked for the hearing to be closed.
6    And they said, well, you know, we're not --
7    president and city council said no, we ain't
8    doing it. And then he says, oh, anybody else
9    want to come in, you know; it's an open meeting,
10   whoever. So they did that.
11       Then the meeting started. I guess they
12   talked about the charges, why I was there, and
13   then they played the tape that Tim Marsh had.
14   Q.   That's just the tape of the meeting?
15   A.   The interview between me and Tim Marsh.
16   Q.   That's the same thing that's on the written
17       transcript, right?
18   A.   Yes.
19   Q.   Do you know if they recorded the determination
20       hearing?
21   A.   I did and the City did and the newspaper did.
22   Q.   How did you record it?
23   A.   With a digital recorder.

**Page 55**

1    Q.   You got all three-and-a-half hours on a digital
2        recorder?
3    A.   Yes. I gave you a CD. I gave April a CD of it.
4    Q.   Okay. After they handed out the transcript,
5        what happened next?
6    A.   They played it, and then -- I really don't
7        recall a lot of it. It's very upsetting for me,
8        but it was just asking a whole bunch of
9        questions of me about guns and --
10   Q.   What kind of questions about guns were asked?
11   A.   If I had one, if I had a permit.
12   Q.   Do you understand how that would have been
13       relevant if you did indeed make that statement
14       to Bill that you were going to cap the mayor and
15       his wife at ten o'clock?
16   A.   I don't know how to answer that. I've never
17       used the word "cap" in my life, and I just
18       don't -- I don't know how to answer that. Me
19       just coming out of surgery and having that
20       spinal cord tear, you know, it was -- I was in
21       no shape to do anything other than go from home
22       to work. I couldn't even --
23   Q.   You were in shape enough to work, weren't you?

**Page 56**

1        We're eight weeks past your surgery, aren't we?
2    A.   Yeah. Yeah. But I'm still -- six weeks after
3        the surgery, I was walking with a cane. And
4        then in eight weeks I'm walking every day trying
5        to get up to a mile. I think at that time I
6        might have been walking a block or two a day.
7    Q.   But around a block?
8    A.   Yeah. Around a city block, you know, for
9        rehab -- for exercise.
10   Q.   Do you remember them asking you any other
11       questions?
12   A.   I don't remember. I know there was a lot of
13       questions, and it went on for a long time. I
14       just don't remember all the questions.
15   Q.   Did you bring anybody with you other than your
16       lawyer?
17   A.   No.
18   Q.   Did your wife know about the hearing?
19   A.   Yes.
20   Q.   And she chose not to attend?
21   A.   Yes.
22   Q.   Did your lawyer ask anybody any questions?
23   A.   Yes.

Telephone Deposition of James F. Trombley, Jr., Vol. III                    September 19, 2007

Page 57

1    Q.  Who did he ask a question to?
2    A.  The mayor.
3    Q.  What question was it?
4    A.  About the meeting where we had talked about Tim
5        Milner's responsibilities.
6    Q.  Why was that relevant?  How did that come up?
7    A.  Because I talked to him about it, and he asked
8        me, you know, what happened before Thanksgiving
9        day weekend, you know.  So I told him about the
10       meeting with the mayor.  I don't remember what
11       day that was.
12   Q.  I understand.
13   A.  I don't remember.  I'm getting confused.
14   Q.  I'm just remembering how did the issue of Tim
15       come up at your determination hearing.
16           What other kind of questions did your
17       attorney ask?
18   A.  I don't remember.
19   Q.  After the hearing -- I guess it was late.  Was
20       it at night?
21   A.  I believe it started at 8:30, nine in the
22       morning.
23   Q.  What did you do after the hearing?

Page 58

1    A.  I believe I went home.
2    Q.  Did they vote or anything in open session?
3    A.  Oh, okay.  They were in open session, and I
4        started getting drifty when they were asking
5        questions and forgetful and couldn't
6        concentrate.
7    Q.  Is that like at the first deposition?
8    A.  Yes.
9    Q.  Go ahead.
10   A.  So what happened was they had the hearing and
11       listened to everybody's questions.  I was then
12       asking a couple of questions, but I don't
13       remember what they were.  But after I got done
14       and I had sort of lost concentration like I'm
15       heading now, the city council then went around
16       to all the members and they all said their
17       peace.  I think Johnny Knight started off first
18       saying that my memory loss, they don't want me
19       around their people.  I'm not exactly sure what
20       words he used, but that's what he said.  And
21       then it went to other members, and it went all
22       the way around the table.
23           And that's when -- Bob Powers, when he had

Page 59

1        his time to speak, he said, I wish there was
2        something else we could do or wished there was
3        another way to go or something like that is what
4        he had said.  And after that somebody made a
5        motion to terminate me.  The motion was
6        seconded, and then there was a vote.  The motion
7        just said motion to terminate, and that was it.
8    Q.  How did Mr. Powers vote?
9    A.  He voted to terminate.
10   Q.  Okay.  Was it unanimous?
11   A.  Yes.
12   Q.  Do you know the names of members of the city
13       council at that time?
14   A.  Stanley Lipscomb; of course, Bob Powers; Jim
15       Martin; Lucious Cobb; and Johnny Knight.
16   Q.  Jim Martin, is he a lawyer down there in
17       Eufaula?
18   A.  Yes.
19   Q.  Did the mayor have a vote?
20   A.  No.  They did ask -- After they went around and
21       said their peace or before -- I don't remember
22       which one -- they asked Bill Cline how he felt.
23       And he says, if Jim stays, I'm leaving.  And

Page 60

1        then they asked the mayor what he thought, and
2        the mayor said I should resign or be fired.
3    Q.  They told that to you?
4    A.  To the city council.  The city council asked the
5        mayor and Bill Cline that question, what they
6        would like to see happen or what they hoped for,
7        and that's what they said.
8    Q.  Is there any particular reason you did not
9        resign?
10   A.  Yeah.  Because I was going through a very
11       difficult time.  And if I would have been
12       anybody else at the City, I would have been
13       given more chances, given some time off with pay
14       or sick time.
15   Q.  So you're saying that if somebody made the
16       statement -- I'm not saying that you did, but
17       you did state that you don't remember.  If
18       somebody made the statement they are going to
19       cap the mayor and his wife at ten o'clock
20       tomorrow night during shift change, you're
21       saying they would have been given sick leave?
22   A.  It says in -- I mean, yeah.  Yeah.  I actually
23       do because --

15 (Pages 57 to 60)

Telephone Deposition of James F. Trombley, Jr., Vol. III                                September 19, 2007

Page 61

1    Q.   Who would have been given that opportunity to
2         threaten somebody's life and then been given
3         sick leave?
4    A.   I just feel that it would have gone a different
5         way for somebody else, and I feel that way
6         because of the job that I had, that I was
7         enforcement and that we had our disagreements,
8         the city council and the mayor, and me, about
9         the way I did things, that I just think they
10        were all too quick to fire me.
11   Q.   Let me ask you this.  Do you know of anybody
12        else that was a City of Eufaula employee that
13        threatened somebody's life that was not fired?
14   A.   I don't know about that.
15   Q.   After the vote to terminate your employment,
16        what happened?
17   A.   Well, Jim Martin just pointed at me and didn't
18        say anything loud enough to be heard, but it
19        looked like he just, you're out of here.  And
20        that was it.  That was the end of the hearing,
21        and everybody went their way.
22   Q.   By this time had you already cleaned out your
23        office?

Page 62

1    A.   I had taken some things out, just like I said, a
2         small box of personal items.  But then I had --
3         after that, of course, I came back for all my
4         certificates and all that stuff.  I hadn't
5         totally cleaned out my office yet.
6    Q.   Do you want to take a short break?  I think
7         we're getting close to being through.  Maybe
8         about 20 or 30 minutes.  But you indicated you
9         may be having problems now.  If we take a
10        15-minute break, would that make things better?
11   A.   Okay.  Okay.
12   Q.   I'll call you about four o'clock.
13   A.   Okay.
14   Q.   Talk to you soon.
15   A.   Okay.
16             (Brief recess.)
17   Q.   (Continuing by Mr. Howard)  Are you ready to
18        wrap this thing up in a few minutes?
19   A.   Yeah.  I've got one thing about what we were
20        just talking about.
21   Q.   Right.
22   A.   Page 59.
23   Q.   Of what?

Page 63

1    A.   The stuff you sent me.
2    Q.   Yes.
3    A.   That's the one page I had sent you from the
4         employee handbook about forced medical leave.
5         It just says employees that could be placed on
6         forced medical leave.  It says all employees are
7         subject to being placed on temporary voluntary
8         medical leave when it's determined to be in the
9         best interest of the employee and/or the City
10        for the employee to be classified as such.  The
11        purpose of temporary voluntarily medical leave
12        is to permit an employee to take time off for
13        actual illness or injury when the department
14        head or his duly assigned designee determines
15        that the action is in the best interest of the
16        affected employee, his/her fellow employees, and
17        that of the governmental entity.
18   Q.   Is there anything in there that says about an
19        appointed individual or did it just say
20        employee?
21   A.   It just says employees, but it says with
22        department head or his duly assigned designee.
23   Q.   Okay.  Here's a question for you.  Under what

Page 64

1         grounds does the federal government grant
2         disability?  Why would you get disability for
3         your back from the federal government?  Is there
4         any kind of criteria that they use?
5    A.   It's loss of range of motion.
6    Q.   But don't you have to be injured in the military
7         or working for the government to get
8         disability from the federal government?
9    A.   You're talking about my VA pension?
10   Q.   Well, you said you got disability.  You were 30
11        percent disabled.
12   A.   VA disability.
13   Q.   VA disability?
14   A.   Right.  It's not a social security or
15        government.  It's just a VA disability.
16   Q.   Do you know how you qualify for VA disability?
17   A.   Yeah.  Because of service-connected disability.
18   Q.   But it has to be connected to the service,
19        correct?
20   A.   Yes.  And it is, yes.
21   Q.   Do you get VA disability for your adjustment
22        disorder?
23   A.   Yes.

Telephone Deposition of James F. Trombley, Jr., Vol. III                    September 19, 2007

|  | Page 65 |
|---|---|
| 1 | Q.  How is that connected to the service? |
| 2 | A.  Because it's secondary to the pain of the back |
| 3 | problem. |
| 4 | Q.  Earlier you stated -- or I think you did -- the |
| 5 | City of Eufaula caused your adjustment disorder, |
| 6 | and I asked you if you filed for any worker's |
| 7 | compensation.  Which caused your adjustment |
| 8 | disorder, back pain or the City of Eufaula? |
| 9 | A.  A combination of the two, because I said a |
| 10 | little bit ago that it wasn't entirely -- I |
| 11 | don't think I said it was entirely the City of |
| 12 | Eufaula that caused the adjustment disorder.  I |
| 13 | said partly. |
| 14 | Q.  After they took the vote at the city council |
| 15 | meeting and you went home, did you have any |
| 16 | other communication with the City? |
| 17 | A.  I don't remember.  I mean, I went by and picked |
| 18 | up my stuff.  I think at one time I went by the |
| 19 | office and picked up a couple of things out of |
| 20 | my office, my journals.  But other than that, I |
| 21 | don't think I went back to the City for |
| 22 | anything. |
| 23 | Q.  Did at some point you or your lawyer ask for an |

|  | Page 66 |
|---|---|
| 1 | appeal? |
| 2 | A.  Oh, yeah.  My lawyer did, yes. |
| 3 | Q.  What was that all about and what was the outcome |
| 4 | of that question? |
| 5 | A.  I mailed you everything, and I've got -- so |
| 6 | you've got it.  I don't know if it's in your |
| 7 | hands yet. |
| 8 | Q.  Okay. |
| 9 | A.  I got the return receipt for it all. |
| 10 | Q.  Okay.  I think I've got it.  Is there anything |
| 11 | outside those letters that you know about? |
| 12 | A.  No.  I don't know -- I don't have any |
| 13 | documentation on any conversations between the |
| 14 | City and my attorney or phone conversations. |
| 15 | All I know is the letters that were sent back |
| 16 | and forth, and they said -- Kelly Trawick said |
| 17 | in writing that because of such and such and |
| 18 | such appeals, it doesn't in her |
| 19 | interpretation -- I don't know exactly what she |
| 20 | said, but it doesn't apply to me; therefore, |
| 21 | it's denied. |
| 22 | Q.  Didn't she say something about appeals are only |
| 23 | granted to people who have been reprimanded by |

|  | Page 67 |
|---|---|
| 1 | department heads or the mayor? |
| 2 | A.  That's what she had said, and that's the part |
| 3 | that I said was unconstitutional. |
| 4 | Q.  Okay.  But whether it's unconstitutional or not, |
| 5 | did the city council make the decision to |
| 6 | terminate you or the mayor? |
| 7 | A.  Well, that's all part of the -- that's all part |
| 8 | of the question.  They voted, but I would say |
| 9 | that with the mayor's comments when they asked |
| 10 | him a question, they voted for him, not what |
| 11 | they actually thought.  Not what they actually |
| 12 | felt. |
| 13 | Q.  How soon after that vote did you move to |
| 14 | Missouri? |
| 15 | A.  I moved to Missouri in June.  I got the job |
| 16 | offer in June. |
| 17 | Q.  At some point you said a police officer was |
| 18 | hanging outside your house.  What month was |
| 19 | that? |
| 20 | A.  Excuse me? |
| 21 | Q.  What month was that?  I remember it happening, |
| 22 | but I just don't remember when. |
| 23 | A.  Yeah.  Well, that was -- I told you it's going |

|  | Page 68 |
|---|---|
| 1 | to be a separate case. |
| 2 | Q.  Okay.  If it's going to be a separate case and |
| 3 | never brought up in this one, then I'm not going |
| 4 | to ask you questions about it. |
| 5 | A.  I've got my right to sue letter so it will come |
| 6 | later. |
| 7 | Q.  Okay.  Let me ask this.  Do you have a stop sign |
| 8 | by your house? |
| 9 | A.  Yes. |
| 10 | Q.  Is there anything that we haven't -- that's in |
| 11 | your complaint that we haven't spoken about? |
| 12 | A.  I think we've covered everything. |
| 13 | Q.  We've covered a lot. |
| 14 | A.  Yeah, we have.  Over six hours' worth. |
| 15 | Q.  Let me ask this.  We've been talking about that |
| 16 | face-to-face settlement conference and going to |
| 17 | Nashville. |
| 18 | A.  Right. |
| 19 | Q.  The judge's order may allow us to do it by |
| 20 | phone.  Is that something that you would be |
| 21 | willing to do is do it by phone or do you want |
| 22 | to talk face-to-face?  I'll do whatever you want |
| 23 | to do.  I was just trying to save you a trip. |

17 (Pages 65 to 68)

Telephone Deposition of James F. Trombley, Jr., Vol. III                        September 19, 2007

Page 69

1  A. Yeah. I mean, if the judge is willing to let it
2     go by phone ...
3  Q. I will check on that and let you know by
4     letter. Okay?
5  A. Oh, okay. Because I thought maybe you had
6     already checked into it or something.
7  Q. No. No. We came out of that thing, and I know
8     the face-to-face settlement conference was
9     mentioned in there. But I think there's another
10    rule that if you live more than 100 or 200 miles
11    apart you can do it by phone. And maybe we can
12    just schedule it for that Friday afternoon.
13 A. Okay. So let me ask a couple of questions.
14 Q. Okay.
15 A. Is the settlement conference going to be -- will
16    it be recorded or is it just --
17 Q. No. It's me and you getting together. You tell
18    me how much you want to settle the case, and I
19    will tell you yes or no and tell you how much I
20    think it's worth if -- I may not get any
21    authority at all to settle it. They may say
22    just file your motion for summary judgment or
23    let's just take this thing to trial.

Page 70

1  A. Okay.
2  Q. That's just -- The Judge wants us to get
3     together to see if we can make the case go
4     away. But in a lot of cases like this, there's
5     no settlement offer at all and we're just going
6     to trial.
7  A. Okay.
8  Q. If you want to meet face-to-face, I can. If
9     not, I can save you a trip and we'll just do it
10    by phone.
11 A. Let's do it by phone. That way I can save a
12    day's work.
13 Q. That's fair. That's good.
14 A. I don't get vacation time for a year, you know.
15 Q. I understand. And I don't want you to miss any
16    work.
17    Well, Jim, I appreciate it. If you can't
18    think of anything else we need to talk about, I
19    think we're over.
20 A. Okay.
21 Q. Do you want a copy of the deposition?
22 A. How much would it cost me?
23 Q. Probably about $300.

Page 71

1  A. Just have her send me a letter telling me it's
2     available and how much it is.
3  Q. That will be best.
4  A. There's one thing I wanted to mention. From the
5     very beginning after the hearing, I had been
6     asking the City on numerous occasions for a copy
7     of the transcript of the hearing, and I never
8     did get one and I still haven't gotten one.
9  Q. That's because it's not ready yet. She's about
10    halfway through. And as soon as I get that, I
11    will send that to you.
12 A. I appreciate it because --
13 Q. I don't have that yet either.
14 A. And I know it was broken up on theirs. They
15    used a tape machine -- little small handheld
16    tape machine so I think it was just directional
17    mikes so it picked up what a couple of people
18    said, but mine picked up everything real good.
19 Q. I think your recording is probably better than
20    ours. I think that's what's taking a while.
21 A. Okay.
22 Q. Is there anything else along those lines we
23    haven't talked about?

Page 72

1  A. No, I don't think so. I think we've covered
2     everything that there is.
3  Q. I do have one question for you. I forgot about
4     it. On that Appendix A of the international
5     building code, it talks about employee
6     qualifications. It says the provisions
7     contained in this appendix are not mandatory
8     unless specifically referenced in the adopting
9     ordinance. I have not seen the ordinance. Do
10    you know if that ordinance specifically
11    references employee qualifications or Appendix
12    A?
13 A. I think it does reference. The way I wrote up
14    the ordinance was I wrote it up adopting all
15    these codes, and then I went through
16    specifically adopting the -- in the next section
17    specifically adopting the appendices of each
18    code saying the following appendices of the 2003
19    international building code are adopted,
20    Appendix A, B, C, D, E. That's the way I wrote
21    it up.
22 Q. Now, you sent me a letter about the shooting
23    that was a few years ago, and I asked how was

18 (Pages 69 to 72)

Telephone Deposition of James F. Trombley, Jr., Vol. III                    September 19, 2007



Page 73

1      that relevant.
2   A.  Uh-huh (positive response).
3   Q.  I don't anticipate arguing that you were using
4       drugs or anything like that at all.  I just --
5       The only thing that I believe it's relevant to
6       is to show that the City has been down this road
7       once with bad consequences, and if there's any
8       threat they take it serious.  I do have a copy
9       of all the police records that I will send you,
10      and I do object to like his personnel file and
11      stuff like that, because I'm not going to use
12      that at all.
13  A.  Well, I mean, if you're going to show that, we
14      have to show his state of mind and if he got any
15      special waivers to get the job with the fire
16      department because, you know, I'm going to just
17      say that, look, I've been through trying to
18      manage this depression and then I was in severe
19      pain before the surgery, and then I went through
20      surgery and I was -- had to stay in the hospital
21      on all these drugs because I had ended up
22      being -- having spinal cord surgery.
23  Q.  Jim, we're not talking about -- we hired you and

Page 74

1       you had a back disability.  We're not talking
2       about the hiring process.  We are simply talking
3       about we've had problems with this before and
4       any warning or any threats we take serious.
5   A.  I understand that.  But as far as I know, he had
6       to have a waiver to be hired so they could have
7       avoided that whole process by not even hiring
8       him.  That's my point that I'm going to bring
9       up, that if they hadn't given him the waiver in
10      the first place to be eligible to join the fire
11      department, that would have never happened.  I
12      know it will be hearsay, but I'll need the
13      records -- someone will have to show the records
14      to prove it's not hearsay.
15  Q.  I understand where you're coming from.  That's
16      just something we'll let the judge decide.  But
17      I will send you the police reports.
18  A.  Okay.
19  Q.  Okay?
20  A.  Okay.
21  Q.  Anything else?
22  A.  I think that's it.
23  Q.  All right.  Thank you for your time.

Page 75

1   A.  Okay.
2          (Deposition concluded at approximately
3          4:15 p.m.)
4
        * * * * * * * * * * * *
5
        FURTHER DEPONENT SAITH NOT
6
        * * * * * * * * * * * *
7
8          REPORTER'S CERTIFICATE
9   STATE OF ALABAMA:
10  MONTGOMERY COUNTY:
11      I, Pamela A. Wilbanks, Registered Professional
12  Reporter and Commissioner for the State of Alabama at
13  Large, do hereby certify that I reported Volume III of
14  the deposition of:
15      JAMES F. TROMBLEY, JR.
16  who was first duly sworn by me to speak the truth, the
17  whole truth and nothing but the truth, in the matter of:
18      JAMES F. TROMBLEY, JR.,
19      Plaintiff,
20      Vs.
21      CITY OF EUFAULA,
22      Defendant.
23      In The U.S. District Court

Page 76

1    For the Middle District of Alabama
2    Northern Division
3    2:07-CV-00547-MEF
4    * * * * * * * * * * * *
     JAMES F. TROMBLEY, JR.,
5
     Plaintiff,
6
     Vs.
7
     CITY OF EUFAULA,
8
     Defendant.
9
     In The U.S. District Court
10
     For the Middle District of Alabama
11
     Northern Division
12
     2:07-CV-00575-MHT
13
     on Wednesday, September 19, 2007.
14
15       The foregoing 75 computer printed pages contain
16   a true and correct transcript of the examination of said
17   witness by counsel for the parties set out herein.  The
18   reading and signing of same is hereby not waived.
19       I further certify that I am neither of kin nor
20   of counsel to the parties to said cause nor in any
21   manner interested in the results thereof.
22       This 1st day of October 2007.
23

Telephone Deposition of James F. Trombley, Jr., Vol. III                                    September 19, 2007

Page 77

1
2
3
4
5
6
      Pamela A. Wilbanks, Certified
7      Court Reporter, ACCR# 391,
      Registered Professional Reporter
8      and Commissioner for the State
      of Alabama at Large.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

I, James F. Trombley, Jr., hereby certify that
I have read the foregoing Volume III of my deposition
given on September 19, 2007, and it is a true and correct
transcript of the testimony given by me at the time and
place stated with the corrections, if any, and the
reasons therefor noted on a separate sheet of paper and
attached hereto.


_____
James F. Trombley, Jr.


SWORN TO AND SUBSCRIBED before me this _____
day of _____, 20__.

_____
NOTARY PUBLIC

10/1/07
Mr. James F. Trombley, Jr.
224 North Highway 67 #107
Florissant, MO 63031
IN RE:  TROMBLEY VS. CITY OF EUFAULA
Dear Mr. Trombley:
Enclosed is a copy of the Volume III of your deposition
taken on Wednesday, September 19, 2007.  Please read the
transcript and make any corrections on the correction
sheet provided specifying the page and line number of
each correction.

You will find the original signature page attached to the
front of the transcript.  Even if there are no
corrections, please sign the original signature page and
have your signature notarized.

Please return the signature page, correction sheet and
transcript within thirty days.  The list of corrections
will be attached to the original deposition and all
parties will be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,

Pamela A. Wilbanks

CCR, ACCR# 391, RPR

cc:  Mr. Rick A. Howard

Telephone Deposition of James F. Trombley, Jr., Vol. III

September 19, 2007

Page 1

| A |
| --- |
| **Abby** 36:20 |
| **able** 10:6 18:13 22:10 |
| **about** 3:8,13,18 5:9,16 |
| 5:17 7:8 10:10 11:12 |
| 11:16 13:12,23 15:5 |
| 15:7,9,12,13,18,21 |
| 17:3,5,6,7,8 18:3,8 |
| 22:2 24:4,4 27:2,19 |
| 28:5,7,8,10,15,15,17 |
| 29:9,22 31:20,21 |
| 32:19,22 33:5 34:1 |
| 34:12 38:4,10,12,23 |
| 39:4,10 40:10,23 |
| 41:12,15 42:14 43:22 |
| 44:1,13 45:4,4,16 |
| 47:16 48:4,21 49:15 |
| 51:2,7 52:23 53:12 |
| 53:15 54:12 55:9,10 |
| 56:18 57:4,4,7,9 61:8 |
| 61:14 62:8,12,19,20 |
| 63:4,18 64:9 66:3,11 |
| 66:22 68:4,11,15 |
| 70:18,23 71:9,23 |
| 72:3,5,22 73:23 74:2 |
| 74:3 |
| **accommodations** 33:8 |
| **ACCR** 2:3 77:7 78:42 |
| **across** 21:5 |
| **action** 1:6,12 63:15 |
| **actual** 30:18 51:23 |
| 63:13 |
| **actually** 6:2,3 21:7 |
| 60:22 67:11,11 |
| **additional** 20:21 27:13 |
| **address** 19:19 |
| **adequate** 22:8,16 |
| **adjustment** 6:7,11 7:3 |
| 7:11 17:16 33:3,7,11 |
| 33:18 34:2,5,9 41:21 |
| 42:6,13,15,21 43:11 |
| 64:21 65:5,7,12 |
| **adjustments** 25:17 |
| 39:23 |
| **administration** 25:10 |
| **administrative** 50:6 |
| 52:5 |
| **administrator** 24:19 |
| 25:14 |
| **admission** 46:6 |
| **adopt** 14:12 15:6 |
| **adopted** 8:3 13:17 14:7 |
| 14:15,20,22 15:1,1,2 |
| 16:1,6 24:13 27:14 |
| 72:19 |
| **adopting** 25:21 72:8,14 |
| 72:16,17 |
| **aesthetics** 26:11 |

| |
| --- |
| **affected** 63:16 |
| **after** 3:2 5:22 9:16 11:2 |
| 27:8 32:17,19,21 |
| 33:16 36:23 37:2 |
| 38:3 44:11 46:20 |
| 47:2 48:10 49:6 55:4 |
| 56:2 57:19,23 58:13 |
| 59:4,20 61:15 62:3 |
| 65:14 67:13 71:5 |
| **afternoon** 69:12 |
| **again** 22:17 28:9 29:13 |
| 29:16 32:7 |
| **against** 31:23 46:2 |
| **agenda** 18:16,17 |
| **ago** 65:10 72:23 |
| **agree** 18:21 29:21 |
| **agreed** 23:16,19 29:1 |
| **agreement** 29:2 |
| **ahead** 15:15 28:20 35:6 |
| 58:9 |
| **ain't** 54:7 |
| **Alabama** 1:2 2:4,7,17 |
| 8:1 14:15,22 15:2 |
| 75:9,12 76:1,10 77:8 |
| **allegation** 44:7 |
| **allegedly** 34:1 |
| **allow** 68:19 |
| **allowed** 7:19 19:17 |
| 29:20 |
| **along** 71:22 |
| **already** 44:2 50:12 |
| 61:22 69:6 |
| **always** 5:23 28:19,20 |
| 28:21 29:1,1,1,4,5,5 |
| 29:6 |
| **and/or** 63:9 |
| **angry** 34:11 38:1 |
| **another** 9:5 10:7 11:7 |
| 22:22 52:14,17 59:3 |
| 69:9 |
| **answer** 32:18 34:4 35:4 |
| 35:14 37:11,13 55:16 |
| 55:18 |
| **anticipate** 73:3 |
| **anxiety** 6:10,20 7:2 |
| 17:19,22 18:7,15 |
| 20:3 |
| **anxious** 6:23 |
| **anybody** 7:8 12:4 33:2 |
| 34:18 54:8 56:15,22 |
| 60:12 61:11 |
| **anymore** 31:12 |
| **anything** 3:15,20 9:1 |
| 29:22 41:11 46:5 |
| 47:10,12,20 48:14,16 |
| 49:21 52:23 55:21 |
| 58:2 61:18 63:18 |
| 65:22 66:10 68:10 |
| 70:18 71:22 73:4 |

| |
| --- |
| 74:21 |
| **anytime** 23:19 |
| **apart** 69:11 |
| **appeal** 66:1 |
| **appealed** 25:16 |
| **appeals** 25:13 66:18,22 |
| **APPEARANCES** 2:10 |
| **appendices** 16:6,8 |
| 72:17,18 |
| **appendix** 16:2,2,14 |
| 72:4,7,11,20 |
| **applied** 11:22 13:20 |
| **Appling** 36:21 |
| **apply** 12:1 66:20 |
| **appointed** 13:7 24:11 |
| 29:17 63:19 |
| **appreciate** 70:17 71:12 |
| **appreciated** 42:8 |
| **approach** 19:16 |
| **approval** 21:7,11 38:18 |
| **approvals** 22:1 39:9 |
| **approve** 18:19 |
| **approved** 21:2 |
| **approximately** 2:8 |
| 75:2 |
| **April** 2:14 55:3 |
| **architectural** 21:13 |
| **area** 26:9 |
| **arguing** 73:3 |
| **argument** 52:12 |
| **arise** 5:19 |
| **arms** 12:19,22 13:11,19 |
| 35:22 |
| **around** 15:2 16:21 |
| 36:10 38:2 40:12 |
| 56:7,8 58:15,19,22 |
| 59:20 |
| **article** 13:11 25:7 |
| **asked** 37:17,18 38:22 |
| 44:16 45:22,23 48:19 |
| 48:20 54:5 55:10 |
| 57:7 59:22 60:1,4 |
| 65:6 67:9 72:23 |
| **asking** 44:13 49:14 |
| 55:8 56:10 58:4,12 |
| 71:6 |
| **asset** 26:23 |
| **assigned** 63:14,22 |
| **attached** 78:7,31,35 |
| **attend** 56:20 |
| **attendance** 53:21 |
| **attention** 48:5 78:37 |
| **attic** 8:15,17,19 |
| **attorney** 39:10,15 |
| 52:21 53:6,22 54:5 |
| 57:17 66:14 |
| **Attorneys** 2:15 |
| **authority** 19:23 69:21 |
| **available** 15:18,19 71:2 |

| |
| --- |
| **avoided** 74:7 |
| **away** 11:23 70:4 |

| B |
| --- |
| **B** 72:20 |
| **back** 21:12 32:12,21 |
| 36:23 37:3 39:8 |
| 40:11,12 41:3,17 |
| 42:11,12,18,19 43:10 |
| 48:10 49:20,22,23 |
| 62:3 64:3 65:2,8,21 |
| 66:15 74:1 |
| **backed** 21:17 |
| **background** 23:12 44:6 |
| **bad** 73:7 |
| **bam** 52:17,18 |
| **Barbour** 36:7 |
| **based** 23:5 52:10 |
| **basis** 16:19,20 17:9,12 |
| **battleships** 26:3,6 |
| **became** 19:10 |
| **become** 21:21 |
| **becoming** 38:1 |
| **before** 2:2 4:2 6:5,14 |
| 6:18 11:11,23 13:5 |
| 21:18 23:2,3 28:22 |
| 29:3 33:3,16,17 40:5 |
| 40:21 41:1 42:1 |
| 45:16 50:20 51:2,4 |
| 53:2 57:8 59:21 |
| 73:19 74:3 78:15 |
| **beginning** 5:18 71:5 |
| **behalf** 51:3 |
| **behind** 12:16 |
| **being** 7:19 18:13 22:16 |
| 29:20 32:23 46:2 |
| 47:22 62:7 63:7 |
| 73:22 |
| **believe** 3:11 9:10 13:6 |
| 13:20 20:2 24:4 |
| 33:20 37:7 44:21 |
| 46:22 57:21 58:1 |
| 73:5 |
| **believed** 51:15 |
| **belonged** 8:1 |
| **best** 7:20 33:12 37:16 |
| 46:10 63:9,15 71:3 |
| **better** 12:11 33:10 42:6 |
| 62:10 71:19 |
| **between** 4:9 8:12 24:6 |
| 53:4 54:15 66:13 |
| **big** 13:22 25:20,23 26:1 |
| 26:3,5,10 39:17 |
| **Bill** 34:1 40:18,22 44:7 |
| 44:12,12,16 45:4,5 |
| 46:17,17,18 55:14 |
| 59:22 60:5 |
| **bit** 3:8 10:23 32:17 |
| 65:10 |

| |
| --- |
| **block** 27:11 56:6,7,8 |
| **blood** 41:13 |
| **blown** 19:2,15 21:7 |
| **board** 25:13,16 28:23 |
| 39:22 |
| **boat** 19:8 |
| **Bob** 58:23 59:14 |
| **Bobby** 12:5,8 |
| **body** 35:16,18 |
| **book** 4:15 |
| **boom** 52:17 |
| **boss** 52:8 |
| **bought** 20:20 21:3 |
| **box** 25:20,23 62:2 |
| **break** 21:16 62:6,10 |
| **brick** 24:4 25:18 26:14 |
| 26:19,21 27:5,6,7,11 |
| 27:23 28:16 29:9 |
| 38:5 |
| **Brief** 62:16 |
| **bring** 10:14 48:4 56:15 |
| 74:8 |
| **broken** 26:11 71:14 |
| **brought** 22:9 68:3 |
| **build** 20:20 21:5 |
| **building** 4:1,6,6,8,9,10 |
| 4:13,17,19,21,22 5:1 |
| 5:4,5,7,8 8:3 10:15 |
| 11:15 13:7 14:7,12 |
| 14:16 15:5,22 16:18 |
| 20:8 21:19 24:18,21 |
| 24:22 26:14,20,22 |
| 27:11 29:18 38:4 |
| 39:5 40:18 72:5,19 |
| **buildings** 26:5 39:1,14 |
| 40:1 |
| **bunch** 22:9 55:8 |
| **Bush** 36:12 |
| **business** 10:9,13 |
| **businesses** 9:18,19,23 |
| 10:5 |

| C |
| --- |
| **C** 12:6,6 72:20 |
| **call** 5:4 13:22 17:9 |
| 44:19,20 62:12 |
| **called** 5:8 24:17 25:6 |
| 41:14 46:6,22 52:16 |
| **calling** 9:5 |
| **calls** 26:5 |
| **Calton** 39:3 |
| **came** 3:11 4:2 6:2 |
| 13:15 29:2 36:23 |
| 37:3,12 38:21 40:12 |
| 41:3 46:12 48:10 |
| 52:19 62:3 69:7 |
| **campers** 19:8 |
| **campground** 19:6 |
| **cane** 56:3 |

Telephone Deposition of James F. Trombley, Jr., Vol. III

September 19, 2007

Page 2

canned 50:12
cap 44:8 55:14,17
  60:19
capping 34:2
Captain 44:22 46:20
car 9:1
Carmichael 2:6,16
carry 35:10,16,19
case 1:7,13 9:1 68:1,2
  69:18 70:3
cases 13:3 70:4
catch 45:15
caught 37:21
cause 11:14 17:15
  76:19
caused 7:1,11 17:18,22
  18:7,15 34:8 65:5,7
  65:12
causes 21:9 34:9
cc 78:43
CCR 78:42
CD 55:3,3
ceiling 8:6,18,21,23
Celexa 41:9,21 42:9
certain 4:18 6:22 10:15
  12:14 18:19,19,19
  20:12 26:13 35:12
CERTIFICATE 75:8
certificates 50:1 62:4
certified 2:2 20:9 77:6
certify 75:13 76:18
  78:1
chances 60:13
change 11:2,19 22:17
  60:20
changes 15:9,12 78:36
charged 35:1,2
charges 47:18,19 52:16
  52:20 54:12
Charles 33:22
check 69:3
checked 69:6
chose 56:20
church 10:8
cities 11:6 14:15,21,21
  15:2 16:1
citizens 24:8
city 1:7,14 2:13,19 3:9
  4:1,14 5:8 6:8,18 7:1
  7:13 13:7 14:8,23
  20:22 23:1 24:8,13
  29:16,22 32:22 33:2
  38:12,22 39:10,15
  43:21 45:4,18 47:1
  48:13 49:10,20,22
  50:2 52:1,20,22 53:6
  54:7,21 56:8 58:15
  59:12 60:4,4,12 61:8
  61:12 63:9 65:5,8,11

65:14,16,21 66:14
  67:5 71:6 73:6 75:21
  76:7 78:26
CIVIL 1:6,12
claim 7:5,9
claiming 33:23 48:7
classified 63:10
cleaned 61:22 62:5
clearly 27:15
Cline 59:22 60:5
close 37:15 62:7
closed 52:22 54:5
Club 8:1
CMU 26:20
Cobb 59:15
code 4:15,16 8:10 9:2,6
  9:11,14 14:16 15:5
  15:10 18:21 20:8
  29:14 39:6 72:5,18
  72:19
codes 4:14 8:3 10:15
  12:15 13:17 14:7,13
  14:20 72:15
Cole 36:15
college 23:14
combination 21:1
  34:10 65:9
combined 20:21
come 17:4 22:12 23:1
  39:9 43:4 45:7 52:15
  54:9 57:6,15 68:5
comes 17:4
coming 5:20 6:1 9:4
  21:23 37:10 40:10
  55:19 74:15
commencing 2:7
comments 67:9
commission 21:2,6,11
  28:23 37:20,23
Commissioner 2:4
  75:12 77:8
committee 25:1,1,2
common 26:9
communication 65:16
communities 20:23
community 10:22,23
  19:6 39:9
compensation 7:5,9
  65:7
complain 11:12,14
complainers 13:22
complaining 13:23
complaint 17:2,8 68:11
complaints 17:4,4,6,7
complying 9:4
compromise 29:2
computer 76:14
concealed 35:19
concentrate 58:6

concentration 58:14
concluded 75:2
concrete 26:10
concurred 28:21
condo 19:7
conducted 52:1
conference 9:9 68:16
  69:8,15
confused 57:13
connected 64:18 65:1
consent 42:23
consequences 73:7
consider 10:8
considered 39:18 44:2
construction 12:6
  15:11
contain 76:14
contained 72:7
contend 45:16
continue 19:17 47:23
continued 7:14
Continuing 62:17
contractor 11:7
contractors 11:3 12:9
contributed 7:4
control 18:16,17
conversation 45:10,12
  46:20 48:21
conversations 66:13,14
cooperated 11:18
copy 3:18 21:8 45:9
  53:1,22 70:21 71:6
  73:8 78:28
cord 55:20 73:22
correct 3:23 6:9 8:22
  8:23 23:7 29:10
  39:19 40:15 44:9
  49:15 50:21 64:19
  76:15 78:3
correction 78:29,30,34
corrections 78:5,29,32
  78:35
correctly 51:17
cost 10:17 27:13 70:22
council 15:4 24:13
  29:17,22 43:21 52:1
  52:23 54:7 58:15
  59:13 60:4,4 61:8
  65:14 67:5
counsel 76:16,19
counseling 42:3
Country 7:23
county 36:6 75:10
couple 5:2,22 32:17
  40:1 47:21 58:12
  65:19 69:13 71:17
course 11:22 43:21
  59:14 62:3
court 1:1 2:2 39:22,22

40:7 43:4 46:6 75:23
  76:9 77:7
covered 68:12,13 72:1
crack 18:9
creek 19:4,4,5 32:6
  38:9,10,11
criteria 64:4
currently 13:6
cut 18:10

_____

D

D 72:20
daily 17:9,12 20:5
date 31:2 37:21
day 3:10,13,16 13:15
  21:14 30:3,13 47:2,2
  47:3 49:23 56:4,6
  57:9,11 76:21 78:16
days 5:3 32:20 78:35
day's 70:12
day-to-day 16:19,20
deal 21:21 26:3 38:17
Dear 78:27
decide 52:13 74:16
decided 21:4
decision 25:15,15
  27:20 39:6 67:5
decisions 32:2,3,4 52:9
Defendant 1:8,15 2:13
  75:22 76:8
degree 23:15
delete 16:16
denied 66:21
denying 39:23
department 4:13 5:12
  11:5,5 12:11 16:23
  17:1 45:6 63:13,22
  67:1 73:16 74:11
DEPONENT 75:5
deposition 1:19 2:1
  23:5 51:14 58:7
  70:21 75:2,14 78:2
  78:28,35
depositions 6:6
depression 6:11 7:2
  73:18
describe 16:17
describing 31:4
deserve 32:5
designee 63:14,22
designs 38:20
desk 6:3
detailed 15:16 17:23
determination 42:14
  42:17 43:15 47:6
  49:18 50:18 52:4
  53:12 54:19 57:15
determined 63:8
determines 63:14

diagnosed 6:19 33:11
  33:18
diagnosis 33:21
difference 4:9 19:18
  27:23
differences 15:19
different 4:17 19:7
  26:11 61:4
difficult 13:15 60:11
digital 54:23 55:1
direct 12:2 19:21
directional 71:16
directly 31:23
disabilities 43:16
disability 42:12,15,17
  42:19 64:2,2,8,10,12
  64:13,15,16,17,21
  74:1
disabled 42:11 44:2
  64:11
disagreement 39:17
disagreements 61:7
discretionary 11:13
discussed 14:11 28:19
discussion 24:6
disorder 6:7,12 7:3,12
  17:16 33:4,7,11,19
  34:3,5,9 41:22 42:6
  42:13,15,21 43:11
  64:22 65:5,8,12
District 1:1,2 75:23
  76:1,9,10
Division 1:3 76:2,11
docks 9:9
doctor 42:3 43:7,9
doctor's 43:5,6
documentation 66:13
documents 3:14
doing 3:20 7:22 13:15
  13:18,23 15:7 17:8
  18:16 28:17 33:10
  38:20 40:6 54:8
done 20:6 25:4 32:6
  38:17 40:5 58:13
down 8:9 18:10 39:21
  44:4 52:4,19 59:16
  73:6
downtown 10:14
dozen 23:23
Dr 33:22
draft 16:11
drifty 58:4
drugs 73:4,21
dry 19:5
duly 63:14,22 75:16
during 34:20 49:20
  51:10 60:20

_____

E

E 72:20
each 4:15 72:17 78:30
earlier 6:6 51:14 65:4
early 33:20
effort 11:19
eight 32:21,23 40:10 56:1,4
either 71:13
elected 27:19
electrical 12:12,21 14:5
eligible 74:10
employed 14:8 48:12
employee 16:14 61:12 63:4,9,10,12,16,20 72:5,11
employees 63:5,6,16,21
employer 52:7
employment 61:15
Enclosed 78:28
end 28:17,18 40:11 61:20
ended 39:21 73:21
energy 15:10
enforce 9:15 18:20
enforcement 11:13 20:8 25:11 61:7
enforcing 9:14
engineer 14:2,5
enough 55:23 61:18
entirely 65:10,11
entitled 51:9,15
entity 63:17
equal 48:22 49:1
Erkins 3:12
Eufaula 1:7,14 2:13,19 3:9 4:1 5:21 6:8,13 6:15,18 7:1,13 13:8 14:8 23:1 24:9 33:2 40:7 45:19 59:17 61:12 65:5,8,12 75:21 76:7 78:26
even 12:11 52:23 53:1 53:2,23 55:22 74:7 78:32
ever 5:23 7:5,8 17:9 22:19 23:16,19 24:23 33:2 35:10,16 36:11 36:14,17 40:17,20 51:3,6
every 5:11 56:4
everybody 6:21 11:22 18:5 36:2 39:11 40:2 53:20 54:1 61:21
everybody's 58:11
Everyone 53:21
everything 3:13 20:5 27:3 31:8 37:20 66:5 68:12 71:18 72:2
evidence 46:5

exactly 22:4 24:18 51:22 58:19 66:19
examination 2:21 3:5 76:15
example 7:22 9:17 10:19
examples 7:21 9:18 19:1
except 31:9
Excuse 34:13 67:20
executive 52:2 53:7
exercise 56:9
expedite 37:17
expense 27:11
expert 13:2 46:4
expire 36:8
expired 36:5,9
explained 9:6,11 15:11 39:19
explaining 15:8 29:17
extra 11:18 21:4 40:1

F
F 1:21 2:1 3:1 75:15,18 76:4 78:1,11,24
facade 24:4 27:12 29:9
face-to-face 68:16,22 69:8 70:8
fact 43:7
factors 34:11
fail 8:7
fair 24:8 70:13
fairer 11:7
fairly 50:15
family 21:3
far 12:16 14:4 74:5
features 26:12
federal 3:21 64:1,3,7,8
feedback 7:14 10:4 17:10 37:2
feel 61:4,5
feet 39:18 40:4
fellow 63:16
felt 20:15 47:22 59:22 67:12
few 23:2 62:18 72:23
file 7:5 30:1,5,13 31:10 48:1 69:22 73:10
filed 48:2 51:3 65:6
filing 7:8
finally 50:10
find 10:7 25:9 30:18 31:4 48:4 78:31
fire 8:19 9:1 10:15 61:10 73:15 74:10
fired 60:2 61:13
first 3:9,13,16 5:9,11 11:1,1 31:20 39:16 53:18,18 58:7,17

74:10 75:16
fix 11:20
Florissant 78:25
folder 28:7
following 72:18
follows 3:4
forced 63:4,6
foregoing 76:14 78:2
forgetful 58:5
forgot 32:9 72:3
forth 66:16
forward 18:23 38:13
found 22:3
four 62:12
FRANCIS 1:4,10
Friday 69:12
friend 21:17
friends 9:17 21:3
from 7:16,17 8:4,13,15 10:4,23 11:7 13:15 13:16 22:13 30:19 31:2 32:18 34:7 36:23 37:2,3,11,21 42:4 43:1 44:20 45:4 46:2 48:10 49:17 51:11 55:21 63:3 64:3,8 71:4 74:15
front 6:2 26:21 78:32
full-time 4:23 32:21
functions 4:18
further 75:5 76:18
future 25:4

G
garage 8:4,7,9,12,13,18 8:18 9:1,3
gave 13:10 15:16 16:12 32:22 47:5 55:3,3
Georgia 13:17
gets 19:14,15
getting 10:3,18 11:23 37:8 38:19 39:21 40:14 42:9 57:13 58:4 62:7 69:17
Gilliland 2:5,15
give 32:1 43:21 47:19
given 5:16 14:9 15:7 42:14 49:10 60:13,13 60:21 61:1,2 74:9 78:3,4
Gloria 36:15
go 5:11 8:20 9:16 11:8 11:18,21 14:17 15:15 17:21 18:22 22:3 24:10 35:6,11 38:13 39:11 40:22 44:4,19 45:6 48:6 49:20 50:8 50:13 53:7,10 55:21 58:9 59:3 69:2 70:3

going 5:15 11:9,10 18:8 18:9,22 21:6,16,23 22:3,12,15 25:3 27:6 28:13 31:1 35:4 37:18,19 38:13,13,18 39:21 42:2,5,9 43:6,9 43:10,20 44:8 47:23 50:10,23 51:6 52:13 52:20,22 53:3,7,10 55:14 60:10,18 67:23 68:2,3,16 69:15 70:5 73:11,13,16 74:8
gone 61:4
good 18:5 26:22 27:3 28:1,3 42:8 70:13 71:18
gotten 12:10 71:8
government 64:1,3,7,8 64:15
governmental 63:17
Governor's 21:22 22:12
grant 64:1
granted 66:23
grateful 12:9
great 26:23
green 26:9
grievance 30:1,5,14 31:2,5,10 48:1,2
grounds 64:1
growth 22:9
guess 17:7 19:23 22:18 23:11 35:14 36:2 37:1 44:7,18 47:3 54:11 57:19
guides 24:10
guilty 21:11
gun 34:20 35:2,7
guns 55:9,10

H
half 9:3 32:20
halfway 71:10
Hall 47:1
hand 10:18 53:19
handbook 63:4
handed 50:17 53:23 55:4
handheld 71:15
handle 19:17 20:9 22:10,21
handouts 15:18
hands 66:7
handwritten 30:18
Hang 36:20
hanging 67:18
happen 6:22 11:9 17:11 60:6
happened 11:2 31:21

44:5,11,18 46:21 47:4 49:7 53:13,17 55:5 57:8 58:10 61:16 74:11
happening 67:21
happens 31:11
happy 11:21 12:1,3
harassed 47:22
harassing 48:7
having 3:2 6:7,20 9:15 18:14 35:1 55:19 62:9 73:22
head 4:13 5:12 9:21 63:14,22
heading 58:15
heads 16:23 17:1 67:1
heard 45:3 61:18
hearing 44:4 45:3 47:6 48:19,20,22 49:16,18 50:14,18 51:12,16,20 51:21 52:10,13,14,22 53:2,12,13 54:5,20 56:18 57:15,19,23 58:10 61:20 71:5,7
hearings 47:17
hearsay 74:12,14
heating 37:5
her 30:13 31:8 47:21 48:3,6 66:18 71:1
hereto 78:7
Hicks 33:22
Higgins 2:6,15
Highway 78:24
him 5:8 8:7 9:4,12 13:4 13:5 21:13,15 27:3 39:3,15,19 44:13 51:7 57:7,9 67:10,10 74:8,9
hire 49:15 51:1
hired 3:19 4:23 5:14 9:15 23:2 49:13 52:8 73:23 74:6
hiring 3:8 50:13 74:2,7
his/her 63:16
Hitson 2:5,15
hold 37:19
Holtsford 2:5,15
home 32:18 37:11,21 55:21 58:1 65:15
hoped 60:6
hospital 73:20
hours 53:14,15 55:1 68:14
house 7:23 8:2,5,5,12 8:14,15,20 12:12 20:20 21:5,19 67:18 68:8
housing 38:11
Howard 2:14,22 3:6

Telephone Deposition of James F. Trombley, Jr., Vol. III

September 19, 2007

Page 4

62:17 78:43
huge 27:10
hurricane 15:10
hurt 34:18

_____
**I**
idea 39:2 48:5
III 1:17 75:13 78:2,28
illness 63:13
imagine 9:23
important 20:13
inch 9:3
indeed 55:13
INDEX 2:21
indicate 6:6
indicated 17:10 51:14
    62:8
individual 63:19
information 5:16 15:17
    15:17 18:1 43:12,14
injured 64:6
injury 63:13
input 49:1
inspected 8:2,5
inspection 7:23 8:8
    11:8 17:7
inspections 12:13
inspector 4:7,10,19,21
    5:2,5,8 12:16 20:9
Instead 9:4
instructions 31:23
insulation 12:21
intentions 32:1
interaction 16:18 17:15
interest 63:9,15
interested 76:20
Interference 29:14
interim 13:7
international 14:12,16
    15:5 72:4,19
interpret 24:20 29:14
    29:18 39:6
interpretation 25:6,8
    25:15 66:19
interpretations 24:14
    24:17 32:3,4
interrupt 14:14
interview 45:17,20,22
    53:19 54:15
involved 19:12 21:21
    22:6,11 38:6,16
    40:14
irritability 34:9,10
irritable 34:11
issue 5:19 24:3 25:18
    26:18 28:16 37:5
    57:14
issued 21:10
issues 21:9 22:19 23:6

24:1,5 37:1 38:6
items 14:10 49:9 50:1
    62:2

_____
**J**
Jackie 8:1 9:9 10:19
James 1:4,10,21 2:1
    3:1 75:15,18 76:4
    78:1,11,24
Jay 28:8
Jim 39:5,13 59:14,16
    59:23 61:17 70:17
    73:23
Jimmy 39:3
job 7:19 13:20 14:1
    17:8 18:16,20 20:5
    21:12 42:8 61:6
    67:15 73:15
John 19:3,13
Johnny 58:17 59:15
join 74:10
joke 18:11
joking 26:6
journals 65:20
Joy 30:4 31:5,7,10,21
    31:22 47:8,10 49:7
    50:4,16
Jr 1:4,10,21 2:1 3:1
    75:15,18 76:4 78:1
    78:11,24
judge 43:7 69:1 70:2
    74:16
judge's 68:19
judgment 69:22
July 42:16,22
June 67:15,16
jungle 26:10
just 3:20 6:21 9:14,17
    10:1 11:5,16 12:10
    12:16 15:8,16 16:5
    16:15,22 19:18 20:6
    26:1,6 27:11,15,20
    27:22 28:1,3 29:7
    31:4 32:10,18 33:6,9
    34:17,18,23 35:16
    37:7 41:18,21 46:7
    50:9,12 54:14 55:8
    55:17,19 56:14 57:14
    59:7 61:4,9,17 62:1
    62:20 63:5,19,21
    64:15 67:22 68:23
    69:12,16,22,23 70:2
    70:5,9 71:1,16 73:4
    73:16 74:16

_____
**K**
keep 35:16 46:1
Kelly 2:19 47:8,12
    48:14 49:6 50:4,16

66:16
kept 16:13
kick 21:20
kidding 13:9
kin 76:18
kind 18:9 19:9 26:8
    34:22 41:2,16,19
    52:3 55:10 57:16
    64:4
kinds 26:11
knew 30:7 37:9 53:2
Knight 58:17 59:15
know 3:17 5:6 6:4,21
    7:19 9:8,22 10:8 11:8
    11:9 12:14 13:4,11
    14:3,13,14 15:16
    16:1,4,5,7 19:13 20:9
    23:12,22 27:4,10,12
    27:22 30:6 31:3 34:4
    34:8,16,18,23 37:9
    37:12 40:1,8 41:11
    41:12 46:7,12 48:19
    51:9,22 52:15,23
    54:6,9,19 55:16,18
    55:20 56:8,12,18
    57:8,9 59:12 61:11
    61:14 64:16 66:6,11
    66:12,15,19 69:3,7
    70:14 71:14 72:10
    73:16 74:5,12
knowledge 12:17 46:11
Kohl's 26:4

_____
**L**
lady 10:13
landscaping 24:5 26:8
large 2:4 25:20 75:13
    77:8
larger 22:10
last 15:21 23:5,13 28:5
    31:10 34:20 37:5
late 57:19
later 3:18 39:8 49:23
    68:6
laugh 18:5
law 2:5,15 20:22 21:8
    21:13,17 25:12
lawsuit 33:23 51:3
lawyer 49:13,14,15
    50:14,17,20 51:1
    56:16,22 59:16 65:23
    66:2
LEAD 1:7
least 46:19
leave 11:16 16:8,10
    50:6 52:5 60:21 61:3
    63:4,6,8,11
leaving 59:23
Ledon 4:5

left 6:5 16:9 42:2 49:9
legal 45:17 46:3
let 13:11 14:14 16:7,17
    25:5 30:5 34:23 43:3
    44:5 61:11 68:7,15
    69:1,3,13 74:16
letter 19:14 29:16,22
    30:15 31:3,5,20
    43:15 47:6,17 49:17
    50:17,20 51:11 52:17
    52:21 53:6 68:5 69:4
    71:1 72:22
letters 66:11,15
letting 29:14
let's 30:17 44:4,4 69:23
    70:11
Lexapro 41:4
lied 45:20
life 13:14 55:17 61:2,13
like 3:15 4:20 6:3,21
    10:18 11:6 18:20
    22:17 24:1,6 26:1,3,4
    26:12 29:15 32:21
    33:6 34:19 38:15,17
    43:17 52:16 58:7,14
    59:3 60:6 61:19 62:1
    70:4 73:4,10,11
liked 27:1,1
likely 43:8
likes 9:13
line 21:5 34:23 78:29
lines 12:2 22:13 71:22
Lipscomb 59:14
list 4:19 14:10,18 78:35
listened 58:11
little 3:8 6:22 32:17
    65:10 71:15
live 69:10
load 22:10
local 42:3
long 12:16 49:17 53:14
    56:13
look 10:6 25:3 28:1,3
    33:6 73:17
looked 26:22 27:3
    31:13 61:19
looking 22:14 30:11,20
loss 58:18 64:5
lost 8:10 58:14
lot 5:7,15 11:3 12:11
    14:17 20:22 26:2
    34:7 39:1,18 42:6
    45:2 55:7 56:12
    68:13 70:4
loud 61:18
Lucious 59:15
Lucy 36:18,19,21

_____
**M**

machine 71:15,16
mad 13:21 23:9 40:17
made 13:14 15:19 19:8
    22:5,6 27:20 28:20
    29:1 33:21 34:1,11
    34:14,16 38:15 42:17
    44:7,8 59:4 60:15,18
mailed 66:5
major 15:9
majority 29:7
make 13:21 15:4
    22:15 23:9 24:9
    27:22,22 33:8 36:11
    36:14,17 52:4,9
    55:13 62:10 67:5
    70:3 78:29
makes 25:14
making 9:10 13:19
    22:11 35:2
manage 73:18
Manager 2:19
mandatory 72:7
manner 76:20
manual 3:19 21:14
manuals 3:15
many 23:22 26:7 38:14
    38:23 39:1,14,18
    40:4,4
marked 28:13
married 36:21
Marsh 44:21,22 45:10
    45:13,23 46:9,11,20
    53:4,20 54:13,15
Martin 59:15,16 61:17
match 9:12 31:17
    32:10
material 26:15,16
matter 75:17 78:37
may 5:20 6:16,19 36:9
    62:9 68:19 69:20,21
maybe 29:6 34:16
    38:22 62:7 69:5,11
    9:13,17 10:4 11:14
    12:2 13:23 14:11
    17:9,18 18:2,14
    19:12,22,23 21:8
    22:17,19 23:9,16,19
    24:7 26:23 27:1,4,8
    28:1,23 29:3 31:23
    33:5,7,13 34:2 37:1,2
    37:16 38:1 39:10
    40:2,17 44:9 47:7,9
    47:22 48:7,16 49:4,6
    50:5,10,16 55:14
    57:2,10 59:19 60:1,2
    60:5,19 61:8 67:1,6
mayor's 16:18 17:15
    47:5 67:9

Telephone Deposition of James F. Trombley, Jr., Vol. III

September 19, 2007

Page 5

McKay 2:14
mean 3:11 4:22 5:23
  6:10 10:8 18:17 20:5
  26:17 27:16 29:15
  34:21 37:7 43:12
  45:20,21 50:22 52:7
  60:22 65:17 69:1
  73:13
means 8:14
meant 4:22 46:13,17,19
Mechanical 12:7
medical 63:4,6,8,11
medication 34:6,8 41:2
  41:6,8,19 43:23
medicine 41:13,16
meet 10:15 16:22 70:8
meeting 5:9 27:8,9
  46:11 49:6 50:4
  51:23 52:3 53:21,22
  54:9,11,14 57:4,10
  65:15
meetings 5:11,12 17:18
  17:21 18:3,8
MEMBER 1:13
members 58:16,21
  59:12
memo 18:6,14 28:6
  44:13
memory 43:23 58:18
memos 15:9 18:1
mental 41:20
mention 4:21 29:21
  71:4
mentioned 4:14 69:9
mentions 30:1
mess 19:10
met 3:11,12 17:1
middle 1:2 40:12 76:1
  76:10
might 4:21 6:17 10:6
  56:6
mikes 71:17
mildly 6:16,17
mile 56:5
miles 69:10
military 35:23 64:6
milligrams 41:4,9,10
millimeter 35:7
Milner 23:1 24:7 27:1
  27:2 39:16 48:22
  49:1
Milner's 57:5
Milton 4:5 14:10
mind 73:14
mine 71:18
minute 32:8
minutes 62:8,18
misdemeanor 21:11
misinterpreting 49:3

miss 70:15
Missouri 41:23 67:14
  67:15
Mo 3:12 78:25
Monday 5:11
Montgomery 2:6,17
  75:10
month 5:11 67:18,21
monthly 17:13,14,18
  17:21
months 21:18 23:2
more 9:22 10:9 20:10
  27:5,7 37:10 40:14
  43:8 54:2 60:13
  69:10
morning 57:22
most 29:6
mostly 15:10
motion 59:5,5,6,7 64:5
  69:22
move 67:13
moved 67:15
much 4:22 18:1 19:5
  20:6 26:14,15 38:23
  53:16 69:18,19 70:22
  71:2
municipalities 14:19
must 32:7 46:18
myself 24:7

_____
         N
name 12:3,7 36:19,20
names 59:12
Nashville 68:17
nationwide 14:20
need 12:14 27:7 70:18
  74:12
needed 12:17 20:6
needling 20:11
negative 7:14 10:4
  17:10 37:2
neither 76:18
never 5:16 6:15,19 33:9
  34:18 39:15 40:3,5
  53:1,2,23 55:16 68:3
  71:7 74:11
new 36:19,20 40:6
  42:21
newspaper 13:11 19:14
  19:15 53:20 54:21
next 9:8 19:13 27:3
  31:11 55:5 72:16
night 57:20 60:20
nine 57:21
Nix 2:5,15
nobody 9:13 22:2
  32:22 37:8
North 78:24
Northern 1:3 76:2,11

notarized 78:33
NOTARY 78:19
note 28:6 31:2,6
noted 78:6
notes 10:7 29:23 30:2
  30:11,18 31:13,16
  43:5
nothing 3:3 6:2 37:22
  75:17
notified 78:36
November 30:8,19
  40:11,12
number 30:21 78:29
numerous 71:6

_____
         O
object 35:2 43:6 73:10
obtain 43:1
occasion 35:18
occasionally 16:22 17:1
  17:12,13
occasions 47:21 71:6
October 32:13 33:3
  40:9 76:21
off 9:21 13:1 21:12,17
  21:20 42:9 54:4
  58:17 60:13 63:12
offer 22:5 67:16 70:5
office 17:5 31:8 45:18
  46:22,23 47:5 49:8
  50:2,8 61:23 62:5
  65:19,20
officer 20:8 67:17
Offices 2:5
official 4:2,6,8,9,13,14
  4:15,16,18,22 5:1,4,6
  5:7 11:15 13:7 15:22
  16:19 21:9 24:19,21
  24:22 29:18 39:5
often 17:11
oh 7:22 10:9 11:16 12:5
  14:23 23:23 38:8,15
  39:11 54:1,8 58:3
  66:2 69:5
okay 8:21,22 10:20
  11:17 13:13 30:9,18
  31:20 35:4 36:22
  38:15 43:3,18 45:6
  51:7,8 55:4 58:3
  59:10 62:11,11,13,15
  63:23 66:8,10 67:4
  68:2,7 69:4,5,13,14
  70:1,7,20 71:21
  74:18,19,20 75:1
once 12:18 22:3 73:7
oncoming 5:15
one 7:22 9:17 10:7,18
  11:7 13:10,14,15,21
  14:9,11 18:10 21:2

21:14 22:21 25:22
  35:18 52:9,16,18,18
  54:2,2 55:11 59:22
  62:19 63:3 65:18
  68:3 71:4,8,8 72:3
ones 13:14 16:10 52:8
one-page 18:6,13
only 5:1,2 40:7 66:22
  73:5
open 51:23 54:9 58:2,3
opinion 7:11 10:21
  19:19
opponent 46:7
opportunity 61:1
order 68:19
ordering 12:20
orders 20:15
ordinance 20:22 24:12
  24:13,16,20 25:6,12
  25:21,23 26:2 27:14
  29:19 39:4 72:9,9,10
  72:14
ordinances 4:17
org 14:18
original 78:31,32,35
other 3:20,21 11:6
  14:14,21 16:1 18:13
  30:12 38:6 41:11
  55:21 56:10,15 57:16
  58:21 65:16,20
out 7:23 10:18 11:8,19
  16:8,9,10 18:14 19:2
  19:11,15 21:3,13
  22:3 27:5 29:8 32:16
  32:23 37:18 40:9,17
  46:12 48:4 50:2,8
  53:19,23 55:4,19
  61:19,22 62:1,5
  65:19 69:7 76:16
outcome 66:3
outside 40:22 66:11
  67:18
over 20:23 35:12 48:12
  68:14 70:19
own 49:11,12
owned 34:21 35:7
owner 19:11 20:19
o'clock 55:15 60:19
  62:12

_____
         P
page 28:12 30:4,6,21
  31:19 62:22 63:3
  78:29,31,32,34
pages 76:14
pain 41:16 65:2,8 73:19
Pamela 2:2 75:11 77:6
  78:41
paper 78:6

papers 3:21
paperwork 50:2
parentheses 31:9,15
parking 26:7
part 6:11 12:14 22:8
  34:20 37:6 67:2,7,7
particular 16:13 60:8
parties 76:16,19 78:36
partly 65:13
parts 12:12,20 26:13
  35:12
party 46:7
part-time 5:2
passing 33:6
past 11:13 38:9 40:3
  50:22 56:1
pay 50:6 52:5 60:13
peace 58:17 59:21
pension 64:9
people 5:7 10:10,21
  11:14,17,20,23 12:19
  20:23 37:11 38:12
  52:9 58:19 66:23
  71:17
per 39:18
perceived 10:21
percent 26:21 42:11,12
  42:12 64:11
period 31:18 51:10
permit 21:10 35:8,19
  36:4 55:11 63:12
person 4:18 24:11
  52:16
personal 2:19 49:9
  50:1,23 62:2
personnel 3:15,18
  45:18 47:15 73:10
Phenix 14:23
phone 66:14 68:20,21
  69:2,11 70:10,11
picked 18:2,4 49:8
  65:17,19 71:17,18
place 4:5 49:18 74:10
  78:5
placed 63:5,7
places 4:19,20 26:3
Plaintiff 1:5,11 2:11
  75:19 76:5
plan 43:3
planned 25:3
planning 21:2,6,10
  23:14 25:1,2 28:22
  37:13,19,22
plans 21:4 37:8,10,12
played 54:13 55:6
please 16:17 78:28,32
  78:34
plugging 19:4
point 22:5,14,14 49:13

Telephone Deposition of James F. Trombley, Jr., Vol. III

September 19, 2007

Page 6

65:23 67:17 74:8
pointed 18:14 27:5
    61:17
police 44:19,22 45:6
    67:17 73:9 74:17
political 19:10 27:15
    27:16,17
politics 27:21
position 46:8
positive 73:2
Powers 58:23 59:8,14
practices 14:5
praise 10:23
precise 26:18
predecessor 5:4
predetermination
    51:16,20,21
prescribed 42:1
prescribing 41:23
PRESENT 2:18
presentation 15:4,8
president 54:7
pressure 41:13
pretty 4:22 11:1 19:5
    53:16
previous 11:15
previously 3:2
printed 76:14
priority 14:10
Pro 2:12
probably 5:22 6:2,4
    26:21 36:9 70:23
    71:19
problem 19:19 32:22
    41:20 65:3
problems 17:16 35:13
    43:5,11,11 62:9 74:3
procedural 20:11
procedures 39:12
process 3:8 25:21 74:2
    74:7
processes 38:19
professional 2:3 11:5
    75:11 77:7
project 38:11
projects 5:10,15 24:10
    28:19
prompt 78:37
property 19:11 20:19
    20:21 21:1,4,5 22:5
    38:19 39:2
proportion 19:2,16
prove 43:10 74:14
provided 78:29
provision 8:11 15:21
provisions 72:6
public 53:20 54:1
    78:19
pump 22:13

purpose 63:11
put 8:6,9,17 10:13 14:3
    22:12,16 26:21 32:9
    52:4
puts 40:10
putting 19:3
p.m 2:8 75:3

**Q**

qualifications 16:14
    72:6,11
qualify 64:16
question 16:3 31:1
    38:23 57:1,3 60:5
    63:23 66:4 67:8,10
    72:3
questioning 35:1
questions 17:5 32:19
    35:3 37:12 48:20
    55:9,10 56:11,13,14
    56:22 57:16 58:5,11
    58:12 68:4 69:13
quick 37:14,15 61:10
quiet 31:18
quit 40:21
quite 10:23

**R**

raise 34:19
range 64:5
Ray 12:19,22 13:11,12
    13:19
RE 78:26
read 30:12 42:10 78:2
    78:28
reading 76:17
ready 62:17 71:9
real 51:20 71:18
really 5:6,17 6:3 10:18
    13:9,21 26:22 37:8
    42:8 45:2 55:6
reason 9:7 16:13,15
    38:2 43:22 60:8
reasons 78:6
recall 10:1,3 16:11 22:4
    36:13 55:7
receipt 66:9
receive 7:15 37:2 44:20
receiving 3:14,18
recess 62:16
recommend 53:7
recommendation 22:11
recommendations 22:6
    28:21,22
recommended 27:4
record 3:7 54:22
recorded 54:19 69:16
recorder 54:23 55:2
recording 71:19

records 43:1 73:9
    74:13,13
recovering 34:7
reduced 42:4
refer 4:15,17
reference 72:13
referenced 72:8
references 72:11
referred 47:15
refers 4:16
regarding 10:4 50:18
Registered 2:3 75:11
    77:7
regulations 4:20 47:16
rehab 56:9
relatively 42:21
relevant 55:13 57:6
    73:1,5
remarks 36:11,14,17
remember 3:7,9,12,14
    3:19,22 5:10,13 6:20
    10:11,17 12:7 21:22
    28:10,11,12 30:11
    33:14,15 37:4 38:1,8
    40:19 41:14 45:2,16
    51:13,16 56:10,12,14
    57:10,13,18 58:13
    59:21 60:17 65:17
    67:21,22
remembering 57:14
reported 75:13
Reporter 2:3,3 75:12
    77:7,7
REPORTER'S 75:8
reports 18:1 74:17
represent 49:16 50:14
reprimanded 66:23
requested 45:18
requires 9:2
research 52:18
residential 7:23 9:23
resign 44:14,16,18 60:2
    60:9
resistant 15:10
respect 32:4
response 73:2
responsibilities 57:5
responsibility 29:19
rest 8:4 49:23
results 76:20
retail 25:20,23 26:2
retired 4:5
return 66:9 78:34
review 37:13
Rick 2:14 78:43
ride 16:21
Ridge 32:6 38:9,10,11
right 9:22 10:1,7 12:23
    13:6 15:23 22:20

23:4,8,10 29:11 31:7
    31:8,13 32:6 38:8
    40:13 48:15 53:11
    54:17 62:21 64:14
    68:5,18 74:23
rigid 11:1
road 2:6,16 73:6
role 5:18
roof 8:16
room 9:9 10:14
RPR 78:42
rule 69:10
rules 11:21,22 12:1
    24:11 46:4 47:16
rumor 5:23
run 8:16 28:18
runs 28:17

**S**

safe 12:21
safer 13:19
SAITH 75:5
same 13:17 24:10,10
    30:3,4 43:20 47:2,3
    54:16 76:17
sat 31:13 52:18
save 68:23 70:9,11
saw 28:11
saying 6:17 7:1,4 8:3
    9:10 11:4 14:21 25:5
    29:12 34:5 37:9,14
    44:3 52:21 54:1
    58:18 60:15,16,21
    72:18
says 9:2,6 20:23 24:18
    24:21,22 26:7,13
    30:4 39:5 47:18 54:8
    59:23 60:22 63:5,6
    63:18,21,21 72:6
schedule 37:23 69:12
se 2:12
second 44:13
secondary 65:2
seconded 59:6
secretary 16:12
section 24:17 25:6,10
    25:11 30:10 47:15
    72:16
sections 27:6,6
security 64:14
see 25:12 26:16 30:17
    30:23 60:6 70:3
seen 6:20 53:23 72:9
send 43:12 71:1,11
    73:9 74:17
sending 52:21
sent 30:15 31:3 63:1,3
    66:15 72:22
separate 8:13,15 68:1,2

78:6
separates 8:23
separating 8:4
September 1:22 2:7
    30:16 76:13 78:3,28
serious 73:8 74:4
Seroquel 41:4,10,21
    42:4,5
serve 13:1
service 64:18 65:1
service-connected
    64:17
session 52:2 53:8 58:2
    58:3
set 76:16
settle 69:18,21
settlement 68:16 69:8
    69:15 70:5
several 12:8 19:7
severe 73:18
sewer 22:7
shape 55:21,23
sheet 78:6,29,34
Sheetrock 8:4,9,11,17
    8:21,23 9:3
shift 60:20
shooting 72:22
short 15:8 62:6
shouting 9:12
show 21:8,13 40:2 73:6
    73:13,14 74:13
showed 6:3 21:15
sick 60:14,21 61:3
side 9:3
sidewalks 26:9
siding 8:6
sign 42:23 68:7 78:32
signature 78:31,32,33
    78:34
signed 3:17
significantly 7:4
signing 3:20 76:17
silt 19:3,4
silted 19:5
simply 74:2
since 5:23 27:13 32:6
    42:19,20
Sincerely 78:39
sir 9:20 16:21
sit 52:4
sits 37:22
sitting 9:8
situation 9:14 51:2
situations 10:17 13:2
    20:10
six 32:19 56:2 68:14
size 39:1
skip 44:4
small 62:2 71:15

smart 18:9
smoke 40:20,22
snap 34:12,14,17
social 64:14
some 4:19,20 6:6 9:22
    10:1,9,11 13:2,3 15:8
    15:9,17 16:9 17:4
    20:20 21:3,22 22:1
    23:6,14 32:18 37:10
    42:23 43:5,12 44:6
    49:8,13,22 50:1 52:3
    54:2 60:13 62:1
    65:23 67:17
somebody 5:20 27:19
    27:20 59:4 60:15,18
    61:5
somebody's 48:5 61:2
    61:13
someone 74:13
something 3:17 11:10
    13:12 18:20 28:8,13
    31:21 34:14 45:3,5
    46:15,16,18 59:2,3
    66:22 68:20 69:6
    74:16
sometimes 5:13 6:16
    17:2 23:6 34:17
    35:11 40:22
somewhere 36:10
    42:10
soon 42:5 62:14 67:13
    71:10
sorry 22:18 30:21
sort 58:14
sounded 38:17
space 26:9
speak 3:3 59:1 75:16
special 73:15
specific 7:21 25:18
    47:18,19 52:16
specifically 5:14 16:9
    30:12 37:17 72:8,10
    72:16,17
specifics 52:19
specifying 78:29
spinal 55:20 73:22
spoke 15:21 31:7,20
spoken 68:11
spots 26:7
spread 8:19
square 39:18 40:4
Stanley 59:14
start 6:9,13 12:19
    21:18
started 6:7,15 9:5
    12:10,18 23:2 38:11
    38:18 40:6 54:4,11
    57:21 58:4,17
starting 40:13

state 2:4 3:21 20:22
    21:8 60:17 73:14
    75:9,12 77:8
stated 65:4 78:5
statement 34:1 44:8
    46:9 55:13 60:16,18
states 1:1 14:19
stating 21:9
station 22:13 44:19
stay 37:23 73:20
stays 59:23
still 36:4 56:2 71:8
stock 12:15
stocking 12:20
stop 68:7
stopping 42:5
store 26:1
stress 34:8
stuff 19:8,9,15 24:6
    26:4,12 31:14 38:5
    38:14 44:2 50:8,23
    62:4 63:1 65:18
    73:11
subject 13:1 63:7
submit 21:4
SUBSCRIBED 78:15
subtitle 25:8
sue 68:5
suffered 6:10
Suite 2:6,16
summary 69:22
Sunday 31:21
supervisor 19:21 20:14
supplied 12:12
supply 12:12
support 18:22
supposed 29:15
sure 5:17 12:5 22:2,15
    24:9,18 25:11 29:2
    51:20 58:19
surgery 32:12 33:16
    34:7 36:23 37:3,19
    40:9,21 41:1 48:11
    55:19 56:1,3 73:19
    73:20,22
sworn 3:2 75:16 78:15
S-A-F-E 14:18

T
table 58:22
tactfully 14:4
take 8:8 44:1 62:6,9
    63:12 69:23 73:8
    74:4
taken 2:2 62:1 78:28
taking 34:6 41:9,13,16
    41:18,19 71:20
talk 7:8 17:3 21:22
    22:1 40:18,23 62:14

68:22 70:18
talked 3:8 5:17 15:7,18
    27:2 28:5 33:5 39:3
    39:15 43:22 44:12
    45:16 47:21 49:14
    51:1,6 54:12 57:4,7
    71:23
talking 12:18 27:19
    28:7,8,10 29:9 38:12
    44:1 48:3 62:20 64:9
    68:15 73:23 74:1,2
talks 31:20 72:5
tape 54:13,14 71:15,16
tax 3:20
taxes 3:21
tea 10:14
team 29:5
tear 55:20
telephone 1:19 2:1,12
tell 12:13 13:12 18:18
    18:21 19:23 20:4
    33:2,13 38:10 42:10
    43:3 44:5 45:12,22
    50:16 53:12,17 69:17
    69:19,19
telling 9:12 71:1
temporary 63:7,11
ten 55:15 60:19
terminate 59:5,7,9
    61:15 67:6
terminating 43:22
termination 15:22
    47:16
Terry 36:12
testified 3:4
testimony 10:3 43:6
    78:4
thank 11:4 74:23 78:37
Thanksgiving 38:2
    57:8
their 19:8 26:5 37:12
    38:20 39:23 43:15
    58:16,19 59:21 61:21
theirs 71:14
therefor 78:6
thereof 76:20
thing 9:8 18:19 19:2,13
    20:11 21:20 27:4
    38:9,10 40:3,14 48:3
    53:18 54:16 62:18,19
    69:7,23 71:4 73:5
things 5:15 6:22 9:23
    11:23 12:9 13:15
    14:9 19:11 20:12
    25:3 33:10 37:17
    38:16 40:23 46:12
    61:9 62:1,10 65:19
think 4:20 5:7 7:10
    9:21 10:20 16:2,15

18:12 19:18 20:13
    23:5,13,13,18 24:17
    25:10 27:18 28:1,3
    32:20 35:18 36:9,10
    36:20,21 38:4,16
    43:2 46:2,19 47:8,10
    47:12 48:14,15,16
    49:8 50:19 56:5
    58:17 61:9 62:6 65:4
    65:11,18,21 66:10
    68:12 69:9,20 70:18
    70:19 71:16,19,20
    72:1,1,13 74:22
thirty 78:35
thought 13:4 16:6
    23:10 39:4 50:9,12
    60:1 67:11 69:5
threat 73:8
threaten 61:2
threatened 61:13
threatening 36:11,14
    36:17
threats 35:2 74:4
three 21:18 38:22
three-and-a-half 53:14
    53:15 55:1
through 8:16 9:16 10:6
    11:18 16:5 22:1
    38:18 39:12 42:2
    60:10 62:7 71:10
    72:15 73:17,19
throughout 8:20
Tim 23:1,6,10,17,20
    24:7 26:23 27:1 28:3
    28:8,19 31:22 39:16
    44:21,22 45:10,13,23
    46:9,11 48:21 49:1
    53:19 54:13,15 57:4
    57:14
time 9:16,16 10:5,6
    23:13 28:5,20 29:6,7
    29:7 31:10,11 38:21
    41:3 43:20 49:17,20
    51:11 56:5,13 59:1
    59:13 60:11,13,14
    61:22 63:12 65:18
    70:14 74:23 78:4
times 6:21 20:15 22:20
    23:16,22
Tim's 23:12
title 5:6
today 36:4 41:6
together 14:11 28:5
    37:8 44:15 69:17
    70:3
told 5:17 8:7 23:13
    27:9,12 30:4,13 31:9
    31:22 37:10,15 46:8
    46:10 50:5,23 57:9

60:3 67:23
tolerate 28:9 29:12,16
    31:11 32:7
tomorrow 60:20
top 9:21 14:10
totally 62:5
touching 8:14
town 9:13 12:13 22:8
    35:12 40:7
Trace 21:23 22:12
trades 14:6
trained 13:16,18 20:7,8
training 35:22
transcript 45:9 53:1,3
    53:4 54:17 55:4 71:7
    76:15 78:4,29,32,35
transcripts 53:19
Trawick 2:19 47:8,12
    66:16
treated 6:19 50:15
trees 26:8
trial 69:23 70:6
tried 19:10
trip 68:23 70:9
Trombley 1:4,10,21
    2:1 3:1 43:8 75:15,18
    76:4 78:1,11,24,26
    78:27
trouble 11:15 50:13
Troy 15:1
truck 16:21 35:11,17
    49:10,11,12
true 3:23 24:23 76:15
    78:3
truth 3:3,3,4 45:12,22
    46:8,10 75:16,17,17
try 17:23 37:17 42:9
trying 15:5 18:16 20:7
    31:17,18 33:12 42:2
    46:1 56:4 68:23
    73:17
turned 9:12 11:4 39:21
two 3:17 21:18 22:20
    49:19,23 52:9 56:6
    65:9
two-week 51:10
Tylenol 41:18
type 35:22 41:6,20
    42:23 43:5,14
typed 31:14 32:8

U
Uh-huh 73:2
unanimous 59:10
unconstitutional 67:3,4
under 34:7 63:23
understand 14:4 46:1
    51:21 55:12 57:12
    70:15 74:5,15

| | | | | |
|---|---|---|---|---|
| unintelligible 24:19 | Wal-Mart's 22:15 | we'll 70:9 74:16 | 14:3,23,23 17:14 | 25 26:21 41:9 42:4 |
| UNITED 1:1 | want 8:19 10:16 24:7,9 | we're 3:7 54:6 56:1 | 18:8 22:23,23,23 | 26 32:8,9 |
| units 19:7 38:14 40:5 | 41:12 46:7 54:9 | 62:7 70:5,19 73:23 | 26:2,18 28:11,17 | _____ |
| unlawful 20:15 | 58:18 62:6 68:21,22 | 74:1 | 30:11,17 31:7 32:9 | **3** |
| unless 72:8 | 69:18 70:8,15,21 | we've 3:7 54:2 68:12,13 | 32:11 33:5 35:5,7 | 3 2:22 33:3 |
| unsupervised 31:22 | wanted 10:13 20:14 | 68:15 72:1 74:3 | 41:1 44:10,17 46:10 | 3rd 32:13 40:9 |
| until 6:4 49:18 51:11 | 27:23 28:1,3 37:14 | while 9:9 11:2 14:7 | 56:2,2,8 60:10,22,22 | 30 41:9 42:11 62:8 |
| updates 5:13 | 37:15 50:15 71:4 | 42:20 71:20 | 62:19 64:17 66:2 | 64:10 |
| upheld 39:22 40:7 | wanting 10:10 | White 30:4 31:7 47:8 | 67:23 68:14 69:1 | 300 2:6,16 |
| uproar 39:10 | wants 20:19 54:1 70:2 | 47:10 | year 3:17 6:4 70:14 | 37 31:19 |
| upset 46:16,18,18 | warning 74:4 | Whitehead 8:2 10:19 | years 5:22 48:12 72:23 | 391 2:3 77:7 78:42 |
| upsetting 55:7 | wasn't 5:17 21:16 35:1 | whole 3:3 22:9 25:7 | Young 36:18,19 | _____ |
| upsize 22:13 | 38:16 45:17 65:10 | 45:2 48:3 55:8 74:7 | _____ | **4** |
| use 28:14 31:1 46:6 | water 22:7,7 | 75:17 | **Z** | 4:15 75:3 |
| 49:10 64:4 73:11 | way 9:7 11:17 12:10 | wife 34:17 44:15 55:15 | zone 24:19 | 4001 2:6,16 |
| used 13:4 31:3 46:2 | 13:16,18,19,23 18:19 | 56:18 60:19 | zoning 24:12,12,16,20 | _____ |
| 49:12 50:22 55:17 | 20:7,12 21:7 22:21 | Wilbanks 2:2 75:11 | 25:1,5,12,14,16 | **5** |
| 58:20 71:15 | 29:8 33:9 39:19 40:5 | 77:6 78:41 | 28:23 29:18 39:4 | 59 62:22 |
| useless 19:9 | 40:6,8 46:13 50:11 | willing 68:21 69:1 | _____ | _____ |
| using 73:3 | 58:22 59:3 61:5,5,9 | Wise 19:3,13 | **$** | **6** |
| U.S 75:23 76:9 | 61:21 70:11 72:13,20 | wish 30:7 59:1 | $300 70:23 | 63031 78:25 |
| _____ | ways 22:20 | wished 59:2 | $300,000 27:13 | 67 78:24 |
| **V** | weapon 34:21,22 35:20 | witness 3:2 13:2 76:16 | _____ | _____ |
| VA 42:1,1 43:1 64:9,12 | Wednesday 2:7 76:13 | wondering 18:8 | **#** | **7** |
| 64:13,15,16,21 | 78:28 | word 5:20 26:6 31:2,4 | #107 78:24 | 75 76:14 |
| vacation 70:14 | week 15:21 38:2 48:10 | 31:8,9,12,12,14,14 | _____ | _____ |
| variance 39:23 | weekend 57:9 | 32:10,10 55:17 | **0** | **8** |
| variances 39:12 | weeks 32:17,19,21,23 | words 58:20 | 06 30:8,19 | 8:30 57:21 |
| various 5:10 | 38:22 40:10 49:19 | work 3:10,13 6:8,13,18 | _____ | _____ |
| very 17:23 26:10 55:7 | 56:1,2,4 | 7:12 12:3 19:10 29:8 | **1** | **9** |
| 60:10 71:5 | well 15:20 17:23 19:2 | 32:18 35:10 37:11,21 | 1st 76:21 | 9 35:7 |
| vinyl 8:6,9 | 23:11 25:2,20 26:20 | 41:3 55:22,23 70:12 | 10 30:16 42:12 | |
| vitamins 41:11,12 | 29:5 42:9 44:5 46:4 | 70:16 | 10,000 20:23 | |
| voice 34:19 | 51:22 53:18 54:6 | worked 5:2 29:5 31:22 | 10/1/07 78:23 | |
| Volume 1:17 75:13 | 61:17 64:10 67:7,23 | worker's 7:5,9 65:6 | 100 69:10 | |
| 78:2,28 | 70:17 73:13 | working 64:7 | 15-minute 62:10 | |
| voluntarily 63:11 | went 6:8,13,18 7:12 | workplace 42:7 | 150 41:5 42:4 | |
| voluntary 63:7 | 16:5 20:20 21:3 | works 12:8 | 19 1:22 2:7 76:13 78:3 | |
| vote 58:2 59:6,8,19 | 22:21,21 28:22 32:20 | world 16:3 | 78:28 | |
| 61:15 65:14 67:13 | 38:18 39:3,8 44:12 | worry 11:16 41:15 | 1989 42:19 | |
| voted 59:9 67:8,10 | 45:8 47:5 48:6 49:8 | worse 7:12 | _____ | |
| Vs 1:6,12 75:20 76:6 | 49:22,23 56:13 58:1 | worth 68:14 69:20 | **2** | |
| 78:26 | 58:15,21,21 59:20 | wouldn't 18:18 | 2:07-CV-00547-MEF | |
| _____ | 61:21 65:15,17,18,21 | wrap 62:18 | 1:6 76:3 | |
| **W** | 72:15 73:19 | Wright 12:5,5,8 | 2:07-CV-00575-MHT | |
| W 2:14 | were 10:12 11:1,21,23 | write 18:13 29:16 | 1:13 76:12 | |
| wait 21:18 32:8 | 12:9,16 14:7,8 21:23 | writes 19:14 | 2:30 2:8 | |
| waived 76:17 | 22:19 23:16 24:1 | writing 66:17 | 20 41:4 42:12 62:8 | |
| waiver 42:23 74:6,9 | 25:21 28:5,8 32:16 | written 24:12,15,16 | 78:16 | |
| waivers 73:15 | 33:18 37:7,9,14 38:6 | 28:6 31:15 54:16 | 200 69:10 | |
| walk 40:17 | 38:12,20 40:9 41:2 | wrong 3:23 32:8 34:15 | 2003 72:18 | |
| walking 56:3,4,6 | 44:1,3 49:10 50:5,9 | 39:13 47:10,12,20 | 2005 42:16,22 | |
| wall 8:16 11:19 | 50:12 51:15 52:1,13 | 48:14,16 | 2006 32:14 33:3,20 | |
| walls 8:14 | 52:20 53:10 55:10,14 | wrote 31:12 72:13,14 | 34:20 37:6 38:3 | |
| Wal-Mart 5:19,20 6:1 | 55:23 58:3,4,13 | 72:20 | 2007 1:22 2:7 30:16 | |
| 21:20,21 22:2 24:1,3 | 61:10 62:19 64:10 | www.iccsafe 14:18 | 36:9 76:13,21 78:3 | |
| 25:19 26:4,5,20 27:9 | 66:15 73:3 | _____ | 78:28 | |
| 27:12 28:7,16 30:10 | weren't 12:1 46:13 | **Y** | 22 30:8,19 | |
| 37:5 38:4,7 40:14 | 55:23 | yeah 6:10 7:22 10:9,10 | 224 78:24 | |

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

James Francis Trombley, Jr.              *
                                         *
          Plaintiff,                     *
                                         *
vs.                                      *      2:07-cv-00547-MEF
                                         *      Lead Case
City of Eufaula                          *
                                         *
          Defendant.                     *

_____

James Francis Trombley, Jr.              *
                                         *
          Plaintiff,                     *
                                         *
vs.                                      *      2:07-cv-00575-MHT
                                         *      Member Case
City of Eufaula,                         *
                                         *
          Defendant.                     *

## DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES, REQUEST FOR PRODUCTION, AND REQUEST FOR ADMISSIONS

**COMES NOW** the Defendant, by and through counsel, and in response to Plaintiff's discovery requests, states and shows as follows:

1.     Please provide a copy of Plaintiff's employment record and all notes, letters, emails, correspondence, records, pictures and any other material or documents in possession of the Defendant or Counsel for the Defendant that pertain to the Plaintiff.

**RESPONSE:**       **Defendant objects to this request to the extent it seeks materials protected by attorney client privilege and/or work product doctrine, or that were otherwise prepared in anticipation of litigation. Without waiving said objection, Defendant has produced Plaintiff's personnel file**



**and copies of notebooks left in the Defendant's possession by the Plaintiff.**

2. Please provide copies of the letters sent to and received from Mr. Sonny Harrison, Attorney for the Plaintiff before, during and after the determination hearing and all correspondence related to the termination and request for an appeal on behalf of Plaintiff.

**RESPONSE:** **See attached.**

3. Please provide a copy of a written transcript from the recording made by the defendant of the hearing. Also, please provide a transcript of the audio CD given to counsel after the scheduling conference by the plaintiff.

**RESPONSE:** **The currently available portion of the transcript from the recording made by Defendant is attached. Defendant has not transcribed, and therefore does not possess a written transcript of, the audio CD given to counsel after the scheduling conference.**

4. Please provide information of any legal action, civil or criminal, involving the Defendant in the past, present or future for employment practices complaints of any type, whether discriminatory in nature or not. Please state:

a. Date and place of such action

b. Name of parties and whether a settlement was reached or award given and how much

c. Type of action

**RESPONSE:** **Defendant objects to this request as it seeks information unrelated to and irrelevant for purposes of this litigation. Without waiving this objection, Defendant states that according to its records, it is aware of the following suits and/or claims against the City of Eufaula within the last ten years involving allegations regarding employment practices:**

(1)    **Aaron Grubbs; filed June 24, 2005 alleging racial discrimination; both EEOC claim and lawsuit dismissed.**

(2)    **John Bradfurt; filed in the United States Court for the Middle District of Alabama in 2000 alleging racial discrimination.**

(3)    **Kimberly Williams; filed EEOC claim alleging gender discrimination; claim dismissed.**

(4)    **Samuel Shabazz; EEOC currently pending alleging discrimination based on religion.**

(5)    **Jennifer Johnson; EEOC currently pending alleging discrimination based on race.**

5.    Please provide copies of any complaint letters and personnel files related to the conduct of other employees working for the Defendant. Namely, Rosie Jordan, Lucy Appling (has married and may have changed her legal name), Teri Bush, Gloria Cole and Joy White, but not limited to these individuals and to include all employees employed by the City of Eufaula, past or present or classified or unclassified.

**RESPONSE:**        **Defendant objects to this request as it seeks information and documents unrelated and irrelevant to this litigation, and files related to classified employees not similarly situated to Plaintiff. Further, this request seeks information which is protected from disclosure due to its health, financial, and/or private nature.**

6.    Please provide copies of the Personnel Rules and Regulations Manual for the City of Eufaula, as well as copies of all ordinances and amendments adopting these regulations and changes along with all notes, recording, transcripts, opinions and any other document related to the drafting and adopting of the rules.

**RESPONSE:**        **See attached.**

3

7.    Please produce a copy of the Ordinance adopting the 2003 International Building Code and its appendices by the City of Eufaula.  I believe the adopting was in October or November of 2005.

**RESPONSE:**        **See attached.**

8.    Please admit that the defendant did not consult with a medical doctor or other trained mental health professional about the mental health condition of the plaintiff.

**RESPONSE:**        **Admitted**.

9.    Please admit that during the determination hearing that Mr. Bob Powers did state that he wished there was something else that could be done other than termination of the Plaintiff.

**RESPONSE:**        **Defendant objects to this request for admission. The transcript of the hearing speaks for itself.**

10.    Please admit that the Defendant did disregard the Personnel Rules and Regulations for the City of Eufaula and did admit to Plaintiff that the Personnel Rules and Regulations did not apply to him.

**RESPONSE:**        **Defendant denies that it disregarded Personnel Rules and Regulations. Defendant admits that the Plaintiff was not a classified employee and the appeal process did not apply to him.**

11.    Please admit that a formal complaint letter was never given to a specific person with specific charges and request for disciplinary action against Plaintiff.

**RESPONSE:**        **Defendant admits that no formal complaint letter was given and that none is required for disciplinary action.**

4

12.    Please admit that the determination hearing letter did not give specific charges and had a false charge of Insubordination included.

**RESPONSE:**        **Denied.**

13.    Please admit that the Plaintiff was not granted an appeal hearing and that such a hearing was requested.

**RESPONSE:**        **Admitted.**

14.    Please admit that the Plaintiff had informed his supervisor of his health problems including depression and back disabilities.

**RESPONSE:**        **Defendant is unable to answer or deny this request as the terms "health problems" is overly vague. Defendant admits it was made aware of Plaintiff's back problems and surgery.**

15.    Please admit that Rosie Jordan was granted an appeals hearing even though she did not attend her determination hearing, thereby giving up her rights to a hearing.  Please provide a copy of all records related to Rosie Jordan's disciplinary action and termination.

**RESPONSE:**        **Admitted that Rosie Jordan was granted an appeals hearing. Defendant objects to the production of the requested documents as they are wholly unrelated to this litigation and not reasonably calculated to lead to the discovery of admissible evidence, as Rosie Jordan was a classified employee.**

16.    Please admit whether Captain Tim Marsh interviewed the Plaintiff at the request of the Personnel Manager or at his own discretion.  Please provide any letters, transcripts o other information related to such a request.

**RESPONSE:**        **Admitted that such interview was at Captain Marsh's own discretion.**

17.    Please admit that the transcript and report released by the Defendant states that it is an interdepartmental report and that the report should have been considered confidential until the determination process was complete.

**RESPONSE:**        **Admitted that the report states it is interdepartmental. Denied that it should have been considered confidential.**

18.    Please admit that prior to the determination hearing that the Defendant was handing out copies of the interview transcript conducted by the investigator to persons in the meeting room, including the press and general public.

**RESPONSE:**        **Admitted that reports were given to the individuals at the hearing; however, it is denied that there were members of the general public present. No one outside of city employees and two members of the press were present.**

19.    Please admit that Mr. Sonny Harrison asked for the determination hearing to be conducted as a closed meeting because the transcript being handed out contained information about Plaintiff's mental health.

**RESPONSE:**        **Admitted.**

20.    Please admit that the Defendant did discuss Plaintiff's mental health and memory loss during the determination hearing.

**RESPONSE:**        **It is admitted that the issue was raised, by the Plaintiff, at the hearing.**

Kelly Trawick

SWORN to and SUBSCRIBED before me on this the 22ⁿᵈ day of October, 2007.

Notary Public
My commission expires: 07/09

ALEX L. HOLTSFORD, JR. (HOL048)
RICK A. HOWARD (RAH045)
APRIL W. MCKAY (WIL304)
Attorneys for Defendant

OF COUNSEL:

NIX HOLTSFORD GILLILAND HIGGINS & HITSON, P.C.
P. O. Box 4128
Montgomery, Alabama 36103
Tel: 334-215-8585
Fax: 334-215-7101

7

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served upon:

James F. Trombley
224 North Hwy 67 #107
Florissant, MO 63031-5108

by placing same in the United States Mail, postage prepaid, on this the 23rd day of October, 2007.

OF COUNSEL

8

# CITY OF EUFAULA

# JOB DESCRIPTION

## IDENTIFICATION

| | |
|---|---|
| Job Title: Building Official | Classification No.: |
| Department: Building Department | |
| Job Analysis conducted: March, 1993 | |

## RELATIONSHIPS

| | |
|---|---|
| Reports to: | Mayor |
| Subordinate staff: | City Hall Custodian; McCoo Complex Custodian; Secretary |
| Other internal contacts: | Members of Administrative Dept. |
| External contacts: | Contractors; New & Existing Businesses; Fire Marshalls; General Public |

## JOB SUMMARY

Enforces city ordinances and notifies citizens of any violations. Examines proposed construction plans and advises contractors; provides interpretations of building codes. Plans, schedules and performs on-site inspections for compliance with building codes. Employee follows established procedures and guidelines in performance of duties but sets own agenda within established parameters and is responsible for recordkeeping.

## JOB DOMAINS

A. <u>Plan Review/Permit Issuance</u> (  %). Reviews commercial plans, and sites for zoning. Reviews structural plans, plumbing, electrical, mechanical, and sprinkler system plans. Ensures that plans for handicapped structures adhere to specified regulations. Reviews structures for adherence to life safety code. Reviews plans for homes, to include structural framework, and electrical plans. Issues permits for all houses and commercial buildings.

B. <u>Inspection</u> (  %). Reviews plans of construction sites to ensure code and zone requirements (area, dimension, density, parking use, etc.) are met and in addition to state and federal regulations. Makes on-site inspections to ensure compliance with standard electrical/mechanical/plumbing codes as well as other state laws and regulations. Makes interpretations of zoning ordinance as they apply to construction/building projects and instructs appropriate people accordingly to ensure compliance. Enforces adherence to zoning regulations as appropriate. Receives letters



DEFENDANT'S EXHIBIT
5

0034

# JOB DOMAINS

B. Inspection (continued).  phone calls or personal visits concerning code violations within jurisdiction. Canvasses the city for unsightly weed growth, undisposed garbage, and buildings that should be condemned. Informs citizens of their respective code violations and requests their compliance with the City's ordinances. Invokes the City's ordinances and charges the citizens in violation for the expenses incurred by the City in bringing the code violations into compliance. Performs slab inspections, rough plumbing, rough electrical, rough heating and air, final wiring and plumbing inspections. Signs plans and inspections after review and approval.

C. Commissions and Boards (  %). Reviews zoning applications which are submitted to the Planning Commission. Attends Planning Commission meetings, analyzes and reviews applications submitted to the Board of Adjustments. Makes recommendations to board based on feasibility. Keeps list of complaints concerning old houses for Building Board of Adjustments. Inspects houses for code compliance. Takes photographs as required. Checks courthouse records for owner identification. Calls meetings of Building Board of Adjustments and Appeals. Gets approval to tear down old homes. Issues letters giving 150 days to repair or tear down a home. Sends letters stating that the house will be presented to council for auction. Presents particular house to council for auction. Sets qualifications for Electrical Board concerning who can get electrical license. Investigates code violations. Levies fines for violations. Serves as a secretary to the board and makes recommendations as required.

D. City Problems (  %). Investigates property line disputes. Corrects individuals who conduct commercial business in residential zones, informs them of city and zoning ordinances. Instructs individuals to clean up their yard if garbage an debris becomes a health or physical risk. Imposes fines on those individuals who violate ordinances.

E. Street Lighting (  %). Receives request for street lights. Inspects area for eligibility. Prepares request for Alabama Power Company. Checks to see that light has been set up. Calls on assistance from power company when engineering expertise is needed.

F. Miscellaneous (  %). Prepares airport budget and building budget. Prepares and signs maintenance budget in conjunction with Utilities Repair Technician.

## JOB SPECIFICATIONS

### Qualifications

<u>Knowledge, Skills and Abilities</u>. Knowledge of city building and zoning ordinances and regulations. Knowledge of state and federal regulations pertaining to construction. Knowledge of Standard Codes, including the following: Standard Building Code, Standard Existing Buildings Code, Standard Gas Code, Standard Mechanical Code, Standard Plumbing Code. Knowledge of the National Electric Code. Knowledge of city rules, regulations, policies and procedures. Verbal skills to communicate effectively with general public, architects, engineers, contractors, local businessman, etc. Math skills to perform advanced mathematical operations such as densities, gross areas, etc. Writing skills to clearly and concisely convey interpretations, requirements, explanations, etc. Reading skills to understand various codes, ordinances, laws, rules and regulations regarding building inspection code enforcement and licensing. Ability to work independently and exercise good judgment. Ability to observe details to effectively perform field inspections of work under construction. Ability to read fine print and numbers without error or transposition; corrective lens acceptable. Ability to communicate with public and address various groups of people. Ability to establish and maintain effective working relationships with general public and others. Ability to respond to noises and verbal communication. Mobility to crawl, walk, bend, and to climb ladders, stairs, scaffolding to perform inspections.

<u>Other Characteristics</u>. Possess a valid Alabama driver's license. Certification as Building Inspector by the Southern Building Code Congress International (SBCCI) within twelve months of starting work as Building Inspector. Ability and willingness to become certified as Building Official by the SBCCI within a reasonable time period as specified by the city. Additional certifications such as Plumbing Inspector, Mechanical Inspector, or Electrical Inspector may be required as requested by the city. Willing to travel to attend workshops, short courses, etc. Any combination of education and experience that provides the necessary qualifications listed above including a working knowledge of construction, plumbing, mechanical, gas, and electrical operations with a minimum of two years experience. Successful completion of relevant courses in building science or an equivalent subject area can offset the two-year experience requirement. Employee shall not be financially interested in the furnishing of labor, material, or appliances for the construction, alteration, or maintenance of a building, structure, service, system, or in the making of plans or of specifications thereof, unless he is the owner of such. This employee shall not engage in any other work which is inconsistent with his duties or conflicts with the interests of the department.

## NOTE

Statements included in this description are intended to be representative of the duties and responsibilities of this job and are not to be interpreted as being all inclusive. The employee may be assigned other duties that are not specifically included.

## APPROVALS

| Name | Title | Date |
|------|-------|------|
| Name | Title | Date |



# CITY OF EUFAULA

P. O. BOX 219   EUFAULA, ALABAMA 36072-0219
TEL.: (334) 687-1206   FAX: (334) 687-1212

**JAY JAXON, JR.**
MAYOR

**JOY WHITE**
CITY CLERK/TREASURER

**JIMMY S. CALTON**
CITY ATTORNEY

COUNCIL MEMBERS
**JAMES L. MARTIN**, President
**JOHNNY A. KNIGHT**, President Pro-Tempore
**LUCIOUS COBBS**
**ROBERT D. POWERS**
**SAMUEL LIPSCOMB**

## CERTIFICATION

I, <u>JAMES F. TROMBLEY JR</u>, certify I have received a copy of the <u>CITY OF EUFAULA PERSONNEL RULES & REGULATIONS.</u>  I understand it is my responsibility to read this information, and notify my supervisor or department head if I have any questions.  I further certify the following sections were reviewed by Mo Erkins, Human Resource/Risk Manager: Anti-Harassment Policy, Drug/Alcohol Policy and Safety Policy.

_____
SIGNATURE

03 - 03 - 2003
DATE

_____
HUMAN  RESOURCE/RISK  MANAGER

DEFENDANT'S EXHIBIT
6

0088



# CITY OF EUFAULA
P. O. BOX 219   EUFAULA, ALABAMA 36072-0219
TEL.: (334) 688-2000   FAX: (334) 688-2015
www.eufaulaalabama.com

**JAY JAXON, JR.**
MAYOR

**JOY WHITE**
CITY CLERK/TREASURER

**JIMMY S. CALTON**
CITY ATTORNEY

COUNCIL MEMBERS
**JAMES L. MARTIN,** President
**JOHNNY A. KNIGHT,** President Pro-Tempore
**LUCIOUS COBBS**
**ROBERT D. POWERS**
**SAMUEL LIPSCOMB**

November 29, 2006

**Memo to File**

On Tuesday November 28, 2006 I met with Jim Trombley in the parking lot of Alabama Power. Jim was extremely upset about something that happened within the office concerning Zoning issues. We talked about the issues and who he thought was responsible for him being upset. He stated that Jay Jaxon has taken away his responsibility for zoning and wanted Tim Milner to do it. Jim told me that I was to not do anything regarding zoning issues and to turn over all the work to Tim Milner. During the conversation Jim made a statement that he should "cap" Jay and his wife, and that he would do it at 10:00 p.m. during a shift change and no one would know who did it. The conversation then was very uncomfortable for me and I told him I had to go on an inspection. I left for the inspection and he went into the office.

Bill Klein
Building /License Inspector

BK

DEFENDANT'S EXHIBIT
7
tabbies

0902



# CITY OF EUFAULA

**P. O. BOX 219   EUFAULA, ALABAMA 36072-0219**
**TEL.: (334) 688-2000   FAX: (334) 688-2015**
www.eufaulaalabama.com

**JAY JAXON, JR.**
MAYOR

**JOY WHITE**
CITY CLERK/TREASURER

**JIMMY S. CALTON**
CITY ATTORNEY

COUNCIL MEMBERS
**JAMES L. MARTIN**, President
**JOHNNY A. KNIGHT**, President Pro-Tempore
**LUCIOUS COBBS**
**ROBERT D. POWERS**
**SAMUEL LIPSCOMB**

### Memorandum

TO:       James Trombley
          Building Official

FROM:     James Martin
          President, Eufaula City Council

DATE:     November 30, 2006

RE:       Determination Hearing

Per Article VIII, Section V and Section VIII of the Personnel Rules and Regulations, you are hereby given notice of a determination hearing with the Eufaula City Council to consider the possibility of disciplinary action up to and including termination from employment with the City of Eufaula.  The hearing is scheduled for Wednesday, December 13, 2006 at 8:30 in the City Hall Conference Room.  You are being placed on administrative leave with pay immediately pending the result of the hearing. The determination hearing is being held to consider the follow charges:

1) Conduct unbecoming an employee in the public service to include making inappropriate comments

2) Insubordination

You may be accompanied by anyone of your choosing and will be afforded the opportunity to respond to the charges orally or in writing.  However, you are required to advise at least one (1) day prior to the hearing if legal counsel will accompany you.  Upon the conclusion of the hearing, a decision will be issued within three (3) working days.  You may waive your right to a Determination Hearing either by delivering a written waiver to myself or by failing to appear for the Determination Hearing.  Waiver of the Determination Hearing shall be considered an admission that the charges against you are correct.



**DEFENDANT'S EXHIBIT**
8

0903



DEFENDANT'S
EXHIBIT
9

COPY

## EUFAULA POLICE DEPARTMENT
## INTER-DEPARTMENTAL REPORT

### TYPE OF REPORT

☐ **INCIDENT**        ☐ **USE OF FORCE**
☒ **INFORMATION**     ☐ **OTHER:** _____

**CASE NUMBER:** 06120055    **DATE:** 11-29-06    **TIME:** 1500 hrs

☒ **OFFENDER**  ☐ **VICTIM**  ☐ **OTHER:** _____

**NAME:** Jim Trombley
**ADDRESS:** City Of Eufaula Building Official (Department Head)

**DOB:** November 23,1961
**SSN:** 097487768
**HEIGHT:** _____
**WEIGHT:** _____
**EYE COLOR:** _____
**HAIR COLOR:** _____
**OTHER:** _____

**INJURIES:** ☐ YES    ☒ NO

**AFTERCARE:** _____

_____

**OFFICERS INVOLVED:** _____

_____

**STATEMENT:** On Wednesday, November 29,2006 Iwas called by the Personnel Officer to meet with them in the Chiefs office. I reported there and met with Chief Walker,Mayor Jaxon,Joy White,Kelly Trawick and Bill Klein.The Chief and I were informed that Jim Trombley had made a threat to (cap) shoot the mayor and his wife. Bill Klein explained to us how and where the threat was made. The mayor did not wish to prosecute at this time. I informed the mayor that I felt obligated to meet with Jim to determine if we should take the threat seriously.I was informed that

## STATEMENT CONTINUED

he was not in the office at that time but should be in after lunch. Later in the afternoon I was called and told that Jim was now in the office. I was unable to reach him by office phone so I phoned his cell phone. I asked Jim to come in to my office when he was not busy. In approximately 10 minutes Mr. Trombley reported in. I activated my recorder as I always do during an interview. I did not advise Mr. Trombl of the Miranda warning since this was not a criminal investigation and he was free to leave at anytime. I began by asking Mr. Trombley about th comment that was made about the mayor and his wife. He explained what he could and continued to inform me about his past history and medical concerns. At the end of the interview Mr. Trombley assured me that he would not harm anyone or himself. The interview ended and he left my office. The recording was transferred to a CD and provided to City Hall so that they could evaluate the threat themselves. JM

REPORTING OFFICER: Captain Jim March      ID # 126
ASSISTING OFFICER: _____      ID # _____
SUPERVISOR'S REVIEW: _____      ID # _____
CAPTAIN'S REVIEW: _____       ID # _____

NOVEMBER 29, 2006
Interview with City of Eufaula Building Official Jim Trombley

**Present: Police Captain Tim Marsh, Building Official Jim Trombley**

**MARSH:**    Jim...

**TROMBLEY:** Um, hm...

**MARSH:**    The reason I've asked you to come in is that I've been called about a comment that you might have made yesterday about the mayor and/or his wife.

**TROMBLEY:** Um, hm.

**MARSH:**    I need to find out about it. What's going on? What's up?

**TROMBLEY:** I said something yesterday that upset Bill, and I don't really remember exactly what I said, but I was so mad at the Mayor.....he harasses me so dog-gone much, that I said something I probably shouldn't have said. And, um, of course I didn't mean it. And, I have adjustment disorder, and short-term memory loss. I have all this under control and I'm seeing a counselor. Every four weeks I see a counselor for an hour. I see my psychiatrist every six months. VA's treating me. Private doctors are treating me. Things get going so good, then out of the blue Jay will call me in his office and chew me out about something. I made a wrong decision. Tim overrode the decision I made. And it just kills me. It draws me back down and, I guess, I had too much and I said something I shouldn't have said. But I would never harm anybody.

**MARSH:**    Do you remember saying that to him?

**TROMBLEY:** Saying....?

**MARSH:**    To Bill...do you remember saying that you ought to cap the mayor and his wife?

**TROMBLEY:** I don't remember exactly what I said.

**MARSH:**    But you remember the conversation.

**TROMBLEY:** I remember the conversation, but I don't quite remember exactly what I said. But, I mean, I, uh...I remember, to be honest with you, that there was a time a long time ago, before I started treatment that I was suicidal. But I'm not, I'm not that way anymore. The stress was so bad that I had a small heart attack earlier this year. I'm trying really hard to keep it together, but the job is killing me.

1



0907

MARSH:    Why don't you quit this stuff? Why don't you put it aside and go do something else? Something that's not so stressful?

TROMBLEY: I want to and….

MARSH:    You don't need all this stress….

TROMBLEY: I know. And, um, I really am, um, thinking about it, and the thing is, I need my health insurance.

MARSH:    What about the VA? Don't they cover you?

TROMBLEY: They're only giving me 30%….$370 a month….that ain't gonna get me much of anything. But they're, I've asked for more, and I'm waiting to hear if I'm gonna get more. And I'm trying, I really do, to be honest with you, I really do want out of this. I'm falling apart. And, um, you know, psychologically I'm not, you know, in perfect health. I wish I was. You know, now that I've had back surgery, my back's getting better. The pain's not constant 24 hours a day. You know, my herniated disk was stuck to my spine, and my spinal cord tore in the surgery in October. And uh, so, I have permanent nerve damage, permanent spinal cord damage. So I'm waiting for VA to reconsider my 30% now that they have a doctor from the letter….a letter from the doctor telling about my spinal cord injury…and I really do...

MARSH:    So you feel better from your surgery then?

TROMBLEY: Um, hm. Oh yeah, a lot better.

MARSH:    Are you taking medication? Is that helping you?

TROMBLEY: Oh yeah. Yeah. I mean, um, it was really stressful for me the week Bill was gone. And, uh, you know, what had happened was, Tuesday we had the Planning Commission meeting. Actually Planning Commission meeting was over and Wal Mart had met with Jay and when it was done they came up to me and said, "Does the Mayor not want us here?" and so I went and talked to Joy and said, "Wal-Mart is under the impression the Mayor doesn't want Wal-Mart in Eufaula." I just wanted to let her know what they were thinking. So she told Jay and Jay took it out on me. You know, and I explained to them that we want the Wal-Mart. They're just under the impression that the Mayor wanted all this red brick and all this fancy stuff and when he was talking to them it was like either "Use this brick or not at all." You know, that's the impression they got. And I'm trying to mend this fence and getting chewed out for it. You know, I'm in a really tough spot. I'm caught in the middle between Jay and Tim having these great big visions for the City. I do too, but Jay doesn't want to hear any of mine. He doesn't care about hearing any of my ideas. And I'll make a decision on a zoning

0908

issue, which is my job. By Code, the law says that I am the zoning official and I interpret the zoning ordinance. And Jay told me on Monday that no, I don't. That's Tim's job. So I told Tim, "It's your job now. I don't do it any more." And Tim goes, "But it's your job by law." I said, "I know it is, but the Mayor doesn't think so. So it's yours." So I've given it to Tim now and he's told me, he says, "Jim, you are nothing but a building official. Nothing more. You know, you have this thing about wanting to be director of this department and over zoning, but you're not." He says, "You are just a building inspector, a building official, is all you are." So, it upset me. And I have a lot of good ideas and I've brought up a lot of good ideas and I think I've been real great for the City and when I left that meeting I was extremely upset. And maybe I snapped a little bit, but whatever I said, I didn't mean any of it. I went home and read a book. Had dinner, increased my dosage, talked to my psychiatrist, increased my dosage, and had a good night's sleep.

**MARSH**:      Good. Well, there's nothing I can do for you as far as the problems you having, you know, within your department. You understand, that has nothing to do with me. The only reason you and I are talking today is if there was any type of threat toward the mayor or any city official or anybody...

**TROMBLEY**: Um, Hm.

**MARSH**:      You know, I take that serious and I want to get to the bottom of it and I want to make sure that you are okay and that you are not so stressed out that you are not letting this get that next to you. And I can tell that this job is very, very stressful. And I know, I don't see how you do it. You cannot satisfy these people. I know that. I know it's a very stressful job. And I don't want to see it take you down the drain, you know, just make you not want to do it.

**TROMBLEY**: Three years ago I was suicidal. Now I'm not. And, um, I've come a long way. My psychiatrist, my counselor especially, says I have come a long way. And I have.

**MARSH**:      You feel as though right now you are going through another hard time like you had two or three years ago?

**TROMBLEY**: No, it's just...I feel good about myself, and before I was damaging my marriage. Damaging my job. And now, my marriage is good. I love my wife. Before I had left her three times in six months. Now I'm not leaving her. I need her, and I know that. The only thing is, I put 110% in my job, and when I'm criticized and harassed and stomped on, it hurts. It hurts my feelings. But I did talk to my psychiatrist. I've got that under control. I'm not where I was three years ago. By no means. My counselor, we talked this morning for an hour this morning, and we talked about the situation....and he says, you know, you've just got to let Tim do his part, and if he can't handle it because he's not a full-time employee and the Mayor discovers that jobs are getting held up and things aren't

0909

happening, then the Mayor's got to make another decision. {Undistinguishable}.....So, when I talked to him, and he explained the best way to handle it, I'm letting it go that course.

**MARSH**: That's right....that's the best way to do then.

**TROMBLEY**: Um. Hm. And, so, my wife was upset, that I was so upset.

**KNOCK ON DOOR**

**TROMBLEY**: And, after seeing my counselor today......

**MARSH**: Well, that's good. So, what you're telling me then, is, I don't have to be concerned with you hurting anybody?

**TROMBLEY**: You don't have to at all.

**MARSH**: With you hurting yourself?

**TROMBLEY**: No. Not at all. I wouldn't do that to myself or my wife. No way. It would kill her. I don't want to hurt myself. Because now, I'm working on getting my life back together. I got diagnosed. I'm being treated with Lexapro and Seroquel. Seroquel is a mood stabilizer. To help me be stable. And the Seroquel is anti-anxiety and depression to try to help me deal with the anxiety and stress of work and depression. I'm on fairly....I mean, the Seroquel, you can go up to 800 mg. I'm only on 125. I'm way down. It's a low amount. And the Lexapro, I'm only on 20. 10 is the minimum. 20 is the next step, then it goes up 30. I'm on fairly low doses of medicine, so it's not like I'm real bad. But, um, I mean, they help me. I sleep at night now. Before, I mean, I would barely get one or two hours of sleep a night. I would spend all my time up at the VFW {unintelligible} and I was drinking way too much. I haven't had a drink in two years.

**MARSH**: So you don't drink anymore?

**TROMBLEY**: I don't drink. I'm putting every bit of energy into myself and my marriage, and I put 110% into everything I do and I'm trying to do that with my job and that's the one part of my life that is not right, is my job. And, you know, it was really, yesterday, Monday, was really tough for me, because that sort of conversation happened with me and Jay before. Because he told me before the election with him and Randall that if Randall became mayor there was gonna be changes and I wouldn't have a job. And pretty much I know the elections are coming up, and he told me, Tim is to make the zoning decisions. Tim is to {unintelligible}. I mean, I understand Tim is more political, more savvy. I'm a code enforcement guy. I'm not, you know, a politician. So, what I felt he was telling me was, you know, I'm ruffling too many feathers, let Tim do that. And he wrote me up, too, because he said, on my evaluation, because he said I made decisions

4

too quickly. And I explained to him, I said, Jay, I'm so overloaded, and I have so many people asking questions and I go to an {unintelligible} and make no decisions, do you realize what's gonna happen to our growth? People are gonna start leaving because they're waiting on Tim to make a decision because he only works half days. And, I told him, it's gonna hurt the City. But he doesn't care. But he will, once people start asking why decisions aren't made. Here's a perfect example. I had a phone call Monday. A gentleman wants to open up a teenage dance hall in the vacant space next to NAPA and I told him no. And, uh, so I gave it to Tim and he agreed. And the reason I told him no was because of the parking. He says, I told him, how many kids you think? He said 100. I said, that's 33 parking spaces. There ain't no way he can get 33 parking spaces in that parking lot. So now he's looking for another place in town, so just to let you know..I think a teenage dance hall would be just as much trouble as the Q-Ball.

**MARSH:**　　　Probably so.

**TROMBLEY:** So he's looking for a place really hard.

**MARSH:**　　　Who is this guy?

**TROMBLEY:** All he told me was his first name….James…..a black guy. I haven't seen him, just talked to him on the phone. And then I told him to talk to Tim. Tim came to the same understanding, agreement, he agreed, no parking. But, um...

**MARSH:**　　　Is he required by law then to have at least one spot per three occupants?

**TROMBLEY:** Yeah. Same as Q-Ball is supposed to have. We're not getting into that mess ago. But you know, and I know, once he gets it going he's gonna say it's not working and I want to make it into a bar and we have to be really careful. And, so, from now on instead of me making those decisions, I, what I do is I have a form. A person comes in and talks to Kim, or whoever's here, and fill the form out what they want to do…I review it, make my comments, attach it, give it to Tim, he reviews it, makes his comments, attach it, I look at it, which way are we going, do we agree or not agree? That's slowing things down. So somebody comes in now, they come in, sit down, talk to me, 15 minutes, 20 minutes. I look at the Code. I answer their question. They're happy. But now it could be a week.

**MARSH:**　　　Well...

**TROMBLEY:** And, so…..

**MARSH:**　　　Did you ever think that maybe the Mayor did some of that to eliminate some of the work load off you?

**TROMBLEY:** Yeah, that's what Bill said...

5

**0911**

**MARSH:**    Could that be possible?

**TROMBLEY:** Maybe so.

**MARSH:**    Even though he may know that it may slow down things in Eufaula and he'd rather do that than jeopardize your ability to work as an employee. And he probably knows he's overloaded you.

**TROMBLEY:** Could be.

**MARSH:**    No, I don't know that.

**TROMBLEY:** I know...No, that's a good observation.....Um,

**MARSH:**    I don't know. I just don't want you to get so upset or angry with anybody that you'd make threats toward them or anything, because I don't want that.

**TROMBLEY:** No, I swear to you right now I'm not gonna do that.

**MARSH:**    Okay.

**TROMBLEY:** I love being in the Coast Guard Auxiliary. I have a Homeland Security clearance. I carry a Homeland Security ID card. I don't want to jeopardize any of that.

**MARSH:**    Right.

**TROMBLEY:** So I'm not gonna do anything to jeopardize my clearance. Because, you know, if it came to my health....I want my health to come back to 100%. And if there's another disaster in New Orleans or someplace and I can go down there with boat for a week and help out. Your guys went down there and helped. I'm an awesome seaman. So, if I can go down there with my boat and help rescue some lives, I'll be glad to do it.

**MARSH:**    Yeah.

**TROMBLEY:** And, and, um, the thing that really, I was told by the Mayor, and I told him I was doing this, and he didn't like it. He said, he said, it better not interfere with, instead of saying, Hey, Jim, I'm glad to see you're supporting the community. He said, it better not interfere with your job. And that's why I say I feel like he harasses me sometimes. He never says anything nice to me. Um, you know, you're doing a great job. He said on my evaluation, you're very productive. That's the only thing he said.

6

**MARSH:**     Coming from Mayor Jaxon, now, that's a pretty good compliment.

**TROMBLEY:** I guess so.

**MARSH:**     I know so. I've been knowing him 20 years. He's just, that's the kind of person he is. And we're all guilty of that. I don't do enough 'at-a-boys....uh, I have officers that do real well and unless they do something just extraordinary, I don't acknowledge it as often as I should. And that's a downfall of a supervisor. And sometimes we get so busy with our own projects that we forget to praise those that are doing a good job for us. One way to look at it, as long as they're not complaining, you're obviously doing a good job.

**TROMBLEY:** Yeah.

**MARSH:**     Well, that's what I wanted to talk to you about. I wanted to make sure you was okay. I wanted to make sure everything was good. I don't want you going down there hurting nobody, hurting yourself....

**TROMBLEY:** I'm not that kind of person.

**MARSH:**     It's not worth it....You know, if that job gets that overloading, overbearing to you, you need to leave it. You need to put it down. There are too many other jobs out there. And be thankful that Tim is taking some of that work load off. If it slows the system down, so be it.

**TROMBLEY:** I'm trying so....I need....my counselor told me to quit taking work home. I take work home. I use my computer and my laptop at home. I e-mail myself a memo...I finish it at home. I think of a memo at nine o'clock at night, I write it up. Or I think of an idea and I e-mail it to myself. I just have to erase work from my mind when I go home. My counselor told me to quit doing that, because I'm making myself all work and no life. And that's what part of my treatment right now is all about. And I guess when I concentrate so much on work and I'm criticized, it hits me so damn hard. To be honest with you, I've never raised a hand to my wife in 25 years. I've never hurt anybody. I have no intent of doing anything. No revenge.....{intelligible}. I'm not that kind of person. If someone does something that really ticks me off....like in my job....if someone were to tick me off about....a prime example...oh, like a builder, who's very nasty to me, cursing, stuff like that, well, when I get back to the office, I'll check and see if his license is valid and this is right, and that's right, and if I find that it's not I'll turn him in. But if someone's nice to me and pleasant to me, there's no reason for me to do a background check on them and see if they're illegal....that's the only thing I do. I don't know if that's revenge, or if that's doing a service to the citizens of the city by getting the bad contractors out of here.

**MARSH:**     That's right.

**0913**

**TROMBLEY**: No, no, whatever I said, I'm sorry for. It won't happen again.

**MARSH:**    Good deal. And, look. If you ever need anybody to talk to…if you think it's getting to the point where you need somebody to talk to, call me. I'm always here. If I'm not you can call me at home. I don't care. Call me at home or call me down here. Come down to see me. Whatever. I'll listen to you.

**TROMBLEY**: Yeah, I've had some friends that have offered…I talked to Hugh yesterday. Hugh Boyd's a really good guy. We was talking {unintelligible}. Yeah. I was doing really good and going through that surgery brought me down a little bit. You know how that goes. I mean, the morphine didn't help at all. I had to stay…it was outpatient surgery, but I had to stay overnight because of the spinal cord tear and I was leaking spinal fluid and they had to patch my spinal cord up and it was scary waking up and being in so much pain. They gave me a syringe of morphine and two oxycodones and then they said no, we can't give you anymore morphine and they gave me oxycodone….and I said forget the morphine, it ain't working.

**MARSH:**    Are you on any kind of pain medication now?

**TROMBLEY**: Just Tylenol. I don't take any…I don't take anything…..just Tylenol. Nah, I had a follow-up with my surgeon on Wednesday of last week and he said I had permanent spinal cord damage and a permanent disability. So, he didn't give me a number, he says he has to wait and do some more follow-up, some more tests, before he can give me an actual percentage.

**MARSH:**    In order to test, is that like therapy? Make you do therapy to determine how much muscle, coordination or movement…..

**TROMBLEY**: Yeah, what they do is….They base the disability on your range of movement. So what they will do is make you bend forward, and they'll take the thing down your hip and they'll measure it and then they'll have you walk around and rotate your hips some and loosen them up and then they'll have you bend again, and see how you bend. That's why the VA gave me 30%, because I can hardly bend back at all. But now I can. A little bit more every day.

**MARSH:**    You had to exercise certain….

**TROMBLEY**: You see, my back, L4 and L5 the disks are gone. I have arthritis. So what happens is, before the surgery, my back would mis-align, the discs would mis-align, the bone spurs….do you realize how that would hurt? You're talking some massive muscle spasms, because your muscles are going like, "Get back where you belong, get back where you belong." Well, he cut those bone spurs off. So, now, when they go out of place, I feel it, and I can be like in a chair and those discs will go "pop" and pops back in place. So, once I get my muscles

0914

built up from surgery, because they had to cut through the muscle tissue, it should stop....

**MARSH:**      So you have certain exercises you do to strengthen that particular muscle....muscle group....

**TROMBLEY:** Yeah, you like lay on the floor and take one knee this way 'til the back pops.....{unintelligible}

**MARSH:**      Right

**TROMBLEY:** Pull both knees to your chest...

**MARSH:**      Yep.

**TROMBLEY:** I'm doing Tai-Chi. I don't know karate or nothing, but I just started doing it one day. I got done with the surgery. It was like five weeks after the surgery. And I know enough of the moves that I just put on  like wave sounds, ocean sounds, and I did the Tai-Chi. And I woke up and I thought, "Oh, My God". You wouldn't think anything so low impact would make you hurt so bad in the morning.

**MARSH:**      Could you move muscles you don't normally move?

**TROMBLEY:** Um. Hmm. Yes.

**MARSH:**      That's good.

**TROMBLEY:** So that's what I do to unwind is Tai-Chi...and, you know, before I started treatment, I couldn't sit still long enough to read a book because of my back pain. And since my....

**MARSH:**      You'd have to get up and change positions?

**TROMBLEY:** Um. Hmm. I'm on my fourth book now. It's awesome. You know, it's like Jay says he has a herniated disc, and, you know, would you recommend the surgery. I says, well, if yours was 22 years old and you were still having the pain, yeah. But, you know, someone's had a herniated disc and they can do exercises and the chiropractor can move that disc out of the way. But, if it's been there for 22 years pushing straight back on your spine, you've got to have something done.

**MARSH:**      That's right.

**TROMBLEY:** Because he told me....because right now, if I walk for exercise, the right side of my foot and the left side of my leg go numb. Now, I have feeling

back in them. But, when I start walking, the muscle spasms hurt so bad it's just like.....that's one of the worst things I'm dealing with right now....Aspercreme, stretching....

**MARSH:**      You put Aspercreme on your back itself?

**TROMBLEY:** It works. Aspercreme and Tylenol, and a heating pad. That's all I ever use.

**MARSH:**      You use a heating pad every night?

**TROMBLEY:** Every day when I get home....first thing I do is hit  the floor and stretch and then I sit in my recliner with the heating pad. He told me it would be about a year before I'd know exactly how much the surgery helped.

**MARSH:**      But at least the pain's gone. Irregardless of how much you can do, the pain is gone. Alright, man, I won't keep you any longer. Thank you very much for coming in....If you need anything.....

**TROMBLEY:** I appreciate that.....

**MARSH:**      Take care of yourself.......


**END OF TRANSCRIPT**



Transcribed December 12, 2006

*Teri B. Bush*
_____
Teri B. Bush

Law Offices of
## RICHARD A. HARRISON L.L.C.
Attorney at Law
104 East Broad Street • Eufaula, Alabama 36027
rharrison@cyber-south.com

Post Office Box 339
Eufaula, Alabama 36072

Telephone 334-687-4824
Facsimile 334-687-4826


December 4, 2006


Jimmy S. Calton, Esquire
Calton & Calton
226 East Broad Street
Eufaula, Alabama  36027

RE:    City of Eufaula
       James F. Trombley, Jr.

Dear Jimmy:

Please be advised that I presently represent Jim Trombley in regard to the undated Memorandum from James Martin as President, Eufaula City Council referenced Determination Hearing to be held December 13 at 8:30.  To properly prepare for this hearing, I am requesting you to clarify and furnish additional information.

I have read the application sections of the City Rules and Regulations as well as the code pertaining to department heads and building officials.  It does not appear this Hearing may be called without the prior consent of the City Council.  Can you tell me if such a recommendation has been made by the Council to hold this Hearing? Mr. Martin's memo advises Mr. Trombley has been placed on administrative leave with pay.  Can you tell me if such a leave was considered by and approved by the City Council?  I have been unable to find such authority without the Council approving such a leave. That authority cited in Mr. Trombley's suspension specifically recites to classified employees.  Assuming the same procedures apply to non classified employees, it would appear the Council would be required to act on all of these procedures.

Assuming the same procedure applies, Article VIII, Section V (a)(1) requires "written notice setting out specific charges.........." be set forth.  The memo sets forth no specific charges. The enumerated causes for Disciplinary Actions under Article VII, Section III (23) has been modified "to include making inappropriate comments" and (9) to "omit" and/or disregard of orders  These allegations do not meet the specific changes brought.  Also, the code states "the code official shall not be removed from office except for cause and after full opportunity to be heard on specific and relevant charges by and before the appointing authority".  Has the Council brought any charges?



DEFENDANT'S EXHIBIT 11    0941

Calton & Calton
December 4, 2006
Page Two

It appears these charges are brought within Article VII which set forth a Grievance Procedure and so requiring the grievance be made in writing. No such writing has been provided to Mr. Trombley for which he can respond. Has a grievance been made?

As requested, I am forwarding to you pertinent Sections of the Code and Handbook for your review. Mr. Trombley is hopeful this matter may be resolved; however he needs the specific allegations for which he may respond for resolution. If I can provide you with any further information, please call me immediately.

Yours truly,

Richard A. Harrison
RAH/hmg

# APPENDIX A

# EMPLOYEE QUALIFICATIONS

*The provisions contained in this appendix are not mandatory unless specifically referenced in the adopting ordinance.*

### SECTION A101
### BUILDING OFFICIAL QUALIFICATIONS

**A101.1 Building official.** The building official shall have at least 10 years' experience or equivalent as an architect, engineer, inspector, contractor or superintendent of construction, or any combination of these, five years of which shall have been supervisory experience. The building official should be certified as a building official through a recognized certification program. The building official shall be appointed or hired by the applicable governing authority.

**A101.2 Chief inspector.** The building official can designate supervisors to administer the provisions of the *International Building, Mechanical* and *Plumbing Codes, International Fuel Gas Code,* and the ICC *Electrical Code.* Each supervisor shall have at least 10 years' experience or equivalent as an architect, engineer, inspector, contractor or superintendent of construction, or any combination of these, five years of which shall have been in a supervisory capacity. They shall be certified through a recognized certification program for the appropriate trade.

**A101.3 Inspector and plan examiner.** The building official shall appoint or hire such number of officers, inspectors, assistants and other employees as shall be authorized by the jurisdiction. A person shall not be appointed or hired as inspector of construction or plan examiner who has not had at least 5 years' experience as a contractor, engineer, architect, or as a superintendent, foreman or competent mechanic in charge of construction. The inspector or plan examiner shall be certified through a recognized certification program for the appropriate trade.

**A101.4 Termination of employment.** Employees in the position of building official, chief inspector or inspector shall not be removed from office except for cause after full opportunity has been given to be heard on specific charges before such applicable governing authority.

### SECTION A102
### REFERENCED STANDARDS

| | | |
|---|---|---|
| IBC-03 | *International Building Code*–A101.2 | |
| IMC-03 | *International Mechanical Code*–A101.2 | |
| IPC-03 | *International Plumbing Code*–A101.2 | |
| IFGC-03 | *International Fuel Gas Code*–A101.2 | |
| ICC EC-03 | ICC *Electrical Code*–A101.2 | |

0943

# CHAPTER 1

# ADMINISTRATION

## SECTION 101
## GENERAL

**101.1 Title.** These regulations shall be known as the *International Property Maintenance Code* of [NAME OF JURISDICTION], hereinafter referred to as "this code."

**101.2 Scope.** The provisions of this code shall apply to all existing residential and nonresidential structures and all existing premises and constitute minimum requirements and standards for premises, structures, equipment and facilities for light, ventilation, space, heating, sanitation, protection from the elements, life safety, safety from fire and other hazards, and for safe and sanitary maintenance; the responsibility of owners, operators and occupants; the occupancy of existing structures and premises, and for administration, enforcement and penalties.

**101.3 Intent.** This code shall be construed to secure its expressed intent, which is to ensure public health, safety and welfare insofar as they are affected by the continued occupancy and maintenance of structures and premises. Existing structures and premises that do not comply with these provisions shall be altered or repaired to provide a minimum level of health and safety as required herein. Repairs, alterations, additions to and change of occupancy in existing buildings shall comply with the *International Existing Building Code*.

**101.4 Severability.** If a section, subsection, sentence, clause or phrase of this code is, for any reason, held to be unconstitutional, such decision shall not affect the validity of the remaining portions of this code.

## SECTION 102
## APPLICABILITY

**102.1 General.** The provisions of this code shall apply to all matters affecting or relating to structures and premises, as set forth in Section 101. Where, in a specific case, different sections of this code specify different requirements, the most restrictive shall govern.

**102.2 Maintenance.** Equipment, systems, devices and safeguards required by this code or a previous regulation or code under which the structure or premises was constructed, altered or repaired shall be maintained in good working order. No owner, operator or occupant shall cause any service, facility, equipment or utility which is required under this section to be removed from or shut off from or discontinued for any occupied dwelling, except for such temporary interruption as necessary while repairs or alterations are in progress. The requirements of this code are not intended to provide the basis for removal or abrogation of fire protection and safety systems and devices in existing structures. Except as otherwise specified herein, the owner or the owner's designated agent shall be responsible for the maintenance of buildings, structures and premises.

**102.3 Application of other codes.** Repairs, additions or alterations to a structure, or changes of occupancy, shall be done in accordance with the procedures and provisions of the *International Existing Building Code*. Nothing in this code shall be construed to cancel, modify or set aside any provision of the *International Zoning Code*.

**102.4 Existing remedies.** The provisions in this code shall not be construed to abolish or impair existing remedies of the jurisdiction or its officers or agencies relating to the removal or demolition of any structure which is dangerous, unsafe and insanitary.

**102.5 Workmanship.** Repairs, maintenance work, alterations or installations which are caused directly or indirectly by the enforcement of this code shall be executed and installed in a workmanlike manner and installed in accordance with the manufacturer's installation instructions.

**102.6 Historic buildings.** The provisions of this code shall not be mandatory for existing buildings or structures designated as historic buildings when such buildings or structures are judged by the code official to be safe and in the public interest of health, safety and welfare.

**102.7 Referenced codes and standards.** The codes and standards referenced in this code shall be those that are listed in Chapter 8 and considered part of the requirements of this code to the prescribed extent of each such reference. Where differences occur between provisions of this code and the referenced standards, the provisions of this code shall apply.

**102.8 Requirements not covered by code.** Requirements necessary for the strength, stability or proper operation of an existing fixture, structure or equipment, or for the public safety, health and general welfare, not specifically covered by this code, shall be determined by the code official.

## SECTION 103
## DEPARTMENT OF PROPERTY
## MAINTENANCE INSPECTION

**103.1 General.** The department of property maintenance inspection is hereby created and the executive official in charge thereof shall be known as the code official.

**103.2 Appointment.** The code official shall be appointed by the chief appointing authority of the jurisdiction; and the code official shall not be removed from office except for cause and after full opportunity to be heard on specific and relevant charges by and before the appointing authority.

**103.3 Deputies.** In accordance with the prescribed procedures of this jurisdiction and with the concurrence of the appointing authority, the code official shall have the authority to appoint a

## SECTION 102 (IFGC)
## APPLICABILITY

**102.1 General.** The provisions of this code shall apply to all matters affecting or relating to structures and premises, as set forth in Section 101. Where, in a specific case, different sections of this code specify different materials, methods of construction or other requirements, the most restrictive shall govern.

**102.2 Existing installations.** Except as otherwise provided for in this chapter, a provision in this code shall not require the removal, alteration or abandonment of, nor prevent the continued utilization and maintenance of, existing installations lawfully in existence at the time of the adoption of this code.

> **[EB] 102.2.1 Existing buildings.** Additions, alterations, renovations or repairs related to building or structural issues shall be regulated by the *International Building Code.*

**102.3 Maintenance.** Installations, both existing and new, and parts thereof shall be maintained in proper operating condition in accordance with the original design and in a safe condition. Devices or safeguards which are required by this code shall be maintained in compliance with the code edition under which they were installed. The owner or the owner's designated agent shall be responsible for maintenance of installations. To determine compliance with this provision, the code official shall have the authority to require an installation to be reinspected.

**[EB] 102.4 Additions, alterations or repairs.** Additions, alterations, renovations or repairs to installations shall conform to that required for new installations without requiring the existing installation to comply with all of the requirements of this code. Additions, alterations or repairs shall not cause an existing installation to become unsafe, hazardous or overloaded.

Minor additions, alterations, renovations and repairs to existing installations shall meet the provisions for new construction, unless such work is done in the same manner and arrangement as was in the existing system, is not hazardous and is approved.

**[EB] 102.5 Change in occupancy.** It shall be unlawful to make a change in the occupancy of a structure which will subject the structure to the special provisions of this code applicable to the new occupancy without approval. The code official shall certify that such structure meets the intent of the provisions of law governing building construction for the proposed new occupancy and that such change of occupancy does not result in any hazard to the public health, safety or welfare.

**[EB] 102.6 Historic buildings.** The provisions of this code relating to the construction, alteration, repair, enlargement, restoration, relocation or moving of buildings or structures shall not be mandatory for existing buildings or structures identified and classified by the state or local jurisdiction as historic buildings when such buildings or structures are judged by the code official to be safe and in the public interest of health, safety and welfare regarding any proposed construction, alteration, repair, enlargement, restoration, relocation or moving of buildings.

**102.7 Moved buildings.** Except as determined by Section 102.2, installations that are a part of buildings or structures moved into or within the jurisdiction shall comply with the provisions of this code for new installations.

**102.8 Referenced codes and standards.** The codes and standards referenced in this code shall be those that are listed in Chapter 8 and such codes and standards shall be considered part of the requirements of this code to the prescribed extent of each such reference. Where differences occur between provisions of this code and the referenced standards, the provisions of this code shall apply.

> **Exception:** Where enforcement of a code provision would violate the conditions of the listing of the equipment or appliance, the conditions of the listing and the manufacturer's installation instructions shall apply.

**102.9 Requirements not covered by code.** Requirements necessary for the strength, stability or proper operation of an existing or proposed installation, or for the public safety, health and general welfare, not specifically covered by this code, shall be determined by the code official.

## SECTION 103 (IFGC)
## DEPARTMENT OF INSPECTION

**103.1 General.** The Department of Inspection is hereby created and the executive official in charge thereof shall be known as the code official.

**103.2 Appointment.** The code official shall be appointed by the chief appointing authority of the jurisdiction; and the code official shall not be removed from office except for cause and after full opportunity to be heard on specific and relevant charges by and before the appointing authority.

**103.3 Deputies.** In accordance with the prescribed procedures of this jurisdiction and with the concurrence of the appointing authority, the code official shall have the authority to appoint a deputy code official, other related technical officers, inspectors and other employees.

**103.4 Liability.** The code official, officer or employee charged with the enforcement of this code, while acting for the jurisdiction, shall not thereby be rendered liable personally, and is hereby relieved from all personal liability for any damage accruing to persons or property as a result of an act required or permitted in the discharge of official duties.

Any suit instituted against any officer or employee because of an act performed by that officer or employee in the lawful discharge of duties and under the provisions of this code shall be defended by the legal representative of the jurisdiction until the final termination of the proceedings. The code official or any subordinate shall not be liable for costs in an action, suit or proceeding that is instituted in pursuance of the provisions of this code; and any officer of the Department of Inspection, acting in good faith and without malice, shall be free from liability for acts performed under any of its provisions or by reason of any act or omission in the performance of official duties in connection therewith.

## SECTION 104 (IFGC)
## DUTIES AND POWERS OF THE CODE OFFICIAL

**104.1 General.** The code official shall enforce the provisions of this code and shall act on any question relative to the installation, alteration, repair, maintenance or operation of systems.

## SECTION 103
## DEPARTMENT OF PLUMBING INSPECTION

**103.1 General.** The department of plumbing inspection is hereby created and the executive official in charge thereof shall be known as the code official.

**103.2 Appointment.** The code official shall be appointed by the chief appointing authority of the jurisdiction, and the code official shall not be removed from office except for cause and after full opportunity to be heard on specific and relevant charges by and before the appointing authority.

**103.3 Deputies.** In accordance with the prescribed procedures of this jurisdiction and with the concurrence of the appointing authority, the code official shall have the authority to appoint a deputy code official, other related technical officers, inspectors and other employees.

**103.4 Liability.** The code official, officer or employee charged with the enforcement of this code, while acting for the jurisdiction, shall not thereby be rendered liable personally, and is hereby relieved from all personal liability for any damage accruing to persons or property as a result of any act required or permitted in the discharge of official duties.

Any suit instituted against any officer or employee because of an act performed by that officer or employee in the lawful discharge of duties and under the provisions of this code shall be defended by the legal representative of the jurisdiction until the final termination of the proceedings. The code official or any subordinate shall not be liable for costs in any action, suit or proceeding that is instituted in pursuance of the provisions of this code, and any officer of the department of plumbing inspection, acting in good faith and without malice, shall be free from liability for acts performed under any of its provisions or by reason of any act or omission in the performance of official duties in connection therewith.

## SECTION 104
## DUTIES AND POWERS OF THE CODE OFFICIAL

**104.1 General.** The code official shall enforce all of the provisions of this code and shall act on any question relative to the installation, alteration, repair, maintenance or operation of all plumbing systems, devices and equipment except as otherwise specifically provided for by statutory requirements or as provided for in Sections 104.2 through 104.8.

**104.2 Rule-making authority.** The code official shall have authority as necessary in the interest of public health, safety and general welfare to adopt and promulgate rules and regulations to interpret and implement the provisions of this code to secure the intent thereof and to designate requirements applicable because of local climatic or other conditions. Such rules shall not have the effect of waiving structural or fire performance requirements specifically provided for in this code, or of violating accepted engineering practice involving public safety.

**104.3 Applications and permits.** The code official shall receive applications and issue permits for the installation and alteration of plumbing, inspect the premises for which such permits have been issued, and enforce compliance with the provisions of this code.

**104.4 Inspections.** The code official shall make all the required inspections, or shall accept reports of inspection by approved agencies or individuals. All reports of such inspections shall be in writing and be certified by a responsible officer of such approved agency or by the responsible individual. The code official is authorized to engage such expert opinion as deemed necessary to report on unusual technical issues that arise, subject to the approval of the appointing authority.

**104.5 Right of entry.** Whenever it is necessary to make an inspection to enforce the provisions of this code, or whenever the code official has reasonable cause to believe that there exists in any building or upon any premises any conditions or violations of this code that make the building or premises unsafe, insanitary, dangerous or hazardous, the code official shall have the authority to enter the building or premises at all reasonable times to inspect or to perform the duties imposed upon the code official by this code. If such building or premises is occupied, the code official shall present credentials to the occupant and request entry. If such building or premises is unoccupied, the code official shall first make a reasonable effort to locate the owner or other person having charge or control of the building or premises and request entry. If entry is refused, the code official shall have recourse to every remedy provided by law to secure entry.

When the code official shall have first obtained a proper inspection warrant or other remedy provided by law to secure entry, no owner or occupant or person having charge, care or control of any building or premises shall fail or neglect, after proper request is made as herein provided, to promptly permit entry therein by the code official for the purpose of inspection and examination pursuant to this code.

**104.6 Identification.** The code official shall carry proper identification when inspecting structures or premises in the performance of duties under this code.

**104.7 Notices and orders.** The code official shall issue all necessary notices or orders to ensure compliance with this code.

**104.8 Department records.** The code official shall keep official records of applications received, permits and certificates issued, fees collected, reports of inspections, and notices and orders issued. Such records shall be retained in the official records as long as the building or structure to which such records relate remains in existence unless otherwise provided for by other regulations.

## SECTION 105
## APPROVAL

**105.1 Modifications.** Whenever there are practical difficulties involved in carrying out the provisions of this code, the code official shall have the authority to grant modifications for individual cases, provided the code official shall first find that special individual reason makes the strict letter of this code impractical and the modification is in conformity with the intent and purpose of this code and that such modification does not lessen health, life and fire safety requirements. The details of action granting modifications shall be recorded and entered in the files of the plumbing inspection department.

existing or proposed mechanical system, or for the public safety, health and general welfare, not specifically covered by this code, shall be determined by the code official.

## SECTION 103
## DEPARTMENT OF MECHANICAL INSPECTION

**103.1 General.** The department of mechanical inspection is hereby created and the executive official in charge thereof shall be known as the code official.

**103.2 Appointment.** The code official shall be appointed by the chief appointing authority of the jurisdiction; and the code official shall not be removed from office except for cause and after full opportunity to be heard on specific and relevant charges by and before the appointing authority.

**103.3 Deputies.** In accordance with the prescribed procedures of this jurisdiction and with the concurrence of the appointing authority, the code official shall have the authority to appoint a deputy code official, other related technical officers, inspectors and other employees.

**103.4 Liability.** The code official, officer or employee charged with the enforcement of this code, while acting for the jurisdiction, shall not thereby be rendered liable personally, and is hereby relieved from all personal liability for any damage accruing to persons or property as a result of an act required or permitted in the discharge of official duties.

Any suit instituted against any officer or employee because of an act performed by that officer or employee in the lawful discharge of duties and under the provisions of this code shall be defended by the legal representative of the jurisdiction until the final termination of the proceedings. The code official or any subordinate shall not be liable for costs in an action, suit or proceeding that is instituted in pursuance of the provisions of this code; and any officer of the department of mechanical inspection, acting in good faith and without malice, shall be free from liability for acts performed under any of its provisions or by reason of any act or omission in the performance of official duties in connection therewith.

## SECTION 104
## DUTIES AND POWERS OF THE CODE OFFICIAL

**104.1 General.** The code official shall enforce the provisions of this code and shall act on any question relative to the installation, alteration, repair, maintenance or operation of mechanical systems, except as otherwise specifically provided for by statutory requirements or as provided for in Sections 104.2 through 104.8.

**104.2 Rule-making authority.** The code official shall have authority as necessary in the interest of public health, safety and general welfare, to adopt and promulgate rules and regulations; to interpret and implement the provisions of this code; to secure the intent thereof; and to designate requirements applicable because of local climatic or other conditions. Such rules shall not have the effect of waiving structural or fire performance requirements specifically provided for in this code, or of violating accepted engineering methods involving public safety.

**104.3 Applications and permits.** The code official shall receive applications and issue permits for the installation and alteration of mechanical systems, inspect the premises for which such permits have been issued and enforce compliance with the provisions of this code.

**104.4 Inspections.** The code official shall make all of the required inspections, or shall accept reports of inspection by approved agencies or individuals. All reports of such inspections shall be in writing and be certified by a responsible officer of such approved agency or by the responsible individual. The code official is authorized to engage such expert opinion as deemed necessary to report upon unusual technical issues that arise, subject to the approval of the appointing authority.

**104.5 Right of entry.** Whenever it is necessary to make an inspection to enforce the provisions of this code, or whenever the code official has reasonable cause to believe that there exists in a building or upon any premises any conditions or violations of this code which make the building or premises unsafe, insanitary, dangerous or hazardous, the code official shall have the authority to enter the building or premises at all reasonable times to inspect or to perform the duties imposed upon the code official by this code. If such building or premises is occupied, the code official shall present credentials to the occupant and request entry. If such building or premises is unoccupied, the code official shall first make a reasonable effort to locate the owner or other person having charge or control of the building or premises and request entry. If entry is refused, the code official has recourse to every remedy provided by law to secure entry.

When the code official has first obtained a proper inspection warrant or other remedy provided by law to secure entry, an owner or occupant or person having charge, care or control of the building or premises shall not fail or neglect, after proper request is made as herein provided, to promptly permit entry therein by the code official for the purpose of inspection and examination pursuant to this code.

**104.6 Identification.** The code official shall carry proper identification when inspecting structures or premises in the performance of duties under this code.

**104.7 Notices and orders.** The code official shall issue all necessary notices or orders to ensure compliance with this code.

**104.8 Department records.** The code official shall keep official records of applications received, permits and certificates issued, fees collected, reports of inspections, and notices and orders issued. Such records shall be retained in the official records as long as the building or structure to which such records relate remains in existence, unless otherwise provided for by other regulations.

## SECTION 105
## APPROVAL

**105.1 Modifications.** Whenever there are practical difficulties involved in carrying out the provisions of this code, the code official shall have the authority to grant modifications for individual cases, provided the code official shall first find that special individual reason makes the strict letter of this code impractical and the modification is in compliance with the intent and pur-

2

(L)    Transfer: The reassignment of an employee to a position in the same pa grade without increase or decrease in rate of pay.

(M)    Compensatory time: Time granted an employee that he/she has earnec by working extra or unscheduled time that is directly equivalent to the time worked, Compensatory time for non-exempt employees must be taken during the month earn and no later than thirty (30) days from the date earned. Compensatory time shall be authorized at the discretion of the department head and will be scheduled in a manne that minimizes the City's liability for overtime under Fair Labor Standards Act. Compensatory time will be measured at the rate of one and one half times the earnec compensatory hours.

## SECTION  IV. ADMINISTRATION OF PERSONNEL, PERSONNEL OFFICER, AGE AND SEX DISCRIMINATION PROHIBITED, EXCEPTION

The City Clerk and Personnel Officer are responsible for personnel administration within the city government. All matters dealing with personnel shall be routed through the City Clerk and Personnel Officer who shall maintain a complete system of personnel files and records. The policy of the City of Eufaula is that the cit will, without regard to race, color, creed, national origin, sex (including pregnancy), ag (40 or over), or physical or mental disability of an otherwise qualified individual, provic equal employment opportunity and equal treatment to all employees in all aspects of employment, except when sex or age is a bona fide occupational qualification.

## ARTICLE II. APPOINTMENT AND PROMOTION

### SECTION I. GENERALLY, FITNESS AS BASIS; ELEVATION OF FITNESS; AUTHORITY

Appointments and promotions to all classified positions shall be solely on the basis of fitness for the position, which shall be determined by evaluation of the applicants:

(1)    Training, education, experience and physical fitness;

(2)    oral interviews; and

(3)    Whenever practical, an examination, promotion potential rating, oral interviews, and demonstration performance test.

The Mayor shall be ultimately responsible for and have sole authority to employ/discharge all employees in classified service. Department heads are nonclassified and are employed/discharged by the council. The City Council will approve the number of positions authorized for each department.



and one-half (1 1/2) times the regular rate at which he/she are paid, provided that no employee shall accrue pay at the overtime rate unless said employee shall have worked Forty (40) hours during the 7-day work week in the pay period for which the overtime rate is claimed.

(2)     Persons serving in the following capacities shall not be regarded as hourly employees; but, instead, shall be regarded as executive, administrative, or professional employees who shall not be entitled to overtime pay but whose annual salary will be set by the City Council: City Clerk, Police Chief, Fire Chief, Superintendent of Public Works, Director of Community Development, Police Captains, Building Inspector, and such other individuals as may be designated as Executive, Administrative, or Professional employees at the time of their employment by the City Council.

(3)     When an emergency crew or individual is "called back" to work after normal working hours, he shall be reimbursed for his overtime hours, but in no case for less than two (2) hours at one and one-half (1 1/2) times the hourly rate at which he is paid.

(4)     No employee in the classified service eligible to receive overtime pay will order himself into overtime work without the approval of the next individual in the supervisory chain of command (e.g., the department head or City Clerk if the situation arises). Regularly designated emergency crews are considered to have approval if a situation arises whereby they are "called back" to duty.

(5)     A twenty-eight-- (28) day work cycle is hereby established for the Fire Department. Firemen shall work 24-hour work shifts every third day. Firemen may be given a Kelly day in an effort to control overtime within the Fire Department. The Fire Chief will have the authority to establish the use of the Kelly day system and set the number of hours to apply to each shift. During any pay period, i. e., any two-week period as heretofore established that a fireman works in excess of the normal scheduled hours he shall be paid at the rate of time and a half for each hour worked. Hours not actually worked, such as annual leave, sick leave, military leave, and administrative leave shall not count toward the normal scheduled hours that must be worked before a firefighter is paid at the overtime rate.

(6)     A fourteen- (14) day work cycle is hereby established for the Police Department, to include all police officers and other police department personnel not otherwise classified as civilian employees. During each pay period, any two week period as heretofore established each employee of the Police Department shall work 80 hours. Hours not actually worked, such as annual leave, sick leave, military leave, and administrative leave, shall not count toward the 80 hours that must be worked before the overtime rate of time and a half must be paid.

9

**SECTION 7.     IF YOU ARE SUBJECTED TO SEXUAL HARASSMENT, REGISTER A COMPLAINT WITH YOUR SUPERIORS.**

Any employee of the City who feels that he/she has been subjected to harassment should register a complaint with his/her immediate superior, the City Clerk, or with the Personnel Officer.

The harassment complaint may initially be made verbally, by talking to the appropriate supervisor, the City Clerk, or with the Personnel Officer and shall be followed up with a written signed complaint.

To the extent practicable, a complaint of harassment will be kept confidential, with due regard to the sensitive nature of such complaints.

**SECTION 8.     PROMPT INVESTIGATION OF COMPLAINT**

The City shall fully, impartially and promptly investigate any harassment complaint filed by one of its employees. An investigator will be in charge of these investigations to ensure a thorough investigation and to assist in maintaining confidentiality of the matter to the fullest extent practicable.

**SECTION 9.     CONFIDENTIAL REPORT OF INVESTIGATION**

The investigator will timely file a confidential written report of the result of the investigation to either an impartial supervisor of the complainant or to the Mayor, depending on the situation at hand. Also, the complainant will be promptly informed of the results of the investigation. If the investigation reveals that the accused harasser acted in a manner to harass the complainant, the accused employee will also receive a copy of the investigator's report.

**SECTION 10.     PROMPT REMEDIAL ACTION**

The City will take prompt action to end any harassment. Following a report by the investigator that harassment in fact occurred, the City shall take immediate steps to discipline the offending employee or employees, including if appropriate immediate discharge.

Any City employee who acts in a manner to harass any other City employee is acting outside the line and scope of their employment with the City.

**SECTION 11.     RIGHT OF REBUTTAL**

Both the complaining employee and the employee who has been accused of harassment have the right to submit facts, documents or other evidence contesting the report of the investigator, to a higher supervisor, or the Mayor, if the circumstances so dictate.

27

## SECTION 12.    RETALIATION PROHIBITED

No employee of the City shall discharge or otherwise discriminate or harass any other City employee who has filed a complaint of harassment under this policy or who has sought redress for harassment with the Equal Employment Opportunity Commission or by instituting an action in Court.

## SECTION 13.    NOTICE

The City shall take all appropriate steps to inform all employees of the City of the contents of this policy.

The City of Eufaula encourages employees to come forward and report any situation which that employee deems of a harassing nature by a fellow employee. Remember, if you do not make your complaint known to your superiors, there will not be any opportunity for the City to assist you in ending the harassment.

## ARTICLE VII.    GRIEVANCE PROCEDURE

### SECTION I.    PURPOSE.

The purpose of the grievance procedure is:

(1)    To insure employees a procedure by which their complaints can be considered rapidly, fairly and without reprisal.

(2)    To encourage the employee to express himself about the conditions of work as they affect him as an employee.

(3)    To promote better understanding of policies, practices and procedures which affect employees.

(4)    To instill confidence in employees that personnel actions are taken in accord with established, fair and uniform policies and procedures.

(5)    To develop in supervisors a greater sense of responsibility in their dealings with employees.

### SECTION II.    DEFINITION.

A "grievance" is any complaint which an employee has relating to working conditions, to terms and conditions of employment, or to disciplinary action, except that of a complaint related to a disciplinary suspension of three (3) days or less, to a disciplinary demotion, or to a dismissal.

28





























## SECTION III.   GRIEVANCE POLICY IN CASES NOT INVOLVING DISMISSAL.

(a)    Purpose; informal adjustments encouraged.  The most effective accomplishment of the work of the municipality requires prompt consideration and equitable adjustment of the employee grievances.  It is the desire of the municipality to adjust the causes of grievances informally, and both supervisors and employees are expected to make every effort to resolve problems as they arise.

(b)    Procedure.  The procedure to be followed by an employee who has a grievance (not involving a complaint relating to a disciplinary suspension of more than three (3) days, to a disciplinary demotion or to a disciplinary termination) is as follows:

STEP 1.  Within five (5) working days after the event giving rise to a grievance, the employee must present the grievance to his/her supervisor in writing.

STEP 2.  If the grievance is not acted upon by the employee's supervisor, or if the grievance is not resolved to the satisfaction of the employee, the grievance must be reduced to writing and submitted by the employee to the Personnel Officer.  The written grievance must be received by the Personnel Officer no later than ten (10) days following the date it was presented to the employee's supervisor and, in no event, more than fifteen (15) days after the event giving rise to the grievance.  Failure to submit a timely written grievance terminates an employee's rights under the grievance procedure.

STEP 3.  Upon receipt of a written grievance, the Personnel Officer shall forward a copy of the grievance to the employee's supervisor who shall, within 10 days of his receipt of the grievance, file a written answer to the grievance with the Personnel Officer.

STEP 4.  Upon receipt of the written grievance and answer, the Personnel Officer shall deliver the grievance and answer to the Mayor.  Within fifteen (15) days after the he has received the grievance and answer, the Mayor shall schedule a hearing to consider the grievance and answer.  The Mayor shall give written notice to the employee and his/her supervisor of the time, date and place of the hearing and shall advise the employee that he/she may present evidence and/or testimony in support of his/her grievance, and that he/she may cross-examine witnesses called by or for the City.  Failure of an employee having a grievance to appear at the hearing will be cause for dismissal of the grievance.

STEP 5.  Within seven (7) days following completion of the Hearing the Mayor shall render a final decision on the grievance.  The decision shall either:

(a)    Dismiss the grievance in the event the employee has failed to adhere to the time limitations set forth above; or

29

0952




(b)    Deny the grievance in whole or in part; or

(c)    Sustain the grievance, in whole or in part, and determine what, if any, corrective action should be taken.



In all cases, the decision of the Mayor shall be final and binding on the employee and the City.

## SECTION IV.  PROTECTION.



No employee shall be disciplined or discriminated against in any way because of his proper use of the grievance procedure, as defined under Section 3 of Article VIII.

ARTICLE VIII.    DISCIPLINE & DISCIPLINARY PROCEDURES



## SECTION I.  GENERAL DUTY OF EMPLOYEE.

It shall be the duty of each employee to maintain high standards of conduct, cooperation, efficiency, economy and performance in work for the City.

## SECTION II.  DISCIPLINE POLICY.



(a)    Generally.  The tenure of every employee shall be conditioned on the satisfactory conduct of the employee and continued satisfactory performance of assigned duties and responsibilities.  An employee who has completed his/her probationary period may be dismissed, demoted, suspended, or reprimanded for cause or for any reason deemed to be in the City's best interest.



## SECTION III.  CAUSES FOR DISCIPLINARY ACTION.

The following are examples of causes which shall be sufficient cause for reprimand, suspension, demotion, or dismissal:



(1)    Conviction of a felony or other crime involving moral turpitude.

(2)    Incompetency or inefficiency.



(3)    Unsatisfactory work performance.

(4)    Absent without leave.



(5)    Failure or refusal to carry out instructions.

(6)    Neglect of duty.



30



(7)    Incapacity due to mental or physical disability.

(8)    Unsatisfactory record of tardiness and/or absenteeism.

(9)    Insubordination and/or disregard of orders.

(10)   Falsification of any information required by a supervisor or the city.

(11)   Failure to properly and/or promptly report accidents or personal injuries.

(12)   Misappropriation, destruction, theft or conversion of public property.

(13)   Neglect or carelessness resulting in damage to public property or to injury to another.

(14)   Conviction during employment of misdemeanor and/or traffic offenses which affect the employee's ability to perform the job.

(15)   Introduction, possession or use, on public property, in or on public equipment, and/or while at work of intoxicating liquors or controlled substances (drugs).

(16)   Proceeding to or from work, presenting himself/herself for work, being present f work while under the influence of intoxicating liquor or controlled substances (drugs).

(17)   Use of public property while off-duty while under the influence of intoxicating liquor or controlled substances (drugs).

(18)   Gambling on public property or while at work.

(19)   Fighting or deliberately injuring another.

(20)   Rude or disrespectful conduct directed toward a member of  the public or co-workers.

(21)   Waste of public supplies or equipment.

(22)   Disorderly or immoral conduct.

(23)   Conduct unbecoming an employee in-the public service.

(24)   Use of public property or equipment on private property for personal gain.

(25)   Any reason deemed to be in the best interest of the city

(26)   Testing positive on a drug and alcohol test.

31

(27)   Failure to sign a drug and alcohol testing consent form.

(28)   Failure to cooperate in any drug and alcohol testing procedure.

(29)   Possession of hand guns or lethal weapons on city property or in city vehicles (excluding sworn Police Officers).

## SECTION IV.   TYPES OF DISCIPLINARY ACTION.

The following disciplinary actions may be implemented by the Mayor or by an employee's Department Head, or his/her designated representative, as set forth below.

(a)   Reprimand.  An employee may be reprimanded for cause.  In such event the reprimand will be reduced to writing and a copy shall be placed in the employee's personnel file.  A reprimand is subject to the grievance procedure set forth in Article V Section III, but is not otherwise appealable.

(b)   Suspension for Three Days or Less.  An employee may be suspended without pay for up to three (3) days for cause.  In such event, the employee shall be given written notice of the suspension together with the reasons therefore.  A suspension of up to three (3) days is subject to the grievance procedure set forth in Article VII, Section III, but is not otherwise appealable.

(c)   Suspension of more than three (3) days.  An employee may be suspended without pay for a period ranging between four (4) and thirty (30) days for cause.  In such event, the procedure set forth below in Section 5 shall be followed, an any such suspension shall not be subject to the grievance procedure set forth in Articl VII, Section III.

(d)   Demotion.  An employee may be demoted from his/her existing position for cause, In such event, the procedure set forth below in Section V. shall be followed and any such demotion shall not be subject to the grievance procedure set forth in Article VII, Section III.

## SECTION V.   PROCEDURE APPLICABLE TO SUSPENSIONS OF MORE THAN THREE (3) DAYS, TO DEMOTION, AND TO DISMISSALS.

The following procedure shall be followed when the Mayor or any Department Head or his/her designated representative proposes to suspend an employee without pay for more than three (3) days, or to demote an employee, or to dismiss an employee.

(a)   Determination Procedure.

(1)   Written notice setting out specific charges and the possibility of disciplinary action shall be served on the employee prior to disciplinary action being

32

0955





## SECTION VI.   SUSPENSION WITH PAY PENDING DETERMINATION OF DISCIPLINE.

Whenever, in the discretion of the Mayor, or an employee's Department Head or his/her designated representative, it is necessary or desirable that an employee be removed from the City's active service pending a determination of possible disciplinary action, the employee may be suspended with pay until a Determination Hearing has been held and a determination of discipline has been made, or if no Determination Hearing is required or if such Hearing is waived, until a determination of discipline has been made.



## SECTION VII.   PROBATIONARY EMPLOYEE.

Any probationary employee may be suspended or removed at any time by the department head or Mayor, Probationary, temporary, seasonal or part-time employees shall not have the right of appeal from such action.



## SECTION VIII.   REMOVAL OF MUNICIPAL OFFICER, NON-CLASSIFIED EMPLOYEES.

Any persons appointed to office in the City may, for cause, after a hearing, be removed by the officer making the appointment.  The City Council may remove, by a two-thirds (2/3) vote of all those elected to the Council, any such person for incompetency, malfeasance, misfeasance or nonfeasance in office and for conduct detrimental to good order or discipline, including habitual neglect of duty, or for any other reason deemed appropriate by the City Council.



### ARTICLE IX.  POLITICAL ACTIVITY

## SECTION I.   POLITICAL LIMITATIONS.



The following provisions, including those included in Section 608, Act 819 of the 1977 session of the Alabama Legislature, apply to all political activity of employees and officials of the City:



(1)     No officer, agent or employee of the City, other than persons subject to popular election shall become a candidate for election or appointment to elective office, except that any person who wishes to do so may apply for leave of absence.



(2)     No person in the employment of the City, whether classified or unclassified, shall be denied the right to participate in county and state political activities to the same extend as any other citizen of the State of Alabama, including endorsing candidates and contributing to campaigns of his/her choosing.

36








# CITY OF EUFAULA
P. O. BOX 219   EUFAULA, ALABAMA 36072-0219
TEL.: (334) 688-2000   FAX: (334) 688-2015
www.eufaulaalabama.com

JAY JAXON, JR.
MAYOR

JOY WHITE
CITY CLERK/TREASURER

JIMMY S. CALTON
CITY ATTORNEY

COUNCIL MEMBERS
JAMES L. MARTIN, President
JOHNNY A. KNIGHT, President Pro-Tempore
LUCIOUS COBBS
ROBERT D. POWERS
SAMUEL LIPSCOMB

December 6, 2006

Mr. Richard A. Harrison
Attorney at Law
104 East Broad Street
Eufaula, AL 36027

RE:   City of Eufaula
James F. Trombley, Jr.
Determination Hearing

Dear Mr. Harrison:

In my capacity as City Attorney, I am writing to you as Mr. James F. Trombley, Jr's attorney, in response to your December 4, 2006 letter.

Please accept this letter as a formal supplement to the November 30, 2006 memo handed to Mr. Trombley on November 30, 2006, advising him of employment related charges that will be heard at a Determination Hearing before the council on December 13, 2006, at 8:30 a.m.

Please find attached to this letter the statements of Mr. Bill Klein, Building/License Inspector, dated November 29 and 30, 2006, relating a conversation between himself and your client wherein your client allegedly stated that "he should 'cap' Jay and his wife and that he would do it at 10:00 p.m. during a shift change and no one would know who did it." Please further be advised that these remarks, if determined by council to have been made by your client, could certainly be determined by the council to be conduct detrimental to good order or discipline or sufficient "other reason" by the council to take appropriate remedial action up to and including removal from his appointed office of Building Official.

I am also enclosing a copy of an audio CD interview between your client and Captain Tim Marsh conducted on Wednesday, November 29, 2006, as well as a copy of his official report.

DEFENDANT'S
EXHIBIT
12

0939

Pursuant to Section 36-25(A)-7(a)(11) of the 1975 Code of Alabama, I intend to recommend to the council that it consider going into executive session to hear testimony in this matter unless you advise me in writing that you want the evidentiary portion of the hearing public. Of course, any action taken by the council would, as required by law, be taken in public after the council reconvenes from the executive hearing.

Regards,

Jimmy S. Calton
City Attorney

0940

trombley2

00001
```
 1
 2   IN RE:  THE CITY OF EUFAULA CITY COUNCIL
 3           SPECIAL SESSION REGARDING THE PERSONNEL
 4           MATTER OF:  JIM TROMBLEY
 5
 6
 7
 8        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 9           REPORTER'S TRANSCRIPT OF PROCEEDINGS
10        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
11
12
13
14        The following transcript of proceedings held
15   December 13, 2006, before the Eufaula City Council was
16   transcribed by Kelli Wise, Certified Court Reporter,
17   from a digital audio recording.  The transcript consists
18   of 99 pages and is a true and accurate transcription of
19   said audio recording.
20           Done this _____ day of September, 2007.
21
22
23                 _____
24                    Kelli Wise, CCR-318
                       (334)738-3284
```
00002
```
 1           (The following council meeting was
 2           held December 13th, 2006:)
 3           MR. MARTIN:  I call the meeting to order.
 4           This is a special council meeting.
 5           Have all of the councilmen signed the waiver, I
 6   believe?  Joy?
 7           MS. WHITE:  Uh-huh (affirmative response).
 8           MR. MARTIN:  I guess it is necessary to call
 9   the roll.
10           (whereupon roll call was held).
11           MR. MARTIN:  We are here on a personnel matter
12   involving Mr. Trombley.  The first thing I'll do is
13   ask Mr. Calton as city attorney to explain the
14   procedure that we are going to follow, generally
15   follow in this proceeding.  Jimmy.
16           MR. CALTON:  Mr. President, under our personnel
17   rules and regulations, a nonclassified employee
18   such as the building official is disciplined under
19   Section 8.  I believe that's Article 8, Section 8,
20   which is, Removal of Municipal Officer,
21   Nonclassified Employee.  So that's the procedure we
22   are acting under which calls for the council as the
23   employing body to conduct a hearing and investigate
24   the facts and everything.
25           And I would like to point out that the Alabama
```
00003
```
 1   Supreme Court in a case involving the City of
 2   Eufaula in 1983 defined what is due process.
 3           Complicit in any hearing is the requirement
 4   that a person be afforded due process on any type
 5   hearing.
 6           Due process is defined in the case of Ulysses
 7   Gwen versus the City of Eufaula, 437 So. Reporter
 8   516; August 26, 1983 as the following:
 9           This court defined due process of law in the
10   case of Ziegler versus South and North Alabama, by
11   stating, quote:  Due process of law implies the
```
Page 1

DEFENDANT'S EXHIBIT 13

0857

trombley2

```
12    right of the person affected thereby to be present
13    before the tribunal which pronounces judgment upon
14    the question of life, liberty of property in this
15    most comprehensive since to be heard by testimony
16    or otherwise and to have the right of controverting
17    by proof every material fact which bears on the
18    question of life in the matter involved.
19         In other words, in order to afford due process,
20    Mr. Trombley has been afforded the nature of the
21    charges that have been leveled in the form of a
22    statement by Mr. Bill Klein, who will testify.
23         He was given an initial letter, which I'll
24    offer into the Record; followed up by a
25    supplemental letter dated December 6, 2006,
□00004
1     outlining the specific statement that we are here
2     to talk about today.
3          I'll offer this.
4          Sonny, you ought to have that.
5          MR. MARTIN:  -- one to counsel.
6          MR. HARRISON:  December 6th is the letter you
7     wrote to me?
8          MR. CALTON:  Right.  December 6th is the letter
9     that I wrote.
10         There should be two.  There should be a
11    memorandum dated November 30th signed by James
12    Martin, council president setting up the
13    termination hearing, and then a December 6, 2006
14    letter more specifically delineating the exact
15    charges that we will be discussing today.
16         MR. HARRISON:  Okay.
17         MR. CALTON:  With that, Mr. President, I am
18    ready to call the first witness.  And the first
19    witness will be Mr. Bill Klein.
20         MR. MARTIN:  Before we do that, let me ask
21    Mr. Harrison.
22         Do you understand the procedure?
23         MR. HARRISON:  I do.  And I have some comments
24    that I would like to make on that to the council.
25         First, I would like to ask, as to witnesses, do
□00005
1     you have more than one witness to call?
2          MR. CALTON:  As far as I know at the present
3     time, I only have one witness, Mr. Bill Klein.
4          MR. HARRISON:  Is the council going to convene
5     to a closed session --
6          MR. MARTIN:  No.
7          MR. HARRISON:  -- for discussion of this?
8          MR. MARTIN:  No.
9          MR. HARRISON:  Okay.  And what's the reason for
10    that?
11         MR. MARTIN:  Advice of counsel.
12         MR. HARRISON:  Now, Mr. Calton, Counsel,
13    advised me that the meeting would be closed unless
14    we requested for it to be open.
15         MR. CALTON:  Let me address that.  After I
16    wrote the letter, I contacted the League because we
17    were faced with a strange situation.  Under
18    36-25(A)7 Executive Sessions, it says:  Executive
19    sessions are not required by this chapter but may
20    be held by governmental body.  So it is not a
21    mandatory thing.
22         But the problem you run in to is that when you
                              Page 2
```

trombley2

23  get over into Section 36-25(A)6, and this is a
24  unique problem that obviously was not addressed in
25  the statute, it says:  A meeting of a governmental
□00006
1   body except while in Executive Session may be open
2   recorded by any person in attendance by means of a
3   tape recorder or by any other means.
4       So you get into the strange position if we are
5   having a due process hearing and by law you can't
6   record it, yet, how are you going to preserve the
7   due process without making a recording of the
8   thing.
9       And so the League's advice was that you could
10  error by going into executive session, but you
11  could not error by not going into executive session
12  since it is made permissive.  And also, they
13  pointed out the reasons are very narrow under
14  Executive Session.
15      It says:  To discuss the general reputation and
16  character, physical condition, professional
17  competence or mental health of the individual.
18      For the statement that I am going to present,
19  and anything that the City is proceeding in chief
20  on, does not involve general reputation, character
21  physical condition, professional competence or
22  mental health of the individual.  It is strictly a
23  statement made.  And, therefore, it would not
24  technically fit within one of those three things.
25      Now, I could foresee a situation where we get
□00007
1   in to the thing and certain things would be coming
2   up which would warrant the council to adjourn and
3   go in for a limited purpose to executive session.
4   But then they would have to come back out.  And
5   then all discussions would have to be in open
6   session.  So it would almost be like a ping-pong
7   thing.  So it just seemed like the best thing was
8   not to go in.  Because I don't know how we would go
9   in and out flipping back and forth.
10      MR. HARRISON:  Well, I think Mr. Calton said,
11  and he just read the code that says that the
12  council may go into executive session to do these
13  things.  And the very first thing that he cited was
14  Section 8 as the reason we are here today.
15      Section 8, under Article 3, I believe it is,
16  states:  Incompetency, malfeasance, misfeasance,
17  and that's exactly -- and conduct detrimental and
18  so forth.
19      That fits the descriptions that he just read as
20  the reasons he can go in to executive session.
21      Now, Mr. Calton told me that we would be in
22  executive session unless we wished for it to be an
23  open meeting.  We have not requested it to be an
24  open meeting.  And I would like for the witnesses
25  that we intend to testify not be included in the
□00008
1   hearings that we have until each witness is called.
2       MR. MARTIN:  Of course, the rules of law -- the
3   evidentiary rules do not strictly apply in hearings
4   such as this.
5       MR. HARRISON:  Except in executive session, you
6   would only have your testifying witness --
7       MR. CALTON:  Exactly.

Page 3

trombley2

8       MR. HARRISON:  -- in an executive session, and
9   that's why we're making that request.
10      MR. CALTON:  That's the ruling for the Chair.
11      MR. MARTIN:  We're not going in to executive
12  session.
13      MR. HARRISON:  Okay.  Now, Mr. Martin.
14      MR. MARTIN:  Yeah.
15      MR. HARRISON:  In reading the personnel rules
16  and regulations that the City adopted, and I
17  believe we have the last version which was adopted
18  in 2003, January 22, 2003, which is the rules that
19  the City presently operated under -- And Mr. Calton
20  has confirmed that for me -- there is a policy and
21  procedure set out for these hearings to be held.
22      Now, granted there is some ambiguity in this
23  handbook.  The policy and procedure is very
24  specific for classified employees or hourly
25  employees.  The policy is not quite so specific for

00009

1   nonclassified and department heads.
2      In the memo that Chairman Martin presented or
3  initial that Mr. Trombley was presented by the
4  personnel manager, it cites Article 3, Section 5.
5      And in that, it also gives subparagraphs number
6  1 and 2, where with it says:  Conduct unbecoming an
7  employee and an insubordination.
8      Both of those counts, 1 and 2, are purely and
9  solely for classified hourly employees.  Section 8
10  is the only section that specifically applies to
11  department heads and nonclassified employees.
12      It appears that the complaint that he was
13  presented was a blending of a complaint for hourly
14  employees as well as department heads.  But the two
15  subparagraphs, 1 and 2, have been
16  altered from what the handbook itself states.
17      "The conduct unbecoming an employee in public
18  service to include making inappropriate comments",
19  the words "to include making inappropriate
20  comments" are not there.
21      Number 23, enumerated on page 31 of the
22  handbook, simply states:  Conduct unbecoming an
23  employee in public service.
24      Now, someone chose to alter that language and
25  add to that, "to include making inappropriate

00010

1   comments".
2      MR. MARTIN:  Sonny, are those the listing of
3  the examples?
4      MR. CALTON:  Yes.
5      MR. HARRISON:  Well, they are.  They are a
6  listing of the examples, and they are enumerated
7  here as being one of those examples.
8      I'm just pointing out to the council members
9  that there has been an alter made in the policy and
10  procedure manual as y'all have it and that y'all
11  have adopted.
12      Then Number 2, Count Number 2 in the charges,
13  as we'll call it, that have been brought against
14  Mr. Trombley are insubordination.  That also has
15  been altered.  Enumerated Number 9, as the example
16  says: Insubordination.  And then it goes further.
17  It says:  And disregard of orders.  And you can
18  also read it:  Insubordination or disregard of
                Page 4

trombley2

```
19    orders.
20         Now, there is no charge here of disregard of
21    orders, so Count Number 2 should be stricken.
22         What I'm saying is both of these counts that
23    are listed on this hearing notice are just
24    incorrect.
25         It also says in the manual that the charges or
□00011
1     complaint -- It gives a grievance procedure.  It
2     gives a complaint procedure.  It gives a harassment
3     procedure.
4          The section on harassment is somewhat
5     convoluted.  It talks mostly about sexual
6     harassment; but it also talks several times about
7     this harassment in general.  And it gives specific
8     things in there that have to be alleged, signed by
9     the complaining party, and presented to this
10    council for consideration.
11         When you read the personnel manager (sic), it
12    requires that these charges that are enumerated in
13    the memorandum be presented to the council for
14    consideration prior to this meeting being held.
15         Now, it's my understanding the first time
16    council had any meeting on this matter was night
17    before last.  The council -- In my impression and
18    my opinion, the council should have had a meeting
19    before this determination hearing was set.
20         Mr. Trombley, as set forth in the ordnances,
21    the various ordnances, report directly to this
22    council.  He is hired by this council.  He is
23    directed in his duties by this council and he is
24    disciplined or discharged by this council.
25         And according to the policy and procedure
□00012
1     manual, this council is who makes the determination
2     as to when a hearing should be held.  And it's my
3     understanding that this council was (sic) not made
4     that determination.
5          MR. MARTIN:  Well, I think you are picking at
6     things, but --
7          MR. HARRISON:  I am.
8          MR. MARTIN:  -- with the council -- all the
9     council present here today and having signed that
10    waiver, I think that is a consent for this hearing.
11         MR. HARRISON:  I am just going to go on
12    further.  We're not going to object to the hearing
13    be held (sic) today, but I just want the council
14    members to understand that I don't think you have
15    followed your policy and procedure that you've set
16    out.
17         Mr. Trombley has been very versed in what you
18    have to do to have this hearing in his department.
19    And he knew right from the offset (sic) that that
20    policy and procedure wasn't followed.
21         MR. MARTIN:  All right.
22         MR. HARRISON:  And also knew that these -- that
23    what's listed here, this Number 1 and Number 2, are
24    not specific enough that you can give a response to
25    it.
□00013
1          MR. MARTIN:  All right.  Mr. Harrison, of
2     course, Mr. Trombley received the notice, the
3     memorandum from me to him dated November the 30th;
```

*Not objecting*

Page 5

trombley2

```
 4    isn't that correct he did receive that?
 5          MR. HARRISON:  He received the memorandum.  I
 6    can't tell you the exact date, but he could.
 7          MR. MARTIN:  Okay.
 8          MR. HARRISON:  We think the memorandum was
 9    received timely.  That's my --
10          MR. MARTIN:  All right.  My next question is:
11    Then you received a letter from Mr. Calton -- well,
12    the date of it was December 6th.  Did you receive
13    it that day or the next day?
14          MR. HARRISON:  Mr. Calton hand delivered it to
15    my office along with a --
16          MR. MARTIN:  Probably that same day then.
17          MR. CALTON:  With the evidence referred to in
18    there.
19          MR. HARRISON:  Along with the CD.
20          MR. MARTIN:  All right.
21          MR. HARRISON:  Along with the comment that if
22    we put the CD in my computer, that it was a bomb
23    and it would explode.
24          (Laughter.)
25          MR. HARRISON:  And I didn't make any complaint
□00014
 1    for him making that comment.
 2          MR. CALTON:  Or to you or my employer.
 3          (Laughter.)
 4          MR. HARRISON:  Oh.  He told my employee that
 5    and then he tracked me down and told me the same
 6    thing.
 7          MR. MARTIN:  And that letter to you dated
 8    December the 6th is, frankly, rather specific about
 9    matters, is I not?
10          MR. HARRISON:  It was.  It was in response to a
11    letter that I wrote him as the city attorney to
12    clarify and give me the specific allegations; and
13    we received those things.
14          MR. MARTIN:  And we are here a week later on
15    these matters?
16          MR. HARRISON:  Yes, sir.
17          MR. MARTIN:  Okay.  All right.  Did you have
18    any other comment you'd like to make before the
19    first witness?
20          MR. HARRISON:  No, sir.
21          MR. MARTIN:  All right.  I'm a notary.  I will
22    swear the witness.  And I think I have the
23    authority to do that anyway as president of the
24    council.
25          Jim.
□00015
 1          MR. CALTON:  I agree with you.
 2          Mr. President, I would like to call Mr. Bill
 3    Klein.
 4          MR. MARTIN:  Mr. Klein.
 5                    BILL KLEIN
 6     having first been duly sworn, testified as follows:
 7                    EXAMINATION
 8    BY MR. CALTON:
 9    Q.   Mr. Klein, what position do you occupy with the
10         City of Eufaula?
11    A.   City Building Inspector.
12    Q.   And how long have you been so employed?
13    A.   Two years.
14    Q.   All right.  And in that capacity, do you work under
```

Page 6

trombley2

```
15        or close with Mr. Jim Trombley?
16   A.   Yes, I do.
17   Q.   Do you recall an event that occurred on or about
18        Tuesday, November the 28th, where you and
19        Mr. Trombley were caused to meet around the parking
20        lot or something around City Hall?
21   A.   Yes, sir.
22   Q.   If you would, just tell this council about that
23        particular event, what happened and who said what
24        and how the conversation came about.
25   A.   Well, it was on Tuesday the 28th, and I was leaving
00016
1         for inspection, and Jim was pulling in to the
2         parking lot. And when he got out of the vehicle,
3         he was extremely agitated about something. And I
4         tried to get it out of him what was going on. And
5         he was talking about the zoning issue problem in
6         the city and that he felt that Jay had took away
7         his authority to do the zoning work for the City of
8         Eufaula.
9             And during the conversation, he specifically
10        stated to me that he would like -- he should cap
11        Jay and his wife. And he was going to do it at ten
12        o'clock at night between a shift change so nobody
13        would know about it.
14   Q.   All right. And what was your reaction when he made
15        that statement?
16   A.   I was stunned. I just -- I just told him, I said,
17        Jim, I've got an inspection going on and I have to
18        leave. And I left.
19   Q.   Did you report that to anybody?
20   A.   Uh-huh; not until the next morning.
21            MR. MARTIN: Excuse me. But what time did this
22        conversation take place?
23            THE WITNESS: It was in the morning; sometime
24        in the morning.
25            MR. MARTIN: Early? Late? Middle?
00017
1             THE WITNESS: Sometime after 9:00.
2             MR. MARTIN: Okay.
3    Q.   Did you run in to Mr. Trombley off and on during
4         the day?
5    A.   Yes, I did.
6    Q.   Did he have any further comment to say to you?
7    A.   No.
8    Q.   Did he ever recant the statement to you?
9    A.   No.
10   Q.   Did he ever ask you to disregard the statement?
11   A.   No.
12   Q.   All right. So at the end of the day you went home;
13        is that right?
14   A.   Yes, I did.
15   Q.   Did you think about or dwell on this statement over
16        night?
17   A.   All night.
18   Q.   All right. And what, if any, action did you take
19        the following morning?
20   A.   The following morning I waited in the parking lot
21        for Joy, and I told her what had happened in the
22        parking lot the day before.
23   Q.   Now, when you say, Joy, for the purpose of the
24        record, would you please identify who Joy is?
25   A.   Joy White, the city clerk.
```

Page 7

trombley2

00018
```
 1   Q.   All right.  So you were in the parking lot when Joy
 2        arrived that morning; right?
 3   A.   Yes.
 4   Q.   And, if you would, relate to us the conversation
 5        you had with Joy.
 6   A.   I just told her I needed to talk to her about
 7        something.  And I explained to her what happened
 8        the day before in the parking lot with Jim.
 9   Q.   Did you repeat the statement that Mr. Trombley had
10        made?
11   A.   Yes, I did.
12   Q.   What, if any, action did the two of you then take?
13   A.   Jason -- oh, I'm sorry.  Joy White said that we
14        should go in and talk to the mayor about it.
15   Q.   All right.  And approximately what time in the
16        morning did y'all inform the mayor of this
17        conversation?
18   A.   Around eight-thirty, nine o'clock; somewhere in
19        that area.
20   Q.   All right.  And what, if any, action was taken at
21        that point?
22   A.   Joy wanted me -- asked me to go over to Jay's
23        personal office -- business office to talk about
24        the situation.
25   Q.   All right.  And was the mayor there at his office?
```

00019
```
 1   A.   Yes, he was.
 2   Q.   And who was present at that time?
 3   A.   Me, Joy White and Jay Jackson.
 4   Q.   And did you repeat to the mayor what had been told
 5        to you by Mr. Trombley the day before?
 6   A.   Yes, I did.
 7   Q.   And what, if any, action was taken at that time?
 8   A.   He decided that he would like to have Mr. Martin
 9        available to talk about it, and so they called
10        Mr. Martin.
11   Q.   All right.  That's Mr. Jim Martin, President of
12        council?
13   A.   Right.
14   Q.   And you repeated the statement to him; is that
15        correct?
16   A.   Yes, I did.
17   Q.   All right.  And what, if any, action occurred after
18        that statement?
19   A.   We decided to call Kelly Traywick in on this.
20   Q.   And who is Kelly Traywick?
21   A.   She's the personnel manager for the City.
22   Q.   And did she join the meeting?
23   A.   Yes, she did.
24   Q.   And after she joined the meeting, what, if any,
25        further action was taken?
```

*told Jim Martin*

00020
```
 1   A.   She asked me what had happened.
 2   Q.   All right.  Did you repeat the statement to them?
 3   A.   Yes, I did.
 4   Q.   And the statement is essentially the same as what
 5        you have testified to already?
 6   A.   It's exactly the same.
 7   Q.   And what, if any, action took place next?
 8   A.   And then they called you, Mr. Calton.
 9   Q.   And then did I arrive?
10   A.   Yes, you did.
```

Page 8

trombley2

```
11   Q.   And did you repeat the statement again?
12   A.   Yes, I did.
13   Q.   Following the termination of that meeting, what
14        action was taken?
15   A.   You and Jay and everybody present discussed this at
16        length --
17   Q.   Right.
18   A.   -- as to whether I felt he was serious about what
19        he had said.
20   Q.   And what was your feeling at the time?
21   A.   My feeling at the time?  I wasn't sure.  I was not
22        sure whether he was truthful or not.
23   Q.   All right.  But he did -- He was in a very
24        agitative state?
25   A.   Yes, he was.
```
□00021
```
 1   Q.   He was not in a joking -- He didn't say it in a
 2        joking or laughing, frivolous manner that day, did
 3        he?
 4   A.   No.
 5   Q.   Then did you or somebody else contact anyone at the
 6        police department?
 7   A.   I believe Mr. Jackson called the police department.
 8        He was concerned about the safety of his wife.
 9   Q.   All right.  And then did you talk or meet with
10        anybody at the police department?
11   A.   Yes, I did.  I was with Joy White, Jay Jackson,
12        Kelly Traywick, and I believe you were there.  No,
13        you weren't there.  And Chief Walker was there.
14   Q.   And Chief Walker.
15   A.   And Captain Marsh.
16   Q.   And Captain Marsh.  And as a result of that
17        conversation, was it determined that Captain Marsh
18        would investigate?
19   A.   Yes.
20   Q.   And then when Captain Marsh -- I mean, when y'all
21        left from down there, did Captain Marsh give you
22        instructions about notifying him?
23   A.   Yes, he did.  He asked someone from the City that
24        if Jim come in, he would like to speak with Jim.
25   Q.   And later on that afternoon, did Mr. Trombley in
```
□00022
```
 1        fact come in?
 2   A.   Yes, he did.  He came in after his doctor's
 3        appointment.
 4   Q.   After his doctor's appointment?
 5   A.   Uh-huh (affirmative response).
 6   Q.   Did you have a conversation with him about whether
 7        he was serious or not at that point?
 8   A.   Yes, I did.  I asked him if he was serious about
 9        what he said.  And he said, absolutely not.  He
10        apologized for his statement to me.  He says, I
11        would never do that.  He said that if he was off of
12        his meds maybe he would do it, but he would never
13        do it being on his meds.
14             And I grilled him again, and I said, are you
15        sure about this, that you would never do anything
16        like this.  And he again apologized profusely to
17        me; that he would never do that.
18   Q.   Well, from the time of making the statement the
19        morning of the 27th -- 28th, I think it was, until
20        y'all's conversation the afternoon of the 29th
21        around one o'clock, he had never contacted you to
```
                              Page 9

                                                    0865

trombley2

```
22        disavow or retract the statement that he had told
23        you, had he?
24   A.   That's correct.
25   Q.   All right. Then, the following morning, which
```
□00023
```
 1        would be the 30th, did you have occasion to have a
 2        conversation with Mr. Trombley regarding your job
 3        performance?
 4   A.   Yes, I did.
 5   Q.   All right.  And where did this conversation take
 6        place?
 7   A.   At the ABC -- In the ABC Store parking lot.
 8   Q.   And what happened on that occasion?
 9   A.   Jim asked me if he could -- Well, we walked through
10        the ABC and did our inspections; then Jim asked me
11        if I could talk to him -- if he could talk to me.
12   Q.   Let me back up.  Had you told Jim that you had
13        reported this to the police?
14   A.   The day before when we were in the vehicle.
15   Q.   In the vehicle the day before?
16   A.   Right.  Right.  I told him that I had contacted Joy
17        as to what he said.
18   Q.   All right.  And what was his comment when you told
19        him that?
20   A.   Well, he said that I should have talked to him
21        about it before I talked to anybody else and that
22        he's probably going to get called in by the police.
23   Q.   All right.  So now go back to the next morning on
24        the 30th.  What, if any, action did Mr. Trombley
25        take in regard to your position on the morning of
```
□00024
```
 1        the 30th?
 2   A.   Well, like I said, we met at the ABC Store to do
 3        some inspections on the building so they could open
 4        up.  And he asked me if he could talke to me.  And
 5        I said, sure.  And he said he talked to his wife
 6        and they decided that he would like to have me
 7        resign.  And I went, oh - kay.  And he says -- And
 8        I said, Well, Jim, I want it in writing or an
 9        E-mail or something.  And I says, I'll think about
10        this.  And I got in my truck and I left and so did
11        Jim.
12   Q.   Now, as a result of those two conversations, did
13        you prepare two memorandums to file; one of them
14        dated the 29th, which I'm going to show you a copy.
15             MR. CALTON:  And these are the same thing I've
16        given you, Sonny.
17             I offer these to the council.
18   Q.   And, likewise, did you prepare a memorandum to file
19        dated November 30th?
20   A.   Yes, I did.
21   Q.   I want to show you a copy of that and ask you if
22        that is the memorandum you prepared?
23   A.   Yes.
24   Q.   And both of those statements relate to the two
25        events you just discussed?
```
□00025
```
 1   A.   Correct.
 2             MR. CALTON:  Mr. President, I would point out,
 3        as self-evident in my letter, that these documents
 4        were delivered to Mr. Harrison on December 6th with
 5        my letter.
 6             MR. MARTIN:  Okay.  And you got them, Mr.
```
Page 10

                              trombley2
```
 7        Harrison?
 8             MR. HARRISON:  Yes.
 9    Q.  Also, Mr. Klein, is that the end of your
10        involvement?
11    A.  That was the end of my involvement.
12    Q.  And you had no further contact with Mr. Trombley or
13        no further involvement; is that correct?
14    A.  Right.  I only seen him in the office here one day
15        at that was it.
16    Q.  Okay.
17             MR. CALTON:  Anwer Mr. Harrison's questions.
18                    EXAMINATION
19   BY MR. HARRISON:
20    Q.  Mr. Klein, Mr. Trombley is your immediate
21        supervisor?
22    A.  Yes.
23    Q.  The past several months, has there been an occasion
24        that Mr. Trombley has not been able to perform his
25        job duties?
□00026
 1    A.  What do you mean by that?
 2    Q.  Has he been in the office every day?
 3    A.  No, he hasn't.
 4    Q.  The times that he has been absent, do you know
 5        where he has been?
 6    A.  The month of October he was out on sick leave with
 7        back surgery.
 8    Q.  Okay.  And that was the entire month of October?
 9    A.  Yes.
10    Q.  Do you recall when he returned to work?
11    A.  I believe it was the first week in November,
12        something like that.
13    Q.  And when he returned to work, did he return to work
14        full-time?
15    A.  Yes, he did.
16    Q.  Okay.  During the month of October, who performed
17        his daily duties?
18    A.  I tried to.
19    Q.  You tried to.  Did you have anyone else assisting
20        you?
21    A.  I had Tim Milner assisting me as much as he
22        possibly could.
23    Q.  Okay.  What was Mr. Milner doing?
24    A.  He was the City Planner.
25    Q.  To assist you, tell me what he was doing.
□00027
 1    A.  I didn't -- probably didn't talk to him too much
 2        during the month.  I didn't have too many zoning
 3        issues to talk to him about.  That's the only thing
 4        that I was concerned about as far as the zoning.
 5        I'm not as versed as Jim as far as zone issues.  I
 6        needed Tim for consultation on certain events.
 7    Q.  For the month of October, did you act as head of
 8        the building department?
 9    A.  No.
10    Q.  Who did?
11    A.  I don't believe I was the head of the building
12        department.  Jim was the head of the building
13        department as far as I was concerned.
14    Q.  I know.  But on a daily basis, who acted in that
15        capacity?
16    A.  I guess I would've.
17    Q.  Okay.  Now, when the comments were made that you
                        Page 11
```

trombley2

| | | |
|---|---|---|
| 18 | | have stated in your November 29th -- that's |
| 19 | | addressed "Memo to File". Let me ask you to |
| 20 | | look -- And I guess you've got a copy of that. |
| 21 | | This is what I was provided with. |
| 22 | | Did you prepare that? |
| 23 | A. | Yes, I did. |
| 24 | Q. | Okay. And where did you prepare that? Did you |
| 25 | | prepare this on a computer? |

00028

| | | |
|---|---|---|
| 1 | A. | In my office at my desk -- |
| 2 | Q. | Here -- |
| 3 | A. | -- on computer. |
| 4 | Q. | In City Hall? |
| 5 | A. | Uh-huh (affirmative response). |
| 6 | Q. | And you prepared this after you had talked to |
| 7 | | Ms. White? |
| 8 | A. | You mean the morning of after I reported it to her? |
| 9 | Q. | Yes, sir. |
| 10 | A. | Yes, I did. |
| 11 | Q. | Okay. And did you have anybody assist you in |
| 12 | | preparing it? |
| 13 | A. | No. |
| 14 | Q. | Okay. Did you and Ms. White discuss what the memo |
| 15 | | would need to contain? |
| 16 | A. | No. |
| 17 | Q. | Okay. So you made a comment down at the bottom |
| 18 | | that the conversation then was very uncomfortable |
| 19 | | to me. And I told him -- and you are referring to |
| 20 | | Mr. Trombley -- I had to go on inspection. I left |
| 21 | | for the inspection, and he went in to the office. |
| 22 | | Now, that was concerning the conversation you |
| 23 | | had with Jim on November the 28th? |
| 24 | A. | Uh-huh (affirmative response). |
| 25 | Q. | About what time that morning did y'all have that |

00029

| | | |
|---|---|---|
| 1 | | conversation? |
| 2 | A. | It was early in the morning; somewhere around nine |
| 3 | | o'clock; nine-thirty, ten o'clock, because Jim had |
| 4 | | just come to work (inaudible). |
| 5 | Q. | Did you discuss that conversation with anyone that |
| 6 | | day? |
| 7 | A. | No, I did not. |
| 8 | Q. | Did you discuss that conversation with anyone that |
| 9 | | night? |
| 10 | A. | No, I did not. |
| 11 | Q. | You didn't talk to Jim about it anymore that day? |
| 12 | A. | No, sir. |
| 13 | Q. | And then on the 29th, you waited for Ms. White in a |
| 14 | | parking lot? |
| 15 | A. | No. She was pulling in about the same time I was. |
| 16 | Q. | Okay. I think you previously stated that you |
| 17 | | waited for her in the parking lot. |
| 18 | | Was that a misstatement of fact? |
| 19 | A. | I was probably out having a cigarette. Okay. |
| 20 | Q. | So you weren't waiting for her in the parking lot |
| 21 | | to tell her the contents of the statement? |
| 22 | A. | No, I was not specifically waiting to tell her |
| 23 | | that. |
| 24 | Q. | At what point in time did you make the decision |
| 25 | | that you were going to tell her the information |

00030

| | | |
|---|---|---|
| 1 | | contained in that statement? |
| 2 | A. | About three o'clock in the morning. |

Page 12

0868

                                        trombley2
 3   Q.   About three in the morning.
 4              And I don't want to go through all of the
 5        various meetings you had as a result of having that
 6        conversation, but at the last meeting that that you
 7        said was attended by Captain Marsh, who all was
 8        present then?
 9   A.   Chief Walker, Captain Marsh, Kelly Trawick, myself,
10        Jay Jackson and Joy White.
11   Q.   When you made this document that's titled, Memo to
12        File, tell me what file that's a memo to.
13   A.   I have no idea.  I was asked to put a memo to file
14        as to what happened.
15   Q.   And you were asked that by whom?
16   A.   Kelly Trawick.
17   Q.   Anyone else?
18   A.   No.
19   Q.   Were you present -- Well, who was present when
20        Ms. Trawick requested that you prepare that memo?
21   A.   It was just her and I.
22   Q.   Just the two of you?
23   A.   Yes, sir.
24   Q.   Did she tell you what the purpose of the
25        preparation of that memo was?
00031
 1   A.   No.  She just asked me to give her a memo to file
 2        as to what transpired on that date.
 3   Q.   When you met with her, did you tell her that you
 4        wanted to make a complaint against Mr. Trombley for
 5        a disciplinary proceeding?
 6   A.   No.
 7   Q.   Sitting here today, are you making a complaint
 8        against Mr. Trombley for a disciplinary proceeding?
 9        You as an individual, now?
10   A.   I'm not making a complaint.  I'm stating what
11        happened on that date.
12   Q.   So you are not here making a complaint.
13              Do you consider the comments that Mr. Trombley
14        made to you were harassment to you?
15   A.   No.
16   Q.   When you made this memo, did you understand that
17        the intent and purpose of that memo was for it to
18        be presented to the council for discipline?
19   A.   Yes.
20   Q.   You did?
21   A.   Yes.
22   Q.   Who told you that?
23   A.   I was informed by, I believe it was, Kelly and Joy
24        that I needed to put one of these in file because
25        there may be a hearing.
00032
 1   Q.   I understand that.  But I need for you to
 2        understand specifically if you understood that you
 3        were being a complaining party to bring this before
 4        the council?
 5   A.   I did not understand it that way.
 6   Q.   Do you understand that to be the case today?
 7   A.   Now I do.
 8   Q.   So the day that Mr. Trombley made the comment and
 9        you talked to nobody, how about the next day other
10        than Ms. White and the various meetings that you
11        had with the city and everybody?
12              Did you have any conversations with anyone else
13        though that day?
                                  Page 13

trombley2

```
14  A.  Not on this particular subject.
15  Q.  How about the next day, the 30th?
16  A.  Yeah, I talked to my wife.  I informed my wife of
17      it on the same morning.
18  Q.  Did you talk to any other individuals on the 30th
19      about it?
20  A.  Other than the city employees, no.
21  Q.  All right.  So after the time that Mr. Trombley
22      made the comment, do you recall the first time that
23      you and he discussed that comment?
24  A.  It was on Wednesday when he came back from his
25      doctor's appointment.
```
00033
```
 1  Q.  Okay.  Did you inform him that you had filed this
 2      memo?
 3  A.  Not at the -- not from the beginning of the
 4      conversation.  I had asked Jim, as I stated before,
 5      if he was serious about his comments.  He profusely
 6      stated that he did not mean it.  He apologized over
 7      and over and over.
 8          I accepted his apology from him and got in my
 9      vehicle and we went traveling throughout the city
10      as we do on certain occasions checking job sites.
11      And that is when I informed him that I told Joy
12      White about it; that I had informed her of this.
13          MR. MARTIN:  That was on -- You told him that
14      you told Joy White in a conversation on the 29th?
15          MR. HARRISON:  I think it was -- the
16      conversation with that was on the 30th.
17          MR. MARTIN:  30th.  Okay.
18  Q.  Do you recall if that was in the morning or the
19      afternoon?
20  A.  That was in the morning.
21  Q.  In the morning.
22          Was that while you were at the ABC Store?
23  A.  No.
24  Q.  Before that?
25  A.  No.
```
00034
```
 1  Q.  After that?
 2  A.  Thursday was at ABC store.  Wednesday was the
 3      morning Jim was at his doctor's appointment.  And
 4      that afternoon when we went traveling, that is when
 5      I told him that I informed Joy.
 6          MR. MARTIN:  So that was the 29th, then?
 7      Right, Sonny?
 8          MR. CALTON:  Right.  And then the --
 9          MR. HARRISON:  The 29th.
10          MR. MARTIN:  Okay.
11          MR. CALTON:  The resigning comment at the ABC
12      Store was the following morning on the 30th?
13          MR. HARRISON:  The 29th was the same day the
14      memo was written.
15          MR. CALTON:  That's right.
16          MR. HARRISON:  Or at least that's the date that
17      y'all --
18          MR. MARTIN:  All right.  I was just trying --
19          MR. HARRISON:  And that's what I was trying to
20      get to also.
21  Q.  At the instant or the moment that Jim made the
22      comments that you were uncomfortable with, tell me
23      how angry he was.
24  A.  He wasn't real angry.  He had his hand out the door
```
Page 14

trombley2

```
25        and was tapping it on the side of my door, and he
000035
1         just said that I wish you would've talked to me
2         about it.  I wish you wouldn've come to me first.
3         And I just said, Well, Jim, I'm sorry.  I
4         apologized to him.
5    Q.   But what about the comments that he made concerning
6         the mayor?  How angry was he when he made those
7         comments?
8    A.   You talking about on the 28th?
9    Q.   Yes, sir.
10   A.   He was extremely agitated.
11   Q.   Extremely agitated.
12   A.   Yes, he was.
13   Q.   Have you seen him that agitated before?
14   A.   Yes.
15   Q.   What was that concerning?
16   A.   On numerous issues.
17   Q.   How many times?
18   A.   Pardon me.
19   Q.   How many times?  Was this daily?
20   A.   Do I have to give a number?
21   Q.   Well, give me an example.
22   A.   Anytime Jim or the mayor would have a falling out,
23        Jim and I would discuss it and he would be -- he'd
24        be extremely mad.
25             MR. MARTIN:  Every time Jim who would have a
000036
1         falling out?
2              THE WITNESS:  The mayor.
3              MR. MARTIN:  Oh.
4    Q.   Okay.  Had you seen him that agitated and angry
5         after the while he may have met with a builder or
6         anything?
7    A.   Well, sometimes, yes; not quite agitated as he was
8         that day.
9    Q.   Okay.  So it wasn't unusual for him to be agitated
10        like that?
11   A.   No.
12   Q.   Okay.  Was it your idea to meet with Captain Marsh?
13   A.   No, it was not.
14             MR. HARRISON:  I believe that's all I have.
15             MR. CALTON:  Mr. President, at this point
16        that's all the City has, but procedurally, it would
17        be within the discretion of the council if any
18        member wants to ask any questions.
19             MR. MARTIN:  All right.  I've got for
20        clarification some matters and maybe other than
21        clarification.
22                        EXAMINATION
23   BY MR. MARTIN:
24   Q.   The statement that Jim Trombley made to you about
25        the mayor and his wife, that was on Tuesday the
000037
1         28th?
2    A.   Yes, sir.
3    Q.   In the morning?
4    A.   Yes.
5    Q.   Do you know if Mr. Trombley had had a meeting with
6         the mayor on that date?
7    A.   I don't know.
8    Q.   Okay.
9    A.   I don't know.
```

Page 15

trombley2

```
10   Q.   The memo that we have that's been presented to us
11        says that he was extremely upset about something
12        that happened within the office concerning zoning
13        issues.
14             Do you know if that was a matter where
15        Mr. Trombley and the mayor had a meeting about
16        zoning matters?
17   A.   I would imagine.  I can't say -- state that for
18        sure.  The conversation came up as far as zoning
19        issues in the city.
20   Q.   Okay.  And while I'm on that subject, a moment ago
21        you said that you had seen Mr. Trombley agitated
22        like that before whenever he had -- I forget what
23        words you used -- whenever he had --
24             UNIDENTIFIED SPEAKER:  Fallen out.
25   Q.   -- fallen out with the mayor.
00038
 1             Again, I know it is hard to give a number of
 2        times, but would it be more than a dozen or less
 3        than a dozen or ...
 4   A.   I can't put a number on it, Mr. Martin.
 5   Q.   All right.  That's fine.
 6             Mr. Klein, in the memo here and, of course,
 7        what I heard you testify to here this morning is
 8        that the conversation or that the statement that
 9        Mr. Trombley made was that he should cap Jay and
10        his wife.
11             Do you know if he used the word Jay -- the name
12        Jay, or did he use the title mayor?
13   A.   He said Jay and his wife.
14   Q.   Okay.  Now, as one who does not watch CSI and that
15        kind of stuff, I didn't know what capped meant
16        until a few days ago.  But could you tell me what
17        cap means in this context?
18   A.   In my opinion, it means shoot.
19   Q.   Okay.  I mean, do you know of any other -- any
20        other meaning it would have?
21   A.   No.
22   Q.   Has Jim Trombley ever complained to you about any
23        dispute he had with the mayor's wife?
24   A.   Not with his wife, no.
25   Q.   Okay.  And he told you that he was going to do this
00039
 1        at ten o'clock during a shift change?
 2   A.   Yes.
 3   Q.   And that no one would know who did it?
 4   A.   That's right.
 5   Q.   Now, is there any doubt or question in your mind
 6        that these statements -- this statement was made to
 7        you by Mr. Trombley on the morning of November
 8        28th?
 9   A.   No doubt.
10   Q.   None whatsoever?
11   A.   None whatsoever.
12   Q.   Can't be any confusion about what might have been
13        said?
14   A.   No.
15   Q.   Now, is there a shift change at ten o'clock at
16        night?
17   A.   I don't know.  I have no -- I was told there was,
18        but I don't know for sure.
19   Q.   Do you know if Mr. Trombley possesses a gun?
20   A.   Yes, I do.
```

                              Page 16

trombley2

```
21  Q.  Do you know if he keeps it on himself, in his
22      truck, at home, or where?
23  A.  I had seen it in the truck on occasions.
24  Q.  Okay.  I mean, can you -- Do you know what kind
25      of -- Was it a pistol or rifle or ...
```
00040
```
 1  A.  It was a pistol.
 2  Q.  Do you know what kind of -- anything more about it?
 3  A.  I think it was a nine milimeter, but I'm not sure.
 4  Q.  Now, that was on the twenty -- On the 29th --
 5          MR. MARTIN:  And I'm still trying to get these
 6      dates correct, Sonny,  so help me here if I
 7      misstate, okay?
 8  Q.  On the 29th, I believe you said that you talked to
 9      Joy and told her about the statement that Jim had
10      made to you?
11  A.  That's correct.
12  Q.  And then it was also on that same date that Jim
13      apologized --
14  A.  Correct.
15  Q.  for saying that?
16  A.  Correct.
17  Q.  I mean, apologized to you; is that right?
18  A.  Correct.
19  Q.  Do you know if he had apologized to the mayor?
20  A.  I do not know that.
21  Q.  Do you know if he has apologized to the mayor to
22      this minute?
23  A.  No, I do not.
24  Q.  Okay.  All right.  So he apologized to you on the
25      29th.  Was that when you told him that you had told
```
00041
```
 1      Joy about it?
 2  A.  Yes.
 3  Q.  Okay.  Now, I think I understood you to say
 4      something a moment ago or earlier about he says, He
 5      wouldn't do it if he was on his meds, but if he was
 6      off his meds, maybe he would do it?
 7  A.  That's what he stated to me, yes.
 8  Q.  Okay.  Let me see.  I had one other thing.  Oh, I
 9      know.
10          So this thing about meeting him at the ABC
11      Store, that was the next day after you had told him
12      that you had told Joy?
13  A.  Correct.
14  Q.  And he says to you, according to this memo, that he
15      wanted you to do something for him and that was
16      that he wanted you to resign from your position?
17  A.  That's correct.
18  Q.  Did he tell you why?
19  A.  No, he did not.
20  Q.  But that comes within 24 hours after you had told
21      him that you had told Joy about the statement?
22  A.  That's correct.
23          COUNCIL MEMBER:  Have you ever -- Excuse
24      me -- at any time heard Mr. Trombley other than
25      this occasion threaten to do harm to anybody?
```
00042
```
 1          THE WITNESS:  No.
 2          MR. MARTIN:  Anybody else got any questions?
 3          Hold on just a minute.  I don't think I've got
 4      anything else.
 5          COUNCIL MEMBER:  I'll follow up off of that.
```
Page 17

trombley2

```
 6        So when you heard this statement, it was an
 7        exception to times when he has been mad.  And
 8        that's what caused you to have such a -- more
 9        concern over his agitation this time than in
10        previous occasions.  Is that a fair statement?
11            THE WITNESS:  What prompted me to be more
12        concerned about it wasn't the time; it was
13        just being --
14            COUNCIL MEMBER:  The details?
15            THE WITNESS:  The detail of it.
16            COUNCIL MEMBER:  And that's why you thought
17        about it and made the decision to report it?
18            THE WITNESS:  I thought about it overnight,
19        yes, I did.
20    Q.  (By Mr. Martin) So the difference would be that his
21        statement indicated a specific plan of action, so
22        to speak?
23    A.  That specific timeline, yes, that's what concerned
24        me the most.
25    Q.  Okay.
```

000043

```
 1            MR. MARTIN:  I don't have anything else.
 2            MR. HARRISON:  I've got one other follow-up
 3        question, Jim.
 4            At the time the statement was made,
 5        apparently -- and obviously I'm concluding
 6        this -- you didn't consider it to be a threat at
 7        the time.  And it was only after you slept on it
 8        overnight that you thought about it some more and
 9        felt like you needed to report it; is that correct?
10            THE WITNESS:  That's correct.
11            MR. HARRISON:  So at the time that the words
12        were uttered, it wasn't like I need to contact the
13        police or get somebody; you know, Jim's going to
14        hurt somebody?  You didn't have that feeling?
15    A.  I didn't have that feeling at that time, no, I did
16        not.
17            MR. HARRISON:  Thank you.
18            MR. MARTIN:  Anything else, Jimmy?
19            MR. CALTON:  Mr. President, the only other
20        thing that the City has is -- as came out in
21        testimony -- is Captain Marsh conducted an
22        interview with Mr. Trombley.  And I would offer at
23        this time to play the tape of that interview.  And
24        we have a transcription of it where everybody can
25        follow along with it.
```

000044

```
 1            It was just transcribed last night, so I have
 2        not had a chance to give that to Sonny until a few
 3        minutes ago.  But he has had the tape in his
 4        possession since December the 6th.  And I have not
 5        even had a chance to read the transcript.  Terry
 6        tells me the transcript is correct, but I cannot
 7        state with -- under oath that every word and
 8        nuance is in there.  So I would say the tape is
 9        the best evidence and use this as a guideline.
10            MR. MARTIN:  Okay.  You've got the transcript
11        there?  And when was this conversation with Captain
12        Marsh?
13            MR. HARRISON:  November 29th.
14            MR. CALTON:  On November 29th.
15            This would just make it easier to follow along
16        with the tape.  We will make a couple more copies
```

Page 18

```
                                trombley2
17      and we will need Tim to come in and be setting up.
18          UNIDENTIFIED SPEAKER:  You need me to bring a
19      cd player?
20          MR. CALTON:  Yeah, a cd player.
21          MR. MARTIN:  We're going to be in recess for
22      five minutes.
23          (Whereupon, after a short recess was taken, the
24          following proceedings were had in open
25          session:)
□00045
1           MR. CALTON:  Mr. President, I'd like to call
2       Captain Tim Marsh.
3           MR. HARRISON:  Well, I'd like to point out
4       something.  Mr Klein's testimony was that he didn't
5       intend for this memorandum to be a complaint.
6       Without a complaint, we have no reason to be here.
7           MR. MARTIN:  I respectfully disagree with you,
8       Mr. Harrison.
9           MR. HARRISON:  Is there someone else that made
10      a complaint that I don't have?
11          MR. MARTIN:  Did you get that memo from me and
12      the one from Mr. Calton?
13          MR. HARRISON:  I've got Mr. Calton's.  And
14      Mr. Calton clarified that, that it was a complaint
15      made by Mr. Klein.  And Mr. Klein's testimony this
16      morning was that he didn't intend that to be used
17      for discipline.
18          MR. CALTON:  It was brought to the attention of
19      the City.  And the City is taking formal action.
20          MR. HARRISON:  So if someone else is taking
21      that and then using that and using him as their
22      witness to support that, then I need to know who
23      that individual is.
24          MR. MARTIN:  Well, what you see here is what
25      you got.  I don't know any other way to respond to
□00046
1       that.
2           MR. CALTON:  It was brought to the attention of
3       the employing body which is the council, in front
4       of the council President.  And the council
5       President determined that the statement needs to be
6       looked into, and that's what this is, is a
7       determination hearing to determine whether or not
8       there's any validity to the statement and what
9       effect, if any, should be given to the statement.
10      And that's the whole purpose of this hearing.
11          MR. HARRISON:  And I would agree that the
12      council should have met and considered all of that
13      before it convened this meeting.
14          MR. CALTON:  I would just point out, Mr.
15      President, that, of course, from a due process
16      standpoint, the less the council knows about it,
17      the more fair the due process hearing is.  And
18      someone has to bring it to the attention of
19      council, which is the role of the presiding
20      officer, to set it up, and then the council hears
21      the facts of it at the same time everybody else
22      hears it to make a more unbiased --
23          MR. MARTIN:  And I think we covered that point
24      earlier.
25          MR. CALTON:  We have.
□00047
1           MR. HARRISON:  But there is no other
                            Page 19
```

trombley2

```
 2    complaining party than Mr. Klein?  Is that the
 3    council's position?
 4         MR. MARTIN:  I don't know that the council has
 5    a position on that other than we're hearing what
 6    the testimony is.  And we're fixing to hear from
 7    Mr. Marsh.
 8         MR. CALTON:  Right.  And actually it is
 9    complaining through the council President that this
10    matter needs to be brought to the attention of the
11    council --
12         MR. HARRISON:  Sure.
13         MR. CALTON:  -- for decision what, if any,
14    action needs to be taken in regard to the
15    statement.
16         MR. HARRISON:  Sure.
17         MR. CALTON:  And that's the whole purpose of
18    this hearing brought through the council President.
19         MR. CALTON:     Captain --
20         MR. MARTIN:  Do I need to swear him?
21         MR. CALTON:  Swear him.
22              CAPTAIN TIM MARSH
23    having first been duly sworn, testified as follows:
24              EXAMINATION
25    BY MR. CALTON:
□00048
 1    Q.   What is your name?
 2    A.   My name is Tim Marsh.
 3    Q.   And what is your position with the City of Eufaula?
 4    A.   I'm a Captain and Administrative Assistant with
 5         Eufaula Police Department.
 6    Q.   And how long have you been so employed?
 7    A.   Twenty years.
 8    Q.   And were you so employed on November the 29th,
 9         2006?
10    A.   Yes, I was.
11    Q.   Prior to getting into this, Captain, would you just
12         tell us one thing?  What time is the shift change
13         at night?
14    A.   At night it's ten p. m.
15    Q.   Ten p. m.?
16    A.   Twenty-two hundred hours.
17    Q.   And what happens at the shift change?
18    A.   All of the second shift units come in and respond
19         to the station for debriefing, turn their reports
20         in.  They brief the oncoming shift, which is the
21         third shift, and there's about a five to ten minute
22         lag that we have -- the streets are pretty open.
23    Q.   They're pretty open.  In other words, there's
24         nothing really going; they're basically unprotected
25         during that time except for emergency response?
□00049
 1    A.   That's correct.
 2    Q.   Okay.  Now, Captain, at the request of officials of
 3         the City, did you conduct an interview with Mr. Jim
 4         Trombley on 11/29/06 in relation to a statement
 5         involving "capping the mayor" that had been
 6         presented to you?
 7    A.   Yes, I did.
 8    Q.   And did Mr. Jim Trombley present himself?
 9    A.   Yes, he did.
10    Q.   And you were not doing it from a criminal
11         investigation; is that right?
12    A.   That is correct.
```

Page 20

trombley2

```
13   Q.   What was the purpose of your investigation?
14   A.   I mainly wanted to get a feel for the attitude and
15        the mental attitude of Mr. Trombley to determine
16        whether there was any validity in the statement
17        that had been told to me he had said.
18   Q.   All right.  And this statement, of course, was 24
19        hours after the statements had been made; is that
20        right?
21   A.   That's correct.
22   Q.   And did you make a recording of this?
23   A.   Yes, I did.
24   Q.   And did Mr. Trombley know you were making the
25        recording?
00050
1    A.   No, he did not.
2    Q.   All right.  Now, the interview with Mr. Trombley,
3         you have put on CD is that correct?
4    A.   That is correct.
5    Q.   All right.  And in this interview -- You furnished
6         me with a copy of it; is that right?
7    A.   Yes.
8    Q.   All right.  I'm going to show you what I've offered
9         to the council as an exhibit that is an interview
10        on CD that you made a copy of; is that correct?
11   A.   Yes.  That's my handwriting.
12             MR. CALTON:  And, Sonny, I'll represent to you
13        as far as I know, this is exactly a duplicate of a
14        copy that I delivered to you on December the 6th.
15   Q.   Captain Marsh, if you would, please play this CD
16        for us.
17             COUNCIL MEMBER:  Could I ask one
18        clarification --
19             MR. CALTON:  Yes.
20             COUNCIL MEMBER:  Did you say he did or did not
21        know he was being recorded?
22             THE WITNESS:  I did not announce it.  You are
23        not required to announce it as long as a party
24        involved is aware that it's being recorded.
25        Anytime I do an interview, whether it be criminal
00051
1         or noncriminal, internal affairs or interview for
2         new employees, I always tape it.  It's just --
3              COUNCIL MEMBER:  And that's authorized under
4         the Alabama law?
5              THE WITNESS:  Yes, it is.
6              MR. CALTON:  All right.  And let me just state
7         to the council that I have listened to this, and
8         the first one minute and fifty-five seconds has
9         nothing to do with anything other than it's a
10        recording of talking about batteries.  So you are
11        going to listen to one minute and fifty-five
12        seconds of what I call jibberish before the
13        interview actually starts two minutes onto the
14        tape.
15             MR. HARRISON:  Jimmy, has the council been
16        given Captain Marsh's written --
17             MR. CALTON:  No, they have not been given that,
18        but I'll be glad to --
19             MR. HARRISON:  Do you have a copy of that for
20        them?
21             MR. CALTON:  I have a copy but (inaudible) --
22        copies for me and while you are setting that up and
23        we're listening to the jibberish, then I'll hand
```

Page 21

trombley2

```
24        this out.
25   Q.   Captain, if you want to go on and do it.
```
□00052
```
1         MR. CALTON:  'Cause like I said, the first
2         minute and fifty-five seconds is nothing but
3         jibberish, as you will understand, and then the
4         interview starts.
5              This is -- I offer Captain Marsh's written
6         follow-up statement.
7              (whereupon, Captain Marsh played the audio
8              recording of his interview with Jim Trombley.)
9              MR. CALTON:  Mr. President, that's all the
10        presentation the City has.
11             MR. MARTIN:  All right.  Mr. Harrison.
12             MR. HARRISON:  I would like to ask Mr. Marsh
13        some questions.
14                      EXAMINATION
15   BY MR. HARRISON:
16   Q.   Mr. Marsh, have you seen the transcript that's been
17        made of the CD?
18   A.   I was reading over the shoulder of Christine with
19        it.
20   Q.   Okay.  And you agree that that's pretty much
21        verbatim with what the CD says?
22   A.   That's correct.
23   Q.   Let me ask you:  On your memo that you prepared
24        that has the date of November 29th, do you recall
25        the day that you actually prepared the memo?
```
□00053
```
1    A.   No, I do not.
2    Q.   Was it the same day the memo was --
3    A.   It was not.
4    Q.   It was not.
5    A.   It was not.
6    Q.   Do you know if -- Well, let me ask you if you can
7         tell me was it a day later?  Two days later?  A
8         week later?  Or what would you. . .
9    A.   It could've been a week.
10   Q.   A week or so.
11             Did anyone else in the department review the
12        memo?
13   A.   In my department, no.
14   Q.   Prior to preparing the memo, did you have any
15        discussion with any city official in the mayor's
16        office or clerk's office or personnel manager?
17   A.   I had conversations with them quite often.
18   Q.   But for the preparation of the memo.  Did y'all
19        discuss the preparation of the memo?
20   A.   with city employees?
21   Q.   Yes, sir.
22   A.   No.
23   Q.   So this input that was placed on the memo is solely
24        your input and not anybody -- anyone else?
25   A.   That's correct.  It's just basically what had
```
□00054
```
1         happened.
2    Q.   All right.  Have you had a chance to review it
3         today?
4    A.   No.
5    Q.   Okay.  Would you like to?
6    A.   Okay.
7    Q.   On the second page in the third from the last
8         sentence, it says:  At the end of the interview,
```
                        Page 22

**0878**

trombley2

```
 9            Mr. Trombley assured me that he would not harm
10       anyone or himself.
11            Did you have that feeling and understanding
12       yourself?
13   A.   I did.
14   Q.   Did you do anything else after you completed this
15       memo to further this investigation?
16   A.   I did not.
17   Q.   Do you know if anyone else in the department has
18       done anything further?
19   A.   Not in my police department, no.
20   Q.   Now, in your first sentence in your report, it
21       says:  On Wednesday, November 29th, 2006, I was
22       called by the personnel officer to meet with them
23       in the chief's office.
24            Now, when you met with the people, and that was
25       Chief Walker, Mayor Jackson, Joy White, Kelly
```
000055
```
 1       Trawick and Bill Klein, what did you understand the
 2       purpose of that meeting was?
 3   A.   I understood it to inform the police department of
 4       a possible threat that had been made by
 5       Mr. Trombley about or in regards to the mayor and
 6       his wife.
 7            And upon hearing that, I immediately said that
 8       I needed to speak with Jim just to find out whether
 9       he actually meant it or what his condition was.
10       Whether he said it or not was not an issue, but
11       what his mental state was at that time.  I wanted
12       to find out if he was going to be a threat to
13       anyone.
14   Q.   Who did you understand the complaining party was?
15   A.   well, I don't really know.  I know the information
16       had -- From what I understand, the information had
17       been delivered to Joy White from Bill Klein.  And I think
18       there were some others, perhaps, mentioned that had
19       made some comments.  But the one that I was
20       interested in because it was the only one that
21       really affected the law enforcement was the one
22       that Mr. Bill Klein had made mentioned of, and that
23       was, "capping the mayor and his wife".
24   Q.   I have a document that we have this morning.  It's
25       dated November 29th and it has Bill Klein's
```
000056
```
 1       signature on it, and it's titled, Memo to File.
 2            when you had the meeting with the chief and
 3       everyone that day, were you provided with this
 4       memo?
 5   A.   No.
 6   Q.   Have you ever been provided with this memo?
 7   A.   No.
 8   Q.   Is today the first time that you've seen it?
 9   A.   Yes.
10   Q.   Okay.  So when you left that meeting with the mayor
11       and the chief and the personnel manager, Clerk
12       White and Mr. Klein, in what capacity did you
13       proceed?
14   A.   I felt obligated as a police officer for the City
15       of Eufaula to contact Jim Trombley because I knew
16       him on a personal basis as well as professional;
17       and just sit him down and get a feel for what
18       condition he was in.  I felt obligated (inaudible)
19   Q.   You felt obligated as a police officer?
```
                              Page 23

trombley2

| 20 | A. | Yes, sir. |
| 21 | Q. | Were you directed by the chief to make an |
| 22 | | investigation as a police officer? |
| 23 | A. | No, I was not. |
| 24 | Q. | Were you requested to proceed with an |
| 25 | | investigation -- Well, first let me ask you:  Are |

□00057

1   you familiar with the personnel rules and
2   regulations of the City?
3   A.   Yes, I am.
4   Q.   Do you have this handbook?
5   A.   Yes.
6   Q.   Okay.  Are you familiar with the procedure that's
7        set out in there for an investigator to investigate
8        complaints of this type or harassing complaints?
9   A.   Sure.
10  Q.   When you left that meeting, did you feel that you
11       were acting in that capacity?
12  A.   No.
13  Q.   So you were acting in the capacity solely as a
14       representative of the Eufaula Police Department?
15  A.   Correct.
16  Q.   Tell me how you contacted Mr. Trombley.
17  A.   By cell phone.
18  Q.   By cell phone.  And do you recall about what the
19       response time was when that came to your office?
20  A.   It was just a few minutes.  He said he was wrapping
21       something up and, I'll be throught in a few
22       minutes.  I think it might have been ten or fifteen
23       minutes.
24  Q.   When he came in to your office, did you shut the
25       door?

□00058

1   A.   Yes.
2   Q.   Was anyone else present?
3   A.   No.
4   Q.   Did you advise him he that had the right to have an
5        attorney present with him?
6   A.   No.
7   Q.   Okay.  And I know in your memo on the second page
8        it states:  I did not advise Mr. Trombley of the
9        Miranda since this was not a criminal
10       investigation.
11            Did you advise him that he was free to leave?
12  A.   I didn't have to.
13  Q.   I understand.  And your furthur comment is:  And he
14       was free to leave at any time.
15  A.   Yes, sir.
16  Q.   But you don't recall specifically telling him that
17       he was free to leave?
18  A.   No.
19  Q.   And you shut the door?
20  A.   Yes, sir.  Because I felt like there may be
21       something said that no one other than myself would
22       hear.
23  Q.   Yes, sir.  In the recording that we just heard, I
24       noted four times -- First, you said the only reason
25       you and I are talking today is if there was any

□00059

1   type of threat towards the mayor or any city
2   official or anybody.  And I think there was a
3   little bit other that probably is not on this
4   transcript.

Page 24

0880

trombley2

```
 5        And then on page 4, you were quoted:  Well,
 6   that's good.  So if you're telling me then is I
 7   don't have to be concerned with you hurting
 8   anybody.
 9        And then, again, on page 6, when Mr. Trombley
10   stated:  No, I swear to you right now, I'm not
11   going to do that.
12        And that's in response to your question:  I
13   don't know; I just don't want you to get so upset
14   or angry with anybody that you're going to make
15   threats toward them or anything because I don't
16   want you to do that.
17        And on page 7, your quote:  I wanted to make
18   sure everything was good.  I don't want you going
19   down there hurting nobody, hurting yourself.
20        And on page 8 Mr. Trombley's quote:  No, no,
21   whatever I said, I'm sorry for.  It won't happen
22   again.
23        Now, what my question is:  After those
24   statements and many others that were made, When
25   Mr. Trombley left your office, were you satisfied
```
00060
```
 1   that he had no intent to harm someone?
 2   A.  I was satisfied at that time.  As a matter of fact,
 3   I called City Hall.  And I can't remember exactly
 4   who it was I spoke with, whether it was the mayor
 5   or personnel officer, but I informed them in my
 6   opinion -- I'm not a psychiatrist or
 7   psychologist -- but in my opinion from the short
 8   interview I had with him -- I let him vent.
 9   Mr. Trombley was able to discuss many things other
10   than just his job.  I was trying to get a feel for
11   his attitude.  I did not feel at that time that he
12   was a threat.
13   Q.  Okay.  Now, how long have you been employed by the
14   City?
15   A.  Twenty years.
16   Q.  Twenty years.  Have you had an occasion during that
17   twenty years to have another similar interview with
18   any other building official, department head or
19   even whoever?
20   A.  I have conducted criminal investigations on a
21   department type case.
22   Q.  But you -- For an investigation of this type, have
23   you ever done it before?
24   A.  No.
25   Q.  I think I'm about finished.
```
00061
```
 1        Do you feel like that day that you interviewed
 2   Mr. Trombley, he held anything back from you?
 3   A.  No.  I think he was very open.
 4   Q.  And he did not know you were making a recording?
 5   A.  He did not.
 6   Q.  At what point did you become aware that this
 7   hearing would be held?
 8   A.  I'm not sure.  It was the day that we had our
 9   meeting on the 29th.  I think there was some
10   discussion about some paperwork that was going to
11   be presented to him if I'm not mistaken.
12   Q.  Okay.
13   A.  I don't know exactly what that paperwork was going
14   to say, but I think I did hear something about some
15   paperwork.
```

Page 25

trombley2

```
16  Q.  All right.  Now, on the 29th, when you and Jim met
17      and you had the interview, I know your time on here
18      is 1500 hours?
19  A.  Right.
20  Q.  Tell us what time of day --
21  A.  That's three p.m.
22  Q.  Three p.m. in the afternoon.  And it went on for
23      about a half an hour?
24  A.  At least.
25  Q.  Okay.  Do you recall that afternoon if you called
```
00062
```
1       anyone in the clerk's office or City Hall?
2   A.  Yes.  Immediately after?
3   Q.  So immediately following that?
4   A.  Well, within -- I can't say immediately but within
5       a few minutes of ending our discussion, I called
6       someone down here.
7           I can't remember right now which person I spoke
8       with, whether it was the mayor or the clerk or
9       personnel officer, just to ensure (sic) them that I
10      did not think that at that time Mr. Trombley was
11      any threat to anyone.
12  Q.  And this is important.  That was on the 29th of
13      November?
14  A.  That I called.
15  Q.  Yes, sir.
16  A.  Yes.
17  Q.  Now, do you recall -- I know you just said that you
18      couldn't recall if you talked to the mayor or --
19          Think about it a few minutes and see if you
20      might can refresh your memory as to who you may
21      have spoken to?
22  A.  I can find out by using our recording system down
23      there, but I really -- I don't remember.
24  Q.  Do you recall what response was given to you?
25  A.  No, I don't.
```
00063
```
1   Q.  Well --
2   A.  It was kind of like they were relieved or
3       something the best I can remember.
4   Q.  Did they -- Did they -- Whoever you spoke
5       to -- Well, let me ask you this:  Do you recall on
6       that day before you spoke to Mr. Trombley if anyone
7       with the mayor's office, the clerk's office,
8       counsel/city attorney, tell you that you had to do
9       this interview to prepare for this hearing?
10  A.  No.
11  Q.  After you reported that afternoon, after the
12      interview, did anyone tell you that?
13  A.  No.
14  Q.  Were you aware that the next day, November 30th,
15      the notice of this hearing was presented to
16      Mr. Trombley?
17  A.  I did find that out afterwards.
18  Q.  Have you ever seen that?
19  A.  No.
20  Q.  And how did you find that out?
21  A.  I kept close touch with City Hall because, to be
22      honest with you, there was some employees down here
23      that was a little bit concerned about threats.  And
24      I would call down just to find out if anything had
25      happened, if anybody had heard anything out of Jim
```
00064

Page 26

0882

trombley2

```
 1        or had he been seen or anything -- (inaudible).
 2   Q.   When did you learn that he had been --
 3   A.   Served?
 4   Q.   -- I guess relieved of his duties with the City
 5        until this hearing was held?
 6   A.   I think it was the same day that he was served,
 7        during that day.
 8   Q.   So it was the next day you learned that?
 9   A.   Yeah, I think that's correct.
10   Q.   Did you find out -- When you learned that, do you
11        recall who you learned it from?
12   A.   No.  Once again, it was either Joy or personnel
13        officer.
14   Q.   When you learned that, did you find that odd
15        considering your phone call the day before, that
16        you weren't concerned?
17   A.   No.
18   Q.   Okay.
19   A.   Actually, I felt obligated to find out when the
20        paperwork was going to be served because if there
21        had been a threat or if Jim was not -- if he got
22        off of his medication or something, perhaps,
23        serving him with this termination notice, I felt
24        obligated to know that and to be a little bit more
25        aware of what was going on.
00065
 1   Q.   Now, in response to my request to Mr. Calton on
 2        December 4th, I made a request of Mr. Calton for
 3        him to give me the specifics of the complaint that
 4        were being brought before the council.
 5             And in response to that request, Mr. Calton
 6        provided me with a CD, which we've just heard
 7        today, and gave some indication and not stating
 8        such, but gave an indication to me by him providing
 9        that CD that perhaps you would be a complaining
10        party today.  Are you?
11   A.   No.
12   Q.   I don't have any other questions.
13             MR. CALTON:  I have a couple.
14                       EXAMINATION
15   BY MR. CALTON:
16   Q.   Captain Marsh, of course, your interview occurred
17        on the 29th; is that right?
18   A.   (Inaudible response.)
19   Q.   The statement occurred on the 28th; is that right?
20   A.   Correct.
21   Q.   And you were not present when the statement was
22        made?
23   A.   No.
24   Q.   So you have no ability to assess whether -- what
25        his state of mind was when he made this statement
00066
 1        at that particular moment; is that correct?
 2   A.   That's correct.
 3   Q.   And so all you are talking about is twenty-four
 4        hours later?
 5   A.   That's correct.
 6   Q.   All right.  And I believe in the course of his
 7        tape, he had said he had gone home, and talked to
 8        his counselor, taken some medication,
 9   A.   Read a book.
10   Q.   -- read a book, got a good night sleep; and then
11        this interview occurred the next day after he said
```

Page 27

trombley2

| | | |
|---|---|---|
| 12 | | everything was okay; is that correct? |
| 13 | A. | That's correct. |
| 14 | Q. | But as on (sic) the 28th when the statement was |
| 15 | | made that morning, according to Mr. Klein, has |
| 16 | | stated he was very agitated, and his whether he |
| 17 | | meant to do it or didn't could certainly have |
| 18 | | changed over twenty-four hours; is that right? |
| 19 | A. | Certainly. |
| 20 | Q. | And he could have posed a threat on the 28th that |
| 21 | | he didn't pose on the 29th and later on the day of |
| 22 | | the 28th; right? |
| 23 | A. | Absolutely. |
| 24 | Q. | Do people a lot of time in your experience do |
| 25 | | things on impulse that they later regret and sorry |

☐00067

| | | |
|---|---|---|
| 1 | | and apologize for? |
| 2 | A. | Yes. |
| 3 | Q. | But sometimes the consequences of those actions |
| 4 | | live on forever; correct? |
| 5 | A. | Yes. |
| 6 | Q. | Just out of curiousity, if this statement -- And I |
| 7 | | don't really know the answer to this, and I may not |
| 8 | | should answer (sic), but I'm gonna ask you.  But if |
| 9 | | the statement had been made, instead of the mayor |
| 10 | | and his wife, the words had been used President |
| 11 | | Bush and Laura Bush, would you have had to report |
| 12 | | that to the Secret Service or something to -- |
| 13 | A. | Yes. |
| 14 | Q. | And then we would have a -- |
| 15 | A. | They would've been here within thirty minutes. |
| 16 | Q. | Thirty minutes time? |
| 17 | A. | Yes. |
| 18 | Q. | So any time you make a threat against a public |
| 19 | | official, I guess, depending on how you go up, |
| 20 | | depending what law enforcement authority gets |
| 21 | | involved; is that correct? |
| 22 | A. | That's correct. |
| 23 | Q. | So it's not unusual procedure when a threat is |
| 24 | | reported to a public -- I mean to the police |
| 25 | | department for them to take it serious on its face? |

☐00068

| | | |
|---|---|---|
| 1 | A. | Absolutely, they'll take it serious. |
| 2 | Q. | And to ascertain what the threat is at a later |
| 3 | | date; is that right? |
| 4 | A. | That's correct |
| 5 | | MR. CALTON:  All right.  That's all. |
| 6 | | MR. MARTIN:  One question.  Captain Marsh, I |
| 7 | | understand that this interview took place at, say, |
| 8 | | three o'clock on the 29th? |
| 9 | | THE WITNESS:  Yes, sir. |
| 10 | | MR. MARTIN:  Took about thirty minutes? |
| 11 | | THE WITNESS:  That's correct. |
| 12 | | MR. MARTIN:  Were you aware that the next |
| 13 | | morning that Mr. Trombley had asked for the |
| 14 | | resignation of the assistant building official, |
| 15 | | Mr. Klein? |
| 16 | | THE WITNESS:  I had no knowledge of that. |
| 17 | | MR. MARTIN:  That's all. |
| 18 | | Anybody else go any questions? |
| 19 | | Sonny? |
| 20 | | MR. HARRISON:  I'm done. |
| 21 | | MR. MARTIN:  Thank you, Captain Marsh. |
| 22 | | MR. CALTON:  Mr. President, the City rests. |

Page 28

trombley2

23      MR. HARRISON: Gentleman, I've provided all of
24  you with a copy of the job description of the
25  building official.  It sets out -- which is dated
☐00069
1   March 1993.  That along with the codes which the
2   City has adopted in regarding to the office of the
3   building official sets out the job description and
4   duties of the building official.
5       A couple of things I'd just like to point out,
6   and then I'm going to let Mr. Trombley give you
7   some testimony.  And he can perhaps answer some
8   questions for you.
9       It states on the first page of the job
10  description under "Job Summary":  The employee
11  follows established procedures and guidelines in
12  performance of duty but sets own agenda.
13      So in other words, that department head is
14  responsible for interpreting what the Code says and
15  applying it as he sees it should be applied.
16      Under "Job Domains", which is Subparagraph B,
17  Inspection, that paragraph says that he makes
18  interpretation of zoning ordnances as they apply to
19  construction and building project.  It further says
20  that he enforces adherence to zoning regulations as
21  appropriate.
22      On what is the third page that gives
23  qualifications for the job down in the middle of
24  the paragraph, it states:  You have to have the
25  ability to work independently and exercise good
☐00070
1   judgment.
2       On the last page under a note, the last
3   sentence says:  The employee may be assigned other
4   duties that are not specifically included.  But
5   nowhere there does it say that duties will be taken
6   away from him.
7       This body, in your governmental
8   setup, all department heads report directly to the
9   council.  And, granted, the council has the right
10  to change the job description, modify the Code,
11  abolish codes, adopt new codes; basically whatever
12  they wish and choose and direct the department
13  heads accordingly.
14      Since Mr. Trombley has been employed, all he's
15  done is what his job description says he's supposed
16  to do.  And in the -- so far in the testimony
17  that's been given today, it appears there's been
18  some interference with him performing his job and
19  duties.  And I think he will probably tell you some
20  of that interference is what caused him to be very
21  angry and perhaps make a statement he shouldn't
22  have made.
23      But I don't think anyone -- the two witnesses
24  that have testified so far both said that, you
25  know, they're not complaining parties here, that
☐00071
1   they didn't consider -- Captain Marsh says he
2   didn't consider him to be a threat.
3       Four times in his interview under police
4   interrogation, where he wasn't free to go, the door
5   was closed, he had a long conversation with him and
6   he made the final determination he was not a
7   threat, called City Hall, talked to someone and
                    Page 29

trombley2

8   reported that.
9        Now, in the policy and procedure manual, the
10  personnel rules and regulations, this sets out a
11  procedure for an investigator to investigate these
12  type complaints. I'll just tell you that procedure
13  was not followed. But we accept the report that
14  was given and we accept the testimony of Captain
15  Marsh. Everything that he stated indicated that he
16  was doing this investigation solely as a police
17  officer not as an investigator for this council and
18  not as an investigator for the personnel
19  department. But that policy is set out in there
20  for an investigator to be appointed. My only point
21  in that is I think those policies were not
22  followed. Regardless of that, we accept his
23  report.
24       I would not want to belabor the council. We
25  have some evidence we can present. I'll let Jim
□00072
1   testify to it, where he was told that an hourly
2   employee was to be considered his equal.
3        MR. MARTIN: Well, let's hear his testimony.
4        MR. HARRISON: And that's where we'll go so
5   that you will know --
6        MR. CALTON: Mr. President.
7        MR. HARRISON: -- what angered him to put us
8   where we are today.
9        MR. CALTON: Could I make just a brief
10  response?
11       MR. MARTIN: Sure. One thing Sonny says is not
12  legally correct. The department heads and
13  employees report to the mayor as the chief
14  administrative officer. The council makes policy,
15  makes legislation and it hires and fires.
16       The council does not run the various
17  departments as this council well knows. The
18  department heads do not report and get their
19  marching orders from the council. That by Code is
20  invested in the Mayor in our form of government.
21       MR. HARRISON: I agree with what Mr. Calton
22  said, and I certainly didn't intend to mean that.
23  On a day-to-day basis, the department heads report
24  to the mayor. Everything -- The council flows
25  through the mayor and the department head flows
□00073
1   back through the mayor to the council. But the
2   policy is set by the council. And the right to
3   hire and fire is specifically set out that it's in
4   the council's sole responsibility not in the
5   mayor's.
6        MR. CALTON: But the day-to-day operations and
7   how a person performs his job is the function of
8   the mayor not of this council.
9        MR. HARRISON: Except as set out in the Code.
10  Mr. Trombley.
11  You want to swear him in?
12       MR. MARTIN: Yeah. Raise your right hand.
13                     JIM TROMBLEY
14  having first been duly sworn, testified as follows:
15                     EXAMINATION
16  BY MR. HARRISON:
17  Q.  Jim, you can be just very casual with this.
18       On the day that the alleged statement was made,
                    Page 30

0886

trombley2

| | | |
|---|---|---|
| 19 | | just tell the council what the conversation was |
| 20 | | with the mayor that agitated you. |
| 21 | A. | Um, I guess the workday before I had mentioned |
| 22 | | something to Joy about Wal-Mart and, you know, |
| 23 | | pretty much having my hands tied and not being able |
| 24 | | to do my job.  And the next workday I was called |
| 25 | | into the mayor's office. |

00074
| | | |
|---|---|---|
| 1 | | MR. MARTIN:  Wait a minute.  I want to get |
| 2 | | these dates straight.  What day were you called in |
| 3 | | to the mayor's office? |
| 4 | A. | The 22nd.  No.  Excuse me.  I was called into the |
| 5 | | mayor's office the Monday after Thanksgiving.  So |
| 6 | | it was the twenty -- |
| 7 | | MR. MARTIN:  Do you know what date that was? |
| 8 | | UNIDENTIFIED FEMALE SPEAKER: 27th. |
| 9 | A. | -- 27th.  I was called into the mayor's office on |
| 10 | | the 27th, and we talked about Wal-Mart and some |
| 11 | | stuff about whether Wal-Mart feels the mayor is for |
| 12 | | the project or not and talked about Tim Milner's |
| 13 | | input as city planer into it.  And I was told that |
| 14 | | I was an equal to Tim Milner. |
| 15 | | And I tried to explain that things were getting |
| 16 | | confused, and I'm making decisions, and then Tim |
| 17 | | Milner, when he comes into work a day or two dater |
| 18 | | that he talks to the mayor about a decision, and |
| 19 | | I'm told that I made a wrong decision; but I am the |
| 20 | | one that's supposed to interpret the Code.  So I'm |
| 21 | | having a very difficult time trying to do my job |
| 22 | | and make decisions; and I'm getting second guessed |
| 23 | | on my decisions and having to backtrack. |
| 24 | | And I guess that whole conversation -- And I |
| 25 | | don't remember a whole lot of that day.  My mind's |

00075
| | | |
|---|---|---|
| 1 | | just gotten rid of it, but it was something like |
| 2 | | that. |
| 3 | Q. | So you were told by the mayor that you were to |
| 4 | | consider Mr. Milner an equal with you in decisions |
| 5 | | concerning -- concerning what matters? |
| 6 | A. | Zoning.  Pretty much development and zoning. |
| 7 | Q. | Development and zoning. |
| 8 | | Now, in your job description, who makes those |
| 9 | | decisions? |
| 10 | A. | I do. |
| 11 | Q. | And in the code, the building code that the City |
| 12 | | has adopted, who makes those decisions? |
| 13 | A. | The zoning ordnance specifies the zone |
| 14 | | administrator.  And the zoning ordnance says the |
| 15 | | building official is the zone adminstrator. |
| 16 | Q. | Now, this statement that you were alleged to have |
| 17 | | made to Bill Klein concerning the mayor and his |
| 18 | | wife, do you recall making that statement? |
| 19 | A. | (Inaudible response.) |
| 20 | | MR. MARTIN:  What's the answer? |
| 21 | A. | No.  I don't recall. |
| 22 | Q. | And they're recording this so you need to respond |
| 23 | | orally so we can get this on a semirecord. |
| 24 | | When was the first time you became aware that |
| 25 | | someone had considered that to have been a threat |

00076
| | | |
|---|---|---|
| 1 | | against the mayor and his wife? |
| 2 | A. | Not until, I believe it was, the next day when Bill |
| 3 | | had told me -- He called me and asked me to meet |

Page 31

trombley2

| | | |
|---|---|---|
| 4 | | him outside.  And he asked me if I really meant |
| 5 | | what I said.  And I told him, no, that I hadn't |
| 6 | | meant whatever I said.  And I had to apologize to |
| 7 | | him, you know, if I upset him, but I recall |
| 8 | | differently back then than I do now.  I don't |
| 9 | | remember anything now. |
| 10 | Q. | Now, when you had that conversation with Bill, did |
| 11 | | he tell you that he had made this memo to the file? |
| 12 | A. | No, he had not. |
| 13 | Q. | Okay.  So you made those comments to him prior to |
| 14 | | him making that memo? |
| 15 | A. | Prior to me knowing he made the memo. |
| 16 | Q. | Prior to you knowing he made the memo.  He didn't |
| 17 | | tell you he had made the memo? |
| 18 | A. | (Inaudible response.) |
| 19 | Q. | When was the first time you became aware that the |
| 20 | | memo had been made? |
| 21 | A. | When you showed it to me in your office. |
| 22 | | After I received it from Jim Calton? |
| 23 | A. | Uh-huh (affirmative response). |
| 24 | Q. | When you received the notice of this hearing today, |
| 25 | | did you make a request as to what specific -- the |

00077

| | | |
|---|---|---|
| 1 | | memorandum from President Martin -- |
| 2 | A. | Yes. |
| 3 | Q. | -- dated the 30th? |
| 4 | | And who did you make that specific request to |
| 5 | | for that -- for the charges that were before you? |
| 6 | A. | Personnel manager, Kelly Traywick. |
| 7 | Q. | Do you recall what her response was? |
| 8 | A. | That she didn't have any; and that as far as she |
| 9 | | knew, she wasn't required to have them with them. |
| 10 | Q. | Did you ask her what the discovery process would |
| 11 | | be? |
| 12 | A. | Yes, I did. |
| 13 | Q. | And what was her response to that? |
| 14 | A. | That she didn't know there was one.  Or that I |
| 15 | | could get with the city attorney, I think she said. |
| 16 | Q. | So until Mr. Calton provided the information that |
| 17 | | we have today, you never knew what the specific |
| 18 | | accusations were; is that correct? |
| 19 | A. | No.  That's correct, I didn't know. |
| 20 | Q. | Have you ever had any -- |
| 21 | | MR. MARTIN:  Excuse me.  Do I understand until |
| 22 | | Mr. Calton's letter? |
| 23 | | MR. HARRISON:  Yes, sir. |
| 24 | | MR. MARTIN:  Okay.  But once he got Mr. |
| 25 | | Calton's letter, then -- |

00078

| | | |
|---|---|---|
| 1 | | MR. HARRISON:  Yeah, we got it. |
| 2 | | MR. MARTIN:  Okay. |
| 3 | | MR. HARRISON:  Once we go it; which is |
| 4 | | ambiguous still as to who's making the complaint, |
| 5 | | but we do have Captain Marsh's statement and Bill's |
| 6 | | statement or memo. |
| 7 | Q. | Has there ever been any time that you intended to |
| 8 | | cause the the mayor or his wife harm? |
| 9 | A. | No.  I never intended to cause anybody harm. |
| 10 | Q. | Has there ever been a time that someone has -- that |
| 11 | | you know of -- that someone has made a threat to |
| 12 | | harm you as the city building official? |
| 13 | A. | Yes. |
| 14 | Q. | Give me an example of that. |

Page 32

trombley2

```
15   A.   Um, several months ago I was called in to the
16        mayor's office, and I was told by the mayor that
17        James Thomas had made a threat against me; that he
18        was going to kick my ass because I had called his
19        mother a liar on the phone.
20             And he told me that -- The mayor had told me
21        that Johnny Knight had called him and given him the
22        complaint. And I was told by the mayor that I
23        better watch my back because James Thomas is
24        ex-special forces.
25             So then after that happened I was very upset,
00079
1         and I called Tim Marsh at the police department and
2         told Tim Marsh that I was a public official and
3         there was a threat against me. And he told me
4         there was nothing to worry about; James Thomas just
5         has a big mouth.
6              MR. MARTIN:  When was this?
7              THE WITNESS:  I have the date in my journal but
8         I don't remember.
9              MR. HARRISON:  About?
10             MR. MARTIN:  Six months?
11             THE WITNESS:  Six months.  It was in -- I think
12        it was in the summer, around July, August.
13   Q.   Did anybody tell you to make a memo?
14   A.   No.
15   Q.   Do you know if Captain Marsh ever made any
16        investigation on that threat?
17   A.   No.  He just brushed me off.
18             MR. MARTIN:  Was that a -- That was not a
19        threat to cap or kill?
20             THE WITNESS:  No.  It was just to kick my ass.
21             MR. CALTON:  And I'd like to -- Also, James was
22        not an employee of the City.
23             MR. MARTIN:  Okay.  Go ahead.
24   Q.   Have you ever made a threat to kill the mayor?
25   A.   No.
00080
1    Q.   Have you ever made a threat to kill the mayor's
2         wife?
3    A.   No.
4    Q.   Have you ever made a threat to harm either the
5         mayor or his wife?
6    A.   No.
7    Q.   The memo to Mr. Klein has been brought up today
8         concerning you asking him to resign.
9              If you would just give the council -- Did you
10        ask him to resign?
11   A.   Yes.
12             MR. HARRISON:  Jim, that was also provided to
13        us by Mr. Calton.
14             MR. MARTIN:  I understand.
15   Q.   Tell the council why you asked him to resign.
16   A.   I was extremely upset that day.  I don't remember
17        what I said.  You know, I see the memo and -- about
18        capping; that's not the way I talk.  I've never
19        used those words.  And I've talked to my wife about
20        it, and she says I've never used those words.
21             And -- what was the question again?
22   Q.   Why did you ask him to resign?
23   A.   Um -- And when I get upset, I don't remember things
24        too well.  I lose track.
25             The reason I asked him to resign is because
```

Page 33

0889

trombley2

☐00081
```
 1     that was said that he had told Joy that I had done
 2     this.  And I knew it was going to snowball; it was
 3     going to blow up.
 4          And I felt -- Because when I was telling the
 5     mayor -- when he would get on me and say -- I'd
 6     tell him that the stress is too much, he'd tell me,
 7     well, if you can't handle it, quit.
 8          So I had been through this process of going
 9     through surgery trying to improve my life.  And
10     I've been gone for -- I was out for a month.  And I
11     didn't come back the first of November full time.
12     I came back the middle of -- first of November
13     part-time, half days.  The middle of November I
14     came back.  I had only been back a couple of weeks
15     until this had happened.
16          And with everything that was happening, I said,
17     you know what, the mayor and Bill are getting rid
18     of me.  Bill wants my job.  And that's why I asked
19     him to resign because I thought he was doing this
20     to take my job away.
21          COUNCIL MEMBER:  Do you think me made
22     up -- made up the statement?  Bill Klein, do you
23     think he made it up?
24          THE WITNESS:  I don't know.  I really don't
25     know.  I may have said something, but I don't
```
☐00082
```
 1     recall anything I may have said.
 2  Q.  (By Mr. Harrison) And you don't recall that "cap"
 3     being in your vocabulary in that manner?
 4  A.  Huh-uh (negative response).
 5          COUNCIL MEMBER:  Are you licensed to carry a
 6     gun?
 7          THE WITNESS:  Yes.
 8  Q.  (By Mr. Harrison) Anything else you want to tell
 9     them?
10  A.  I may have a couple of things.  I have some notes
11     down here because I can't remeber everything.  But
12     what I -- what I want to say from the get-go is I
13     did apologize to Bill because I know I had blown up
14     that morning; but I don't know what I said.  And if
15     I upset anybody else, if I upset the city or the
16     city employees or the mayor or Joy, you know, I
17     apologize.  I'm sincerely sorry.
18          I mean, that next day after I was so upset, I
19     called my counselor and I was in Dothan at my
20     counselor's office.  So I was seeing my counselor,
21     talking to my counselor about how upset I was while
22     Bill was talking to Joy.
23          You know, if I had been here and Bill could
24     have talked to me, maybe we wouldn't be here right
25     now.  But I was getting help.  I knew that I had
```
☐00083
```
 1     blown up and it was a problem with my health
 2     condition.  So my counselor called my psychiatrist
 3     and adjusted my medication.  And I'm doing fine
 4     except my memory, when I'm a little stressed, I
 5     can't remember a lot of stuff.
 6          There are some things I want to say about you
 7     know, being able to do my job.  I really love my
 8     job.  I like working with people.  And when it
 9     comes to planning review and doing developments, I
10     really have a good relationship with architects,
```
                         Page 34

```
                              trombley2
11      builders, designers, and I enjoy it.
12           And I've never ever been in a hearing like this
13      in my life.  I've never been arrested.  I've never
14      been detained by the police.  The first time I've
15      ever been in a police department getting
16      interrogated or interviewed was with Tim Marsh.
17      I've never been in that my whole life.
18           You can talk to my counselor or whoever.  I've
19      been through a very, very difficult time.  And
20      every job I've ever been at, I've been in a
21      position like this, and I've reported to a senior
22      city employee, like a city manager, but never to an
23      elected official.
24           When I first started working with the City, me
25      and Mr. Bob Powers, we were working together; we
□00084
1       were talking about where we were going to take the
2       software and the stuff to do different things.  And
3       all of the sudden it all stopped because I was
4       directed by the mayor that I couldn't talk to the
5       council members anymore, that I couldn't work with
6       them.
7            And recently Mr. Powers had left me a message
8       asking me to contact him so he could be updated on
9       what's going on.  Well, I have to get permission
10      from the mayor before I could talk to Mr. Powers.
11      Well, I never got that permission; and then I was
12      put on administrative leave so I never had a chance
13      to call him.
14           When I've been in different jobs in code
15      enforcement and building enforcement, I've had
16      either working under a building official or working
17      for a city manager that whenever a complaint was
18      filed, it was automatic, let's get both sides.
19           Well, I'm wrong.  You know, Why did you tell
20      this person he had to do that?  Or, Why did you
21      tell this person, you know.  There's -- There's
22      laws that I have to follow.  And even it says in my
23      job description that when I issue permits, I have
24      to make sure they meet state law, local law,
25      federal law, that I meet all these requirements.
□00085
1            And what I'm feeling like is being so very
2       difficult is I can't do my job evenly and fairly
3       without being counseled or criticized on the way
4       I'm doing it.
5            All I have to say is:  I'm really sorry that we
6       are here, and if I caused this, I apologize.  I
7       don't have anything else to say.
8            MR. MARTIN:  Can I ask a couple of questions?
9            MR. HARRISON:  Yes, sir.  Any of you can.
10                         EXAMINATION
11   BY MR. MARTIN:
12   Q.  Jim, when I was listening to that tape a few
13       minutes ago -- And, of course, when you look at it
14       on paper, you said:  When I was so mad at the
15       mayor.  But if you listen to that tape, the
16       inflection of your voice was, I was SO MAD!
17            Just how mad were you?
18   A.  Not mad enough to hurt anybody.
19   Q.  Do you deny making the statement to Bill Klein that
20       you should "cap" the mayor and his wife at ten
21       o'clock at night and nobody would know it?
                              Page 35
```

trombley2

```
22  A.   I don't recall the statement.  That's all I can
23       say.
24  Q.   You don't deny you made the statement?
25  A.   Correct.  I don't recall making the statement.
```
□00086
```
 1  Q.   Okay.  All right.  That was on the 28th?
 2  A.   Correct.
 3            MR. HARRISON:  The 28th is when the statement
 4       was to have been made.
 5            MR. MARTIN:  Right.
 6  Q.   And, of course, in this statement here, you say
 7       you were so mad at the mayor.  And then I heard you
 8       say a moment ago that two days later when you met
 9       Bill Klein at the ABC store that you were extremely
10       upset.
11            Now, were you extremely upset because you knew
12       that Bill had told Joy about the statement that was
13       allegedly made?
14  A.   I guess so.
15  Q.   So you wanted Bill to resign because of that?
16  A.   Yeah.  I felt like my trust was violated.
17  Q.   Do you have authority to dismiss him?
18  A.   Well, yes.  I appointed him as building inspector
19       so he is a -- Yes, I do.  But he has a right to
20       come to the council.
21            But I just want to say one thing about that,
22       though.  When I had received this letter about this
23       determination hearing, that event had not even
24       occurred.
25  Q.   I understand that.  And that causes me even more
```
□00087
```
 1       concern.  That's exactly my point.  I'm trying to
 2       get this timetable set out here.  Let me ask you
 3       again -- And Mr. Cobb eluded to it a while ago.
 4       But do you carry a gun in your truck
 5  A.   (Inaudible response.)
 6  Q.   Do you own a nine millimeter or whatever kind of
 7       gun it is?
 8  A.   (Inaudible response.)
 9  Q.   And you do have a permit for it, whatever they
10       require?
11  A.   I haven't carried it in so long, I don't even know
12       if it's current or expired.  It's locked up at
13       home.
14  Q.   Now, it seems like to me -- I'm hearing about some
15       things you've said about what you think your
16       authority is and maybe what the mayor's is and Tim
17       Milner's.  But you do understand that the mayor is
18       the chief administrative officer of the city?
19  A.   Yes, I do.
20            MR. MARTIN:  Anybody else got questions while
21       I'm looking?
22            MR. CALTON:  I do.
23                      EXAMINATION
24  BY MR. CALTON:
25  Q.   Jim, as I understand it, you said the thing that
```
□00088
```
 1       triggered this was a conversation you had with the
 2       mayor on Monday; is that right, and that's why you
 3       -- Monday afternoon?
 4  A.   I believe.  I don't know if it was Monday or
 5       Tuesday.
 6  Q.   Well, I believe according to Bill, this occurred on
```
Page 36

```
                              trombley2
 7            Tuesday the 28th, in that morning?
 8    A.      I don't know.
 9    Q.      And I believe you said you had met, if I'm
10            correct -- And the timetable here again, I hope I
11            don't get the timetable mixed up.  But I think you
12            testified that you had met with the mayor on Monday
13            after Thanksgiving and that y'all had -- that was
14            when the conversation about Tim and everything
15            happened that made you so mad; isn't that right?
16    A.      Yeah, I guess it was Monday.
17    Q.      So the mad that you're talking about lasted from
18            Monday afternoon when you walked out of the mayor's
19            office all night Monday night and carried forward
20            to Tuesday morning.  And Bill met you in the
21            parking lot sometime before ten o'clock.  So you
22            were agitated enough from that afternoon that it
23            didn't resolve itself all night long and the next
24            day?
25    A.      No, I don't remember.
00089
 1    Q.      I know you don't remember it, but that's what the
 2            time line indicates.  According to your testimony,
 3            you became mad at the mayor on Monday afternoon,
 4            and then this conversation you made to Bill out of
 5            the blue occurred on Tuesday around ten o'clock in
 6            the morning.
 7    A.      You're trying to set a time line.  I don't know.
 8    Q.      Well, I mean, this is the time line you testified
 9            to?
10    A.      Well, then I don't know if I was right or not.  I
11            don't know.
12    Q.      You didn't meet with the mayor Tuesday morning, did
13            you?
14    A.      I don't know.  I met with him -- I know I talked to
15            Joy the Wednesday before Thanksgiving, and I met
16            with him, I guess, the next workday.  I don't --
17    Q.      Well, according to your testimony, you were called
18            in on the Monday after Thanksgiving to talk to the
19            mayor about the Wal-Mart thing?
20    A.      Uh-huh (affirmative response).
21    Q.      And then during that conversation, according to
22            your testimony, when the mayor told you that Tim
23            Milner would not report to you --
24    A.      Uh-huh (affirmative response).
25    Q.      -- that y'all would have coequal positions, I
00090
 1            believe your terminology would be; coequal.  And
 2            that made you so mad that you walked out of the
 3            office mad.  The next day at 10:00 in the morning,
 4            almost sixteen hours later after going through all
 5            night long, you were mad enough to make a statement
 6            that you don't recall what you made but don't
 7            deny --
 8    A.      I can't testify to the time line because I don't
 9            know.
10    Q.      Well, I'm just saying this is the time line you've
11            already testified to?
12    A.      Well, then, take it back.  I don't know.  I don't
13            know.  All I know is I thought it was Monday.
14            That's what I'm telling you.  I think it was
15            Monday.  I don't know.
16    Q.      Well, we know this:  We know it happened on Tuesday
17            the 28th, don't we?
```

Page 37

trombley2

18  A.  I guess.  I don't know.  Supposedly whenever Bill
19      made his -- said I said whatever I said.  I don't
20      know.  Like I told you, I don't remember --
21  Q.  Well, let me just back this way:  Irrespective of
22      the dates, we know the conversation with the mayor
23      occurred the night before because it didn't occur
24      the morning before you talked to Bill.
25          Whatever date it was, whether it was September
□00091
1       or October, whenever, just forget the dates, we
2       know the conversation with the mayor that made you
3       so hot occurred the afternoon before your
4       conversation with him the next morning, whatever
5       date it was, whether it was on a Tuesday and a
6       Wednesday, a Thursday, Friday or whenever?
7   A.  I don't know if I took it home over night or if it
8       was the same day.  I don't know.  I honestly don't
9       know.
10  Q.  Are you saying then it is a possibility that you
11      had just walked out of the mayor's office and
12      walked out into the thing --
13  A.  It's a possiblity.
14  Q.  On Tuesday morning?
15  A.  I guess.  I don't know.  I don't remember.
16  Q.  You just don't remember anything?
17  A.  No.
18  Q.  Well, if you don't know, you can't dispute what
19      Bill says is his time line, can you?
20  A.  No.  That's what I said to Mr. Martin's questions.
21  Q.  Okay.
22          MR. HARRISON:  Yeah, he has refuted that.
23  Q.  And then also on the tape at seven minutes,
24      forty-nine seconds into the tape, is found this:  I
25      left that meeting.  I was extremely upset and maybe
□00092
1       I snapped a little bit.  But whatever I said, I
2       didn't mean any of it.
3           And so you admit even on the tape to Tim Marsh
4       that you snapped?
5   A.  Well, I had a drastic mood change.  You know, I
6       admit that something happened, but I remembered
7       more back then than I do right now.
8   Q.  All right.  Well, let me ask you this:  I know you
9       don't remember, making the statement, but let me just
10      ask you about this:  Can you
11      foresee any circumstances where it would be
12      appropriate for anybody, whether they are a
13      department head employee, anybody, to ever make a
14      statement, I should cap the mayor and his wife, and
15      I would do it at ten o'clock during a shift change
16      where I can get away with it.
17          Can you think -- No matter what had happened,
18      do you think there is ever an occasion where that
19      would be an appropriate statement?
20  A.  No.  It's not an appropriate statement and I
21      apologize.  I know it wasn't appropriate, if I said
22      it.
23  Q.  And can you understand why that kind of statement
24      would evoke the reaction?
25  A.  Well, I can understand that; I really can.  But the
□00093
1       rules apply differently to people than me.  Because
2       I was threatened and nobody did anything about it
                    Page 38

0894

trombley2

```
 3        so ...
 4   Q.   So you're angry about that?
 5   A.   No, not angry.  It's just business as usual.
 6   Q.   Business as usual.
 7   A.   It's unfair.
 8   Q.   Just totally unfair.
 9   A.   Uh-huh (affirmative response).
10   Q.   So basically the whole way you're treated down here
11        is unfair; is that right?
12   A.   Not necessarily, no.  I just -- I don't want to go
13        any further.
14   Q.   Okay.
15             COUNCIL MEMBER:  I have a question.
16             MR. CALTON:  Yes, sir.
17             COUNCIL MEMBER:  After this occurred, has there
18        been any time that you've had any counseling
19        session with the mayor -- (inaudible).
20             THE WITNESS:  I've never been counseled, never
21        been written up.  The only thing I've ever been
22        with the mayor on anything in writing was my
23        evaluations; that's it.
24             COUNCIL MEMBER:  Since this has occurred, there
25        has never been a meeting between you and the mayor?
□00094
 1             THE WITNESS:  No.
 2             MR. MARTIN:  I want to clarify something I
 3        asked you earlier about your conversation with Bill
 4        Klein to ask him to resign.
 5             Was that in retaliation for his comment to Joy?
 6             THE WITNESS:  I really don't think so.  I think
 7        it was a reaction because I was afraid for my own
 8        job; that I thought he was trying to get my job.
 9        And I don't think it was retaliation.  I think it
10        was, oh, man, I've got all of these health
11        problems; what am I going to do without any income
12        or without any insurance?
13             COUNCIL MEMBER:  Did you ask him that question,
14        whether he was trying to get your job?
15             THE WITNESS:  No.
16             MR. HARRISON:  You just took circumstances and
17        facts and assumed that, hey, this guy is trying to
18        get my job; that's what this whole problem is
19        about; is that --
20             THE WITNESS:  Uh-huh (affirmative response).
21             MR. HARRISON:  -- pretty much ...
22             THE WITNESS:  Yeah.  Because I had -- in my
23        conversations with the mayor, he's always asking,
24        you know, how is Bill doing; can he do your job?
25             MR. MARTIN:  Now, Mister --
□00095
 1             COUNCIL MEMBER:  Let me ask one other question.
 2             MR. HARRISON:  Sure.  Go ahead.
 3             COUNCIL MEMBER:  Since this occurred, the only
 4        interview that you've had and conversations that
 5        you've had regarding this have been with Bill Klein
 6        and Captain Marsh; is that correct?
 7             THE WITNESS:  Yes.
 8             COUNCIL MEMBER:  No other city --
 9             THE WITNESS:  No.
10             COUNCIL MEMBER:  -- employees have gone into a
11        query about the background on all of this?
12             THE WITNESS:  No.
13             COUNCIL MEMBER:  So no one has called Bill and
```

Page 39

trombley2

```
14   you in and reviewed the circumstances?
15        THE WITNESS:  No.
16        MR. HARRISON:  And it took days to get the
17   specific allegations.
18        MR. MARTIN:  You still think Bill Klein wants
19   your job?
20        THE WITNESS:  I don't know.  He says he doesn't
21   want it.  Probably not.
22        COUNCIL MEMBER:  If he says he doesn't want it
23   and you say you've never asked him, how did this
24   come about?
25        If Bill said he doesn't want your job and you
```
□00096
```
1    say you've never asked him --
2         THE WITNESS:  Yeah, right, I never asked him
3    that.
4         COUNCIL MEMBER:  How did this come up?
5         MR. HARRISON:  Just conclusions.
6         THE WITNESS:  Just conclusions on my part and
7    my wife within our discussions.
8         MR. HARRISON:  Jim, Mr. Martin asked you if you
9    didn't understand that you reported directly to the
10   mayor and you did what the mayor told you to do.
11        MR. MARTIN:  Whoa now.  You're putting words in
12   my mouth, Mr. Harrison, as you are prone to do in a
13   courtroom.
14        MR. HARRISON:  Tell me what you asked him
15   again, then.
16        MR. MARTIN:  I asked him did he understand that
17   the mayor was the chief administrative officer of
18   the city.
19        THE WITNESS:  Yes.  I said, yes.
20        MR. HARRISON:  And?
21        MR. MARTIN:  He said yes.
22        MR. HARRISON:  Okay.  Has there ever been an
23   occasion that you have disregarded the mayor's
24   orders?
25        THE WITNESS:  Never.  Never.  I mean, he has
```
□00097
```
1    even told me, you know, if you want to go forward,
2    you can go forward, but you go forward without my
3    support.  And I said, well, I'm not going through
4    without his support.
5         MR. CALTON:  Mr. President, the mayor would
6    just like to respond to those allegations about
7    that meeting if it would be acceptable to the
8    chair.
9         MR. HARRISON:  You calling him as a witness?
10        MR. CALTON:  Yeah.
11        MR. HARRISON:  Okay.
12                  MAYOR JAY JACKSON
13   having been first duly sworn, testified as follows:
14                     EXAMINATION
15   BY MR. CALTON:
16   Q.   Mayor, if you would -- I'm just going to let you
17        speak informally, but relate to the com -- the
18        testimony that Mr. Trombley has inferred involved
19        you.
20   A.   I think we did visit the Wal-mart issue, the,
21        quote, meeting about Wal-Mart.
22        MR. MARTIN:  Yeah.  And I had meant to ask that
23   question.  I'm sorry.  Go ahead, Mayor.
24        THE WITNESS:  Jim, do you remember anybody else
```
Page 40

trombley2

```
25          being present at that meeting?
□00098
1               MR. TROMBLEY:  I think Joy might have been.
2               THE WITNESS:  She was.
3    A.    During that meeting I was called because Bill came
4          to me and said you'd made the comment that I was
5          not supportive to the Wal-Mart project.  And I
6          asked you if you said that.  And I simply told you
7          that I was, that my meeting with the Wal-Mart
8          officials (inaudible) the planning commission was
9          as the meeting was over and I was walking out, and
10         I said -- (inaudible).
11              I never said, it's got to be this way.  The
12         only thing that I said during the meeting about job
13         responsibilities -- Jim had submitted to me a memo
14         wanting to have Tim Milner report to him.  And I
15         said we were not going to do that.  Tim would have
16         equal access to me.  And that's all I said; equal
17         access to me, and I want y'all to work --
18         (inaudible).  I never reassigned any duties.  I
19         just -- (inaudible).  And that's the extent of the
20         Wal-Mart meeting.  We can go on.
21              MR. CALTON:  No, that's not necessary.
22              MR. MARTIN:  Well --
23              COUNCIL MEMBER:  Could I ask some questions as
24         to that?
25              MR. MARTIN:  Yeah.  Go ahead.
□00099
1               COUNCIL MEMBER:  In typically dealing with
2          employee issues, especially employees who report to
3          you, what's the process of addressing complaints
4          or -- You need me to hold on?
5               (End of audio recording.)
6
□
```

Page 41

0897

## RESOLUTION
## 81-2007

WHEREAS, the City of Eufaula enacted Personnel Rules and regulations on January 21, 1987; and

WHEREAS, it is now the desire of the City of Eufaula to repeal said ordinance and to adopt Personnel and Rules and Regulations by resolution.

NOW THEREFORE, BE IT RESOLVED by the City Council of the City of Eufaula, Alabama, that the Personnel Rules and Regulations dated January 21, 1987, as previously adopted by Ordinance 1987-1 and as amended from time to time, be and the same are hereby adopted as the Personnel Rules and Regulations governing the employees of the City of Eufaula.

This Resolution shall become effective as of the effective date of Ordinance 2007-12.

BE IT FUTHER RESOLVED that any personnel matters pending under Ordinance 1987-1, as amended, be governed by the identical Personnel Rules and Regulations adopted by this resolution.

ADOPTED AND APPROVED this 4TH day of September, 2007.
CITY OF EUFAULA, ALABAMA,
A MUNICIPAL CORPORATION

_____
James L. Martin, City Council President

ATTEST:

_____
Joy White, City Clerk/Treasurer

## PERSONNEL RULES AND REGULATIONS
## EUFAULA, ALABAMA

### ARTICLE I.  INTRODUCTION

SECTION I.  ESTABLISHMENT OF RULES.

The following rules, regulations and other administrative provisions for personnel administration (hereinafter called "Rules") are established for the information and guidance of all concerned.



DEFENDANT'S EXHIBIT
14

The rules herein established shall apply to all regular full time and part time employees, temporary/seasonal employees, department heads, provisional, and emergency appointed employees of the city. The City Clerk or Personnel Officer shall report cases of violations of the established rules to the Mayor and Council.

SECTION *II*.  DISSEMINATION OF RULES.

Department heads will be furnished complete copies of all rules and changes thereto, and shall be responsible for maintaining a complete set of rules, and for bringing these rules to the attention of all employees under their supervision.   All new employees will be given a copy of the Personnel Rules and Regulations.

SECTION III.  DEFINITIONS

(A)    Allocation: The assignment of an individual position to an appropriate class of positions on the basis of the kind, difficulty, required skill, and responsibility of the work performed.

(B)    Appointing Authority: that official or body having authority under the ordinances of the City Council.

(C)    Classification: The entire process of assigning and reassigning individuals to positions, positions to classes, and classes to grades, to the end that employees will be employed and compensated on the basis of fitness, actual duties performed, so that there may exist equal pay for equal work.

(D)    Demotion: The change of an employee from a position in one class to a position in another class having a lower pay grade and requiring the performance of less responsible duties.

(E)    Official, officer:

(1)    A person chosen by the electorate to serve as a public official of the city; the Mayor, or a councilman, for example.

(2)    A department head elected by the City Council; the fire chief, or the chief of police, for example.

(3)    A person delegated to serve in place of a department head, when so doing.

**2**

(4)    A person appointed or deputized by the Mayor or the City Council to serve in a special capacity.

(F)    Position description: A detailed written description of the specific duties assigned to and performed by a particular employee to serve as the basis for classification.

(G)    Probation: A working test period twelve (12) months for each and every city employee during which an employee is required to demonstrate, by actual performance, his/her fitness for the duties to which he/she is appointed, and his/her general fitness and suitability as a public employee.

(H)    Promotion: The change of an employee from a position in one class to a position in another class having a higher pay grade and requiring the performance of more responsible duties.

(I)    Reclassification: The reallocation of an employee or position to a different class of positions based upon substantial change in duties and responsibilities.

(J)  Classified Employees:  Persons in this class are appointed/discharged based on recommendation by the Department Head and approved by the Mayor.

(K)  Non-Classified Employees:  Persons in this class are appointed/discharged by the City Council.  Persons in this class include: City Clerk, Police Chief, Fire Chief, Street and Sanitation Superintendent, Building Inspector.  The Librarian and Parks and Recreation Director are appointed and discharged by their respective Boards.

(L)    Transfer: The reassignment of an employee to a position in the same pay grade without increase or decrease in rate of pay.

(M)    Compensatory time: Time granted an employee that he/she has earned by working extra or unscheduled time that is directly equivalent to the time worked, Compensatory time for non-exempt employees must be taken during the month earned and no later than thirty (30) days from the date earned. Compensatory time shall be authorized at the discretion of the department head and will be scheduled in a manner that minimizes the City's liability for overtime under Fair Labor Standards Act.  Compensatory time will be measured at the rate of one and one half times the earned compensatory hours.

3

## SECTION IV. ADMINISTRATION OF PERSONNEL, PERSONNEL OFFICER, AGE AND SEX DISCRIMINATION PROHIBITED, EXCEPTION

The City Clerk and Personnel Officer are responsible for personnel administration within the city government. All matters dealing with personnel shall be routed through the City Clerk and Personnel Officer who shall maintain a complete system of personnel files and records. The policy of the City of Eufaula is that the city will, without regard to race, color, creed, national origin, sex (including pregnancy), age (40 or over), or physical or mental disability of an otherwise qualified individual, provide equal employment opportunity and equal treatment to all employees in all aspects of employment, except when sex or age is a bona fide occupational qualification.

### ARTICLE II. APPOINTMENT AND PROMOTION

SECTION I. GENERALLY, FITNESS AS BASIS; ELEVATION OF FITNESS; AUTHORITY

Appointments and promotions to all classified positions shall be solely on the basis of fitness for the position, which shall be determined by evaluation of the applicants:

(1)     Training, education, experience and physical fitness;

(2)     oral interviews; and

(3)     Whenever practical, an examination, promotion potential rating, oral interviews, and demonstration performance test.

The Mayor shall be ultimately responsible for and have sole authority to employ/discharge all employees in classified service. Department heads are nonclassified and are employed/discharged by the council. The City Council will approve the number of positions authorized for each department.

SECTION II. TESTS.

(1) Test and examinations may be established which are warranted to determine whether or not the applicant or employee meets established standards.

(2)     Before an individual is employed or transferred to a more rigorous position, he must be given a physical examination to determine his fitness to perform the job for which he has been employed.

4

SECTION III.  AGE REQUIREMENTS

The minimum age for employment to a regular full-time position within the classified service shall be eighteen (18) years of age, except for police officers the minimum age shall be twenty-one (21) years, and fire fighters the minimum age will be nineteen (19).  The minimum age for employment of seasonal employees shall be sixteen (16) years of age.

The Mayor may establish lower minimum age levels for part-time, seasonal employees.

SECTION IV.  PROMOTION

(a) General

Vacancies occurring in the classified service shall, whenever practical, be filled by promotion or transfer of a qualified employee within the public service.  The Personnel Officer will post notices of vacancies in all city departments.  The notice will advise employees of the vacant position, eligibility requirements, procedure of applying, and closing date for submitting application. However, the Personnel Officer may recruit applicants from outside the classified service when it is determined such recruitment to be in the best interest of the department.  Promotion from within the classified service shall be from a promotional roster established pursuant to Section 4 (b).  Promotions shall be made by department heads with the concurrence of the Mayor.

(b) Establishment of Rosters.

The Personnel Officer and Department heads will establish promotion rosters as needed.  Employees will be ranked on the roster on the basis of scores derived from one or more of the following factors: (1) written tests, (2) interviews, (3) performance evaluations, and/or (4) such other criteria as may be prescribed from time to time by Executive Order. The factor to be used in establishing such rosters and the relative weights to be assigned to each such factors and weights are determined and assigned by Executive Order.  Rosters shall be valid for such period of time, as each department head shall deem appropriate; but in no event shall a roster be used more than 18 months after its establishment.

(c) Selection from Rosters.

The procedure for selection of employees for promotion from a promotional roster in any department may be established from time to time by Executive Order.  In the absence of an Executive order establishing

such procedure, the employee having the highest ranking on the promotional roster shall be promoted.

SECTION V. PROBATION.

(a) Generally.

Each and every employee receiving an appointment or a promotion to a position in the classified service must complete a minimum twelve-(12) month probationary period. Each and every employee in the classified service must complete his probationary period and receive the affirmative approval of the appointing authority before appointment or promotion shall be considered regular. During the employee's probationary period, the employee's work habits, abilities, promptness, and other pertinent characteristics will be observed and evaluated by a supervisor, department head and the appointing authority. If the probationary employee fails to meet required standards of performance, employment will be terminated, or if the individual, is a promoted regular employee, the individual may be restored to the classification and position from which he was promoted or to a comparable position. Demotion will be conditional, subject to review and approval of the appointing authority. An employee shall not be promoted during his probationary period without special written justification by the department head, and written approval by the Mayor. The probationary employee must complete a full year in regular status before being considered for a promotion unless upon the written request of the department head and approval by the Mayor.

(b) Termination during probationary period.

If at any time during the probationary period the department head determines that the service of the employee has been unsatisfactory, the employee may be suspended immediately without pay and be terminated from his position. The department head shall notify the appointing authority in writing at least seven (7) calendar days before the effective date of termination of the reasons for the separation. Termination will be conditional, subject to review and approval of the appointing authority.

(c) Probationary reports,

Approximately ten (10) days prior to the employee's completing approximately fifty (50%) per cent of his probationary period and approximately ten (10) days prior to completing the probationary period, the department head shall complete a probationary report and notify the appointing authority in writing that either:

6

(1)    The employee has successfully completed his probationary period and shall henceforth be considered a regular employee with all rights and privileges due him.

(2)    The employee has not demonstrated the ability to perform satisfactorily the duties of the position, and is to be terminated from employment or, if promoted from another position, returned to the previous or a similar classification.

(d)    Conversion from probationary to regular status.

Notwithstanding, anything contained to the contrary herein, no employee shall move from a probationary status to a regular status without the written affirmative approval of the appointing authority regardless of the length of time served by said probationary employee, the probationary status shall be deemed to be automatically extended to afford sufficient time to the department head to comply with any time or percentage requirements herein.  A Personnel Action Form will be completed and signed by the Department Head and forwarded to the Personnel Officer for proper processing.

(e)    The time, portions, and numbers specified in paragraphs 5(a), 5(b), 5(c)99, and 5(d) hereinabove are guidelines only; and the failure of a supervisor, department head, Mayor, or the City Council to comply with any specified or implied deadline shall not be deemed to be a violation of an employee's rights and shall be correctable at anytime during said probationary period by complying with said times, portions, and numbers within a reasonable time after it has been reported to the appointing authority that there has been a failure to comply with said times, portions, and numbers.

SECTION  VI.  RELATIVES IN THE LOCAL GOVERNMENT.

No employee shall supervise a member of his immediate family. "Immediate family" is defined as wife, husband, mother, father, brother, sister, son, daughter, mother-in-law, father-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, stepmother, stepfather, stepson, stepdaughter, uncle or aunt. Department heads will be responsible for arranging shift conditions to adjust any conflicts that may develop as a result of promotion or demotion within his department.  This section shall not prevent a department head from utilizing all available personnel in an emergency situation.

SECTION  VII. REEMPLOYMENT FOLLOWING RESIGNATION.

7

Any classified employee resigning in good standing may file a written request to be placed on a reemployment roster for a period of one year. Employees who are listed on the employment roster may, within one year of their effective date of resignation, make a written request to the Mayor for reemployment to their original position. If the request is approved, all entrance requirements will be waived with the exception of the physical examination and drug screen, which must be successfully completed prior to reappointment.

This section applies only to classified-employees.

SECTION VIII. EMERGENCY APPOINTMENTS.

When an emergency arises, such that in order to prevent loss of public property or serious inconvenience to the public, one or more persons must be immediately employed without taking time to secure certification from the personnel officer of the names of eligible persons, an appointing authority or subordinate officer or employee designated by the mayor may appoint any qualified person during the period of the emergency but not for a period exceeding one month. No vacancy in a position caused by a resignation of which the appointing authority has had reasonable notice shall be considered an emergency. The appointing authority or his authorized agent shall, as soon as possible, report to the personnel officer any emergency appointment giving name of appointee, rate of pay, probable length of employment, nature of emergency, and nature of duties performed. Separation from service of an emergency appointee shall likewise be reported. No emergency appointment may be renewed.

SECTION IX. PROVISIONAL APPOINTMENTS.

Whenever it is impossible to certify eligible persons for appointment to fill a vacancy in the classified service, the department head, with the approval of the Mayor, may appoint a person to fill such vacancy only until an appropriate register can be established and appointment made therefrom. In no event shall a provisional appointment be continued for more than one hundred fifty-six (156) work days. Successive provisional appointments of the same person shall not be made.

ARTICLE III. PAY OF EMPLOYEES

SECTION I. PAY PLAN GENERALLY.

Salaries of city employees are regulated by an established pay plan consisting of fifteen grades. Ten steps are within each grade, with step one being entry level. Positions classifications are assigned to a grade and

based on job duties, responsibilities, education requirements, skills, and knowledge, along with other criteria. Employees receive a step increase every two years, on his/her anniversary date, based on performance evaluations with the following exceptions: Anniversary dates for employees in Public Safety will be June 1st if hired prior to June 1, 1997. The anniversary date of all other employees will be October 1st if employed prior to October 1, 1997. Employees that have surpassed Step 10 of their pay grade will receive a cost of living increase each year as approved by the city council. At the discretion of the city council, city employees may receive a cost of living pay increase annually. These pay increases are fixed by the City Council and when authorized are adjusted effective October 1st of the year it is authorized. Probationary employees pay will be adjusted upon successful completion of probationary period.

Beginning with the biweekly pay period starting immediately after April 1, 2007, a salary increase of $1,500 per year will be added to the pay plan for all certified Police Officers and Fire Fighters who have achieved the minimum level of Grade 6, Step 2.

SECTION II.  PERFORMANCE EVALUATIONS.

A performance evaluation form approved by the appointing authority must be completed annually and reviewed with each employee, and forwarded to the Personnel Officer. Probationary employees will be evaluated semi-annually and ten (10) days prior to the end of his or her probationary period.

All requests for pay changes must be accompanied by a copy of the most recent performance evaluation for the employee.

SECTION III.  REVIEW OF PERFORMANCE EVALUATIONS BY EMPLOYEES.

An employee may request a copy of his performance evaluation from the personnel officer without prior approval by his or her supervisor; however, if there is evidence of a grievance, the employee is advised to follow the procedure as established in Article IX, "Employee Complaint or Grievance Procedure".

SECTION IV.  PAY AND ALLOWANCES.

Rates of pay established are gross and total compensation for full-time or part-time service in the various classifications. Rates of pay established provide full compensation for whatever hours may be reasonably required in all classes of positions, and no position shall be subject to additional compensation as a result of any reasonable variation in hours worked. The department head may authorize pay for overtime

work in emergencies or other usual occasions beyond reasonable requirements of hours worked.

SECTION V.  OVERTIME.

As a general rule, all City departments operate on a seven-day, forty-hour workweek (five (5) days, eight (8) hours each day) with the exception of the fire department and police department, for which separate provision is made hereunder.  Considering good management procedures and fiscal implication, it is incumbent upon department heads to plan work schedules to preclude unnecessary or avoidable overtime, However, when employees are directed by supervisors to work extra time in addition to their regular working hours during any emergency or other contingency, they shall be compensated for such overtime, Records of all overtime worked will be kept by the respective department heads and will be attached as supporting documents to the respective payrolls.  Effective upon adoption of these rules:

(1)    Any employee, except fire fighters and police officers who are required to work more than forty (40) hours per week will receive pay for those extra hours at one and one-half (1 1/2) times the regular rate at which he/she are paid, provided that no employee shall accrue pay at the overtime rate unless said employee shall have worked Forty (40) hours during the 7-day work week in the pay period for which the overtime rate is claimed.

(2)    Persons serving in the following capacities shall not be regarded as hourly employees; but, instead, shall be regarded as executive, administrative, or professional employees who shall not be entitled to overtime pay but whose annual salary will be set by the City Council: City Clerk, Police Chief, Fire Chief, Superintendent of Public Works, Director of Community Development, Police Captains, Building Inspector, and such other individuals as may be designated as Executive, Administrative, or Professional employees at the time of their employment by the City Council.

(3)    When an emergency crew or individual is "called back" to work after normal working hours, he shall be reimbursed for his overtime hours, but in no case for less than two (2) hours at one and one-half (1 1/2) times the hourly rate at which he is paid.

(4)    No employee in the classified service eligible to receive overtime pay will order himself into overtime work without the approval of the next individual in the supervisory chain of command (e.g., the department head or City Clerk if the situation arises).  Regularly designated

**10**

emergency crews are considered to have approval if a situation arises whereby they are "called back" to duty.

(5)    A twenty-eight-- (28) day work cycle is hereby established for the Fire Department.  Firemen shall work 24-hour work shifts every third day.  Firemen may be given a Kelly day in an effort to control overtime within the Fire Department, The Fire Chief will have the authority to establish the use of the Kelly day system and set the number of hours to apply to each shift.  During any pay period, i. e., any two-week period as heretofore established that a fireman works in excess of the normal scheduled hours he shall be paid at the rate of time and a half for each hour worked.  Hours not actually worked, such as annual leave, sick leave, military leave, and administrative leave shall not count toward the normal scheduled hours that must be worked before a firefighter is paid at the overtime rate.

(6)    A fourteen- (14) day work cycle is hereby established for the Police Department, to include all police officers and other police department personnel not otherwise classified as civilian employees.  During each pay period, any two week period as heretofore established each employee of the Police Department shall work 80 hours, Hours not actually worked, such as annual leave, sick leave, military leave, and administrative leave, shall not count toward the 80 hours that must be worked before the overtime rate of time and a half must be paid.

SECTION VI.  PAY FOR PART-TIME SEASONAL EMPLOYMENT.

The City Clerk, with the concurrence of the Mayor and council, may establish rates of pay for part-time or temporary employment or for other employment of a limited duration not to exceed six (6) months. Part-time or temporary positions will be exempt from the pay plan.

SECTION VII.  DEDUCTIONS ON TERMINATION.

On termination of employment, the municipality shall deduct and withhold from the final paycheck of an employee any amount owed the municipality in payment for unearned leave, unreturned equipment, or any other indebtedness to the municipality; and the final paycheck shall be issued less balance owed on any indebtedness to the municipality.  The department head shall be responsible for notifying the Mayor of any of the above.

SECTION VIII.   PAY ADJUSTMENT FOR PRIOR STANDARDS TRAINING.

Any person appointed as a police officer or firefighters or paramedic who has completed the minimum standard training required by state law

and who holds a current, valid certificate of completion of these standards will, upon appointment, be paid based on the chart below:

12 - 24 months prior experience -  Step 2

25- 60 months prior experience -  Step 3

61+ months prior experience    -  Step 4

### ARTICLE IV.  LEAVES OF ABSENCE

SECTION I.  GENERAL POLICY, TYPES OF LEAVES AUTHORIZED.

The following types of leaves, and no other, are officially established: holidays, annual leave, sick leave, military leave, educational leave, civil leave, leave without pay, official duty leave, bereavement leave, and family medical leave.

SECTION II.  HOLIDAYS.

(a)     Designated.  The following and such other days as the governing body proclaims are recognized as holidays for all employees:

New Year's Day (January lst)

Martin Luther King Day (to coincide with Federally                             designated holiday)

Memorial Day (last Monday in May)

Independence Day (July 4th)

Labor Day (first Monday in September)

Veterans Day (November 11th)

Thanksgiving Day (4TH THURSDAY IN NOVEMBER AND THE DAY                        FOLLOWING THANKSGIVING DAY

Christmas Eve  (December 24th)

Christmas Day (December 25th)

(b)     Holidays on scheduled workdays.  Each employee will receive holiday pay for each of these days in an amount equal to the number of his regularly scheduled daily work hours times his regular rate of pay, provided that the employee must not have been absent without leave on

## 12

his last scheduled workday before the holiday or his scheduled workday after the holiday.

(c)    Compensation for work on designated holidays: If an employee is required to work on one of the above holidays, he will be compensated at one and one-half (1 1/2) times his regular rate of pay for all hours worked that day fire fighters will be paid for eight (8) hours.

SECTION III.  ANNUAL.

(a)    Generally.  All full-time classified and non-classified employees will earn annual leave as follows:

(b) Conditions for approval.  Employees must receive approval from his/her supervisor or Department Head prior to taking annual leave.  Length of notification as set forth by policy in each Department.

CHART A
FIRE DEPARTMENT PERSONNEL
Months of Service Hours of Annual Accumulated Leave

| | |
|---|---|
| 0-60 | 144 (12hr/mo) |
| 61-120 | 168 (14hr/mo) |
| 121-180 | 192 (16hr/mo) |
| 181+ | 216 (18hr/mo) |

MAXIMUM ACCUMULATION:    288 hours

Fire Department Personnel earning 18 hours of leave will be allowed to accrue 540 *360* hours.

Firemen will be credited with 72 hours of annual leave after successful completion of ~~six~~ months of his/her probationary period and will accrue 12 hours for every month thereafter or as otherwise provided in CHART A above as he/she advances through the chart for months of continuous service.

CHART B
ALL OTHER FULL TIME PERSONNEL

| Months of Service | Hours of Annual Accumulated Leave |
|---|---|
| 0-60 | 96 (8hr/mo) |
| 61-120 | 120 (10hr/mo) |
| 121-180 | 144 (12hr/mo) |
| 181+ | 168 (14hr/mo) |

13

**MAXIMUM ACCUMULATION: 192 hours**

**Employees earning 14 hours of leave will be allowed to accrue a maximum of 240 hours.**
**All other personnel will be credited with 48 hours of annual leave upon successful completion of six months of his/her probationary period and will accrue eight (8) hours for each month thereafter or as otherwise provided in CHART B as he/she advances through the chart for months of continuous service.**

CHART C
REGULAR PART TIME PERSONNEL

**Regular part-time personnel.  Regular part-time employees with service of:**

**0  -  60 mos  -  4 hrs/mo**
**61  - 120 mos  -  6 hrs/mo**
**121 - 180 mos  -  8 hrs/mo**

**(b)    Separation and Retirement.  Employees resigning voluntarily, in good standing, or retiring and who give the maximum notice of two (2) weeks of their intention to resign/retire will earn annual leave credit as of the date of resignation.  Failure to give the required notice could result in loss of accumulated annual leave.**

**(c) Disposition of annual leave at separation.  Employees with six- (6) month's service or more will be allowed payment of unused leave balance.**

SECTION IV.   SICK LEAVE.

**(a)    Generally.  All employees, after one month of service, are eligible for sick leave.  Sick leave with pay shall be granted only for the following reasons: Personal illness and physical incapacity resulting from causes beyond the employee's control; enforced quarantine of the employee in accordance with community health regulations, or attendance upon members of the family ("family member" means husband, wife, mother, father, son, daughter, stepmother, stepson, stepdaughter, stepfather, grandchild, grandparents, father-in-law and mother-in-law) of the employee whose illness requires the care of such employee.  A doctor's certificate may be required, at the discretion of the department head when an employee is absent from work due to family illness as defined above.**

**(b)    Amount of sick leave.  Each full-time regular employee accrues sick leave at the same rate of one working day per month. After a probationary employee has worked one month, he/she shall be entitled to**

**14**

sick leave. Each part-time regular employee accrues sick leave at the rate of 4 hours per month. The City will allow unlimited accumulation of sick leave.

    **(c)**    **Conditions for approval.**

    **(1)**    Employees may be required to furnish a statement from a doctor certifying that the employee was sick. This statement must be furnished to the employee's immediate supervisor upon returning to work. Failure to furnish the required statement will result in the loss of pay from the first day of leave.

    **(2)**    Sick leave is not a right but a privilege and shall not be used as annual leave. The Personnel Officer and department heads are authorized to take all necessary steps to prevent abuses, to include verifying illness, or to require a medical examination as evidence of physical condition.

    **(d)**    Disposition of sick leave at separation, Upon separation from the service, all sick leave is canceled and is not transferable to annual leave.

    **(e) Sick leave at the time of retirement:** Employees will be paid ten (10%) percent of unused sick leave at the time of retirement, Fire Department Personnel will be paid five (5%) percent of unused sick leave.

SECTION . V.  SICK LEAVE BANK

    A sick leave bank is established to assist City employees who have exhausted his or her accrued leave and unable to work due to illness or injury. Employees may contribute any number hours of sick leave as often as he/she wishes. Hours donated will be placed in a bank and used for catastrophic illness or injury to an employee. Terminating employees may donate his/her unused sick leave to the bank.

    A panel consisting of 2 employees and the Personnel Officer will take under consideration the request and submit their recommendation for approval applying the following guidelines.

DEFINITION OF CATASTROPHIC ILLNESS OR INJURY:

    Critical illness, such as cancer, heart disease, etc., major surgery or severe injury that requires extensive medical treatment.

CRITERIA FOR ELIGIBILITY:

**1. Employee must have exhausted all leave. A doctor's certificate will be accompanied with the employee's request to receive sick leave hours. Employees will not be eligible, if he/she has a secondary job and capable of carrying out those duties.**

**2. Employees will be limited to receiving 240 hours, and 636 hours for fire department personnel.**

**3. The employee must be in good standing and have a good attendance record during the course of their employment with the City prior to the illness/injury.**

4. The employee must have at least one year of continuing service with the City of Eufaula.

SECTION VI.  BEREAVEMENT LEAVE.

**All classified employees will be credited with three (3) working days of leave for the death of an immediate family member (mother, father, sister, brother, daughter, son, wife, husband, stepmother, stepfather, son-in-law, daughter-in-law, grandparents, grandchild, mother-in-law, and father-in-law). A work day for fire department personnel will be calculated at 24 hours; for all other city personnel, a work day will be calculated at 8 hours. The three days are considered to be the day before, the day of, and the day after the funeral. If an employee is notified of the death on a scheduled work day and is released of his duties, a sick leave day will be credited for that day, to be calculated at the rate of 24 hours for fire department personnel, and 8 hours for all other city personnel. Any additional time that an employee requests after the bereavement leave has been exhausted will be counted against the employee annual leave, if available and will be granted as departmental schedules permit, Immediate family member will be considered to be: mother, father, sister, brother, daughter, son, wife, husband, stepmother, stepfather, son-in-law, daughter-in-law, grandparents, grandchild, mother-in-law, and father-in-law. Bereavement leave shall only apply to the above and under conditions as defined and cannot be transferred to any other leave, Upon separation from service, all bereavement leave is canceled.**

SECTION VII.  MILITARY LEAVE.

**(a)    Generally. Military leave means training and service duty performed by an inductee, enlistee, or reservist, or any entrant into a component of the armed forces of the United States, to include time spent**

16

in reporting and returning from such training in service or, if rejection occurs, from the place of reporting for service. It also includes active duty training as a reservist in the armed forces of the United States, or as a member of the National Guard of the United States.

(b)    **Restoration.** An employee returning from military leave of a maximum of four (4) years shall be entitled to restoration to his former position, providing he/she makes application within ninety (90) days after his/her release from duty and is physically and mentally capable of performing the duty involved.

(c)    **Disposition of pay and sick leave.** A regular employee who leaves employment with the city directly for such military leave without pay may elect to be paid for any accrued vacation as he/she may be entitled to if he/she were actually separated from the service. If the employee elects not to be paid for such leave, the accrued leave credit shall be reinstated upon return of the employee to duty under this provision and shall have unused sick leave credits restored for their use.

(d)    **Mandatory training,** Any employee who is a member of the National Guard of Alabama or a reserve officer or an enlisted man/woman in the Army or Navy or Marine Corps or Air Force reserve shall be granted leave of absence with pay for the purpose of attending an encampment of such organization for training when so ordered by the military authority. The maximum military leave with pay shall not exceed 168 hours in any calendar year.

SECTION VIII.    LEAVE WITHOUT PAY.

(a)    **Generally.** The appointing authority may grant leaves without pay for other than medical reasons for a period not to exceed one year when it is in the interest of the local government to do so. At the expiration of the leave without pay, the employee has the right to, and shall be reinstated to, the position he vacated if the position still exists or, if not, to any other vacant position in the same class. Approved leave without pay shall not constitute a break in service.

(b)    **Unexplained absence.** Unexplained absence shall not be compensable nor charged as paid leave time. Leave of any category in excess of that authorized shall be charged as leave without pay and deduction made from pay for that period.

SECTION IX.  FAMILY AND MEDICAL LEAVE

In compliance with the Federal Family and Medical Leave Act of 1993, effective August 5, 1993, a maximum of 12 weeks of Family and Medical Leave without pay in any 12 month period measured forward from the commencement of an employee's first leave under the Policy will grant, as follows for:

(1)  the birth of a child and care for a child following a    birth;

(2)  the placement of a child with the employee.  A "child"includes a biological, adopted or foster child, stepchild, a legal ward, or a child for whom the employee stands in loco parentis (i.e., in the place of a parent) who is under 18 years of age; or 18 years of age or older and incapable of self care because of a mental or physical disability.

(3)  to care for the spouse, child, or parent of the employee who have a "serious        health condition".  A "parent" means the biological parent of an employee or an individual who stood in loco parentis to an employee when the employee was a son or daughter.

Documentation of relationships or illnesses will be required in a timely manner.

Under this section, leave after the birth or placement of a child must be taken within twelve months after the birth or placement.

A serious health condition is an illness, injury, impairment, or physical or mental condition that involves:

(1)  inpatient care at a hospital, hospice, or residential medical care facility, or

(2)  continuing treatment by a health care provider.

CONDITIONS:

1.  Prior to requesting applicable leave without pay, employees must first exhaust all applicable accrued sick and vacation leave.

2.  Leave without pay will not be considered time worked for purposes of accruing seniority, longevity, vacation, sick or other employee benefits.

18

3. If the husband and wife both work for the City, a combined total of 12 weeks of leave for both (not 12 weeks each) are possible during any 12 month period, if the leave is to care for a new child (by birth or placement). If the leave is to care for a sick child or the other spouse, then each spouse is entitled to 12 weeks each.

4. The employee may take Family and Medical Leave in 12 consecutive weeks, may use the leave intermittently (take a day periodically when needed over the year), or under certain circumstances may use the leave to reduce the work week or workday, resulting in a reduced hour schedule. In all cases, the leave may not exceed a total of 12 weeks over a 12-month period. However, for the birth, adoption or foster care of a child, the City and the employee must mutually agree to the schedule before the employee may take the leave intermittently or work a reduced hour schedule.

The City may temporarily transfer an employee to an available alternative position with equivalent pay and benefits if the employee is qualified for the position and if the alternative position would better accommodate the intermittent or reduced schedule.

5. The employee may be required to report periodically on his/her status and intention to return to work.

6. The employee's position may be filled by a temporary appointment or assignment of another employee. At the expiration of the leave, the employee shall be reinstated in the position vacated.

7. Except as provided herein, the employee, upon returning to work from a medical leave must report to their Supervisor or Department Head. The employee may be required to submit a written approval from their health care provider stating the employee is approved to return to work. The employee may be required to complete a health examination.

8. While the employee is on Medical and Family Leave, the City will continue the employee's health benefits during the leave period at the same level of benefits and under the same conditions as if the employee had continued to work.

9. Under current City procedures, an employee on paid leave continues to pay the contribution rate via payroll deductions when an active employee. An employee on unpaid Family and Medical Leave continues to pay the contribution as when an active employee. The employee must continue to make this payment either in person or by mail to the City's Accounting Department. Payment must be received by the last day of the month prior to each month of coverage. If the payment is

19

late, the employee's health care coverage may be dropped for the duration of the leave.

If the employee chooses not to return to work for reasons other than a continuation, recurrence, or onset of a serious health condition or for other circumstances beyond the control of the employee, the City will require the employee to reimburse the City the amount it paid for the employee's health insurance premium during the leave period.

9. Employees are eligible if they have at least 12 months of service with the City, and have worked 1250 hours over the previous 12 months.

SECTION X.  EDUCATIONAL LEAVE.

The appointing authority may grant leave without pay at his discretion for an employee to further his/her education when it is in the best interest of the city.  An employee must file a request in writing from his supervisor.

SECTION II.  OFFICIAL DUTY LEAVE.

An employee who is absent from work while on official business for the municipality, or while participating in training or educational courses to which he/she has been asked by the municipality, or while attending professional conferences and meetings authorized or required by the appointing authority shall be granted leave with full pay without charge against annual leave.

SECTION  XII.  CIVIL LEAVE.

An employee called for service on a jury may be granted leave with full pay for the duration of the period for which called, unless released earlier, without charge against annual leave.

SECTION XIII.  FORCED MEDICAL LEAVE

(a)    Generally.  All employees are subject to being placed on temporary involuntary medical leave when it is determined to be in the best interest of the employee and/or the City for the employee to be classified as such.  The purpose of temporary involuntary medical leave is to permit an employee to take time off for an actual illness or injury when the Department Head or his duly assigned designee determines that the action is in the best interest of the affected employee, his/her fellow employees, and that of the governmental entity.

**20**

**(b)     Amount of temporary involuntary medical leave. Any employee placed on temporary involuntary medical leave shall use his accumulated sick leave as specified in Section 4, Article IV. In order to be taken off temporary involuntary medical leave, the employee must furnish a written medical report from his/her physician and/or any City designated physician, stating that the employee is able to return to his/her normal assigned work duties and that the employee is able to discharge his/her full responsibilities without undue risk to the employee, his/her fellow employees, or the City of Eufaula.**

**(c)     In case of a work-related injury making it impossible for an employee to perform the employee's work, every effort will be made to assign the employee to work that can be done within  the limitations caused by the injury. If the injury prevents the employee from doing any work at all, the employee shall be eligible for Workers Compensation benefits according to the particular facts surrounding the occurrence which resulted in the injury.**

SECTION XIV.    PERSONNEL FILES.

All personnel files shall be maintained and secured for confidential purposes by the personnel officer. Personnel files may be reviewed by the employee, his/her Department Head, Mayor, City Clerk, and City Attorney when requested by the City Clerk and/or Mayor.

ARTICLE V. EMPLOYEE BENEFITS

SECTION I.  OFFICE HOURS.

**Normal office hours are an eight-hour day between the hours of 8 A. M. and 5 P. M. Where activities of a particular department require some other schedule to meet work loads, the appointing authority may authorize a deviation from the normal schedule. A maximum of one hour is permitted for lunch, and such time shall be considered noncompensable.**

SECTION II.  GROUP LIFE AND HEALTH INSURANCE.

**The city participates in a group health and life insurance program. The city pays a portion of this insurance program for each of its employees, and employees may cover their dependents by payment of whatever charges are incurred for dependent coverage. The City makes available a dental insurance program, but does not contribute toward premiums. The Personnel Officer can furnish each employee with a booklet which explains the insurance program in detail.**

**21**

SECTION III.  RETIREMENT.

The city is a member of the State Employees Retirement System of Alabama.  Enrollment in the retirement program is mandatory and is a condition of employment for full-time, regular employees.

SECTION IV.  WORKERS COMPENSATION.

Employees are covered under Risk Management Insurance, as required by Code of Alabama 1975, Title 25, Chapter 4, Articles 1 through 7, inclusive.

SECTION V.   SUPPLEMENTARY TRAINING PROGRAM.

(a)     Generally.  The City recognizes that improved skills and capabilities of its employees can be valuable from the viewpoint of both the City and the employee.  Consequently, it is the City's policy to aid its employees to improve themselves through professional educational programs, seminars, workshops,  conferences, and personal enrichment courses.

(b)     Eligibility.  All full-time regular employees will be eligible to attend programs for professional improvement.  All police officers are required to attend and successfully complete a basic police officers' training course within nine (9) months of their employment.  All fire-fighters must successfully complete Alabama's Fire Fighters Personnel Standards and Education Commission within twelve (12) months of their employment.

(c) Approved courses.  A program may be eligible if, in the opinion of the appointing authority, it will either:

(1)     Improve the employee's ability to perform his/her present job; or,

(2)     Help prepare the employee for a job with the City which will demand a higher level of responsibility and/or skill.

(d)     Financial consideration.  The City may pay the cost of tuition, registration fee, books, and laboratory fees, travel and meals and lodging away from home.

SECTION VI.   IN-SERVICE TRAINING.

22

**Department Heads, with the assistance of the Personnel Officer, shall be responsible for developing the skills of their employees through in-service training, for investigating training programs outside the city government and referring municipal employees to those programs, and for making recommendations on whether the municipality should pay for such training.**

SECTION VIII.   WORKING CONDITIONS, FOREMANSHIP.

**Department Heads shall be held responsible for providing suitable and adequate working conditions within their means, and for making recommendations for corrections not within their means of any conditions not suitable or adequate, Department heads shall further be held responsible for those matters normally associated with foremanship, such as development of employee morale and effectiveness.**

### ARTICLE VI.  POLICIES

SECTION I.   CONFLICT OF INTEREST

**Employees of the City of Eufaula and the many governmental entities associated with the city's comprehensive operations should be aware of a conflict of interest and potential ethics violation regarding the use of their job for personal gain.  Employees should not be using city owned or board owned equipment for their personal use, nor should employees be using the exempt status of the municipality or its governmental entities to purchase items for their personal use.  Any employee found to be breaking this regulation may face city or board disciplinary action as well as action by the Alabama Ethics Commission.  Supervisors are charged with the responsibility to report these violations to their department head as soon as the incident is discovered for immediate action.**

SECTION II.   SMOKING POLICY.

**For mutual well being and comfort of all employees and visitors the following policy will apply to all employees and visitors:**

**Smoking will not be allowed in city buildings at any time.  Employees and visitors will refrain from smoking inside city offices and facilities.**

SECTION III.   DRUG/ALCOHOL POLICY

WHEREAS, the City Council of the City of Eufaula, Alabama adopted Resolution 81-2007, adopting the Personnel Rules and Regulations; and

WHEREAS, the Drug/Alcohol Policy is a part of the Personnel Rules and Regulations and is hereby revised as follows:

SECTION III.  DRUG/ALCOHOL POLICY

## CITY OF EUFAULA, ALABAMA

## DRUG & ALCOHOL POLICY

## SECTION 1. INTRODUCTION

The City of Eufaula provides a variety of public services.  The employees of the City are its most valuable resource, since it is through their work that services are provided.  When delivering services, the health and safety of the public and the health and safety of employees are of paramount importance.  Drug and alcohol abuse is a problem of serious concern and one, which affects all segments of the community, including the workplace.  The City strives to provide a safe work environment and to protect the public by ensuring a drug and alcohol free workplace.

A.  The use of any alcohol or illegal drugs, including narcotics or hallucinogenic drugs, marijuana, or other non-prescribed controlled substances is prohibited during work hours or while on the City's property.  That includes their use, possession, distribution, or reporting to work under the influence of intoxicants or illegal drugs (including narcotic or hallucinogenic drugs, marijuana or other non-prescribed controlled substances).  This also includes any equipment, products, and material which are used, intended for use, or designed for use with non-prescribed controlled substance, while on the City's property or during work hours.

B.  Reporting to or being at work where the presence of alcohol, other intoxicants, non-prescribed narcotics, hallucinogenic drugs, marijuana or other  non-prescribed controlled substances present in blood or urine is prohibited.

C.  Reporting to or being at work where the presence of prescribed or over-the-counter narcotics or drugs where, in the opinion of the City, such use prevents the employee from performing his or her job or poses a risk to the safety of the employee, other persons, the general public or property, is prohibited.

**24**

Any employee taking a prescribed drug or narcotic or over-the-counter medication must advise his or her supervisor of its use if its use would effect the employee's ability to perform their assigned duties. Over-the-counter medications and prescription drugs brought to work should remain in the original labeled container and prescription drugs should show both the prescribing doctor's name and the prescription's expiration date or discard date. An employee using such prescribed or over-the-counter substances may remain on his or her job or may be required to take a leave of absence or other appropriate action as determined by supervision based upon job-relatedness and the employees' ability to perform their job duties properly.

D.    Employees who are scheduled as an on-call employee are prohibited from using alcohol for the specific scheduled on-standby hours of that employee. Whether an employee is considered on "stand-by" or "on-call," it is the employee's responsibility to inform his/her supervisor at the earliest possible time of any potential impairment from alcohol, whether the employee was scheduled to be on-call, on standby or was unexpectedly called in to work.

E.    Adherence to the City's policy on drugs and alcohol is a condition of employment for all employees. All employees will be required to sign the applicable acknowledgement form and to consent to this policy.

F.    Employees must notify the City of any conviction on drug-related charges within five (5) working days of such conviction in conformity with the Drug Free Work Place Act of 1988.

G.    Violations of this policy, including (but not limited to) a positive laboratory test result for drugs or alcohol: refusal to sign a consent or chain of custody form; refusal to submit to or cooperate with a substance screening by blood, urine, hair, or saliva, as required in this policy; knowingly submitting an adulterated, diluted, or otherwise altered blood or urine specimen; or submitting a specimen from another persons, are subject to disciplinary action by the City as allowed by law, up to and including termination. All refusals will be classified as a positive test.

H.    The City reserves the sole right to interpret all provisions of this policy and take all appropriate actions within its sole discretion and judgement. Off-the-job usage of drug, alcohol

**25**

or any other prohibited substances which results in impaired work performance, such as absenteeism, tardiness, poor work product, or harm to the City's image is prohibited. Employees should realize that these regulations prohibit all illicit drug use-on and off duty.

I.  Additionally, these rules may apply to any contractor used by the City and to any employee of that contractor working on the premises of the City. This provision, however, is not intended to mandate the City disclose this policy to any such contractor and there is no duty assumed by the City in relation to the drug policies of a City hired contractor or any similar third party.

J.  At a minimum, any employee of the City who tests positive for substance or alcohol abuse shall not be considered for promotions or merit raises for one (1) year from the date of the negative test which is required upon completion of a counseling or rehabilitation program. Any employee of the City who wishes to transfer from a job that is not safety sensitive to a job that is considered safety sensitive must first submit to a drug test. Transfers will not be finalized until all results have been approved.

K.  The City reserves the right to alter, amend or supplement the terms and conditions of this policy to accommodate changes in current state and federal regulations, insurance requirements, testing technologies, or circumstances which impact City practices and policies or industry standards.

## SECTION 2. DEFINTIONS

As used in this Policy, terms referred to shall have the following definitions:

*Accident*- Any mishap or occurrence resulting in injury to people, property, or equipment, which results in loss of work time or necessitates to an employee, or other person, medical attention or assistance in excess of simple first aid procedures, any injury that results in workers' compensation injury, or damage to property.

*Alcohol*- The intoxicating agent in beverage alcohol, spirits of wine, ethyl alcohol, hydrated oxide of ethyl, or other low molecular weight alcohols, including methyl or isopropyl alcohol, from whatever source or by whatever process produced.

**26**

*Alcohol Concentration (or Breath Alcohol Concentration)-* The alcohol in a volume of breath expressed in terms of grams of alcohol per 210 liters of breath, as indicated by a breath test required by this policy.

*Applicant or Final Applicant-* A person who has applied for a position with the City and/or has been offered employment conditioned upon successfully passing an alcohol and or substance abuse screen or test.

*Call In Employee-* All City employees are subject to call-in-twenty-four (24) hours per day. An employee who has been called in to work from off duty status due to an emergency or disaster is considered a call-in employee. The employee is considered on duty and subject to drug or alcohol testing under this Policy at such time as he or she receives the call to report to work.

*Chain of Custody-* The procedure established by the testing laboratory and followed by the City, the specimen collector, and the courier to account for the identification and integrity of each specimen by tracking its handling and storage from point of specimen collection to final disposition of the specimen. These procedures shall conform with the regulations of the United States Department of Transportation set forth in 49 C.F.R. § 40,et seq.

*City-* City of Eufaula, Alabama.

*Contact Person-* Individual authorized to accept specimen/testing results and administer the City Drug and Alcohol Testing program. Presently the contact person for the City is Hometown Doctors, Dr. Wesley Marner/Dr. Rajesh Patel.

*Controlled Substance-* "Controlled substances" include the following and any other controlled substance subject to testing by the United States Department of Transportation as set forth in 49 C.F.R. § 40.21:

1. -marijuana, cocaine, heroin, hallucinogens, methaqualone, benzodiazepine, opiates, amphetamines, methamphetamine, barbiturates, phencyclidine, (PCP), any other substance, and all derivatives thereof, whose manufacture, sale, distribution, dispensation, possession or use is prohibited or controlled by state or federal law in this country;
2. –any prescription substance;
3. –any so called "designer drug," "look alike," synthetic drug and similar substance, even if not specifically prohibited by state or federal law;

**27**

4.  –any other substance which may be used, whether available legally over-the-counter (such as cough syrup) or naturally occurring (such as hallucinogenic mushrooms) or which was never intended for human consumption (such as glue); and

5.  – a metabolite of any substance described in paragraphs (1) and (2) above.

*Department of Health and Human Services (DHHS)*- Federal administrative body which oversees, among other things, the certification of drug and alcohol testing, laboratories and technicians, and research in connection with drug use and alcohol abuse in the workplace; current successor to the National Institute for Drug Abuse (NIDA).

*Drug*- Includes but is not limited to: amphetamines, cannabinoids, cocaine, phencyclidine (PCP), methadone, methaqualone, opiates, barbiturates, and benzodiazepines.

*Drug-Free Workplace Policy Statement* – Document set out in writing, maintained, and followed by the City, that conforms to the testing procedures specified in 49 C.F.R. Part 40, or otherwise reliable standards.

Effective Date- This Alabama Drug-Free Workplace Policy Statement of the City is effective as of _____, 2007. (effective date).

*Employee*- Any person who is paid through the City of Eufaula Payroll System except for Elected Officials.

*Employer*- City of Eufaula

*Laboratory ("Lab")*- Is a City–designated facility certified under the Department of Health and Human Services "Mandatory Guidelines for Federal Workplace Drug Testing Programs. "49 C.F.R. § 40.39.

*Medical Review Officer (MRO)*- Is a licensed physician responsible for receiving laboratory results generated by an employer's testing program who has knowledge of substance abuse disorders and has appropriate medical training to interpret and evaluate an individual's positive test result together with his or her medical history and any other relevant biomedical information. A licensed physician (medical doctor or doctor of osteopathy), certified by either the American College of Occupational and Environmental Medicine of The American Association of Medical Review Officers, responsible for receiving laboratory results generated by an employer's drug-testing program. The MRO shall have knowledge of substance abuse disorders and appropriate medical training to interpret and evaluate an individual's positive test, medical history, and other

relevant biomedical information.  The MRO shall be responsible for compliance with the applicable statutory and regulation requirements.

*Non-Prescription Medication*- A drug or medication authorized pursuant to the federal or state law for general distribution and use without a prescription in the treatment of human disease, ailments, or injuries.

*Non-Safety Sensitive Position*- Any position applied for or held by any person which is not considered safety sensitive position except for Elected positions.

*Pass an Alcohol Test*- A breath alcohol test which indicates a concentration of alcohol of less than .04

*Pass a Drug Test*- A drug test reported by the laboratory that the MRO finds:

1.    Showed no evidence or insufficient evidence of a prohibited drug; OR
2.    Showed evidence of a prohibited drug but there was a legitimate medical explanation for the result; and it's use did not impair the ability of the employee to perform his or her job duties safely and appropriately; OR
3.    Was scientifically insufficient to warrant further action.

*Policy*- City of Eufaula, Alabama Drug & Alcohol Policy

*Positive Alcohol Test*- A confirmed breath alcohol test conducted by a properly trained Breath Alcohol Technician (BAT) using a properly calibrated Evidential Breath Testing (EBT) device which indicates an alcohol concentration of 0.04 or greater for all employee functions. Employees will be subject to discipline, up to and including termination for a breath alcohol content of 0.04 or higher.

*Positive Drug Test*- a drug test reported positive by the laboratory and subsequently verified after review by the Medical Review Officer (MRO) as evidence of the illegal or illicit use of a prohibited drug.

*Prescription Medication*- A drug or medication lawfully prescribed by a physician or authorized medical personnel for an individual and taken by that individual in accordance with the prescription.

*Prohibited Drug*- One of the authorized by the DOT to be tested for under 49 C.F.R. Part 40, and under Code of Alabama (1975) § 25-5-331(4). The term "prohibited drug" includes but is not limited to: amphetamines, cocaine, cannabinoids, opiates, phencyclidine (PCP), barbiturates,

benzodiazepines, or propoxphene, unless the substance was prescribe by a licensed medical practitioner who is familiar with the employee's medical history and assigned duties.

Reasonable Suspicion Testing- **Substance abuse testing based on a belief that an employee is using or has used drugs or alcohol in violation of this Policy drawn from specific objective and articulable facts and reasonable inferences drawn from the facts in light of experience and/or training. The facts and inference used in this determination may be based upon, but not limited to, the following criteria:**

a.  **Observable behavior while at work, such as direct observation of substance abuse or of the physical symptoms or manifestations of being impaired due to substance abuse.**
b.  **Abnormal conduct or erratic behavior while at work or a significant deterioration in work performance.**
c.  **A report of substance abuse provided by a reliable third party.**
d.  **Evidence that an individual has tampered with any substance abuse test during his or her employment with the current employer.**
e.  **Information that an employee has caused or contributed to an accident at work.**
f.  **Evidence that an employee has used, possessed, sold, solicited, or transferred drugs while working or while on the premises of the employer or while operating the employer's vehicle, machinery, or equipment.**

*Refusal of an Alcohol* Test- **A verbal or written refusal by an employee to provide a breath specimen, or to sign the breath alcohol testing form or otherwise to cooperate with the testing process in a way that prevents the completion of the test required under this Policy. Failure to report for testing immediately can also be considered to be a refusal to test and classified as a positive test.**

*Refusal of a Drug Test*- **A verbal or written refusal by an employee to provide a urine specimen for a drug test authorized under this Policy. Failure to report for testing immediately can also be considered a refusal to test and classified as a positive test.**

*Safety-Sensitive Positions*- **Safety-sensitive employees are those employees who discharge duties fraught with risk of injury to others so that even a momentary lapse of attention can have disastrous consequences.  Factors which have been considered in determining whether a position is safety sensitive include handling or potentially handling dangerous machinery; responsibility for children, and handling of hazardous substances in an environment where others could be injured. Positions which have been found to be safety sensitive include firefighters,**

emergency medical technicians, law enforcement officials who carry firearms, dispatchers, 911 operators, heavy machinery operators, bus drivers, transportation workers, jail officers, and any other employee who is authorized to operate a city vehicle. Some employees who come under federal laws and regulations; such as those under the Department of Transportation regulations, natural gas pipeline industry, and aviation, are determined to be safety sensitive by those regulations.

The following positions at the City have been determined to be safety sensitive by way of example only:

Police Officers, Dispatchers, Jailers, Animal Control Officers, Investigators, Detectives, Officers of the Courts, Firefighter, Drivers, Maintenance Personnel for Traffic Safety, Mechanics, Heavy Equipment Operators, School Crossing Guards, Life Guards, Revenue Officers, Household Sanitation Collectors, and such other personnel whose positions may be considered safety sensitive. This list is not to be considered as an exhaustive list.

*Stand By Employee*- An employee who has been assigned formal stand-by-duty by their Department Head for a specified length of time on a regular occurring basis and is required to carry a telephone, beeper or pager in order to be notified when a situation arises necessitating they report to a specified location and perform his/her work duties. The employee is considered on duty and subject to drug or alcohol testing under this Policy at such time as he or she receives the call to report to work.

*Substance*- Drugs or alcohol.

*Substance Abuse Test or Test*- Any chemical, biological, or physical instrumental analysis administered for the purpose of determining the presence or absence of a drug or alcohol.

*Vehicle*- Any mode or manner of transportation mechanism, including but not limited to automobiles, trucks, forklifts, tow motors, off-road vehicles; or heavy equipment, such as bulldozers, backhoes, or cranes; or motorized mechanism otherwise used to convey people, product, or equipment.

*SECTION 3. DRUG/ALCOHOL TESTING*

Under this Policy, all potential employees in either a non-safety sensitive position or safety position (see Section 2 for definitions and listing of safety-sensitive position and non-safety sensitive positions) or positions where a history of documented substance abuse problems exists which would create the special need to test, may be requested to undergo an

31

urinalysis, blood, saliva, or other diagnostic test performed by certified laboratory, to detect the presence of drugs and/or alcohol.

Except for Pre-Employment Testing, The Department Head shall arrange transportation for employees to be taken to the collection location. If an employee refuses to accept transportation arranged by the Department Head, the employee shall be subject to disciplinary action, up to and including discharge. If supervisory or management personnel believe that the employee is impaired by alcohol or a controlled substance, the Department Head will notify law enforcement authorities if the employee attempts to drive.

Employees, including Department Heads, will be subject to testing for alcohol or drugs, with the exception of Elected Officials. The following are the six circumstances when the City will test for drugs or alcohol:

1.     Pre-Employment.

All potential employees for either non-safety sensitive positions (whether applying for classified or unclassified temporary or non-temporary positions) or positions where a history of documented substance abuse problems exists which would create the special need to test shall be given a test for controlled substances after receiving a conditional offer of employment. Present employees who transfer into another safety-sensitive position may also be required to complete a pre-employment substance test. All potential employees who apply for positions requiring Commercial Drivers Licenses shall be given a test for alcohol and controlled substances after receiving a conditional offer of employment. The conditional employee must pass the test before receiving final appointment to the position. Any offer of employment is contingent upon such applicant testing negative. No applicant shall be permitted to begin work until the test results have been obtained and verified by the MRO and transmitted to the Human Resource/Risk Manager.

Applicants must sign an Applicant/Employee Consent /Release Form before voluntarily submitting testing conducted by a City representative, or at a certified lab/agency chosen by the City. The City shall inform applicants that any offer of employment is conditioned upon passing a substance test. The applicant will be informed that the specimen is subject to being tested for the presence of any or all of the following substances: Amphetamines, Cocaine, Cannabinoids, Opiates, Phencyclidine (PCP), Methadone, Methaqualone; Barbiturates, Benzodiazepines, Propoxyphene, or alcohol in conformity with this policy.

Job offers are conditional and will be withdrawn if the applicant tests positive in a lab test, refuses to submit to a test, or refuses to execute the required consent/release form.

Any applicant who decides not to cooperate in the pre-employment testing or who is unwilling to acknowledge this City's Policy on drug and alcohol testing may withdraw his/her application, and will not be considered for employment.

The City of Eufaula will not employ any applicant who refuses to undergo a test or who tests positive for alcohol or a controlled substance. Positive and negative tests will be reported to the Human Resource/Risk Manager by the MRO.

    2.    Upon "Reasonable Suspicion"

All employees will be tested when there is good reason for a City Department Head, Supervisor, or Human Resource/Risk Manager to suspect that an employee has reported to work or is on City property under the influence of alcohol, other intoxicants, drugs, or narcotics. Reasonable suspicion may be based on a supervisor's observation of an employee's drug or alcohol use, or an employee's personal behaviors that may indicate drug or alcohol use. The Department Head, Supervisor, or Safety Officer must immediately detail in writing their specific reasons and observations for requiring an employee to undergo reasonable suspicion testing. Any employee who reports to work visibly impaired by drugs or alcohol will be tested immediately.

    3.    Post-accident

The Supervisor or Department Head must complete a Supervisor's Accident Report. Employees will be tested after any work-related injury/or accident where:

    (a.)    an employee is injured beyond the need for simple first aid, or
    (b.)    property or vehicles are damaged, or
    (c.)    an employee has caused or contributed to an on-the-job injury which results in loss of work time, or
    (d.)    an injury that is a workers' compensation injury, or
    (e.)    if there is reasonable suspicion of drug or alcohol use or other intoxicants, or
    (f.)    involved in any vehicular accident.

Employees are prohibited from using alcohol within eight (8) hours following an accident, or until testing is completed. Any test for alcohol should be completed within two (2) hours of a work-related accident, or as soon thereafter as is practicable but not to exceed eight (8) hours.

**33**

All employees are put on notice that a positive laboratory alcohol or drug test following an on the job accident is evidence of "willful misconduct" under this Policy and may disqualify the employee from receipt of workers' compensation benefits and subject employee to additional disciplinary action up to and including termination from employment in accordance with the Personnel Rules and Regulations.

### 4.    Fitness-For-Duty Physical Exam

Any safety-sensitive employee whose job position requires him or her to undergo regular physical examinations will be screened as part of any such routine examination.

### 5.    Follow-Up Testing After Returning To Work

Any employee who is referred to a drug or alcohol rehabilitation program through work, who was referred to a rehab program after testing positive for drugs or alcohol while at work, or who has been suspended from work for any other violation of the drug and alcohol policy, must complete follow-up testing when he/she returns to work. The employee will also be subject to required periodic and unannounced testing for a minimum of one (1) year after his or her return to work. The frequency of said periodic testing shall be left at the sole discretion of the Human Resource/Risk Manager. This paragraph is not intended to obligate the City to provide any rehabilitation services or continued employment to any employee.

### 6.    Random Testing of Safety-Sensitive Employees

Employees in safety-sensitive positions or positions where a history of documented substance abuse problems exists which would create the special need to test are subject to random testing without notice. The City requires the random, unannounced testing for controlled substances of all safety sensitive employees, using a random number table or a computer-based random generator. In addition, the City requires alcohol testing on a random unannounced basis for all employees who hold Commercial Driver's Licenses. Tests of employees for illicit drugs will be conducted in a number equal to or greater than 50 percent of the affected workforce- without advance notice – in any given 12 month period. There will be no maximum of samples that any one individual will be required to provide during the testing schedule. The list of employees in the random pool will be updated on a quarterly basis. Employees will be required to report to the City's designated collection site immediately upon notification. The Department Head shall arrange for transportation of employees to be taken to the collection site.

A safety sensitive employee who has been randomly selected for testing while on scheduled time off shall nevertheless submit to the above-referenced testing immediately upon his/her return to work.

## SECTION 4. EMPLOYEE RESPONSIBILITIES

For any random or required drug and alcohol testing, an employee is responsible for the following:

1. Reporting to the collection site immediately when ordered to report there by a Department Head, Supervisor or Human Resource/Risk Manager. If the employee fails to report in the time specified, he/she will be considered to have refused to take the test (classified as a positive result), and will be subject to termination.

2. Providing a specimen for testing, whether it be breath, urine, hair, blood, or saliva, as the specific test to be given may require. If the test results indicate the specimen has been adulterated or diluted or the employee refuses the test, substitutes the specimen of another person, sends an impostor, or has not signed the required forms, the employee will be subject to termination from employment as if the test were positive.

3. Cooperating with the MRO in providing specimen or medical information. The job of the MRO is to decide whether the employee has passed the laboratory drug or alcohol test. As part of the verification process, the MRO may:

   a. Conduct a medical interview with the individual, if the individual consents to such an interview (this interview may be in person or by telephone);
   b. Review the individual's medical history and any relevant biomedical factors, if the individual consents to the review and cooperates with the MRO during the interview;
   c. Review all medical records made available by the individual tested to determine if a laboratory positive test resulted from legally prescribed medications;
   d. If necessary, reanalyze the original specimen taken at the lab to determine the accuracy of test results;
   e. Verify that the lab report and assessment are correct. Based on available data, including other test results, the MRO may conclude that a particular drug test is

**35**

scientifically insufficient for further action and would conclude that the test for that individual is negative.

The MRO will provide the employee with an opportunity to discuss the results of any apparently positive lab test. If in the sole judgment of the MRO, there is no legitimate medical reason for a positive lab test, the MRO will verify the test as positive and report the finding to the City's Human Resource/Risk Manager. It is the employee's responsibility to return any phone calls from the MRO. If the employee does not contact the MRO, the MRO may report the result of the test to the City. An employee who tests positive for drugs or alcohol in a positive lab test will be subject to disciplinary action, up to and including termination of employment in accordance with the Personnel Rules and Regulations.

## SECTION 5. TESTING PROCEDURE

All lab testing will be performed by a laboratory certified by the National Institute on Drug Abuse/Substance Abuse and Mental Health Services Administration (NIDA/SAMHSA) or Department of Health and Human Service (DHHS) as qualified to perform drug and alcohol testing under federal workplace testing programs. Procedure may include a lab test for any or all of the following: Amphetamines, Cocaine, Cannabinoids, Opiates, Phencyclidine (PCP) Methadone, Methaqualone, Barbiturates, Benzodiazepines, Propoxyphene, or Alcohol. All laboratory drug tests are to be conducted pursuant to regulations adopted for drug and alcohol testing by the U.S. Department of Transportation (DOT) in 49 C.F.R. Part 40.

Any employee or applicant who receives a positive test result may choose to have their specimen submitted to a certified lab chosen by the City but different that the lab performing the initial testing for further laboratory testing, provided the employee or applicant pays in advance the amount equal to the cost of the second review of the specimen. Failure to pay this fee shall constitute a waiver of the employee's right to have the specimen reviewed. In the event that the second test results are negative, the employee or applicant will be reimbursed the amount he/she paid for the test.

A positive lab test conducted in accordance with DOT 49 C.F.R Part 40, for controlled substance is a conclusive presumption of impairment. A positive breath, saliva, or blood alcohol test result which shows a Breath Alcohol Content of 0.04 or higher is a conclusive presumption of impairment for all applicants and employees. An applicant shall be denied employment: in the case of an employee, the Human Resource/Risk Manager shall notify the Department Head, who shall immediately put the employee on administrative leave and begin the disciplinary process. The employee shall be disciplined, up to and including termination and may be

**36**

referred for appropriate counseling and rehabilitation in accordance with this Policy and Program.

The City may use optional initial screening procedures in accordance with FDA approved rapid screening device for initial screening.

### SECTION 6. EMPLOYEE DRUG & ALCOHOL EDUCATION PROGRAM

The City will conduct educational programs to educate employees about the dangers of drug and alcohol abuse.  Programs may include the indicators of drug and alcohol abuse, its policy of maintaining a drug-free workplace, and the penalties that may be imposed for violation of this Policy.  Attendance for training is mandatory and is part of the employee's job performance.  Such education and training shall be documented and maintained as part of each employee's personnel file.  Department Heads, Human Resource/Risk Manager and Supervisors will participate in such educational programs and will also receive training on how to recognize signs of substance abuse, how to document signs of employee substance abuse, and how to refer employees to the proper treatment providers.

### SECTION 7. CONFIDENTIALITY

The City is committed to a safe, productive workplace that is free of substance abuse.  The City is also concerned about employees' privacy. All information received by the City, its Department Heads and Supervisors, testing lab, or MRO, concerning employee drug and alcohol testing, lab test results, and related medical information is confidential. Such information shall be released only upon written consent of the employee, except:

1.  To local, state, or federal agencies with investigative or regulatory jurisdiction
2.  To its workers' compensation carrier, or other third-party administrator of workers' compensation or insurance claims, employees of the City who have a "need to know" as well as any retained consultant or counselor of the City related to its Drug and Alcohol Testing Program.
3.  To be used as evidence, obtainable discovery, or disclosure in any public or private proceeding, with the exception of any criminal proceeding against the employee
4.  By subpoena of a court of competent jurisdiction
5.  To subsequent employer upon receipt of a written request from the former employee
6.  When they are needed to implement disciplinary action.

**37**

Records relating to drug and alcohol testing, lab reports showing test results, or other documents relating to the City's drug and alcohol testing program shall be kept in a separate filing location from employees' individual personnel files. Records shall be kept in a secure location, and only authorized personnel shall have access to the records. Release of information to parties other than the City, its MRO, third-party administrator of claims, those falling within the categories as set forth above, or related entity shall be solely pursuant to a written consent form signed voluntarily by the person tested, unless the release is compelled by an agency of the state or a court of competent jurisdiction or unless deemed appropriate by a professional or occupational licensing board in a related disciplinary hearing.

## SECTION 8. CONSEQUENCES OF POLICY VIOLATION

Violation of the City's Drug and Alcohol Policy may result in severe disciplinary action, including termination for a first offense in accordance with the Personnel Rules and Regulations. While it is not feasible to list every violation that might lead to termination, the following are representative:

1. Unauthorized use, consumption, possession, manufacture, growth, distribution, dispensation or sale of controlled substances, abuse of a prescription drug, any mind altering substance, drug paraphernalia or alcohol on City premises, in City supplied vehicles, or in any City work area.

2. Being under the influence of an unauthorized or controlled substance, or illegal drug or alcohol on City premises, in City supplied vehicles, or in any City work area.

3. Conviction of an employee for the sale or possession of a controlled substance, illegal drug, drug paraphernalia, or alcohol while an employee of the City.

4. Off-the-job use of illicit drug, alcohol, abuse of a prescription drug or any prohibited substances which result in impaired work performance, including, but not limited to, absenteeism, tardiness, poor work product, or harm to the City's image.

5. When the employee stores in a locker, desk, automobile or other repository on City premises any illegal drug, drug paraphernalia, or any controlled substance whose use is unauthorized.

6. When any employee participates in switching, tampering, or adulterating or attempts such switching, tampering, or adulteration, of urine or other specimen provided for testing.

7. When the employee refuses to consent to testing or submit to a breath test, saliva, urine or other specimen for testing when ordered to by his/her supervisor, department head or the Human Resource/Risk Manager.

8. When an employee fails to fulfill the terms of a drug/alcohol assistance agreement.

An employee who refuses to submit to or cooperate with a blood, saliva, breath or urine test after an accident forfeits his or her right to recover Worker' Compensation benefits under Alabama Code Section 25-5-51 and is subject to disciplinary action up to and including termination. An employee who is terminated for refusing to submit to a screening or testing procedure, for the testing positive in a lab test for either drugs or alcohol, or for other violation of this drug and alcohol policy, forfeits his or her unemployment benefits under Alabama Code Section 25-4-78.

## SECTION 9. RIGHT TO APPEAL

An employee subject to discipline or termination for the violation of this Policy shall have the same rights of hearing or appeal as set forth for any other violation of City policy in accordance with the Personnel Rules and Regulations.

D. PERSONAL SEARCH OF EMPLOYEES, PERSONAL PROPERTY AND VEHICLES

In connection with the enforcement of the foregoing policies, where reasonable grounds exists, any employee on City property or in a City vehicle at any time (including non-working hours) may be requested to submit to a reasonable search, to include the employee's clothes, lunch box, tool box, locker or other personal container, or the employee's vehicle. Employees who refuse to cooperate in such searches will be subject to termination.

E. UNDERCOVER SURVEILLANCE AND DETECTION

In connection with the enforcement of the foregoing policies, the City reserves the right to employ undercover agents, and to use detection methods (including trained canines) to assist in the detection of the presence of alcohol or illegal drugs. Employees who engage in any activity

designed to prevent or deter the use of such surveillance or detection practices will be subject to termination.

SECTION 3.  EMPLOYEE ASSISTANCE PROGRAM

(a)  Admission to the EAP is voluntary, and any employee with a drug or alcohol problem is encouraged to contact the EAP Representative on a confidential basis to talk about the program.  The name and telephone number of the current EAP Representative will be posted on employee bulletin boards.

(b)  Statements made to the EAP Representative about the employee's drug or alcohol problems will be kept confidential and will not be used against the employee in considering a violation of the policy as set forth in Sections 1 and 2 above, or in connection with any criminal prosecution.

(c)  The EAP is not available to employees after (1) notification that they will be tested for drugs or alcohol or (2)  they are found to have violated any of the City's published policies against the use, possession or being under the influence of drugs or alcohol, as set forth in Sections 1 and 2 above.  In order to be eligible for the EAP, an employee must request admission to the program before the occurrence of any incident, notification of test procedure, or investigation following which the employee is found to have committed a termination offense under any of the foregoing policies.

(d)  When an employee comes forward and admits to an alcohol/drug problem, the EAP Representative refers that employee to a treatment facility.  The type of facility will vary based on the type of problem the employee is experiencing.

(e)  The City's psychiatric health benefits include the EPS, Expanded Psychiatric Services Program, where the employee can enter a designated EPS provider health care facility at no charge to the employee.

(f)  Employees may use available sick leave and vacation time while participating in an approved EAP Program.  Following the exhausting of such benefits, employees will be on leave of absence without pay.

(g)  Employees who satisfactorily complete an approved EAP Treatment Program will be returned to work in their former position, if available, and if not, to a comparable position.

(h)  Following completion of the program, the employee will enter into a memorandum of understanding regarding his/her ongoing

**40**

employment, and be subject to periodic drug or alcohol testing during the remainder of his or her employment with the City. If the employee tests positive for the use of any illegal drug (including unauthorized prescription drugs) or if test results indicate continued alcohol abuse, the employee will be terminated.

(I) Employees will be eligible for admission to the EAP only once during their employment. Employees are not eligible following resignation, retirement, or the termination of their employment for any reason.

(j) Employees who are convicted of the off-duty sale, distribution, manufacture or possession with intent to distribute illegal drugs will be terminated.

(k) All employees who are subjected to testing under this policy will be asked to sign the following consent form:

CONSENT FORM

I hereby consent to provide specimens to the City of Eufaula for the performance of a drug or alcohol test. I also consent to the release of the report of test results to the City's Mayor or the Mayor's designee. I understand that if I am an applicant for employment with the City, in a public safety sensitive position, passing a physical examination and drug/alcohol test does not mean that I will be offered employment with the City.

_____
Signature

_____
Witness

_____
Witness

_____
Date

Employees who fail to sign said consent form and who fail to cooperate with required testing will be subject to termination.

SECTION IV.    ANTI-HARRASSMENT POLICY

SECTION 1.    PURPOSE

A. To state the City of Eufaula's policy prohibiting discrimination and harassment;

B. To specifically address harassment, by defining what it is, by assisting employees in identifying harassment, by listing types of

41

harassment and by providing employees a procedure by which they can complain of harassment and have their complaints investigated and resolved; and

      C. To encourage any employee who believes that he or she is a victim of harassment to come forward and voice their complaint to their superiors, the City Clerk or Personnel Officer, so that the City can act to end any harassment.

SECTION 2.    CITY POLICY GOVERNING DISCRIMINATION

      It is the policy of the City of Eufaula, and all departments thereof, to provide equal employment opportunity and equal treatment to all employees in all aspects of employment without regard to race, color, religion, sex (including pregnancy), age (40 or over), national origin, or physical or mental disability (of an otherwise qualified individual.)

SECTION 3.    CITY POLICY REGARDING HOSTILE WORKING CONDITIONS
AND HARASSMENT IN THE WORK PLACE

      All types of harassment, including harassment based on sex, gender, race, national origin, age and disability are not tolerated and are strictly prohibited on the part of all employees, supervisors, contractors, volunteers and others by the City of Eufaula.

SECTION 4.    HARASSMENT DEFINED

      A. Harassment may be done by unwelcomed words or acts, including the following:

      (1) Course jokes;
      (2) display of unwelcomed pictures or graphics (including on the computer screen;
      (3) unwelcomed touching or hugging;
      (4) heavy cursing;
      (5) questions about one's personal life;
      (6) repeated unwelcomed requests for dates;
      (7) to follow a severe, cutting remark based on race, gender or other categories above with the words, "I'm just joking";
      (8) starting or passing on damaging rumors;
      (9) frequent unnecessary visits to one's workplace;
      (10) repeatedly calling someone by an unwelcomed name or phrase based on one of the categories above;
      (11) requests for sexual favors;
      (12) implied demands of silence in the face of pervasive, frequent, severe and unwelcomed words or actions

**42**

B.  Hostile environment harassment means severe, frequent and pervasive harassing words or acts, which are unwelcomed.  The standard of an unwelcomed action as perceived by the recipient and not the harasser is important, and consent of the target may not be a defense.  One response to an unwelcomed word or action may be to say, "I am uncomfortable with that, would you please not repeat it".  However, if the offending word or act is very severe, or is frequent and pervasive, or if the recipient of the alleged harassment prefers to report it immediately, such should be reported.

SECTION 5.    IDENTIFICATION OF HARASSMENT

The City of Eufaula and each of its supervisors, administrators, other employees, volunteers, contractors and guests will not do any harassing behavior or speech, and will act to prevent such from happening. Harassing behavior and words must be stopped as soon as they appear. This includes preventing harassment of any member of the City employment or volunteer community by any other member or visitor. Anyone who witnesses harassment should report it.  Each member of the City of Eufaula employment, or contractors' must read and sign a copy of this anti-harassment policy and grievance procedure to indicate the reception of and agreement to follow this policy and grievance procedure in order to remain a member in good standing as an employee or contractor.  Any member of the City community who has witnessed or experienced harassment, must, as part of this policy, report such by using the grievance procedure herein.  Frivolous or false reporting of harassment may lead to dismissals or suspensions.  Retaliation against a person who reports possible harassment will not be tolerated.  Job or position action could result against one who either files a frivolous or false report, or retaliates.

SECTION 6.   WHO CAN BE INVOLVED IN SEXUAL HARASSMENT

Harassment can occur in a wide variety of circumstances and may encompass many variables. It is important to realize that:

* Victims can be of either gender (male or female);

* Harassers can be of either gender (male or female);

* Harassers may be supervisors of victims, but harassers may also be co-workers or even non-employees;

* Harassers and victims need not be of the opposite gender, if the conduct is still based upon sex;

**43**

\* Victims may be third-party observers, affected by the behavior of others and exposed to a hostile or abusive atmosphere based upon sex;

\* Victims need not suffer any financial loss;

\* The harassment need not seriously affect a victim's psychological well-being or lead the victim to suffer injury; instead, conduct or an environment based upon actions that a reasonable person would and does believe to be hostile or abusive constitutes harassment.

SECTION 7.   IF YOU ARE SUBJECTED TO SEXUAL HARASSMENT, REGISTER A COMPLAINT WITH YOUR SUPERIORS.

Any employee of the City who feels that he/she has been subjected to harassment should register a complaint with his/her immediate superior, the City Clerk, or with the Personnel Officer.

The harassment complaint may initially be made verbally, by talking to the appropriate supervisor, the City Clerk, or with the Personnel Officer and shall be followed up with a written signed complaint.

To the extent practicable, a complaint of harassment will be kept confidential, with due regard to the sensitive nature of such complaints.

SECTION 8.   PROMPT INVESTIGATION OF COMPLAINT

The City shall fully, impartially and promptly investigate any harassment complaint filed by one of its employees. An investigator will be in charge of these investigations to ensure a thorough investigation and to assist in maintaining confidentiality of the matter to the fullest extent practicable.

SECTION 9.   CONFIDENTIAL REPORT OF INVESTIGATION

The investigator will timely file a confidential written report of the result of the investigation to either an impartial supervisor of the complainant or to the Mayor, depending on the situation at hand. Also, the complainant will be promptly informed of the results of the investigation. If the investigation reveals that the accused harasser acted in a manner to harass the complaint, the accused employee will also receive a copy of the investigator's report.

SECTION 10.   PROMPT REMEDIAL ACTION

The City will take prompt action to end any harassment. Following a report by the investigator that harassment in fact occurred, the City shall

**44**

take immediate steps to discipline the offending employee or employees, including if appropriate immediate discharge.

Any City employee who acts in a manner to harass any other City employee is acting outside the line and scope of their employment with the City.

SECTION 11.    RIGHT OF REBUTTAL

Both the complaining employee and the employee who has been accused of harassment have the right to submit facts, documents or other evidence contesting the report of the investigator, to a higher supervisor, or the Mayor, if the circumstances so dictate.

SECTION 12.    RETALIATION PROHIBITED

No employee of the City shall discharge or otherwise discriminate or harass any other City employee who has filed a complaint of harassment under this policy or who has sought redress for harassment with the Equal Employment Opportunity Commission or by instituting an action in Court.

SECTION 13.    NOTICE

The City shall take all appropriate steps to inform all employees of the City of the contents of this policy.

The City of Eufaula encourages employees to come forward and report any situation which that employee deems of a harassing nature by a fellow employee. Remember, if you do not make your complaint known to your superiors, there will not be any opportunity for the City to assist you in ending the harassment.

ARTICLE VII.    GRIEVANCE PROCEDURE

SECTION I.    PURPOSE.

The purpose of the grievance procedure is:

(1)    To insure employees a procedure by which their complaints can be considered rapidly, fairly and without reprisal.

(2)    To encourage the employee to express himself about the conditions of work as they affect him as an employee.

(3)    To promote better understanding of policies, practices and procedures which affect employees.

45

(4)    To instill confidence in employees that personnel actions are taken in accord with established, fair and uniform policies and procedures.

(5)    To develop in supervisors a greater sense of responsibility in their dealings with employees.

SECTION II.    DEFINITION.

A "grievance" is any complaint which an employee has relating to working conditions, to terms and conditions of employment, or to disciplinary action, except that of a complaint related to a disciplinary suspension of three (3) days or less, to a disciplinary demotion, or to a dismissal.

SECTION III.    GRIEVANCE POLICY IN CASES NOT INVOLVING
                DISMISSAL.

(a)    Purpose; informal adjustments encouraged.  The most effective accomplishment of the work of the municipality requires prompt consideration and equitable adjustment of the employee grievances. It is the desire of the municipality to adjust the causes of grievances informally, and both supervisors and employees are expected to make every effort to resolve problems as they arise.

(b)    Procedure.  The procedure to be followed by an employee who has a grievance (not involving a complaint relating to a disciplinary suspension of more than three (3) days, to a disciplinary demotion or to a disciplinary termination) is as follows:

STEP 1.  Within five (5) working days after the event-giving rise to a grievance, the employee must present the grievance to his/her supervisor in writing.

STEP 2.  If the grievance is not acted upon by the employee's supervisor, or if the grievance is not resolved to the satisfaction of the employee, the grievance must be reduced to writing and submitted by the employee to the Personnel Officer.  The written grievance must be received by the Personnel Officer no later than ten (10) days following the date it was presented to the employee's supervisor and, in no event, more than fifteen (15) days after the event giving rise to the grievance.  Failure to submit a timely written grievance terminates an employee's rights under the grievance procedure.

STEP 3.  Upon receipt of a written grievance, the Personnel Officer shall forward a copy of the grievance to the employee's supervisor who

46

shall, within 10 days of his receipt of the grievance, file a written answer to the grievance with the Personnel Officer.

STEP 4.  Upon receipt of the written grievance and answer, the Personnel Officer shall deliver the grievance and answer to the Mayor. Within fifteen (15) days after he has received the grievance and answer, the Mayor shall schedule a hearing to consider the grievance and answer.  The Mayor shall give written notice to the employee and his/her supervisor of the time, date and place of the hearing and shall advise the employee that he/she may present evidence and/or testimony in support of his/her grievance, and that he/she may cross-examine witnesses called by or for the City.  Failure of an employee having a grievance to appear at the hearing will be cause for dismissal of the grievance.

STEP 5.  Within seven (7) days following completion of the Hearing the Mayor shall render a final decision on the grievance.  The decision shall either:

(a)    Dismiss the grievance in the event the employee has failed to adhere to the time limitations set forth above; or

(b)    Deny the grievance in whole or in part; or

(c)    Sustain the grievance, in whole or in part, and determine what, if any, corrective action should be taken.

In all cases, the decision of the Mayor shall be final and binding on the employee and the City.

SECTION IV.  PROTECTION.

No employee shall be disciplined or discriminated against in any way because of his proper use of the grievance procedure, as defined under Section 3 of Article VIII.

ARTICLE VIII.    DISCIPLINE & DISCIPLINARY PROCEDURES

SECTION I.  GENERAL DUTY OF EMPLOYEE.

It shall be the duty of each employee to maintain high standards of conduct, cooperation, efficiency, economy and performance in work for the City.

SECTION II.  DISCIPLINE POLICY.

47

(a)    **Generally.  The tenure of every employee shall be conditioned on the satisfactory conduct of the employee and continued satisfactory performance of assigned duties and responsibilities.  An employee who has completed his/her probationary period may be dismissed, demoted, suspended, or reprimanded for cause or for any reason deemed to be in the City's best interest.**

SECTION III.   CAUSES FOR DISCIPLINARY ACTION.

**The following are examples of causes which shall be sufficient cause for reprimand, suspension, demotion, or dismissal:**

(1)    **Conviction of a felony or other crime involving moral turpitude.**

(2)    **Incompetency or inefficiency.**

(3)    **Unsatisfactory work performance.**

(4)    **Absent without leave.**

(5)    **Failure or refusal to carry out instructions.**

(6)    **Neglect of duty.**

(7)    **Incapacity due to mental or physical disability.**

(8)    **Unsatisfactory record of tardiness and/or absenteeism.**

(9)    **Insubordination and/or disregard of orders.**

(10)    **Falsification of any information required by a supervisor or the city.**

(11)    **Failure to properly and/or promptly report accidents or personal injuries.**

(12)    **Misappropriation, destruction, theft or conversion of public property.**

(13)    **Neglect or carelessness resulting in damage to public property or to injury to another.**

(14)    **Conviction during employment of misdemeanor and/or traffic offenses which affect the employee's ability to perform the job.**

**48**

(15)    Introduction, possession or use, on public property, in or on public equipment, and/or while at work of intoxicating liquors or controlled substances (drugs).

(16)    Proceeding to or from work, presenting himself/herself for work, being present for work while under the influence of        intoxicating liquor or controlled substances (drugs).

(17)    Use of public property while off-duty while under the influence of intoxicating liquor or controlled substances (drugs).

(18)    Gambling on public property or while at work.

(19)    Fighting or deliberately injuring another.

(20)    Rude or disrespectful conduct directed toward a member of     the public or co-workers.

(21)    Waste of public supplies or equipment.

(22)    Disorderly or immoral conduct.

(23)    Conduct unbecoming an employee in-the public service.

(24)    Use of public property or equipment on private property for personal gain.

(25)    Any reason deemed to be in the best interest of the city

(26)    Testing positive on a drug and alcohol test.

(27)    Failure to sign a drug and alcohol testing consent form.

(28)    Failure to cooperate in any drug and alcohol testing procedure.

(29)    Possession of hand guns or lethal weapons on city property or in city vehicles  (excluding sworn Police Officers).

SECTION IV.   TYPES OF DISCIPLINARY ACTION.

The following disciplinary actions may be implemented by the Mayor or by an employee's Department Head, or his/her designated representative, as set forth below:

(a)    Reprimand.  An employee may be reprimanded for cause.  In such event, the reprimand will be reduced to writing and a copy shall be

placed in the employee's personnel file. A reprimand is subject to the grievance procedure set forth in Article VII Section III, but is not otherwise appealable.

(b)    **Suspension for Three Days or Less.** An employee may be suspended without pay for up to three (3) days for cause. In such event, the employee shall be given written notice of the suspension together with the reasons therefore. A suspension of up to three (3) days is subject to the grievance procedure set forth in Article VII, Section III, but is not otherwise appealable.

(c)    **Suspension of more than three (3) days.** An employee may be suspended without pay for a period ranging between four (4) and thirty (30) days for cause. In such event, the procedure set forth below in Section 5 shall be followed, and any such suspension shall not be subject to the grievance procedure set forth in Article VII, Section III.

(d)    **Demotion.** An employee may be demoted from his/her existing position for cause, In such event, the procedure set forth below in Section V. shall be followed, and any such demotion shall not be subject to the grievance procedure set forth in Article VII, Section III.

SECTION V.    PROCEDURE APPLICABLE TO SUSPENSIONS OF MORE THAN THREE (3) DAYS, TO DEMOTION, AND TO DISMISSALS.

The following procedure shall be followed when the Mayor or any Department Head or his/her designated representative proposes to suspend an employee without pay for more than three (3) days, or to demote an employee, or to dismiss an employee.

(a)    Determination Procedure.

(1)    Written notice setting out specific charges and the possibility of disciplinary action shall be served on the employee prior to disciplinary action being taken. Employee will be given at least seven (7) days notice of hearing. Employee will be required to advise at least one (1) day prior to the hearing if he/she will be accompanied by legal counsel. Such written notice shall advise the employee:

(aa)    that a Determination Hearing will be held and the date, time and place of such hearing.

(bb)    that the Determination Hearing will be held to consider the charges against the employee and the possibility of disciplinary action being taken against the employee.

**50**

(cc)   that at the Determination Hearing the employee may be accompanied by anyone of his choosing and will be afforded the opportunity to respond to the charges orally or in writing.

(2)   The Determination Hearing shall be conducted by the Mayor, or by the Department Head or his/her designated representative who proposes to take disciplinary action and shall be held within five (5) working days after the employee has received the written notice setting forth the charges against him/her and the possibility of disciplinary action. At such hearing the evidence against the employee shall be explained and the employee shall be afforded opportunity to respond orally or in writing.

(3)   The Mayor or the Department Head or his/her designated representative conducting the Determination Hearing shall issue his/her decision within three (3) working days of conclusion of the hearing, Such decision shall be promptly delivered to the employee and shall advise the employee:

(aa) of the decision;

(bb) of the date on which the discipline to be imposed, if any, is to become effective; and

(cc) If the decision is to suspend the employee without pay for more than three (3) days, to demote the employee, or to dismiss the employee, that the employee has a right to appeal such action, that such appeal must be made in writing and must be delivered to the Personnel Officer within five (5) working days of the employee's receipt of the decision, and that if written notice of appeal is not received within five (5) working days of the employee's receipt of the decision, all rights to appeal are extinguished.

(4)   An employee may waive his/her right to a Determination Hearing either by delivering a written waiver to the Mayor or to the Department Head or his/her designated representative who proposed to take disciplinary action or by failing to appear for the Determination Hearing. Waiver of the Determination Hearing shall be considered an admission that the charges against the employee are correct, In the event of waiver, the Mayor or Department Head or his/her designated representative who has proposed to take disciplinary action shall render his/her decision within five (5) working days of the date on which the Determination was set.

(b) Appeal to Personnel Advisory Panel.

In the event that the decision following a Determination hearing is to suspend an employee for more than three (3) days, to demote an employee,

51

or to dismiss an employee, the employee may appeal such decision to the Personnel Advisory Panel. Such Appeal shall be subject to the following requirements and procedures:

(1)    Any appeal from the decision following a Determination Hearing must be in writing and must be delivered to the Personnel Officer within five (5) working days of the employee's receipt of the decision. In the event written notice of appeal by the employee is not received within five (5) working days of the employee's receipt of the decision, the decision shall be final and shall not be subject to further review.

(2)    Upon receipt of timely notice of appeal by an employee, the Personnel Officer shall within five (5) working days schedule the date for a hearing to be conducted by the Personnel Advisory Panel. The date for commencement of such Hearing shall be within fifteen (15) days of receipt by the Personnel Officer of the employee's timely notice of appeal. Notice of the date, time and place for such hearing shall be delivered to the employee and his/her Department Head.

(3)    The Hearing shall be conducted by the Personnel Advisory Panel for the purpose of reviewing the decision and considering such evidence as may be offered in connection with such decision and the charge against the employee, At such hearing, the employee shall:

(aa)    have the right to appear on his own behalf and/or to be represented by    counsel of his/her own choosing;

(bb)    have the right to call witnesses to testify on his/her own behalf;

(cc)    have the right to cross-examine witnesses testifying against him/her;

(dd)    have the right to refuse to testify but he/she may be cross-examined if he chooses to testify;

(4)    The Personnel Advisory Panel shall have the power to issue subpoenas compelling the attendance and testimony of witnesses and the production of documents or other papers. Failure to comply with a subpoena issued by the Personnel Advisory Panel shall be punishable by a fine of not less than fifty dollars ($50.00), nor more than five hundred dollars ($500.00).

(5)    Failure of the employee to appear at a Hearing before the Personnel Advisory Panel shall result in a dismissal of the appeal. In that event, the decision which was appealed from shall be final and binding.

**52**

(6)    Within seven (7) working days following conclusion of the Hearing, the Personnel Advisory Panel shall issue a written recommendation to the Mayor.  The Personnel Advisory Panel may recommend that:

(aa)    the decision appealed from be affirmed and ratified; or

(bb)    the decision appealed from be rescinded; or

(cc)    the decision appealed from be modified, and may recommend that the disciplinary penalty imposed be modified, increased, or decreased.

(7)  Within fourteen (14) working days of his receipt of the recommendation from the Personnel Advisory Panel, the Mayor shall issue a written decision which shall be final and binding on the employee and the City.  In rendering  his final decision, the Mayor shall not be bound by the recommendation of the Personnel Advisory Panel which shall be deemed advisory only.   The Mayor may:

(aa) affirm and ratify the decision appealed from; or

(bb) rescind the decision appealed from; or

(cc) modify the decision appealed from and may modify, increase, or decrease

the penalty imposed.

(8)    The decision of the Mayor shall be final and binding on the employee and the City.

(9)    In any case in which the Mayor has been the person who has proposed to take disciplinary action and/or who has acted as the deciding official at the Determination Hearing, the Mayor may, in his discretion, appoint a member of the City Council as his designee to receive and act upon the recommendation of the Personnel Advisory Panel in which event the decision of such designee shall be final and binding.

(10)    The final decision of the Mayor or his designee shall be promptly reported by the Personnel officer to the employee.

SECTION VI.   SUSPENSION WITH PAY PENDING DETERMINATION OF DISCIPLINE.

**53**

Whenever, in the discretion of the Mayor, or an employee's Department Head or his/her designated representative, it is necessary or desirable that an employee be removed from the City's active service pending a determination of possible disciplinary action, the employee may be suspended with pay until a Determination Hearing has been held and a determination of discipline has been made, or if no Determination Hearing is required or if such Hearing is waived, until a determination of discipline has been made.

SECTION VII.    PROBATIONARY EMPLOYEE.

**Any probationary employee may be suspended or removed at any time by the department head or Mayor, Probationary, temporary, seasonal or part-time employees shall not have the right of appeal from such action.**

SECTION VIII.    REMOVAL OF MUNICIPAL OFFICER, NON-CLASSIFIED
EMPLOYEES.

**Any persons appointed to office in the City may, for cause, after a hearing, be removed by the officer making the appointment. The City Council may remove, by a two-thirds (2/3) vote of all those elected to the Council, any such person for incompetency, malfeasance, misfeasance or nonfeasance in office and for conduct detrimental to good order or discipline, including habitual neglect of duty, or for any other reason deemed appropriate by the City Council.**

ARTICLE IX.  POLITICAL ACTIVITY

SECTION I.    POLITICAL LIMITATIONS.

**The following provisions, including those included in Section 608, Act 819 of the 1977 session of the Alabama Legislature, apply to all political activity of employees and officials of the City:**

**(1)    No officer, agent or employee of the City, other than persons subject to popular election shall become a candidate for election or appointment to elective office, except that any person who wishes to do so may apply for leave of absence.**

**(2)    No person in the employment of the City, whether classified or unclassified, shall be denied the right to participate in county and state political activities to the same extend as any other citizen of the State of Alabama, including endorsing candidates and contributing to campaigns of his/her choosing.**

SECTION II.  AFFILIATION.

54

(a)     All persons in the employment of any City or County shall have the right to join local political clubs and organizations, and state or national political parties.

(b)     All persons in the employment of any City or County shall have the right to publicly support issues of public welfare, circulate petitions calling for or in support of referendums, and contribute freely to those of his/her choosing.

SECTION III.   POLITICAL PRESSURE.

No person shall attempt to use his/her official authority or position for the purpose of influencing the vote or political action of any person. Any person who violates this section of this article shall be guilty of a felony (under State law, Section 608,[Act 819 of the 1977 session of the Alabama Legislature]), punishable by a fine not exceeding ten thousand dollars ($10,000.00) or imprisonment in the state penitentiary for a period not to exceed two (2) years, or both.

## ARTICLE X.  CONDUCT OF EMPLOYEES

SECTION  I. EMPLOYMENT RESTRICTIONS OF OFFICERS AND EMPLOYEES
OF THE CITY OF EUFAULA

(a)  No alderman or officer or employee of the municipality shall be directly or indirectly interested in any work, business or contract, the expense, price or consideration of which is paid from the treasury, nor shall any member of the council or officer of the municipality be surety for any person having a contract, work or business with such municipality for the performance of which a surety may be required.

(b)  Any person who violates any of the provisions of this section shall be guilty of a misdemeanor and, on conviction thereof, shall be fined not less than $50.00 nor more than $1,000.00, and may also be sentenced to hard labor for the county for not more than six months.

## SECTION II. OUTSIDE EMPLOYMENT

No full-time employee in the classified service shall accept outside employment, whether part-time, temporary or permanent, without prior notification to his/her department head. Each change in outside employment shall require separate notification. Approval shall not be granted when outside employment conflicts or interferes, or is likely to

conflict or interfere with the employee's public service. Employees may not engage in any private business or activity while on duty. No employee shall engage in or accept private employment or render any service for private interest when such employment or service is incompatible or creates a conflict of interest with his/her official duties.

SECTION III.   ATTENDANCE AND PUNCTUALITY.

Each employee is expected to be on duty at the time prescribed by his particular department or division. If an employee is to be absent for a valid reason (sickness, funeral, etc.), it is the employee's responsibility to notify his/her supervisor of such intended absence prior to his/her normal reporting time.

SECTION IV.   DRESS AND APPEARANCE.

The rules and regulations governing hair and personal appearance styles in the Eufaula Police and Fire Divisions are expected to be complied with in a spirit of cooperation by all members. It is emphasized that the primary responsibility for conformity to proper appearance lies with the individual employee. To shirk or disregard this responsibility shall subject the employee to disciplinary action.

(1)    Hair on the sides of the head shall not extend below the bottom of the ear. Hair on the back of the head shall not extend below the top of the collar of the shirt when the individual is standing at attention. No hairstyle will be permitted that will result in bushy or excessively thick hair. Hair thickness shall not exceed one and one-half (1 1/2) inches when measured from the scalp to the periphery of the hair at any point.

(2)    Sideburns shall not extend below the bottom of the ear, must be even in width, and shall be neatly trimmed.

(3)    Mustaches shall be permitted, provided they are neatly trimmed. The mustache shall not extend horizontally beyond the "smile line" and shall not extend downward below the bottom of the lower lip. The mustache shall not extend downward or over the Vermilion line of the upper lip.

(4)    Beards and goatees shall not be permitted.

(5)    Members shall be clean-shaven upon reporting for duty and shall remain clean-shaven throughout their tour of duty, except as provided in (3) above.

**56**

There shall be no hairstyle allowed that would prevent the proper fitting of any uniform items, and in no way shall the style interfere with the proper wearing and fitting of safety equipment. (Grooming and neatness shall prevail for all hairstyles, mustaches, and sideburns).

SECTION V.   OPERATORS OF CITY-OWNED MOTOR VEHICLES.

(a)    It shall be the responsibility of the department head to prevent the operation of any City-owned motor vehicle by an employee not covered by the City's insurance program.

(b)    A record of any accident involving a city vehicle shall be placed in the personnel file of the employee operating the vehicle, whether or not the accident is judged to the fault of the employee.

(c) Employees must maintain a driving record which meets standards required by the City's automobile insurance carrier.

(d) Employees are prohibited from using city-owned vehicles for personal use without prior authorization.  Personal use includes, but not limited to, transporting family members and friends in a city vehicle, conducting personal business, utilizing a city vehicle which is not in the realm of the employee's job duties.

(e)  Unauthorized use of city-owned motor vehicles can consequently be basis for the city insurance company's refusal to represent if an incident resulting in injuries or damages occur.

ARTICLE XI.   PERSONNEL ADVISORY PANEL

SECTION I.  SELECTION OF MEMBERS.

The City Council shall, within thirty (30) days after the effective date of these rules and regulations, appoint a Personnel Panel of five (5) members.  The initial members shall be appointed on a basis as follows:

Two (2) members shall be appointed for a term of one year.

Two (2) members shall be appointed for a term of two (2) years.

The fifth member shall be appointed for a term of three (3) years,

Each successor appointment shall be for a full term of three (3) years.

**51**

SECTION II.   QUALIFICATIONS.

(a)      Generally.  Persons appointed to the panel:

(1)      Shall be in agreement with the basic policies and principles of high quality public service for the government of the City of Eufaula.

(2)      Shall be qualified voters of the municipality.

(3)      Shall have resided in the municipality for at least one year immediately prior to the appointment.

(b)      Restrictions.  Persons may not be a member of the panel while:

(1)      Residing outside the corporate limits,

(2)      Employed by the municipality,

(3)      Holding an appointive position with salary or elective office of the municipality.

(4)      Running for an elective public office.

(5)      Serving as an officer of a political party.

SECTION III.   REMOVAL AND VACANCIES.

(a)      If, during the term for which he is appointed to the panel, a member is absent from three (3) of its meetings without excuse, his position on the panel shall become vacant.

(b)      A member of the panel may be removed from the panel for just cause by the action of two-thirds (2/3) of the members of the City Council.

(c)      The City Council fills all vacancies on the panel.  A person appointed to fill such a vacancy shall hold the position on the panel for the remainder of the unexpired term of the person who leaves the position vacant.

SECTION IV.   DUTIES

The panel shall elect its own chairman and establish its own rules of procedure.  The chairman shall convene the panel at any time, upon receipt

**58**

of a written request signed by two (2) members of the panel or signed by the Mayor within a period not exceeding seventy-two (72) hours.

The panel shall, upon the request of the City Council or upon its own initiative, inquire into the administration of the personnel system and, on the basis of the inquiry, make written recommendations regarding the system to the city council. The panel, as a whole, shall have access to any records necessary for its inquiry.

SECTION V.   PERSONNEL OFFICER

The Personnel Officer of the City will act as secretary to the Personnel Advisory Panel and maintain records and files on all panel activities.

APPENDIX I.  TRAVEL EXPENSES

SECTION 1.  REIMBURSEMENT FOR TRAVEL.

Reimbursement for travel costs, including transportation, food and lodging, incurred by personnel in the performance of their official duties while away from their regular place of duty, shall be limited to the following schedule:

(1)    TRANSPORTATION:

(a)    For reimbursement for the actual costs of air fares, not to exceed cost of accommodations that are less than first class unless only first class is available, together with ground transportation by the most feasible economical means from the airport to the hotel and meeting facilities.

(b)    For the use of privately owned vehicles, mileage at a rate not to exceed the rate generally accepted and set by the Federal Government for governmental employees.

(2)    Subsistence and other expenses: Per Diem is permitted at rates not to exceed those applicable to government employees.  The following general provisions apply:

(a)    Lodging Cost - Per Diem allowances for lodging will be paid at the cost of lodging incurred during an official trip.  Employees are encouraged to seek the governmental rate normally provided for by the majority of lodging establishments throughout the country.  Lodging cost will not include tips, valet parking, room service, in room movies, calls for hotel reservation, etc., but are restricted to the actual room cost plus any

**59**

applicable tax.  All claims for lodging must be supported by either appropriate certification by the traveler including identification of the place of lodging on the travel voucher or by receipts submitted from the lodging establishment.

(b)    Per Diem cost associated with food shall be based on the following: For overnight trips the per diem rate shall be Thirty-three $33.00 Dollars per day.  For out of town trips less than 24-hours the following shall apply: 5 A. M. to 10:59 A. M. (6 hours), $7.00; 11 A. M. to 4:59 P. M. (6 hours) $10.00 5 P. M. to 11 P. M. (6 hours) $16.00. Any combination of the above which total less than 24 hours or an overnight stay will be reimbursed by totaling the reimbursable rate for each covered time period.

The Mayor may authorize greater lodging and per diem rates for travel to high cost areas, provided that the higher costs are documented by receipts and sworn vouchers.

SECTION 2.  The provisions of this ordinance are severable.  If any part of the ordinance is declared invalid or unconstitutional, such declaration shall not affect the part which remains.

SECTION 3. All ordinances or parts thereof which conflict with this ordinance are hereby repealed.

SECTION 4. This ordinance shall become effective immediately upon its passage and approval by the Mayor, or upon its otherwise becoming a law.

ADOPTED this 4th day of September, 2007.

/s/  James L. Martin
City Council President

ATTEST:
/s/ Joy White
City Clerk/Treasurer


AMENDED TO INCLUDE:
Resolution 82-2007 adopted September 4, 2007


(gloria/resolut/PER.R&R)



60